IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CITY OF ROSEVILLE EMPLOYEES'        :        CIVIL ACTION
RETIREMENT SYSTEM, et al.           :
                                    :
          v.                        :
                                    :
HORIZON LINES, INC., et al.         :        NO. 08-969

MEMORANDUM

Bartle, C.J.                                     November 13, 2009

          This is a putative securities class action against the
following defendants:  Horizon Lines, Inc. ("Horizon"); its
subsidiaries, Horizon Lines, LLC and Horizon Lines of Puerto
Rico, Inc. (collectively, "Horizon" or "corporate defendants");
and its executives or former executives Charles Raymond
("Raymond"), Mark Urbania ("Urbania"), John Keenan ("Keenan"),
Gabriel Serra ("Serra"), R. Kevin Gill ("Gill"), and Gregory
Glova ("Glova").  Before the court is the motion of defendants
Horizon, Raymond, Urbania, and Keenan to dismiss the consolidated
class action complaint ("Complaint") for failure to satisfy the
heightened pleading requirements of the Private Securities
Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4, et
seq.[1]

---

1.  Defendants Serra, Gill, and Glova have not joined in this
motion to dismiss.

I.

On June 18, 2009, we awarded lead plaintiff status to
Police and Fire Retirement System of the City of Detroit, which
seeks to represent all those who acquired the common stock of
Horizon Lines, Inc. during the period from March 2, 2007 through
April 25, 2008 (the "class period"), excluding defendants and
certain related persons or entities.

Plaintiffs aver, in Count I of their Complaint, that
defendants deceived investors by making materially false or
misleading statements in violation of § 10(b) of the Securities
Exchange Act of 1934 ("Securities Exchange Act"), 15 U.S.C.
§ 78j(b) ("§ 10(b)"), and Rule 10b-5 promulgated thereunder, 17
C.F.R. § 240.10b-5 ("Rule 10b-5").  Specifically, plaintiffs
contend that defendants falsely attributed Horizon's increased
revenue during the class period to legitimate business practices
when, in fact, it was an illegal rate-fixing scheme within the
Puerto Rican cabotage market[2] that propelled its success.  In
Count II, based on the same factual allegations, plaintiffs seek
to hold Horizon Lines, Inc. liable as a controlling person under
§ 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t
("§ 20(a)").  Finally, Count III alleges that defendants Raymond,
Urbania, Keenan, Serra, and Gill are also liable as controlling
persons under § 20(a).

---

2.  Although plaintiffs suggest that Horizon may have conducted
similar rate-fixing schemes in other markets, the Complaint
focuses almost entirely on the Puerto Rican cabotage.

II.

In reviewing defendants' motion to dismiss, we "accept all factual allegations in the complaint as true," and consider any "exhibits attached thereto and matters of public record." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Beverly Enters. Inc. v. Trump, 182 F.3d 183, 190 n.3 (3d Cir. 1999).

According to the Complaint, Horizon Lines, Inc. is a publicly-traded commercial container shipping and logistics company whose principal place of business is Charlotte, North Carolina.  Horizon Lines, Inc. operates as a holding company of various wholly-owned subsidiaries, including defendants Horizon Lines, LLC and Horizon Lines of Puerto Rico, Inc.  During the relevant class period, defendant Raymond was Chairman, President, and Chief Executive Officer ("CEO") of Horizon Lines, Inc. as well as President and CEO of Horizon Lines, LLC; defendant Keenan was President of Horizon Lines, LLC and an officer of Horizon Lines, Inc.[3]; and, until April 4, 2008, defendant Urbania was Executive Vice President and Chief Financial Officer ("CFO") of Horizon Lines, Inc.  Also named as defendants, though not parties to the instant motion, are:  Serra, former Senior Vice President and General Manager for Horizon Lines, Inc. and Horizon Lines, LLC, Puerto Rico division; Gill, former Vice President of

---

3.  Defendant Keenan attained his positions at Horizon Lines, Inc. and Horizon Lines, LLC in August of 2007, approximately five months after the start of the class period.

Marketing for Horizon Lines, Inc., Puerto Rico division[4]; and Glova, former Marketing and Pricing Director for Horizon Lines, LLC, Puerto Rico division.

Horizon conducts its shipping operations in a few highly regulated, oligopolistic markets, the most important of which, for the purposes of this litigation, is the Puerto Rican cabotage.[5]  This cabotage consists of commercial shipping between Puerto Rico and the continental United States.

On April 17, 2008, Horizon announced that it was the subject of a federal investigation related to its pricing practices in Puerto Rico.  On October 1, 2008, the Department of Justice ("DOJ") charged defendants Serra, Gill, and Glova--as well as Peter Baci, an executive of Horizon's competitor, Sea Star--with conspiracy to suppress and eliminate competition by rigging bids, fixing prices, and allocating customers in violation of the Sherman Act, 15 U.S.C. § 1.[6]  Serra, Gill, and

---

4. The Complaint asserts that Gill was also a member of the executive management team at Horizon Lines, LLC.

5.  Horizon has operated in the cabotage for more than 50 years and commands 35% of the market.  The remaining portion of the Puerto Rican cabotage market is controlled by Crowley Liner Services, Inc., with 30%; Sea Star Line, LLC, with 21%; and Trailer Bridge, Inc., with 14%.  According to estimates by independent financial analysts, business in the Puerto Rico market accounts for approximately one-third of Horizon's annual revenue.  (Compl. ¶ 37).  Horizon also ships in the Alaska, Hawaii, and Guam markets.  (Compl. ¶ 36).

6.  The DOJ charged another Sea Star executive, Alexander Chisholm, with altering, destroying, and concealing records and documents with the intent to impair the availability of those
                                                    (continued...)

Glova pleaded guilty on October 28, 2008[7] and are now in prison.
According to their confessions, the illegal conspiracy began as
early as May 2002 and continued until April 2008.  (Compl. ¶ 46).
The DOJ investigation apparently remains ongoing.

        The price of the publicly traded stock of Horizon
Lines, Inc. dropped precipitously after the DOJ investigation
came to light.  On April 17, 2009, the day Horizon disclosed the
investigation to the public, the price of the stock fell from
$18.23 to $14.70 per share.  When Horizon downgraded its earnings

_____

6.(...continued)
records and documents for use in the federal grand jury
investigation.  (Compl. ¶ 45).

7.  As part of a plea agreement, Serra, Gill, and Glova each
admitted to having

        participated in a conspiracy with one or more
        providers of Puerto Rico freight services, a
        primary purpose of which was to suppress or
        eliminate competition.  During the relevant
        period, defendant[s] committed acts in
        furtherance of the conspiracy, including
        engaging in discussions and attending
        meetings with representatives of one or more
        competing providers of Puerto Rico freight
        services.  During such discussions and
        meetings, agreements were reached between and
        among competitors for Puerto Rico freight
        services to allocate customers, rig bids
        submitted to government and commercial
        buyers, and to fix the prices of rates,
        surcharges, and other fees charged to
        customers .... [Each of the defendants] was
        an organizer or leader of the conspiracy
        which involved at least five participants and
        was otherwise extensive.

(Compl. ¶ 47).

-5-

forecast on April 25, 2008, its shares again tumbled from a
$15.08 per share closing price on April 24 to $11.25 per share at
closing on the 25th.  In total, the price of Horizon Lines,
Inc.'s stock declined by more than 38% in little over a week.
(Compl. ¶ 177-79).

        Defendants contend, in their motion to dismiss, that
plaintiffs failed to plead the necessary elements of their claims
with the particularity required under the PSLRA.  Specifically,
defendants maintain that the referenced statements were not false
or misleading and, in any event, the requisite state of mind of
defendants has not been adequately set forth.

        In deciding defendants' motion, we must examine closely
the allegedly false or misleading statements.  They can be
grouped into the following categories:  (1) those contained in
Horizon's Code of Business Conduct and Ethics; (2) those related
to revenue, pricing, and competition, and (3) those made as part
of Sarbanes-Oxley certifications.

        According to the Complaint, Horizon maintains a Code of
Business Conduct and Ethics ("Code of Ethics") in order to
"provide guidance and set common ethical standards" within the
company and "avoid acts that might be unlawful ... and to the
detriment of ... stockholders."  (Compl. ¶¶ 84, 87).  The Code
includes a section entitled "U.S.A. Antitrust Laws," which
proclaims "[o]ur policy is to comply with all applicable
antitrust laws."  (Compl. ¶ 85).  The section identifies and
condemns certain conduct that would violate federal antitrust

-6-

law:  "[i]t is a 'per se' violation for rates to be fixed among two or more competitors," and "[t]wo or more competitors cannot agree among themselves as to the customers, markets or territories which each will serve."  (Compl. ¶ 86).  This Code of Ethics is made available on Horizon's website and was attached to or referenced in a number of documents filed with the SEC.[8]

Plaintiffs contend Horizon's Code of Ethics was materially misleading during the class period because it led shareholders to believe that the company was complying with federal antitrust laws when, in reality, there was an ongoing rate-fixing scheme between Horizon and at least one competitor in the Puerto Rican cabotage.  Plaintiffs also identify in their Complaint a number of allegedly false or misleading statements by defendants Raymond, Keenan, and Urbania relating to Horizon's revenue, pricing, and competition.

On March 2, 2007, Horizon issued its annual report with the SEC on Form 10-K.  In this annual report, Horizon emphasized its strong customer relationships as a key competitive advantage. The report explained that Horizon services its customers through "confidential negotiated transportation service contracts" and that the rates charged in such contracts are "based on the length of inland and ocean cargo transportation hauls, type of cargo and other requirements, such as shipment timing and type of

---

8.  The Code was attached to Horizon's February 6, 2008 Form 10-K.  It was also referenced in the March 2, 2007 Form 10-K as well as the April 18, 2008 Schedule 14A Proxy Statement.  (Compl. ¶ 83 n.4).

container."  (Compl. ¶ 93).  The Report also noted an 11.8%
increase in operating revenue from year-end 2004 to year-end 2005
and attributed this grown to "rate improvements resulting from
favorable changes in cargo mix, general rate increases, increased
bunker and intermodal fuel surcharges to help offset increases in
fuel costs, and revenue increases from non-transportation and
other revenue services."  (Compl. ¶ 117).  Although recognizing
"soft market conditions" in Puerto Rico, the report reassured
stockholders that the decrease in "revenue container volume" was
"offset by higher margin cargo mix in addition to general rate
increases."  Id.

Horizon held a conference call[9] concerning its fourth
quarter 2006 performance on March 2, 2007 in conjunction with its
SEC filings.  During that call, Raymond responded to a question
regarding Horizon's pricing power in Puerto Rico:  "I believe
we're still gaining in terms of real dollar increases in our
prices in Puerto Rico.  I don't see that stopping.  I believe we
still have a little bit of a ways to go there."  (Compl. ¶ 92).
Finally, in a press release issued on the same day, Horizon
touted a 3% increase in 2006 fourth quarter operating revenue as

9.  In the Complaint, plaintiffs repeatedly refer to "conference
calls," "earnings calls," and "guidance calls."  Plaintiffs do
not specify the nature of these calls, nor do they indicate who
participated in the calls.  However, for the purposes of deciding
this motion, we will assume that these calls are of the kind
regularly conducted by publicly traded companies, in which senior
executives discuss the company's financial reporting and answer
questions from analysts.  For the sake of consistency, we refer
to all such calls as "conference calls."

compared to that in fourth quarter 2005.  It explained that this
growth was "fueled by cargo mix upgrades, rate increases and
higher fuel recovery, more than offsetting some volume softness."
(Compl. ¶ 116).

        Horizon disclosed its first quarter 2007 financials in
a press release on April 26, 2007.  The release described flat
first quarter operating revenue as a result of "soft market
conditions in Puerto Rico."  (Compl. ¶ 119).  It quoted Raymond
as saying, "despite less than ideal market conditions ...
[s]tringent cost controls, Horizon EDGE savings, cargo mix
upgrades and rate improvements all combined to more than offset
some lingering volume softness."  Id.

        On April 26, 2007, Horizon held a first quarter 2007
conference call.  When questioned about Horizon's plans for
dealing with the weak Puerto Rico market, Raymond expressed
confidence that "the Puerto Rico operating team [was] doing a
magnificent job of improving productivity and managing their
costs."  (Compl. ¶ 95).  Raymond reported that he and several
other Horizon employees had recently met with "key" Puerto Rico
customers, and explained that "even though [the Puerto Rico]
market is a little light, we're continuing to get rate increases
that are slightly ahead of what our inflationary costs are.  So
in terms of the real rate benefit in the Puerto Rico trade, that
march that we've been on now since 2002, continues."  Id.

        On July 27, 2007, Horizon filed with the SEC its Form
10-Q for the second quarter of 2007, in which it reported a 2%

                              -9-

increase in operating revenue since second quarter 2006.  Horizon
again attributed this increase to "rate improvements resulting
from favorable changes in cargo mix and general rate increases"
along with "increased slot charter revenue, partially offset by
fewer revenue containers shipped."  (Compl. ¶ 120).  The company
also repeated its assurance that the "revenue container volume
decrease" in Puerto Rico was "offset by higher margin cargo mix
and general rate increases."  Id.  This news was reinforced
during an earnings release presentation and a press release in
which Raymond was quoted as boasting that Horizon "once again
overcame challenges and delivered solid earnings" despite
"lingering volume softness."  (Compl. ¶ 122).  Raymond ascribed
this success to "[b]enefits generated by our Horizon EDGE process
re-engineering and customer service program, stringent costs
controls and unit revenue and cargo mix improvements."  Id.

     During a second quarter 2007 conference call held on
the same day, Raymond explained the company's market share
stability by noting "[Horizon's] business is characterized by
stable markets with only a handful of competitors" who
"understand that cutting prices to gain revenue through volume is
a zero sum game."  (Compl. ¶ 96).

     In Horizon's third quarter 2007 Form 10-Q, filed with
the SEC on October 26, 2007, the company reported an operating
revenue increase of 5.4% since third quarter 2006, again
accrediting the gain to "unit revenue improvements resulting from
favorable changes in cargo mix and general rate increases as well

-10-

as increased slot charter revenue, partially offset by fewer
revenue containers shipped." (Compl. ¶ 123). In a press release
issued the same day, Raymond declared, "Horizon Lines once again
rose to the challenge and overcame a less than ideal operating
environment." (Compl. ¶ 125). Raymond reiterated the problem of
"[v]olume softness, primarily caused by lingering conditions in
our Puerto Rico trade-lane" and again reassured that the softness
"was offset by unit revenue improvements, benefits derived from
our Horizon EDGE process re-engineering and customer service
program and tight controls on our costs." Id.

　　　　During a third quarter conference call on October 26,
2007, Raymond informed his audience that he and defendant Keenan
had been in Puerto Rico "all week ... working with customers."
(Compl. ¶ 98). Keenan then commented that, despite weakness in
the Puerto Rican economy, Horizon continued to renew customer
contracts with "increases in ... tradable rates." Id.

　　　　On November 9, 2007, in a conference call during the
fourth quarter, Raymond again noted decreased volume in the
Puerto Rico market. However, defendant Urbania remained
optimistic, explaining that: "[t]here's been good discipline in
the market between ourselves and our [Puerto Rico market]
competitors. Price increases have come through even though
volume softness has existed in 2007. There's no reason for us to
believe that will change in 2008 and we're factoring between 3
and 4% in terms of real rate improvement." (Compl. ¶ 99).

-11-

Ten days later, on November 19, 2007, Horizon issued a press release stating that it would "still deliver very satisfactory results in 2007, despite an environment that was extraordinarily challenging in numerous, unforseen ways" such as "a deep recession in Puerto Rico and fuel prices that have soared to record levels." (Compl. ¶ 126).  The release also projected: (1) 2008 operating revenue of $1,360-$1,380 million; (2) earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $175-$185 million; (3) diluted earnings per share ("EPS") of $1.94-$2.18; and (4) free cash flow of $115-$125 million.  Id.

During a conference call on February 1, 2008 concerning Horizon's fourth quarter 2007 results, Urbania stated that the company was "most proud of the fact that we overcame difficult market conditions in Puerto Rico to keep our earnings pretty much in line with 2006." (Compl. ¶ 99).  In a press release issued the same day, Raymond commented that, during 2007, Horizon "managed to offset soft market conditions in Puerto Rico and rising fuel costs by aggressively managing costs and introducing valuable complimentary services to ... customers." (Compl. ¶ 128).  In the same release, Urbania also acknowledged the "soft market in Puerto Rico," and attributed Horizon's success to "improved cargo mix, a stable rate environment in all three of [Horizon's] offshore markets, and the benefits of ... cost reduction efforts."  Id.

Horizon updated the financial projections of November 19 in a February 1, 2008 press release.  It now

forecast:  (1) 2008 operating revenue of $1,345-$1,365 million;
(2) EBITDA of $175-$185 million; (3) diluted EPS of $2.01-$2.26;
and (4) free cash flow of $115-$125 million.  Id.

On February 6, 2008, Horizon filed its Form 10-K with
the SEC.  In it, Horizon reported revenue increases in years 2006
and 2007 despite poor market conditions in Puerto Rico.  Reasons
for this success included "favorable changes to cargo mix," "rate
increases," "revenue related to acquisitions," "increased bunker
fuel and intermodal fuel surcharges to help offset increases in
fuel costs," "increased slot charter revenue," and "revenue
increases from non-transportation and other revenue services."
(Compl. ¶ 129).  In its "outlook for 2008," Horizon predicted
"approximately 1.5% in revenue container volume growth in 2008
and approximately 2.5% revenue growth due to more favorable cargo
mix and general rate increases."  Id.

On April 17, 2008, as previously noted, Horizon issued
its public statement revealing that the DOJ was investigating the
company's Puerto Rico pricing practices.  Eight days later, on
April 25, Horizon revised its financial projection downward:  (1)
operating revenue at $1,315-$1,350 million; (2) EBITDA at $145-
$160 million; (3) diluted earnings per share at $1.30-$1.69; and
(4) free cash flow at $72-$87 million.  (Compl. ¶ 133).  When
questioned about this downgraded forecast, Keenan responded that
Horizon was choosing to be "less aggressive" in setting rates.
(Compl. ¶ 136).  A press release quoted Raymond as saying, "[t]he
outlook for our Puerto Rico market in particular is somewhat

softer that we had originally anticipated and fuel costs have continued to rise at unprecedented rates, impacting our profitability in the near term."  (Compl. ¶ 133).

Plaintiffs allege the above-mentioned statements regarding revenue, pricing, and competition are all false or misleading because they omit the material fact that Horizon executives were engaged in a fraudulent price-fixing scheme.  In addition, plaintiffs claim that defendants knew, or were reckless in not knowing, their statements were false or misleading when made.

Finally, the complaint alleges false or misleading statements in the certifications made by Raymond and Urbania pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and the Securities and Exchange Commission ("SEC") Rules promulgated thereunder.  Raymond and Urbania signed Horizon's quarterly and annual reports,[10] certifying that:  (1) Horizon had adequate "internal control over financial reporting"; (2) Horizon maintained effective "disclosure controls and procedures"; (3) the financial information in the reports, to their knowledge, was "fairly presented"; and (4) the reports did not, to their knowledge, contain any misleading statements or omissions. (Compl. ¶ 106).; see also 15 U.S.C. § 7241, 17 C.F.R. §§ 240.13a-14, 240.15d-14.  Plaintiffs allege that these certifications were

---

10.  During the class period, Raymond and Urbania signed 10-K forms on March 2, 2007 and February 6, 2008, and signed 10-Q forms on April 26, 2007, July 27, 2007, and October 26, 2007.

false or misleading, again, because they failed to mention that
Horizon's reported revenues were artificially inflated by an
illegal rate-fixing scheme.

III.

Section 10(b) of the Securities Exchange Act makes it
unlawful to "use or employ, in connection with the purchase or
sale of any security ..., any manipulative or deceptive device or
contrivance in contravention of such rules and regulations as the
Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to its
authority under § 10(b), the SEC promulgated Rule 10b-5, which
provides:

> It shall be unlawful for any person ...
>
> (a)  To employ any device, scheme, or
> artifice to defraud,
>
> (b)  To make any untrue statement of a
> material fact or to omit to state a material
> fact necessary in order to make the
> statements made, in the light of the
> circumstances under which they were made, not
> misleading, or
>
> (c)  To engage in any act, practice, or
> course of business which operates or would
> operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of
> any security.

17 C.F.R. § 240.10b-5.

Section 10(b) and Rule 10b-5 have been interpreted as
creating a private right of action "for investors harmed by
materially false or misleading statements." In re Alpharma Inc.
Sec. Litig., 372 F.3d 137, 147 (3d Cir. 2004); Basic Inc. v.
Levinson, 485 U.S. 224, 230-31 (1988). To state a claim for

relief, plaintiffs must plead facts demonstrating that:  "(1) the defendant[s] made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant[s] acted with scienter; and (3) the plaintiff[s]' reliance on the defendant[s]' misstatement caused [their] injury." Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004); Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 251 (3d Cir. 2009).  "'An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding' how to act." Ieradi v. Mylan Labs., Inc., 230 F.3d 594, 599 (3d Cir. 2000) (citing Basic Inc, 485 U.S. at 232).

In their motion to dismiss, defendants contend that plaintiffs' § 10(b) and Rule 10b-5 claims must fail because the Complaint demonstrates neither falsity nor scienter.[11] Specifically, defendants maintain that no untrue statements of material fact were made nor were there any omissions of material fact necessary to make the statements made not misleading. Defendants also assert that neither Raymond nor Keenan nor Urbania acted with "a 'mental state embracing intent to deceive, manipulate, or defraud.'" Avaya, 564 F.3d at 252 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976)).

---

11. Defendants do not dispute that these remaining elements of the cause of action are present:  a connection with the purchase or sale of a security, reliance, economic loss, and loss causation. In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 275-76 (3d Cir. 2006) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

Under § 20(a), any individual who exercises control over a "controlled person" is jointly and severally liable under certain circumstances for violations of § 10(b) committed by that controlled person.  15 U.S.C. § 78t(a).[12]  Accordingly, liability under § 20(a) is contingent upon an underlying violation of § 10(b) by the controlled person, such that "plaintiffs must 'prove not only that one person controlled another person, but also that the 'controlled person' is liable under [Section 10(b)].'"  Alpharma, 372 F.3d at 153 (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 279 (3d Cir. 1992)); Avaya, 564 F.3d at 252. Section 20(a) applies to corporations as well as individuals. Avaya, 564 F.3d at 252.  Based on their challenge to plaintiffs' § 10(b) claims, defendants maintain that we must also dismiss plaintiffs' controlling-person liability claims under § 20(a).

The PSLRA imposes a dramatically higher standard on a plaintiff drafting a complaint than that of traditional notice

────────────────

12.  Section 20(a) provides,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

-17-

pleading.[13]  First, the complaint must "specify each allegedly misleading statement, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." Avaya, 564 F.3d at 259 (citing 15 U.S.C. § 78u-4(b)(1)).  Second, "with respect to each act or omission alleged to violate [§ 10(b)]," a plaintiff is required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).[14]

Under both prongs of the PSLRA, facts must be pleaded "with particularity."  Avaya, 564 F.3d at 253.  With respect to the falsity requirement, the particularity standard echoes Rule 9(b) of the Federal Rule of Civil Procedure, which "is comparable to and effectively subsumed by the requirements of ... the

---

13.  The PSLRA's heightened pleading requirements were constructed in order to

> restrict abuses in securities class-action litigation, including:  (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys.

In re Advanta Corp. Sec. Litig., 180 F.3d 525, 531 (3d Cir. 1999).

14.  The PSLRA commands that, "[i]n any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the [pleading] requirements ... are not met."  15 U.S.C. § 78u-4(b)(3)(A).

PSLRA."  Avaya, 564 F.3d at 253 (internal quotation marks
omitted).  Like Rule 9(b), the PSLRA "requires plaintiffs to
plead the who, what, when, where and how:  the first paragraph of
any newspaper story."  Id. (internal quotation marks omitted).
Additionally, "if an allegation regarding [a] statement or
omission is made on information and belief," a plaintiff must
"state with particularity all facts on which that belief is
formed."  15 U.S.C. § 78u-4(b)(1).

        However, as our Court of Appeals has explained, "[t]he
PSLRA's requirement for pleading scienter ... marks a sharp break
with Rule 9(b)."  Avaya, 564 F.3d at 253.  Unlike Rule 9(b),
under which a defendant could plead scienter generally, § 78u-
4(b)(2) requires "any private securities complaint alleging that
the defendant made a false or misleading statement ... [to]
'state with particularity facts giving rise to a strong inference
that the defendant acted with the required state of mind.'"
Tellabs, 551 U.S. at 321 (quoting 15 U.S.C. § 78u-4(b)(2)).

                                IV.

        To satisfy the falsity requirement[15] of the PSLRA, a
plaintiff must "specify each allegedly misleading statement, the
reason or reasons why the statement is misleading, and, if an
allegation is made on information and belief, all facts

---

15.  Although we refer to this aspect of the PSLRA as the
"falsity" requirement, we do not use the word "falsity" in its
strictest sense, but rather as shorthand for those false or
misleading statements or omissions which must be pleaded with
particularity under 15 U.S.C. § 78u-4(b)(1).  See Avaya, 564 F.3d
at 259.

                              -19-

supporting that belief with particularity." <u>Avaya</u>, 564 F.3d at 259 (citing 15 U.S.C. § 78u-4(b)(1)).  Plaintiffs, as noted above, have identified three types of allegedly false or misleading statements or omissions:  (1) those contained in Horizon's Code of Ethics; (2) those regarding revenue, pricing, and competition; and (3) those contained in Sarbanes-Oxley certifications.

Plaintiffs allege that statements contained in Horizon's Code of Ethics were materially false or misleading because defendants failed to disclose that certain employees engaged in an illegal rate-fixing scheme with at least one of Horizon's Puerto Rico competitors.  Essentially, plaintiffs argue that the Code of Ethics, which appeared on Horizon's website and was referenced in multiple Forms 10-K and on Horizon's April 18, 2008 Schedule 14A Proxy Statement, would lead investors to believe that the company's executives were acting in conformity with its code and were not fixing prices, when in fact they were violating the code and engaging in a price-fixing scheme. Plaintiffs suggest that defendants had a duty to disclose violations of their Code of Ethics, and their failure to do so rendered the Code itself misleading.  Defendants counter that a company's code of ethics does not become misleading merely because a few employees choose to violate it.

SEC regulations require a company either to (1) adopt and make publicly available a code of ethics "that applies to the registrant's principal executive officer, principal financial

-20-

officer, principal accounting officer or controller, or persons performing similar functions," or (2) explain its reasons for failing to do so.  17 C.F.R. § 229.406.  Were we to accept plaintiffs' position, any company with a code of ethics in compliance with § 229.406 would be required to disclose all violations of that code or face liability under federal securities law.  Such a result is untenable.

Plaintiffs' position has been soundly rejected by those courts that have considered it.  In Desai v. General Growth Props., Inc., the court determined that a company's publishing a code of ethics on its website "is [not] equivalent to a representation that the code is not being violated" and therefore cannot be considered misleading.  No. 09 C 487, 2009 WL 2971065 at *19 (N.D. Ill. Sep. 17, 2009).  Similarly, in Andropolis v. Red Robin Gourmet Burgers, Inc., the court found that a company's announcement adopting a code of ethics was not misleading by omission even though that company's CEO and CFO were violating the code at the time of the announcement.  505 F. Supp. 2d 662, 685-86 (D. Colo. 2007).  The court noted that "the mandatory nature of the adoption of such a code makes clear that all public companies—whether run by crooks or angels—will adopt just such a code," and this adoption "simply does not imply that all of its directors and officers are following that code of ethics."  Id. at 686.  We agree with this compelling reasoning.  Accordingly, we find that plaintiffs have failed to plead falsity under the

PSLRA with respect to the statements contained in Horizon's Code of Ethics.

Next, we must determine whether certain statements by defendants regarding revenue, pricing, and competition were false or misleading because defendants failed to disclose the ongoing rate-fixing scheme in the Puerto Rico shipping market. Generally, "there is no ... duty on the part of a company to provide the public with all material information." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997). Furthermore, silence alone is not misleading. See Basic, 485 U.S. at 239 n.17. However, our Court of Appeals has recognized that a duty to disclose arises when there is "an inaccurate, incomplete or misleading prior disclosure." Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000). More specifically, "[a]ccurately depicting successful financial performance, but attributing the performance to the wrong source, is misleading under the securities laws." In re ATI Techs., Inc. Sec. Litig., 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002); see also, In re Providian Fin. Corp. Sec. Litig., 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001); In re Campbell Soup Sec. Litig., 145 F. Supp. 2d 574, 588-89 (D.N.J. 2001).

The Complaint identifies numerous instances in which defendants continually repeated statements regarding Horizon's ability to increase revenue in the Puerto Rico market despite volume decreases. Defendants offered a number of explanations for this current success, including: "favorable changes to cargo

-22-

mix," "stringent cost controls," "rate increases," "revenue
related to acquisitions," "increased bunker fuel and intermodal
fuel surcharges to help offset increases in fuel costs,"
"increased slot charter revenue," "revenue increases from non-
transportation and other revenue services," good "customer
relationships," and market "discipline" between Horizon and its
Puerto Rico competitors.  Consequently, defendants put the issue
of Horizon's success "in play" and were obligated to disclose all
material facts regarding Horizon's success in the Puerto Rico
market.  See Providian, 152 F. Supp. 2d at 824-25.

        Even though the statements may have accurately depicted
Horizon's financial performance, attributing such performance to
only lawful conduct falls below the level of honesty required by
the securities laws.  ATI Techs., 216 F. Supp. 2d at 436.  In our
view, facts regarding an anti-competitive rate-fixing scheme
"would have been viewed by the reasonable investor as having
significantly altered the 'total mix' of information made
available."[16]  Basic, 485 U.S. at 231-32 (internal quotation
marks omitted).  Those facts were therefore material, and the
failure to disclose them was misleading.  This does not end our
inquiry, however, because not only must plaintiffs identify each
false or misleading statement, they must "specify the role of
each defendant, demonstrating each [d]efendant's involvement in

_____

16.  This view is bolstered by the fact that Horizon's stock
price plummeted upon public disclosure of the DOJ investigation.

misstatements and omissions."  <u>Winer Family Trust v. Queen</u>, 503
F.3d 319, 335-36 (3d Cir. 2007).

      The Complaint repeatedly quotes Raymond, then President
and CEO of Horizon Lines, Inc. and Horizon Lines, LLC, as
offering purportedly legitimate explanations for Horizon's
success in the Puerto Rico market.[17]  The Complaint also quotes
Keenan, then President of Horizon Lines, LLC, who said during a
third quarter 2007 conference call that Horizon's "unit revenue
per container [was] up approximately 4.8%" because of the "cargo
mix upgrade and ... rate improvements" which were "driven by
[Horizon's] strong customer relationships and ... high service
levels." (Compl. ¶ 97).  Similarly, plaintiffs quote defendant
Urbania, then Executive Vice President and CFO of Horizon Lines,
Inc., who explained during a fourth quarter 2007 conference call
that "[p]rice increases [had] come through [in the Puerto Rico
market] even though ... volume softness existed in 2007" because
of "good discipline in the market" between Horizon and its
competitors.  (Compl. ¶ 101).  Finally, plaintiffs identify
Horizon Lines, Inc. as making false or misleading statements

---

17.  For example, in a July 27, 2007 press release, Raymond
reported that Horizon "once again overcame challenges and
delivered solid earnings" despite "lingering volume softness."
He attributed this success to "[b]enefits generated by our
Horizon EDGE process re-engineering and customer service program,
stringent costs controls and unit revenue and cargo mix
improvements."  (Compl. ¶ 122).

regarding pricing, revenue, and competition in the Forms 10-K and
10-Q filed with the SEC during the class period.[18]

       With respect to these statements regarding revenue,
pricing, and competition, by identifying each statement,
explaining why those statements are false or misleading, and
demonstrating the role of each defendant responsible for those
statements, plaintiffs have satisfied their burden of pleading
with particularity the falsity prong of the PSLRA.

       The last category of statements identified by
plaintiffs are those contained in the Sarbanes-Oxley
certifications signed by Raymond and Urbania and attached to
Horizon's quarterly and annual SEC reports during the class
period.  As stated earlier, the Complaint identifies the
following certifications:  (1) those declaring the adequacy of
the company's "internal control over financial reporting"; (2)
those declaring the adequacy of the company's "disclosure
controls and procedures"; (3) one stating that, to the knowledge
of the certifying officers, the financial information included in
the report is "fairly present[ed]"; and (4) one stating that, to
the knowledge of the certifying officers, the report does not
contain misleading statements or omissions.

_____

18.  In the Form 10-K submitted by Horizon Lines, Inc. for the
2006 fiscal year, for example, the company noted the "soft
market" in Puerto Rico, and claimed that any "revenue container
volume decrease" in that market was "offset by higher margin
cargo mix in addition to general rate increases."  (Compl.
¶ 117).

Congress enacted Sarbanes-Oxley to restore investor confidence in the wake of numerous, highly-publicized, cases of accounting fraud.  See Recent Legislation, Congress Passes Corporate and Accounting Fraud Legislation: Sarbanes-Oxley Act of 2002, 116 Harv. L. Rev. 728, 728 (2002).  As then Senator (now Vice President) Joseph Biden declared on the floor of the Senate, Congress was determined to ensure that "corporate executives certify that their books are not cooked and their numbers are truthful."  148 Cong. Rec. S7426, 7426-27 (July 26, 2002) (statement of Sen. Biden).  To accomplish this goal, § 302 of the Act directed the SEC to establish rules requiring a company's CEO and CFO to certify the accuracy of financial reporting.[19]  See 15 U.S.C. § 7241.  Section 906 of the Act also sets forth certification requirements and prescribes criminal penalties for officers who knowingly or willfully violate that section.  See 18 U.S.C. § 1350.  As a result, the law no longer tolerates corporate executives who "bury [their] heads in the sand."  148 Cong. Rec. S7426, 7427 (July 26, 2002) (statement of Sen. Biden).

Although Congress has provided for criminal penalties, it has not specifically created a separate private right of action under Sarbanes-Oxley for violations of the certification

---

19.  Pursuant to Congress's mandate in § 302, the SEC adopted Rules 13a-14 and 15d-14, which require that all periodic financial reports filed pursuant to Rules 13(a) and 15(d) contain these mandatory certifications.  17 C.F.R. §§ 240.13a-14, 240.15d-14.  The actual language to be used by executives making Rule 13(a) and 15(d) certifications is set forth in 17 C.F.R. § 229.601(b)(31).

requirements, and none can be implied.  See In re Intelligroup
Sec. Litig., 468 F. Supp. 2d 670, 706-07 (D.N.J. 2006)
("Intelligroup I"); see also Alexander v. Sandoval, 532 U.S. 275,
286 (2001).  Nevertheless, where "the complaint asserts facts
indicating that, at the time of the certification, defendants
knew or consciously avoided any meaningful exposure to the
information that was rendering their [Sarbanes-Oxley]
certification erroneous," a false or misleading certification may
form the basis of a § 10(b) and Rule 10b-5 claim.  In re
Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 290 (D.N.J. 2007)
("Intelligroup II").[20]  Plaintiffs making such a claim must still
satisfy the heightened pleading requirements of the PSLRA.  Id.
at 289-90.

     Typically, plaintiffs alleging fraud on the basis of
Sarbanes-Oxley certifications do so by setting forth the
inaccuracy of the financial numbers themselves or by pleading
that an officer who certifies the adequacy of his company's
internal controls later admits they were defective.  See, e.g.,
Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981 (9th Cir.
2009); In re Ceridian Corp. Sec. Litig., 542 F.3d 240 (8th Cir.
2008); Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group,

---

20.  Although the Supreme Court has not spoken on the interaction
between Sarbanes-Oxley and § 10(b) of the Securities Exchange
Act, the Intelligroup approach fits with the Court's "long
recogni[tion] that meritorious private actions to enforce federal
antifraud securities laws are an essential supplement to criminal
prosecutions and civil enforcement actions brought, respectively,
by the Department of Justice and the Securities and Exchange
Commission."  Tellabs, 551 U.S. at 313.

Inc., 537 F.3d 527 (5th Cir. 2008); Cent. Laborers' Pension Fund
v. Integrated Elec. Servs. Inc., 497 F.3d 546 (5th Cir. 2007);
Garfield v. NDC Health Corp., 466 F.3d 1255 (11th Cir. 2006);
Intelligroup II, 527 F. Supp. 2d 262; Wieland v. Stone Energy
Corp., No. 05-2088, 2007 WL 2903178 (W.D. La. Aug. 17, 2007);
Intelligroup I, 468 F. Supp. 2d 670; In re Watchguard Sec.
Litig., No. C05-678LR, 2006 WL 2927663 (W.D. Wash. Oct. 12,
2006); Limantour v. Cray Inc., 432 F. Supp. 2d 1129 (W.D. Wash.
2006).  This case is unusual in that plaintiffs do not contest
the accuracy of the financial figures contained in the reports
Horizon filed with the SEC, nor have they pleaded facts
demonstrating that Horizon's internal controls were defective.
Rather they contend that certifications by Raymond and Urbania
were false or misleading because the documents to which those
certifications were attached failed to disclose that the reported
revenue was obtained, in part, through unlawful conduct.

     The majority of Raymond and Urbania's certifications
were principally concerned with the accuracy of the financial
information reported to the SEC and the internal controls by
which that accuracy is ensured.[21]  As noted above, plaintiffs do

---

21.  First, Raymond and Urbania certified that they had disclosed
(1) any changes affecting Horizon's "internal control over
financial reporting," (2) any "deficiencies and material
weaknesses in the design or operation of internal control over
financial reporting which [were] reasonably likely to adversely
affect [Horizon's] ability to record, process, summarize and
report financial information," and (3) any fraud involving those
with a "significant role in [Horizon's] internal control over
financial reporting."  (Compl.  ¶ 106).  The SEC defines
                                              (continued...)

21. (...continued)
"internal control over financial reporting" as "[a] process
designed ... to provide reasonable assurance regarding the
reliability of financial reporting and the preparation of
financial statements ... in accordance with generally accepted
accounting principles ...."  17 C.F.R. § 240.15d-15(f).  The SEC
explicitly rejected proposals to broaden the definition of
"internal control" to cover other aspects of corporate governance
and management.  <u>See</u> <u>Management's Report on Internal Control Over
Financial Reporting and Certification of Disclosure in Exchange
Act Periodic Reports</u>, Securities Act Release No. 8238, Exchange
Act Release No. 47,986, Investment Company Act Release No. 26068,
80 SEC Docket 1014 (June 5, 2003).

     Second, Raymond and Urbania certified that they had
established and maintained effective "disclosure controls and
procedures." (Compl. ¶ 106).  The SEC defines "disclosure
controls and procedures" as those controls and procedures
"designed to ensure that information required to be disclosed by
the issuer in the reports that it files or submits under the Act
(15 U.S.C. 78a <u>et seq</u>.) is recorded, processed, summarized and
reported, within the time periods specified in the Commission's
rules and forms."  17 C.F.R. § 240.15d-15(e).

        Finally, Raymand and Urbania certified, "based on my
knowledge, the financial statements, and other financial
information included in this report, fairly present in all
material respects the financial condition, results of operations
and cash flows of the registrant as of, and for, the periods
represented in this report."  (Compl.  ¶ 106).  According to the
SEC, a "fair presentation" of a company's financial condition
encompasses:

                the selection of appropriate accounting
                policies, proper application of appropriate
                accounting policies, disclosure of financial
                information that is informative and
                reasonably reflects the underlying
                transactions and events and the inclusion of
                any additional disclosure necessary to
                provide investors with a materially accurate
                and complete picture of an issuer's financial
                condition, results of operations and cash
                flows.

Certification of Disclosure in Companies' Quarterly and Annual
Reports, Securities Act Release No. 8124, Exchange Act Release
                                        (continued...)

not challenge the accuracy of these financial figures themselves and present no facts indicating a breakdown in Horizon's internal controls.  The Complaint offers only the conclusory statement that "[Horizon] lacked adequate internal controls," (Compl. ¶ 112), which falls far short of the PSLRA's particularity requirement.  Therefore, to the extent the certifications affirm the accuracy of the financial figures contained in the reports filed with the SEC, or the internal controls from which those figures are derived, plaintiffs have failed to establish that they are false or misleading.

Sarbanes-Oxley, however, is not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices.  Any interpretation restricting its scope to these purposes would be artificially narrow and inconsistent with the remedial purpose of the statute.  As evidenced by the precipitous decline of Horizon's stock price upon public disclosure of the DOJ investigation, the rate-fixing scheme orchestrated by Serra, Gill, Glova and individuals from one of Horizon's competitors was every bit as destructive to investor capital as inaccurate statements on a balance sheet.

---

21.(...continued)
No. 46,427, Investment Company Act Release No. 25,722, 78 SEC Docket 875 (Aug. 28, 2002).  Although, as discussed below, this particular certification covers all aspects of a company's financial condition, the SEC's explanation makes clear that it is principally concerned with the legitimacy of accounting practices and the accuracy of the resulting financial figures.

The SEC requires executives to certify, "based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and "based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of the company.  17 C.F.R. § 229.601(b)(31)(I).  As noted above, the SEC interprets "fair presentation" of financials to include "any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition." Certification of Disclosure in Companies' Quarterly and Annual Reports, Securities Act Release No. 8124, Exchange Act Release No. 46,427, Investment Company Act Release No. 25,722, 78 SEC Docket 875 (Aug. 28, 2002).  By failing to disclose the fact that Horizon was obtaining its revenue, in part, through an illegal price-fixing conspiracy, the financial reports, though numerically accurate, did not fairly present a complete picture of Horizon's financial condition.

The Act, however, does not mandate officers certify that their company's reports are completely devoid of any misleading statements or omissions.  Officers are not guarantors of their truth.  Instead, they must certify that they personally have no <u>knowledge</u> of such misleading statements or omissions.  Of

-31-

course, this is not a license for executives to simply bury their
heads in the sand, but it does mean they can only certify the
truthfulness of their reports based on the information they know,
or of which they should reasonably have been aware, at the time.
Accordingly, defendants Raymond and Urbania can only be held
liable under § 10(b) and Rule 10b-5 for these Sarbanes-Oxley
certifications if plaintiffs plead with sufficient particularity
that either Raymond or Urbania was aware or should have been
aware of the rate-fixing scheme at the time those certifications
were made.  This leads us to the scienter prong of the PSLRA.

V.

Plaintiffs cannot proceed with their claims under
§ 10(b) and Rule 10b-5 unless they plead with particularity facts
giving rise to a strong inference that defendants acted with
scienter.  15 U.S.C. § 78u-4(b)(2); Avaya, 564 F.3d at 267.  To
meet this standard, plaintiffs must "allege facts giving rise to
a 'strong inference' of 'either reckless or conscious behavior.'"
Avaya, 564 F.3d at 267 (quoting Advanta, 180 F.3d at 534-35)
(footnote omitted).[22]  Statements are reckless when they indicate

---

22.  When a plaintiff brings § 10(b) and Rule 10b-5 claims based
on a defendant's allegedly misleading "forward-looking"
statements, the PSLRA requires plaintiffs to show the defendant
made such statements with "actual knowledge" of their falsity.
15 U.S.C. § 78u-5(c); Avaya, 564 F.3d at 253-54.  Here,
plaintiffs do not claim to have been misled by any forward-
looking statements, and defendants do not argue that the safe-
harbor provision applies to any of the statements on which
plaintiffs did rely.  Accordingly, we will not apply the safe
harbor provision, and plaintiffs can satisfy their burden by
showing either actual knowledge or recklessness.

"an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  <u>Avaya</u>, 564 F.3d at 267 n.42 (internal quotation marks omitted).

In <u>Avaya</u>, our Court of Appeals, interpreting the Supreme Court's opinion in <u>Tellabs</u>, outlined the proper analysis for determining whether a plaintiff has sufficiently pleaded a strong inference of scienter under the PSLRA:  courts must "weigh the 'plausible nonculpable explanations for the defendant's conduct' against the 'inferences favoring the plaintiff'" to determine whether the inference of scienter is "'cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  <u>Avaya</u>, 564 F.3d at 267 (quoting <u>Tellabs</u>, 551 U.S. at 314, 324).  "The inference that the defendant acted with scienter need not be irrefutable, <u>i.e.</u>, of the "smoking-gun" genre, or even the most plausible of competing inferences."  <u>Tellabs</u>, 551 U.S. at 324 (internal quotation marks omitted).  Rather, we must determine "whether <u>all</u> of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  <u>Id.</u> at 310.

Finally, plaintiffs may not make general allegations of scienter against a collective group of defendants; they must "specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions."  <u>Winer</u>,

-33-

503 F.3d at 335-36.  When a plaintiff brings § 10(b) and Rule
10b-5 claims against a corporate defendant, we must determine
whether plaintiffs have adequately pleaded the requisite state of
mind on the part of an individual officer alleged to have made,
or participated in the making of, false or misleading statements
on behalf of the corporation.  Southland Sec. Litig. v. INSpire
Ins. Solutions, Inc., 365 F.3d 353, 367 (5th Cir. 2004).  This is
because a corporate defendant will not be held liable absent a
showing that at least one individual officer who made, or
participated in the making of, a false or misleading statement
did so with scienter.  In re Apple Computer, Inc. Sec. Litig.,
243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002).  Accordingly, we
begin with plaintiffs' scienter allegations against the
individual defendants.[23]

---

23.  We note here that defendants contend plaintiffs have engaged
in group pleading and thereby fail to meet the particularity
requirements of the PSLRA.  In Winer, our Court of Appeals
determined that the group pleading doctrine is "inconsistent with
the PSLRA's requirement that scienter be pleaded with respect to
'each act or omission' by 'the defendant.'"  503 F.3d at 335.
Though we acknowledge that group pleading is insufficient under
the PSLRA, plaintiffs here, in their Complaint, have identified
sufficiently each individual defendant to which allegedly false
or misleading statements are attributed and have pleaded their
allegations of scienter with similar precision.  As for the
corporate defendants, to the extent that plaintiffs have
identified the positions held by each individual defendant within
the defendant companies, plaintiffs have connected their falsity
and scienter allegations with those corporate defendants.  Cf.
Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co., No. 07-
5423, 2009 WL 2590087, *17-18 (E.D. Pa. Aug. 20, 2009).
Accordingly, we reject defendants' argument on this issue and
will examine plaintiffs' scienter allegations under the standard
set forth in Tellabs.

(continued...)

Plaintiffs' § 10(b) and Rule 10b-5 claims are premised on the fact that Serra, Gill, and Glova pleaded guilty to orchestrating a rate-fixing conspiracy with at least one of Horizon's Puerto Rico competitors.  However, no false or misleading statements are attributed to these three defendants, nor do plaintiffs claim they were instrumental in the formulation or dissemination of the false or misleading statements made by others.  Rather, plaintiffs' claims rest on an inference that Raymond, Keenan, and Urbania, that is, the individual defendants actually making the false or misleading statements, either knew or were reckless in not knowing that the conspiracy existed at the time those statements were made.  To establish this strong inference, plaintiffs claim that:  (1) Raymond, Keenan, and Urbania must have learned of the conspiracy through their dealings with Serra, Gill, and Glova; (2) Raymond, Keenan, and Urbania's statements themselves are sufficient to raise an inference of scienter; and (3) stock sales by Raymond, Keenan, and Urbania indicate that each had a motive to mislead investors.

Plaintiffs allege that, during the class period, Horizon was controlled by a small group of senior executives, which included Raymond, Keenan, Urbania, Serra, and Gill.  The Complaint avers that Serra, as Senior Vice President and General Manager for Horizon Lines, Inc., and Horizon Lines, LLC, Puerto Rico division, was responsible for setting Horizon's rates for

---

23.(...continued)

the Puerto Rican cabotage.  According to statements by the
Government during a sentencing hearing in the criminal price-
fixing case, Serra had "direct communications with a number of
... senior executives" at Horizon Lines, Inc.  (Compl. ¶ 64).
The Government also mentioned that defendant Gill provided
evidence against "yet to be charged ... superiors."  (Compl.
¶ 71).

        Plaintiffs also offer statements from a confidential
witness ("CW 1"),[24] who claimed that all rates, surcharges, and
fees were determined by Horizon's sales department and authorized
by the CEO such that employees in Puerto Rico were unable to
unilaterally set prices without direction from Horizon's main
headquarters in Charlotte, North Carolina.  Based on these
statements from CW 1, the supposed hierarchical relationship
among the defendants, and meetings between Raymond, Keenan, and
certain Puerto Rico customers, plaintiffs suggest "it is not
particularly plausible that Serra, Gill, and Glova would have
conceived and enacted this illegal conspiracy ... without
discussing it with their superiors."  Pls.' Resp. to Defs.' Mot.
to Dismiss 41.

        It is well established that, "allegations that a
securities-fraud defendant, because of his position in the
company, 'must have known' a statement was false or misleading

───────────────

24.  CW 1 is identified in the Complaint as "a member of
Horizon's Fleet Administration department from 2001 to 2003."
(Compl. ¶ 57).

are ... inadequate." <u>Advanta</u>, 180 F.3d 525 at 539 (quoting <u>Maldonado v. Dominguez</u>, 137 F.3d 1, 10 (1st Cir. 1998)).  As noted in <u>Clark v. Comcast Corp.</u>, a plaintiff cannot establish scienter on the part of defendant executives by "loosely describing the managerial hierarchy" by which fraudulent conduct could have come to their attention."  582 F. Supp. 2d 692, 706 (E.D. Pa. 2008).  Accordingly, we cannot infer that Raymond, Keenan, and Urbania were aware of the conspiracy merely because they held high-level positions within the company.[25]

The statements by CW 1 similarly provide plaintiffs with little assistance.  When confidential witness allegations are used to support a securities fraud claim, we must evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." <u>Avaya</u>, 564 F.3d at 263 (quoting <u>Chubb</u>, 394 F.3d at 147).  Here, we know nothing about the reliability of CW 1 and there are no facts pleaded to corroborate this source's statements.  Furthermore, it is unclear how CW 1's position as a "member of Horizon's Fleet Administration department from 2001 to 2003" would make him or her privy to Horizon's rate-setting

---

25.  The fact that Raymond and Keenan went to Puerto Rico to meet with customers does not change this conclusion, because those customers were obviously unaware they were being overcharged and could not have imparted upon defendants any information regarding the conspiracy.

procedures.  When, as here, the allegations of a confidential witness lack sufficient indicia of reliability, "we must discount them steeply."  Id.  We also note that, even if CW 1 were correct about Horizon's policy requiring authorization of Puerto Rico rates, there are no facts to suggest those making such approvals, whomever they may be, would have any reason to believe that such rates were the result of a price-fixing conspiracy.

Finally, the Government's statements regarding Serra and Gill's alleged collusion with unnamed Horizon executives do not help plaintiffs.  In addition to the caution with which we ordinarily consider accusations against others contained in a person's guilty plea,[26] the Government's remarks are extraordinarily vague and do not specify who these alleged co-conspirators were.  Plaintiffs' suggestion that these statements refer to either Raymond, Keenan, or Urbania is conclusory and speculative at best.  See Burlington Coat Factory, 114 F.3d at 1418.

Next, plaintiffs attempt to bootstrap the scienter requirement by claiming we can infer knowledge or recklessness based on the nature of the false or misleading statements themselves.  Plaintiffs argue that shipping rates in the Puerto Rican cabotage were so important to Horizon's overall revenue that Raymond, Keenan, and Urbania either knew the rates were

---

26. For example, our model jury instructions include a warning that "great care and caution" should be used when considering the testimony of an alleged accomplice or co-conspirator.  Third Circuit Model Criminal Jury Instructions, § 4.19 (2009).

unlawfully inflated or they were reckless in not knowing.  For
this proposition, plaintiffs cite In re RAIT Fin. Trust Sec.
Litig., in which the court inferred scienter where top executives
of a real estate investment trust allegedly made repeated
misleading statements regarding the trust's underwriting
standards, risk exposure, and compliance with Generally Accepted
Accounting Principals despite constant access to contrary
information.  No. 07-cv-03148, 2008 WL 5378164, at *13 (E.D. Pa.
Dec. 22, 2008).  They also rely on In re Vicuron Pharm., Inc.
Sec. Litig., in which scienter was inferred where pharmaceutical
company executives allegedly overstated the efficacy of their
lead drug under development while simultaneously concealing
unfavorable clinical trial results.  No. 04-cv-2647, 2005 WL
2989674, at *5 (E.D. Pa. July 1, 2005).

　　　　Plaintiffs, however, plead no facts showing that either
Raymond or Keenan or Urbania was made aware of the conspiracy or
had access to information which would have allowed them to
discover it.  Nor have plaintiffs pleaded that the rates charged
to Puerto Rico customers were so suspicious that Raymond, Keenan,
and Urbania should have suspected something was amiss.  While it
is true that false or misleading statements by key executives
regarding a company's lead product or core business practices
will weigh in favor of finding a strong inference of scienter, we
will not make such an inference "absent particularized
allegations showing that defendants had ample reason to know of
the falsity of their statements."  In re Stonepath Group, Inc.

-39-

Sec. Litig., No. 04-4515, 2006 WL 890767 at *12 (E.D. Pa. Apr. 3, 2006); see also RAIT, 2008 WL 5378164 at *12.  It is this lack of additional evidence that distinguishes the instant case from those cited by plaintiffs.

In RAIT, where officer defendants allegedly made misleading statements regarding the company's underwriting practices, risk exposure, and compliance with Generally Accepted Accounting Principles, the court found that plaintiffs had sufficiently alleged that the defendants had reason to know of the falsity of their statements because the complaint averred that each was a member of RAIT's "management investment committee" which "met two times per week to monitor RAIT's credit risks" and provided the defendants access to "both inside and public information" contradicting their statements.  RAIT, 2008 WL 5378164 at *13.  Similarly, in Vicuron, where defendants allegedly made materially false and misleading statements regarding the company's leading pharmaceutical product in development, plaintiffs' amended complaint stated that the defendants were "aware of [contradictory] data" which was concealed from investors.  Vicuron, 2005 WL 2989674 at *6.[27]  By contrast, plaintiffs here have not "specifically alleged defendants' knowledge of facts or access to information

---

27.  The plaintiffs in Vicuron also pleaded facts showing that the company's CFO blatantly overstated the efficacy of the developmental drug at a time when he had actual knowledge of clinical trial data that contradicted his statements.  Vicuron, 2005 WL 2989674 at *10.

contradicting their public statements." Campbell Soup Co., 145
F. Supp. 2d at 599 (internal quotation marks omitted).

Nevertheless, plaintiffs urge that an inference of
scienter is warranted here because Raymond, Keenan, and Urbania
were involved in conference calls during which they were
repeatedly questioned about Horizon's revenue and still failed to
disclose the conspiracy.  Plaintiffs cite Avaya, in which our
Court of Appeals found a strong inference of scienter where the
complaint alleged that the defendant CFO, despite direct
questions about price competition, repeatedly assured analysts
that prices were stable when in fact the company was offering
20-40% discounts to its customers.  Avaya, 564 F.3d at 270.

Plaintiffs' reliance on Avaya is misplaced.  At issue
in that case were the company's pricing discounts, which were
documented figures to which the defendant CFO had access.  The
court determined that, because the company had experienced a
"steep decline" in its operating margins, the CFO should have
been "paying close attention" to those discount rates.  Avaya,
564 F.3d 268-72.  At issue here is an illegal price-fixing
conspiracy, which by its very nature is a secret undertaking.
Unlike Avaya, plaintiffs here have pleaded no facts showing that
Raymond, Keenan, or Urbania had access to information which would
have alerted them to the misleading nature of their statements.
The revenues and shipping rates discussed by Raymond, Keenan, and
Urbania are bottom-line figures derived from a number of variable

-41-

components.[28]  Absent facts indicating that those defendants were
aware of or had available to them information which would have
alerted them to the conspiracy, or that the rates and revenues
were so distorted by the illegal conduct that they should have
been aware of it, the mere fact that Raymond, Keenan, and Urbania
made statements about revenues and rates does not imply that they
were aware of the price-fixing conspiracy.  See Avaya, 564 F.3d
at 269-70.

        As the final component of their argument, plaintiffs
assert defendants Raymond, Keenan, and Urbania were motivated to
mislead investors so they could take advantage of the
artificially inflated price of Horizon Lines, Inc. common stock
by selling their personal shares for a significant profit.
During the class period, all three of these defendants sold
shares of their personally held Horizon Lines, Inc. common stock
and realized proceeds of $1,976,733, $1,105,354, and $750,720
respectively.  These sales were all made once per month in
uniform amounts in accordance with what are known as Rule 10b5-1
sales plans, pursuant to which corporate executives sell a
predetermined amount of stock at pre-established dates to avoid

---

28.  As plaintiffs note in their Complaint, Horizon's shipping
rates are based on a number of factors, including "the length of
inland and ocean cargo transportation hauls, type of cargo, and
other requirements such as shipment timing and type of
container."  (Compl. ¶ 93).  Also, during the class period,
surcharges were increased to offset the rising cost of fuel.
(Compl. ¶ 129).

liability for insider trading.  Such plans are specifically authorized by the SEC.  <u>See</u> 17 C.F.R. 240.10b5-1(c)(1)(i)(A).

Absent evidence of "unusual ... scope or timing," we will not "infer fraudulent intent from the mere fact that some officers sold stock." <u>Burlington Coat Factory</u>, 114 F.3d at 1424; <u>Advanta</u>, 180 F.3d at 540.  Here, the sales by Raymond, Keenan, and Urbania were not unusual in scope.  During the class period, defendants sold the same number of shares every month with each sale amounting to less than 1% of each defendant's total holdings.[29]  Nor were the sales unusual in timing.  Defendants made sales at regular monthly intervals as specified by their Rule 10b5-1 plans.  Accordingly, "the sales do not marginally increase the likelihood that defendants make knowingly false or misleading statements out of a desire for personal financial gain." <u>Avaya</u>, 564 F.3d at 279.

As required by <u>Tellabs</u>, we must determine whether plaintiffs have pleaded a strong inference of scienter not on "individual allegation[s], scrutinized in isolation," but rather upon "<u>all</u> of the facts alleged, taken collectively." <u>Tellabs</u>, 551 U.S. at 323.  Considering all the allegations in the

---

29. Raymond sold 6000 shares per month during the class period, or 0.6% per month of the 1,016,477 shares he possessed at the beginning of the class period; Keenan sold 3,000 shares per month during the class period, or 0.6% per month of the 518,096 shares he possessed at the beginning of the class period; and Urbania sold 3,000 in eight of the class period's 14 months, or 0.7% per month of the 469,127 shares he possessed at the beginning of the class period.  Defs.' Br. in Supp. of Mot. to Dismiss, Ex. 2, 4, 6.

Complaint in their totality, we find that plaintiffs have not demonstrated it is "at least as compelling" that defendants Raymond, Keenan, or Urbania acted with scienter as it is that they acted without it.  Id. at 324.  The only defendants actually implicated in the rate-fixing conspiracy were Serra, Gill, and Glova.  By its nature, this conspiracy, though expansive, was shrouded in secrecy.  There are simply no particularized facts articulated in the Complaint demonstrating that Raymond or Keenan or Urbania was part of or knew about the conspiracy.

Plaintiffs, in sum, have not met the heightened pleading requirement under the PSLRA with respect to their scienter allegations against Raymond, Keenan, and Urbania. Although plaintiffs are not required to produce the proverbial "smoking gun," id., it is insufficient to proceed against corporate executives merely for failing to catch the purposefully fraudulent conduct of their subordinates.  See Tellabs II, 513 F.3d at 708.  Plaintiffs bear the burden of "plead[ing] with particularity facts giving rise to a strong inference of scienter."  Avaya, 564 F.3d at 267.  This they have failed to do. Accordingly, we will dismiss Count I of the Complaint as against defendants Raymond, Keenan, and Urbania.

We now turn to plaintiffs' Count I claims against the corporate defendants:  Horizon Lines, Inc., Horizon Lines, LLC, and Horizon Lines of Puerto Rico, Inc.  First, we recognize that a corporate entity can act only through the conduct of its employees.  Any materially false or misleading statements of

-44-

executives can be attributed to the corporation.  <u>Avaya</u>, 564 F.3d at 251-52.  However, the requisite mental state of scienter must be found within the mind of an employee who either made, or participated in the making of, such a statement.  <u>Southland</u>, 365 F.3d at 365-67.  As stated by the Court of Appeals for the Ninth Circuit in <u>Apple Computer</u>, "[i]t is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false.  A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement ... knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement."  243 F. Supp. 2d at 1023.  Therefore, to plead scienter against the corporate defendants, plaintiffs must identify facts raising a strong inference that false or misleading statements were made or otherwise promoted by an individual acting on behalf of each company and who knew or was reckless in not knowing that the statements were false or misleading at the time they were made.  <u>See</u> <u>Winer</u>, 503 F.3d at 335; <u>Luminent</u>, 2009 WL 2590087 at *17-18.

First, we must dismiss plaintiffs' Count I claims against Horizon Lines of Puerto Rico, Inc.  Although plaintiffs name Horizon Lines of Puerto Rico, Inc. as a defendant,[30] the Complaint does not attribute a single false or misleading

_____

30.  The company is described as "a Delaware corporation with its principal place of business in San Juan, Puerto Rico" and "a wholly owned subsidiary of Horizon Lines, Inc."  (Compl. ¶ 16).

-45-

statement to this company or any employees speaking on its behalf. It does not otherwise describe how Horizon Lines of Puerto Rico, Inc. is implicated in plaintiffs claims under § 10(b) and Rule 10b-5.

With respect to defendants Horizon Lines, Inc. and Horizon Lines, LLC, plaintiffs are unable to satisfy their burden of pleading scienter under the PSLRA. Although the complaint describes the relationship between these two companies and the individual defendants,[31] plaintiffs have not pleaded facts showing that any employee of either company made or otherwise promoted false or misleading statements with knowledge of or reckless disregard for their falsity.

While it is true that defendants Serra, Gill, and Glova were part of the rate-fixing conspiracy, and therefore would likely have been aware of the false or misleading nature of the statements made by Raymond, Keenan, and Urbania, plaintiffs have pleaded no facts showing that Serra, Gill, or Glova themselves made any false or misleading statements. Nor does the Complaint allege that Serra, Gill, or Glova were "senior controlling officers" who, "acting within the scope of their apparent

---

31. According to the complaint, Horizon Lines, Inc. employed the following individual defendants: (1) Raymond, as its Chairman, President, and CEO; (2) Urbania, as its Executive Vice President and CFO; (3) Keenan, as an officer; (4) Serra, as Senior Vice President and General Manager; and (5) Gill, as Marketing and Pricing Director. And Horizon Lines, LLC employed: (1) Raymond as President and CEO; (2) Keenan, as President of Horizon Lines, LLC; (3) Serra, as Senior Vice President and General Manager; (4) Gill as a member of the executive management team; and (5) Glova as Marketing and Pricing Director.

authority," authorized, approved, or otherwise promoted false or
misleading statements.[32] Adams v. Kinder-Morgan, Inc., 340 F.3d
1083, 1106-07 (10th Cir. 2003); In re JP Morgan Chase Sec.
Litig., 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005).  Rather this is
a situation where the false or misleading statements were
apparently made without knowledge of their falsity by one set of
individuals, Raymond, Keenan, and Urbania, while a separate group
of individuals, Serra, Gill, and Glova, are the ones to which
scienter must be attributed.  Consequently, plaintiffs cannot
hold the corporate defendants liable for the statements of
Raymond, Keenan, and Urbania.  See Southland, 365 F.3d at 366;
Apple Computer, 243 F. Supp. 2d at 1023.

     Nor have plaintiffs pleaded any facts connecting Serra,
Gill, Glova, or any other employee with knowledge of the rate-
fixing scheme with the false or misleading statements made by
Horizon Lines, Inc. in its annual and quarterly SEC reports.
Absent particularized facts, we cannot tie their knowledge of and
participation in the conspiracy to the statements of Horizon
Lines, Inc.  To do so would amount to reverse group-pleading and

---

32.  Of course it could be said that, in a very literal sense,
Serra, Gill, and Glova, by purposefully and unlawfully
influencing the rates on which Raymond, Keenan, and Urbania's
statements were based, have "participat[ed] in any way" in the
misleading remarks.  ING Bank, FSB v. PNC Fin. Servs. Group,
Inc., 629 F. Supp. 2d 351, 355 (D. Del. 2009); see also,
Southland, 356 F.3d at 366.  However, we believe it would be
unreasonable to impute liability to the corporate defendants
based on such an attenuated chain of causation.

would flatly contradict the decision of our Court of Appeals in
<u>Winer</u>.  <u>See</u> <u>Winer</u>, 503 F.3d at 337.

Because plaintiffs have failed sufficiently to plead
scienter against Horizon Lines, Inc. or Horizon Lines, LLC, their
Count I claims against those two corporate defendants must fail.

VI.

In Count II of their Complaint, plaintiffs allege that
Horizon Lines, Inc. is liable under § 20(a) for exercising
control over its subsidiaries, Horizon Lines LLC and Horizon
Lines of Puerto Rico, Inc., and its present and former
executives, Raymond, Keenan, Urbania, Serra, Gill, and Glova.
And, in Count III, plaintiffs claim that defendants Raymond,
Keenan, Urbania, Serra, and Gill, are liable under § 20(a)
because of their control over the three corporate defendants,
Horizon Lines, Inc., Horizon Lines, LLC, and Horizon Lines of
Puerto Rico, Inc.

As discussed previously, § 20(a) establishes a
derivative cause of action in which liability "is premised on an
independent violation of the federal securities laws."  <u>In re
Rockefeller Cent. Props., Inc. Sec. Litig.</u>, 311 F.3d 198, 211 (3d
Cir. 2002).  To make out their § 20(a) claims, plaintiffs must
show that one person controlled another, and that the "controlled
person" is liable under § 10(b).  <u>Avaya</u>, 564 F.3d at 252.
Accordingly, "once all predicate § 10(b) claims are dismissed,
there are no allegations upon which § 20(a) liability can be
based."  <u>Shapiro</u>, 964 F.2d at 279.

Plaintiffs can only succeed in pleading their § 20(a) claim against Horizon Lines, Inc. if one of the individual or corporate defendants over which the company exercised control has violated § 10(b).  Avaya, 564 F.3d at 252.  Because we will be dismissing plaintiffs' § 10(b) claims against defendants Horizon Lines LLC, Horizon Lines of Puerto Rico, Inc., Raymond, Keenan, and Urbania, we must also dismiss plaintiffs' § 20(a) claim against Horizon Lines, Inc. insofar as it is premised upon the underlying § 10(b) violations of those particular defendants.

In addition, plaintiffs' § 20(a) claim against Horizon Lines, Inc. must be dismissed insofar as it is premised upon an underlying § 10(b) violation by Serra, Gill, or Glova.  Although those three defendants have not joined in this motion to dismiss, and we therefore do not decide the motion as to them, we do consider the viability of plaintiffs' § 10(b) claims against them as an underlying component of our decision whether to dismiss plaintiffs' § 20(a) claim against Horizon Lines, Inc.  See Fox Int'l Relations v. Fiserv Sec., Inc., 490 F. Supp. 2d 590, 601 (E.D. Pa. 2007).

We repeat that, to make out a claim against defendants Serra, Gill, and Glova, under § 10(b), plaintiffs must show, among other things, that each of the three defendants made a false or misleading statement or omission.  Avaya, 564 F.3d at 251-52.  Here, plaintiffs have not attributed a single false or misleading statement or omission to defendants Serra, Gill, or Glova.  Accordingly, plaintiffs have failed to plead facts

-49-

showing an underlying violation of § 10(b) by either Serra, Gill, or Glova,[33] and we must therefore dismiss plaintiffs § 20(a) claim against Horizon Lines, Inc. in its entirety.

Finally, in Count III, plaintiffs claim that Raymond, Keenan, and Urbania are liable under § 20(a) because of their control over the corporate defendants.[34]  As previously discussed, plaintiffs have failed sufficiently to plead that Horizon Lines, Inc., Horizon Lines, LLC, or Horizon Lines of Puerto Rico, Inc. are liable under § 10(b).  We must therefore dismiss plaintiffs' § 20(a) claims against defendants Raymond, Keenan, and Urbania.

VII.

Plaintiffs have requested we grant leave to amend their Complaint to address any deficiencies we find to exist if we grant defendants' motion to dismiss.  Under Rule 15(a)(1) of the Federal Rules of Civil Procedure, "[a] party may amend its pleading once as a matter of course before being served with a responsive pleading."  For additional amendments leave of court

---

33.  Although we find that plaintiffs have not sufficiently pleaded their § 10(b) claims against Serra, Gill, and Glova, we do so only in the context of deciding whether to dismiss plaintiffs' § 20(a) claim against Horizon Lines, Inc.  Because defendants Serra, Gill, and Glova have not joined in this motion to dismiss, we will not dismiss the § 10(b) and Rule 10b-5 claims found in Count I of the Complaint, insofar as those claims apply to them.

34.  Because defendants Serra and Gill have not joined in this motion to dismiss, we do not address Count III of the Complaint insofar as it applies to those defendants.

must be obtained and such leave must be granted "when justice so requires." Fed. R. Civ. P. 15(a)(2).

Plaintiffs here filed their original complaint on December 30, 2008 and their consolidated securities class action complaint on July 29, 2009. Defendants responded to the second complaint with the pending motion to dismiss. Since this action is still in an early stage, plaintiffs may file a second amended complaint within eleven days of the order being entered in this action. We remind counsel of their obligations under Rule 11 of the Federal Rules of Civil Procedure.