## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | No. 08-969(HB) |
| | (Securities Class Action) |
| | Hon. Harvey Bartle, III |
| Plaintiff, | |
| | ELECTRONICALLY FILED |
| v. | |
| | **JURY TRIAL DEMANDED** |
| HORIZON LINES, INC., HORIZON LINES, LLC, CHARLES G. RAYMOND, MARK URBANIA, JOHN V. KEENAN, JOHN W. HANDY, BRIAN TAYLOR, GABRIEL SERRA, R. KEVIN GILL, and GREGORY GLOVA, | |
| Defendants. | |

## AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................... 1

II.     JURISDICTION AND VENUE ..................................................................... 8

III.    PARTIES ...................................................................................................... 8

        A.      Lead Plaintiff ................................................................................... 8

        B.      Defendants ........................................................................................ 9

IV.     CLASS ACTION ALLEGATIONS ............................................................ 15

V.      DEFENDANTS' FRAUDULENT SCHEME .............................................. 17

        A.      Competition in Horizon's Trade Lines ........................................... 17

        B.      Horizon's September 26, 2005 IPO ................................................ 21

        C.      Ongoing Criminal Antitrust Investigation and Defendants' Guilty Pleas ........... 23

        D.      Horizon is A Defendant in an Antitrust Class Action in Puerto Rico ................. 26

        E.      Information Relevant to this Action is Particularly Within Defendants'
                Control ............................................................................................ 27

                1)      The Ongoing DOJ Investigation Has Restricted Lead Plaintiff's
                        Access to Witnesses and Information ..................................... 27

                2)      Horizon Has Prevented Lead Plaintiff From Gaining Access to
                        Information Provided By Horizon as Part of its Settlement
                        Agreement in the Puerto Rico Action ..................................... 29

                3)      Horizon Has Specifically Barred Lead Plaintiff from Accessing
                        Information the Company Provided Pursuant to a Delaware Books
                        and Records Request .............................................................. 30

        F.      Horizon's Fraudulent Price-Fixing Scheme in Its Puerto Rico Trade Line
                and Defendants' Scienter .............................................................. 31

VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................... 47

        A.      Misstatements and Omissions Related to the Sources of Horizon's
                Revenues and Financial Performance .............................................. 48

        B.      Misstatements and Omissions Related to Pricing, the Market and
                Competition ..................................................................................... 66

i

C.   Materially Misleading Statements and Omissions Related to the Puerto Rican Market and Its Post-Cartel Exposure Earnings Guidance .......................... 98

D.   Misstatements in Sarbanes-Oxley Certifications ................................................ 105

VII.   ADDITIONAL STATEMENTS DEMONSTRATING AUTHORITY TO SPEAK ON BEHALF OF HORIZON BY DEFENDANT SERRA .................................................. 107

VIII.   ADDITIONAL ALLEGATIONS RELEVANT TO SCIENTER .................................. 109

A.   The Senior Management Defendants Had A Duty to Monitor Horizon's Compliance With the U.S. Antitrust Laws Prohibiting Price-Fixing and Ignored Red Flags Alerting Them To the Need to Investigate .......................... 109

B.   Defendants Serra, Gill and Glova Have Already Admitted Their Scienter and Confirmed Horizon's Participation in the Price-Fixing Conspiracy............ 112

C.   Defendants Raymond, Urbania, Keenan, Taylor and Handy Acted With Scienter ..................................................................................................... 113

D.   Defendants Were Motivated By a Desire to Make Millions of Dollars in the IPO and Then to Sell Their Inflated Shares of Common Stock Throughout the Class Period.............................................................................. 121

IX.   LOSS CAUSATION.................................................................................................... 130

X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ............................................................................................. 133

XI.   PRESUMPTION OF RELIANCE .............................................................................. 134

XI.   CLAIMS FOR RELIEF .............................................................................................. 135

COUNT ONE:  For Violations Of Section 10(b)  Of The Exchange Act, Against All Defendants ......................................................................................135

COUNT TWO: For Violations Of Section 20(a) Of The  Exchange Act Against Horizon Lines, Inc. ...........................................................................................136

COUNT THREE: For Violations Of Section 20(a) Of The Exchange Act  Against Defendants Raymond, Urbania, Keenan, Handy, Taylor, Serra and Gill ...........138

XII.   JURY TRIAL DEMAND ............................................................................................ 140

XIII.   PRAYER FOR RELIEF .............................................................................................. 140

The Police and Fire Retirement System of the City of Detroit ("Detroit P&F," "Lead Plaintiff," or "Plaintiff") brings this federal securities law class action on behalf of itself and all other persons and entities, other than Defendants and their affiliates as specified below, who purchased or acquired publicly traded shares of common stock of Horizon Lines, Inc. between September 26, 2005 and April 25, 2008, inclusive (the "Class Period"), and based on the conduct of Defendants asserted herein, were injured thereby.

## I.    NATURE OF THE ACTION

1.     This case arises from an admitted antitrust price-fixing conspiracy that took place at one of the United States' leading ocean container shipping companies—Defendant Horizon Lines, Inc. and its subsidiaries Defendant Horizon Lines, LLC, Horizon Logistics Holdings, LLC and Horizon Lines of Puerto Rico, Inc. (unless otherwise specified, referred to herein collectively as, "Horizon" or the "Company")—over a period of at least five years.  During the Class Period, Defendants misled investors about the most fundamental aspects of the Company's business, including the legality and sustainability of its pricing practices, and the underlying reasons for the Company's reported competitive advantages, earnings and financial growth.

2.     By knowingly breaking the law, making false and misleading misrepresentations and omissions to investors, and placing the Company at the heart of an ongoing criminal investigation—as a result of which, to date, three of Horizon's executives (named as Defendants here) were sentenced to a collective 83 months in prison—Defendants caused hundreds of millions of dollars in investor losses.  By contrast, the price-fixing conspiracy allowed Horizon to conduct an initial public offering ("IPO") on favorable terms at the start of the Class Period and to thereafter artificially inflate the value of its common stock until the conspiracy was revealed.  The IPO and the Company's artificially inflated stock price personally enriched the individual executives at Horizon by millions of dollars.

3.      Horizon's illegal price-fixing scheme is the subject of continuing criminal investigations and its full contours are yet to be revealed.  It is clear, however, that the conspiracy was centered on the core operations of the Company and that the unlawful behavior was widespread and extended to the highest levels of management.  Indeed, Horizon has agreed to pay $20 million dollars to settle a civil antitrust class action in the District of Puerto Rico (and to cooperate extensively with those plaintiffs pursuant to a confidentiality agreement.  The limited information that has been made available to date confirms that, beginning no later than 2002, Horizon entered into unlawful and secret agreements with its three Puerto Rican competitors to allocate customers amongst themselves.  The Company and its competitors then conspired to fix shipping rates by insuring that each conspirator's allocated customer would receive meaningful rate quotes from only one company.  Horizon and its co-conspirators also agreed to fix fuel and surcharge rates to unlawfully boost revenues and meet earnings expectations.  As a result of this unlawful conspiracy, Horizon's investors were deceived into believing that Horizon's profits in Puerto Rico and elsewhere were improving, or, later in the Class Period, at least remaining stable, despite a poor, or "soft" market.  As investors later learned, this was not the case.

4.      Throughout the Class Period, Horizon and its senior executives made public and material misstatements and omissions related to Horizon's pricing practices, the competitive market for Horizon's services, Horizon's historical and projected revenues and the Company's business prospects in the Puerto Rico ocean shipping market and elsewhere.  For instance, the pricing figures and reports that were the direct product of the antitrust conspiracy were generated by the Puerto Rico division led by Defendant Serra and incorporated into Horizon's reported revenues and EBITDA in the Company's financial statements.  Moreover, in the second quarter

of 2007, Defendants reassured investors that, notwithstanding the weakness in the Company's vital Puerto Rican market, the Company was "continuing to get rate increases that are slightly ahead of what [their] inflationary costs are."  Again and again, during calls with investors announcing Horizon's financial results, Defendants disclosed "increase[d] tradable rates" in Puerto Rico of 3%-4% despite the negative outlook in the Puerto Rican market.  Rather than attribute these rate increases to the Company's illegal price fixing conspiracy, Horizon insisted that rates increased despite volume softness because, among other things, "[t]here's been good discipline in the market between [Horizon] and [its] competitors."  Although Horizon and its senior executives told investors that the Company's revenue growth, competitive advantages, and stability were the result of negotiated contracts, rate improvements, "strong customer relationships" and high service levels, these statements were false and were designed to conceal the real reason for Horizon's revenue growth: an admitted criminal price-fixing conspiracy.

5.      On April 17, 2008, the truth about Horizon was partially revealed when the Department of Justice ("DOJ") Antitrust Division and the Federal Bureau of Investigation ("FBI") executed search warrants on Horizon and its co-conspirators, revealing to the public that Horizon was at the center of a scandal involving price-fixing and bid-rigging in the Puerto Rico ocean shipping market.  To date, three Horizon executives—Defendants Gabriel Serra, Gregory Glova and R. Kevin Gill—have pled guilty to criminal conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating customers in violation of the Sherman Act.  According to the DOJ, Defendant Serra had regular and "direct communications with a number of other senior executives" at Horizon and represented only the "middle" of the hierarchy involved in the conspiracy.  Moreover, in the DOJ's sentencing memorandum for Defendant Gill, the DOJ stated that "[Gill] has provided evidence, in the form of statements and

documents, against his superiors within [Horizon], including presently uncharged co-conspirators." All of Defendant Gill's "superiors" at the Company that were involved in the Puerto Rico trade lane are named as Defendants in this action, as are those Horizon officers senior to Serra.

6.      Following the announcement that the DOJ and FBI were investigating Horizon, Defendants were faced with the reality that their price-fixing scheme was no longer viable. Without this illegal activity, Defendants knew that they could not sustain their financial performance in a competitive market. One week after the announcement of the DOJ investigation, Horizon reported its first quarter 2008 results and announced a material reduction in its earnings guidance. Rather than admitting the truth, Defendants attempted to blame this reduction on "softness" in the Puerto Rico market. During the Class Period, however, Horizon had repeatedly described the Puerto Rico market as soft, but had consistently stated that the "soft market" did not prevent Horizon from effectively managing costs, developing customer relationships and increasing its shipping rates in the face of what investors were told was a freely-competitive marketplace for Horizon's services. The Company's disclosure—one week after the revelation of the DOJ and FBI investigations—that the softness of the market would lead to lower earnings and revenue implicitly confirmed that the Company's illegal price fixing scheme was the true reason for much of Horizon's Class Period earnings. In fact, reported rate increases decreased from $14.44 million in "general rate increases" in the second quarter of 2007 to just $933,000 in "general rate increases" in the third quarter of 2009, after the conspiracy was disclosed and halted.

7.      The Company's disclosures caused a severe decrease in the price of Horizon's publicly traded securities, which traded at a high of over $34 per share during the Class Period.

Following the April 17, 2008 disclosure of the criminal investigation, the Company's stock dropped from $18.23 to $14.70 per share, a nearly 20% decrease. The next week, on April 25, 2008, following Horizon's disclosure that its revenue and earnings were not sustainable, Horizon's shares fell an additional 23%, from $15.08 to $11.25 per share. In total, Horizon' s disclosures led to the loss of 38% of the value of Horizon's shares in little over one week. As evidenced by the precipitous decline of Horizon's stock price upon public disclosure of the DOJ investigation and subsequent disclosures, the rate-fixing scheme at Horizon caused hundreds of millions of dollars in losses to Horizon's shareholders.

8.      Since April 2008, as noted above, Defendants Serra, Gill and Glova have pled guilty to a price-fixing conspiracy and have been sentenced to a collective six and a half years in prison. During the Class Period, Horizon announced publicly that Defendant Serra worked very closely with the other senior executives named as defendants herein. For instance, in the IPO prospectus dated September 26, 2005, pursuant to which Horizon sold $125 million shares of stock to investors in an initial public offering, Horizon touted as one of its "competitive strengths" the "cohesiveness" of its senior management team – *i.e.*, the "cohesiveness" between Serra and the five other senior executives named as Defendants herein—stating: "our senior management has a long history of working together as a team, with six of our eight most senior managers" "having continuing direct involvement with multiple aspects of our business, including servicing our largest customers and the operation of our shipping and logistics services." Indeed, at Serra's sentencing, the federal prosecutor stated in open court that "there are others higher than Mr. Serra who are certainly of interest to the government" and that Serra was "in the middle" of the hierarchy of the conspiracy.

9.      As an important member of Horizon's executive management team, Serra was also instrumental in the formulation and dissemination of false and misleading statements made by Horizon and other senior executive Defendants.  During and prior to the Class Period, Serra himself was repeatedly authorized by Horizon to speak to the public regarding core aspects of the Company's business.  Among other things, and as discussed in more detail below, Serra publicly spoke on behalf of Horizon with respect to Horizon's financial performance and the rates it charged to customers.  For instance, in an extensive article in the Journal of Commerce, dated January 31, 2005, which focused on the "end" of "rate-cutting" by ocean shipping carriers operating between Puerto Rico and the United States mainland, Serra was identified as the "vice president and general manager" of Horizon and was cited as providing specific information about Horizon's rates and operations, including by being directly quoted as saying that "Horizon's rates are up an average of 5 to 6 percent" and "the rate recovery has continued, and we feel more comfortable with the net port-to-port rate."  In that January 31, 2005 article, Serra also falsely attributed Horizon's "rate increases" to "cost recovery" initiatives (rather than Horizon's illegal price fixing conspiracy).

10.     In addition, Serra spoke directly to the public during the Class Period, including in a lengthy marketing article published in the Journal of Commerce on September 25, 2006.  This article was commissioned by Horizon itself and, in a section titled "Investing For The Future," prominently featured a color photograph of Serra (identifying him as the Vice President and General Manager of Horizon).  In the article, Serra was extensively quoted regarding Horizon's cargo mix and operating costs, and purported reasons why "customers consistently confirm" that Horizon had advantages and "important differentiators" over its competitors.  Serra made other false and misleading statements to the public during the Class Period as well, and

was repeatedly authorized by Horizon to provide quotes for public news stories.  Serra was also referenced on public conference calls held by Defendants as the source for information that other senior executives were providing to investors during the Class Period.  Serra's statements during the Class Period did not reveal the antitrust price-fixing conspiracy being carried out at Horizon and were materially false and misleading.

11.     Serra was not the only Guilty Plea Defendant authorized by Horizon to speak to the public during the Class Period.  The same September 25, 2006 Journal of Commerce article that featured Serra also contained a color photograph of Gill, with a caption identifying him as the "Vice President of Marketing, Horizon Lines."  Gill was similarly quoted in the article as stating that "we have let our customers in . . . opened up information in our terminals . .. **Our competitors are still trying to catch up.**"  Given that Gill has pled guilty to involvement in an anticompetitive price-fixing conspiracy that was ongoing at this time, his statement was materially false and misleading.  These are not isolated statements, as each of the Individual Defendants made numerous public and materially false and misleading statements throughout the Class Period.

12.     Horizon has entered into a settlement agreement in the antitrust class action filed in the District of Puerto Rico.  *See In re Puerto Rican Cabotage Antitrust Litigation*, 08-MD-1960 (DRD) (D.P.R.).  Pursuant to this agreement, Horizon has agreed to cooperate in the civil plaintiffs' investigation by, among other things, providing documents and witnesses to plaintiffs in that action in support of their claims against Horizon's co-conspirators.  Lead Plaintiff, however, presently has no access to those documents because of a restrictive confidentiality agreement in effect in that litigation.  Moreover, as described below, Horizon has taken active steps to deprive Lead Plaintiff of access to information that has been provided to others and

which may help Lead Plaintiff plead its claims in this case. As the investigation continues and Horizon's cooperation with the antitrust case begins, more details concerning the full extent of the price fixing scheme in all of Horizon's markets and at the highest levels of the Company will be revealed.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

15.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).    Horizon is incorporated in this Judicial District, and this Court has previously ruled that venue in this District is proper.

16.    In connection with the acts, conduct, and other wrongs alleged in this Amended Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiff

17.    Plaintiff Police & Fire Retirement System of the City of Detroit ("Detroit P&F") is a retirement system maintained for the benefit of current and former policemen, firemen and their families.  Detroit P&F manages over $3.5 billion in assets and has its principal office and place of business located in Detroit, Michigan.  As set forth in a sworn certification previously

filed with the Court, during the Class Period, Detroit P&F purchased common stock in Horizon and, as a result of these purchases of Horizon securities and the violation of the securities laws alleged herein, Detroit P&F suffered substantial damages.  On June 18, 2009, this Court appointed Detroit P&F as Lead Plaintiff for this consolidated litigation.

### B.    Defendants

18.    Defendant Horizon Lines, Inc. is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  On or about September 26, 2005, Horizon Lines, Inc. went public when it completed its initial public offering.  Its stock is traded on the New York Stock Exchange.  It operates as a holding company for the following wholly-owned subsidiaries: (i) Horizon Lines, LLC; (ii) Horizon Logistics Holdings, LLC; (iii) Horizon Lines of Puerto Rico, Inc.; and (iv) Horizon Lines of Alaska, LLC.

19.    Defendant Horizon Lines, LLC is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina. It is as an ocean carriage containership operating subsidiary of Horizon Lines, Inc.  Horizon Lines, LLC operates a fleet of 21 U.S.-flag containerships and five port terminals linking the continental United States with Puerto Rico, Hawaii, Alaska, Guam and Micronesia.

20.    Defendant Charles G. Raymond was, at all relevant times, Chairman, President and Chief Executive Officer of Horizon Lines, Inc.  Appointed as the first Chairman of the Board of Directors of Horizon Lines, Inc. in October of 2006, he has served as President and Chief Executive Officer and as a director of Horizon Lines, Inc. and Horizon Lines Holding Corp. since July 2004, and as a director of Horizon Lines, LLC since November 1999 and President and Chief Executive Officer of Horizon Lines, LLC since January 2000.  At all relevant times, Raymond was a member of the executive officer management team of Horizon Lines, Inc., and Horizon Lines, L.L.C.  Raymond has worked in the ocean shipping industry since at least 1994,

and has 39 years of experience in the greater transportation industry.  Raymond was identified throughout the Class Period as a "key" executive whose departure could "adversely affect our future operating results because of [his] experience and knowledge of our business and customer relationships.

21.     Defendant M. Mark Urbania was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of Horizon Lines, Inc. until his sudden and precipitous resignation from the Company effective April 4, 2008, just two weeks before the DOJ investigation was announced and weeks before the Company was to report on its first quarter earnnings.  As CFO, Urbania was responsible for the accounting, finance and treasury management of the Company and its businesses.  At all relevant times, Urbania was a member of the executive officer management team of Horizon Lines, Inc., and Horizon Lines, L.L.C.

22.     Defendant John V. Keenan has been, since August 2007, President of Horizon Lines, LLC., as well as an officer of Horizon Lines, Inc.  Keenan joined Horizon in 1983. Keenan is responsible for all core ocean transportation services in the Alaska, Hawaii, Guam, Micronesia and Puerto Rico markets. These responsibilities include all port, terminal and vessel operations, sales and marketing, and service delivery functions. Prior to being appointed President of Horizon Lines, LLC, Keenan was Senior Vice President and Chief Transportation Officer of Horizon Lines, Inc.  In that capacity, he reported to Defendant John W. Handy.  At all relevant times, Keenan was a member of the executive officer management team of Horizon Lines, Inc. and Horizon Lines, L.L.C.  Keenan was identified throughout the Class Period as a "key" executive whose departure could "adversely affect our future operating results because of [his] experience and knowledge of our business and customer relationships.

23.     Defendant John W. Handy has been, since December 20, 2005, Executive Vice President of Horizon Lines, Inc. and a board member of Horizon Services Group, a wholly owned subsidiary of the Company.  Handy's responsibilities at the Company included the enhancement of trade lane profitability and system service integrity, the leadership of strategic business development, and the development of the Company's management team.  At all relevant times, Handy was a member of the executive officer management team of Horizon Lines, Inc., and Horizon Lines, L.L.C.  Defendant Serra reported directly to Defendant Handy. Thus, Handy was in close contact with, and responsible for the supervision of, Defendant Serra's work in Puerto Rico.  In a news article published on December 21, 2005, Horizon announced that Handy was joining the Company and stated that he would be responsible for "lane profitability and system service integrity," and explicitly stated that Gabriel Serra would be reporting directly to Handy.  Handy was identified during the Class Period as a "key" executive whose departure could "adversely affect our future operating results because of [his] experience and knowledge of our business and customer relationships."  As disclosed in Horizon's April 2009 Proxy, when Handy retired in early 2009, he received "certain benefits to Mr. Handy in recognition of his past services to the Company and in consideration for his consent to certain post-termination obligations and a release of claims. These benefits consist of a single lump-sum cash payment of $388,881, full vesting of 70,000 shares of restricted stock which were otherwise scheduled to vest in 2011, payment of approximately $19,000 for accrued but unpaid dividends on a portion of the 70,000 shares of restricted stock (plus interest on those accrued dividends) and full vesting of certain stock option awards and extension of the period of exercise of those stock options until their original expiration dates."  The "post-termination obligations" that Handy committed to in exchange for these payments included non-disparagement and

11

confidentiality agreements, as well as an agreement to "cooperate" with Horizon "in connection

with certain matters that may arise following his retirement.

24.     Defendant Brian W. Taylor served as Senior Vice President, Sales and Marketing,

of Horizon Lines Inc. from December 2005 through August 2007.  Since August 2007, Taylor

has served as President of Horizon Logistics Holdings, LLC, a wholly owned subsidiary of

Horizon Lines Inc.  Defendant Taylor served as Vice President and General Manager for the

Puerto Rican market from July 1998 to June 2000.  At all relevant times, Taylor was a member

of the executive officer management team of Horizon Lines, Inc., and Horizon Lines, L.L.C.

Defendant Gill reported directly to Defendant Taylor, and Taylor reported directly to Defendant

Raymond.  Thus, Taylor was in close contact with, and responsible for the supervision of,

Defendant Gill.  In a news article published on December 21, 2005, Horizon announced that

Taylor had been promoted to vice president, will report directly to Raymond and will "assume

direct responsibility for sales and marketing plans."  That article also stated that "Kevin Gill has

been named vice president, marketing" and would report directly to Taylor.  Taylor was

identified throughout the Class Period as a "key" executive whose departure could "adversely

affect our future operating results because of [his] experience and knowledge of our business and

customer relationships.

25.     Defendant Gabriel Serra was, at all relevant times, Senior Vice President and

General Manager for Horizon Lines, LLC, Puerto Rico division, and was responsible for

determining Horizon's pricing for Puerto Rican cabotage.  At all relevant times, Defendant Serra

was one of the top ten executive officers of Horizon Lines, Inc. and, served on the executive

officer management team with Defendants Raymond, Urbania, Keenan, Handy and Taylor.  At

the times of the September 26, 2005 IPO, Defendant Serra was one of the five highest paid

executives at Horizon.  His responsibilities included oversight of the operational, sales and strategic activities of the Puerto Rico market.  Serra repeatedly made statements on behalf of Horizon to the public regarding Horizon's Puerto Rico business.  Defendant Serra reported directly to Defendant Handy.  As described more fully below, on October 20, 2008, Serra pleaded guilty to violating the Sherman Act and was sentenced, on May 12, 2009, to 34 months in prison.

26.     Defendant R. Kevin Gill was, from at least as early as May 2002 until December 2005, the Marketing and Pricing Director for Horizon Lines Inc.,  Puerto Rico division, and was responsible for determining Horizon Lines LLC's pricing for Puerto Rican cabotage.  From December 2005 until at least April 2008, Gill was Horizon's Vice President of Marketing and was responsible for marketing Horizon's Puerto Rican cabotage services.  Defendant Gill reported directly to Defendant Taylor.  As described more fully below, on October 20, 2008, Gill pleaded guilty to violating the Sherman Act and was sentenced, on May 12, 2009, to 29 months in prison.  In an article in the Wheelhouse Weekly, dated January 26, 2006, Gill spoke on behalf of Horizon, accepting an award for "Outstanding Ocean Service Provider for 2005" by stating that "The people of Horizon Lines are adept at finding ways to partner with our customers to reduce cycle time and meet tight delivery schedules . . . being recognized for five years in a row is a great source of pride for our entire team as it validates these efforts."   Gill also spoke about Horizon's supposed competitive advantages during the Class Period.

27.     Defendant Gregory Glova, from December 2005 until at least April 2008, was the Marketing and Pricing Director for Horizon Lines LLC, Puerto Rico division, and was responsible for determining Horizon's pricing for Puerto Rican cabotage.  As described more

fully below, on October 20, 2008, Glova pleaded guilty to violating the Sherman Act and was sentenced, on May 12, 2009, to 20 months in prison.

28.     Non-party Sea Star Lines, LLC ("Sea Star") is a Delaware corporation that is privately held by SaltChuk Resources, Inc. and Taino Star, Inc.  Sea Star accounts for approximately 21 percent of the Puerto Rican cabotage market.  Sea Star marketed and sold Puerto Rican cabotage in the United States and Puerto Rico from at least as early as May 2002 and continuing until at least as late as April 2008.

29.     Non-party Peter Baci, during the relevant period, was the Senior Vice President of Yield Management for Sea Star and was responsible for determining Sea Star's pricing for Puerto Rican cabotage.  As described more fully below, on October 20, 2008, Baci pleaded guilty to violating the Sherman Act and was sentenced, on January 30, 2009, to 48 months in prison.

30.     Non-party Alexander Chisholm, during the relevant period, was the Assistant Vice President of Yield Management for Sea Star.  As described more fully below, on October 20, 2008, Chisholm pleaded guilty to obstruction of an ongoing investigation and was sentenced, on May 12, 2009, to 7 months in prison.

31.     Defendants Raymond, Urbania, Keenan, Handy, Taylor, Serra, Gill and Glova are collectively referred to hereinafter as the "Individual Defendants."  Defendants Serra, Gill and Glova are referred to herein as the "Guilty Plea Defendants."  Further, Defendants Raymond, Urbania, Keenan, Handy, Taylor and Serra are collectively referred to hereinafter as the "Senior Management Defendants."  The Senior Management Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Horizon's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers

and institutional investors, i.e., the market.  Each Senior Management Defendant was provided

with copies of the Company's reports and press releases alleged herein to be misleading prior to,

or shortly after, their issuance and had the ability and opportunity to prevent their issuance or

cause them to be corrected.  As discussed in more detail below, because of their positions and

access to material non-public information available to them, each of these Defendants knew that

the adverse facts specified herein had not been disclosed to, and were being concealed from, the

public, and that the positive representations which were being made were then materially false

and/or misleading.

## IV.   CLASS ACTION ALLEGATIONS

32.     Lead Plaintiff brings this action on behalf of itself and as a class action pursuant

to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons or entities (the

"Class") that acquired the common stock of Horizon during the period from September 26, 2005

through April 25, 2008, inclusive, and who suffered damages as a result. Excluded from the

Class are: (a) Defendants; (b) members of the immediate families of the Individual Defendants;

(c) the subsidiaries and affiliates of Defendants; (d) any person or entity who is a partner,

executive officer, director, trustee, or controlling person of Horizon (including any of its

subsidiaries or affiliates); (e) any entity in which any Defendant has a controlling interest; (f)

Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the

legal representatives, heirs, successors and assigns of any such excluded party.

33.     The members of the Class are so numerous that joinder of all members is

impracticable. Horizon had 30.17 million common shares outstanding. Throughout the Class

Period, Horizon's common stock was actively traded on the New York Stock Exchange.  While

the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff

believes that Class members number in the thousands.

15

34.     Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and other members of the Class acquired Horizon common stock in the open market during the Class Period.  Lead Plaintiff and members of the Class sustained damages as a result of Defendants' conduct complained of herein.

35.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are adverse or antagonistic to the Class.

36.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

37.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      Whether the federal securities laws were violated by Defendants' conduct as alleged herein;

b.      Whether the SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

c.      Whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

d.      Whether and to what extent the market prices of Horizon common stock were artificially inflated during the Class Period due to the omissions and/or misstatements complained of herein;

e.      Whether Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

16

   f.  Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

   g.  Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

  38.  The names and addresses of those persons and entities that purchased or sold Horizon securities during the Class Period are available from the Company's transfer agent(s). Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

**V. DEFENDANTS' FRAUDULENT SCHEME**

  **A.  Competition in Horizon's Trade Lines**

  39.  Horizon is a container shipping and logistics company that operates under the regulation of the Merchant Marine Act of 1920, 46 U.S.C. § 100, et seq., commonly referred to as the Jones Act. The Jones Act grants an exclusive privilege to certain United States-flagged vessels to engage in ocean shipping of merchandise or goods to or from the United States territories, possessions or non-contiguous states. This law is restrictive, prohibiting all other vessels, such as foreign-flagged, foreign-built, foreign-crewed, or even foreign-refurbished vessels from engaging in this trade.

  40.  The purpose of the Jones Act is to protect United States shipping companies by restricting, within the relatively small size of the domestic trades routes, the carriage of domestic ocean cargo to United States-made, United States-flagged, predominately United States-crewed, and United States-owned ships. These restrictions result in an oligopolistic but competitive market where a small number of carriers control any particular route.

  41.  Antitrust laws and regulations are of particular interest to executives in the ocean shipping industry and the Jones Act-regulated industry, in particular. Since the late 1800s,

international ocean shipping has been subject to a "truly unique regulatory structure" that provides antitrust immunity for international carriers with the goal of minimizing "destructive competition and excess capacity."  Paul S. Clyde & James D. Reitzes, Market Power and Collusion in the Ocean Shipping Industry: Is a Bigger Cartel a Better Cartel?, 36:2 ECONOMIC INQUIRY 292, 292 (Apr. 1998).  The United States formally extended antitrust immunity to international ocean shipping carriers with the Shipping Act of 1916, 46 U.S.C. § 801, et seq., and the seminal Ocean Shipping Reform Act of 1998, 46 U.S.C. § 1701, et seq., reaffirmed these immunity provisions with some modifications.

42.     However, no antitrust immunity provision has ever applied in the Jones Act context, and all Jones Act carriers are subject to the full reach of the U.S. antitrust laws.  This was confirmed on October 6, 2006, when the Jones Act was re-codified without creating antitrust immunity for Jones Act shippers.  Horizon's top-level officers have at all times been acutely aware of how important the regulatory environment is in Horizon's shipping business.  For instance, Defendant and Horizon CEO Raymond is on the Board of Directors of an industry group called the Maritime Cabotage Task Force, which is devoted to "promot[ing] the long-standing maritime cabotage laws" and to defending Jones Act companies from legislative interference.  The Maritime Cabotage Task Force specifically highlights the importance of competition in the cabotage industry: "What's perhaps most impressive about America's Jones Act fleet is that companies engaged in domestic waterborne commerce receive no subsidies.  The fleet has attained its stature **because the Jones Act guarantees a level playing field, both among vessel operators and other modes of transportation.  Knowing that everyone plays by the same rules allows fair competition to drive the marketplace.  Competition is fierce**.  Only the most efficient can thrive in the Jones Act trades." Maritime Cabotage Task Force,

About the U.S. Maritime Cabotage Laws, *available at*

http://www.mctf.com/about_cabotage.shtml (2006) (emphasis added).

43.     The Maritime Cabotage Task Force and its members are exceptionally protective of the Jones Act carriers' insulated status.  A July 2003 article in the Journal of Commerce—the primary trade magazine for the ocean shipping industry, which was closely followed by investors and analysts as well as professionals in the industry and market observers—noted that the Task Force was "rankled" by proposed amendments that would open the U.S. cabotage market to international competition.  Annu Mangat, Hawaii Rep Challenges Jones Act, JOURNAL OF COMMERCE (July 29, 2003).  In addition to Raymond's  membership on the Maritime Cabotage Task Force's Board of Directors, Horizon, Crowley, Sea Star, and Trailer Bridge all belong to the Task Force as members.

44.     The fact that antitrust immunity does not apply in the Jones Act context was also recognized in Horizon's Code of Business Conduct and Ethics, which repeatedly averred to Horizon's policy of "compl[iance] with all applicable antitrust laws" and emphasized that "[u]nless a particular activity is specifically exempted from the antitrust laws, those laws apply," and that "[u]nless expressly authorized by an exemption, there cannot be any discussion with competitors with regard to rates in U.S. domestic or foreign trades or in any business in U.S. commerce."  The Code of Business Conduct and Ethics also described provisions of the U.S. antitrust laws in granular detail, noting that "[t]here are no defenses to price-fixing" and "[t]wo or more competitors cannot agree among themselves as to the customers, markets or territories which each will serve when U.S. antitrust laws apply."

45.     Horizon's three main trade routes between Alaska, Hawaii/Guam and Puerto Rico and the continental United States represent the three non-contiguous Jones Act markets.

Horizon's Puerto Rican cabotage is the noncontiguous shipping between the continental United States and Puerto Rico.  At all relevant times, Puerto Rican cabotage has been a highly concentrated oligopoly in which Horizon commands 35% of the Puerto Rican cabotage market.  The other three players in the oligopoly are Sea Star Line, LLC, which accounts for approximately 21% of the of the Puerto Rican cabotage market, Crowley Liner Services, Inc., which accounts for approximately 30% of the Puerto Rican cabotage market, and Trailer Bridge, Inc., which accounts for approximately 14% of the Puerto Rican cabotage market.  Horizon has maintained offices, ports and ongoing business interests in Puerto Rico for 50 years, with offices in San Juan and Guaynabo, and the Puerto Rican cabotage business is essential to Horizon, constituting over one third of Horizon Lines, Inc.'s revenue.  Horizon's shipping lines generate 85% of the Company's operating revenue, with the Puerto Rico line contributing approximately one-third of that sum.

46.     Because Horizon and its three main competitors in Puerto Rico offer essentially the same service—transportation of cargo from a specified origin to a destination within a certain time frame—the domestic ocean shipping services Horizon operated out of Puerto Rico are highly fungible.  Without the price-fixing conspiracy carried out by Horizon and its competitors, purchasers of Puerto Rican cabotage would have selected a carrier based on competitive prices and Horizon would have had to compete on price.  As noted by the U.S. Department of Transportation Maritime Administration (MARAD), "Ocean liner companies [like Horizon and its competitors] provide similar services, and thus are viewed by shippers as close substitutes for each other, which makes competition more likely to occur."  MARAD Report, Competition in the Noncontiguous Domestic Maritime Trades (May 2006).

20

47.     Despite Defendants' awareness of the illegality of price fixing, Defendants actively orchestrated and participated in a longstanding illegal price-fixing conspiracy and, as a result of that conspiracy, throughout the Class Period, Defendants repeatedly made false and misleading statements regarding Horizon's pricing, revenue and the profitability of the cabotage market.

**B.     Horizon's September 26, 2005 IPO**

48.     On or about September 26, 2005, Horizon Lines, Inc. completed an initial public offering of 12,500,000 shares of common stock, which were sold to the public at a price of $10 per share, raising approximately $125 million from investors.  The IPO was conducted pursuant to a Form S-1 Registration Statement dated March 2, 2005 and subsequent Form S-1/A amendments to the Registration Statement, and a Form 424B4 Prospectus (the "IPO Prospectus") (collectively with the March 2, 2005 Registration Statement and amendments thereto, the "IPO Registration Statement").  The IPO Registration Statement, which stated that Horizon "was in compliance with all applicable laws and regulations," was signed by Defendants Keenan and Urbania.

49.     The IPO Prospectus emphasized the "team" oriented approach of Horizon's senior management group, which included Serra.  The IPO Prospectus stated:

> *Experienced management with strong culture of commitment to service and operational excellence.*   Our senior management, headed by Charles G. Raymond, is comprised of seasoned leaders in the shipping and logistics industry with an average of 18 years of experience in the industry. **Our senior management has a long history of working together as a team, with six of our eight most senior managers having worked together at Horizon Lines or our predecessors for over 15 years. In addition, seven of our eight most senior managers have served in multiple roles at Horizon Lines and its predecessors or have continuing direct involvement with multiple aspects of our business, including servicing our largest customers and the operation of our shipping and logistics services**. We believe that our

21

management's **experience, cohesiveness and depth, as well as our management's long-standing relationships within the industry**, enable us to readily identify market opportunities and develop and execute strategies to pursue these opportunities.

50.     The IPO Prospectus further states that:

> Furthermore, as of the date hereof, without giving effect the consummation of this offering, our management team, including family members, owns approximately 19% of our common equity on a fully diluted basis and will own approximately 12% of our common equity on a fully diluted basis after this offering (approximately 11% if the underwriters' option to purchase additional shares is exercised in full). We believe that the cash incentive plan further incentivizes our management to achieve and surpass our targeted performance and goals.

51.     Emphasizing the detailed involvement of Horizon's key senior executives in the details of Horizon's business, the IPO Prospectus stated

> *Loss of our key management personnel could adversely affect our business.* Our future success will depend, in significant part, upon the continued services of Charles G. Raymond, our President and Chief Executive Officer, John V. Keenan, our Senior Vice President and Chief Operating Officer, and M. Mark Urbania, our Senior Vice President—Finance and Administration and Chief Financial Officer. **The loss of the services of any of these executive officers could adversely affect our future operating results because of their experience and knowledge of our business and customer relationships.** If key employees depart, we may have to incur significant costs to replace them and our ability to execute our business model could be impaired if we cannot replace them in a timely manner. We do not expect to maintain key person insurance on any of our executive officers.

52.     The IPO Prospectus also emphasized that all pricing activities were "centrally coordinated" by Senior Management:

> Senior sales and marketing professionals in charlotte are responsible for developing sales and marketing strategies and are closely involved in servicing our largest customers. **All pricing activities are also centrally coordinated from Charlotte and from Tacoma, Washington, enabling us to manage our customer relationships**.  The marketing team located in Charlotte is responsible for providing appropriate market intelligence and

> direction to the Puerto Rico sales organization . . . we believe that
> the breadth and depth of our relationships with our customers is the
> principal driver of repeat business from our customers.  We further
> believe that our long-standing customer relationships and our
> cross-selling efforts enable us to forge customer relationships
> which provide us with a distinct competitive advantage.

53.     As discussed in more detail below in Section VII, the IPO created a public market

for Horizon's stock, where none existed before ("prior to this [IPO], there has been no public

market for the shares"), and provided powerful incentives for the Individual Defendants to

implement and perpetuate the unlawful price fixing conspiracy that not only allowed the IPO to

occur in the first place, but helped the price of Horizon's common stock rise to a Class Period

high of approximately $34.80 per share.

54.     The IPO Prospectus pursuant to which Horizon sold itself to the public contained

numerous false and misleading statements and omissions, which are described in more detail

below in Section VI.

**C.     Ongoing Criminal Antitrust Investigation and Defendants' Guilty Pleas**

55.     After years of engaging in a nationwide scheme of undisclosed and unlawful

price-fixing and bid-rigging, Horizon's illegal actions were uncovered when Horizon and its co-

conspirators became the targets of a lengthy covert investigation by the United States

government, assisted by the DOJ Antitrust Division and the FBI.  This covert investigation was

revealed to the public when, on or about April 17, 2008, agents of the FBI executed search

warrants on the premises of Horizon and several other competitors regarding the Puerto Rico

cabotage business.

56.     On that same day, Horizon admitted that it was the subject of an ongoing

investigation being conducted by the DOJ Antitrust Division and that it had been served with

search warrants and a grand jury subpoena by federal agents related to its ocean carrier pricing practices in Puerto Rico.

57.     On October 1, 2008, the DOJ charged Defendants Serra, Gill, Glova and an executive from competitor Sea Star – Peter Baci – with criminal conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating customers in violation of the Sherman Act, 15 U.S.C. § 1 in the District Court for the Middle District of Florida.  Another Sea Star executive, Alexander Chisholm, was charged with altering, destroying and concealing records and documents with the intent to impair the availability of those records and documents for use in the federal grand jury investigation.

58.     On October 20, 2008, Defendants Serra, Gill and Glova pleaded guilty to the charges alleged against them by the DOJ.  They each pleaded guilty to entering into and engaging "in a combination and conspiracy to suppress and eliminate competition in the market coastal water freight transportation services between the United States and Puerto Rico ("Puerto Rico freight services"), which began at least as early as May 2002 and continued as late as April 2008…by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges,  and other fees charged to customers."

59.     In the Plea Agreements reached with the United States, Defendants Serra, Gill and Glova each voluntarily and truthfully admitted that he:

> [P]articipated in a conspiracy with one or more providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition.  During the relevant period, defendant committed acts in furtherance of the conspiracy, including engaging in discussions and attending meetings with representatives of one or more competing providers of Puerto Rico freight services.  During such discussions and meetings, agreements were reached between and among competitors for

Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers ("Relevant Offense"). The defendant was an organizer or leader of the conspiracy which involved at least five participants and was otherwise extensive.

*****

[S]old Puerto Rico freight services and conducted those services in the interstate commerce between and among the United States and Puerto Rico, transmitted and received bids, proposals, contracts, invoices for payment,  payments, and other documents essential to the provision of Puerto Rico freight services in interstate commerce.

60.     Non-party Sea Star executive Peter Baci also pleaded guilty on October 20, 2008 to entering into and engaging "in a combination and conspiracy to suppress and eliminate competition in the market coastal water freight transportation services between the United States and Puerto Rico ("Puerto Rico freight services"), which began at least as early as May 2002 and continued as late as April 2008…by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges,  and other fees charged to customers."

61.     On October 20, 2008, non-party Sea Star executive Alexander Chisholm pleaded guilty to having corruptly altered, destroyed, and concealed records and documents and attempted to do so with the intent to impair the availability of the records and documents for use in the grand jury investigation.

62.     On January 30, 2009, Baci was sentenced to serve 48 months in prison and a fine. On May 12, 2009, Defendant Serra was sentenced to 34 months in prison and a fine; Defendant Gill was sentenced to 29 months in prison and a fine; and Defendant Glova was sentenced to 20 months in prison and a fine.  Former Sea Star executive Chisholm was sentenced to 7 months in

prison and a fine for his obstruction of the investigation.  The DOJ investigation against Horizon and other individuals at the company is ongoing and additional charges are expected.

> **D.**     **Horizon is A Defendant in an Antitrust Class Action in Puerto Rico**

63.     Horizon recently settled the claims against it in an antitrust class action pending in Puerto Rico.  In the class action *In re Puerto Rican Cabotage Antitrust Litigation*, 08-MD-1960 (DRD) (D.P.R.), consolidated and transferred by the JPML to the District of Puerto Rico in August 2008, Horizon, Defendants Serra, Gill and Glova, along with Sea Star, Trailer Bridge, Crowley and other related companies and individuals, are alleged to have "entered into and engaged in a combination and conspiracy to suppress and eliminate the competition in the market for coastal water freight transportation services between the United States and Puerto Rico" by agreeing to "allocate customers, rig bids to customers and fix the prices of rates, surcharges and other fees charged to customers in violation of Sections 1 and 3 of the Sherman Act."

64.     On July 8, 2009, after announcing a settlement, Horizon and the antitrust class plaintiffs filed a settlement agreement with the court in the Puerto Rico antitrust litigation. According to the settlement papers filed in Puerto Rico, in addition to a cash payment of $20 million (no part of which provides relief to Horizon's shareholders, who lost hundreds of millions of dollars) and an agreement to freeze base rates for two years for certain plaintiffs, Horizon has agreed to provide evidence in support of plaintiffs' allegations against the remaining defendants in the action and has offered the cooperation of the three Horizon defendants who had pleaded guilty to the criminal charges brought by the DOJ and to otherwise "cooperate with Plaintiffs in litigating their claims against the remaining Defendants."

E. **Information Relevant to this Action is Particularly Within Defendants' Control**

65.     Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Amended Complaint after a reasonable opportunity for discovery.  As discussed more fully below, many of the facts supporting the allegations contained herein are currently known only to the Defendants or are exclusively within their custody and/or control. Moreover, Defendants have taken active steps to deprive Lead Plaintiff from obtaining information bearing on Defendants' culpability.

66.     Horizon is currently a potential target in the DOJ's ongoing criminal antitrust investigation, a defendant in two civil class action lawsuits based on the company's unlawful antitrust violations, and has agreed to settle the claims against it in the Puerto Rico antitrust litigation.  Because of the ongoing investigation, and the inaccessible confidential information being produced by Horizon in the Puerto Rico antitrust litigation, Lead Plaintiff is peculiarly unable to conduct a full investigation of former insiders and other relevant fact witnesses, and is also without access to the most recent complaints, court filings and customer and expert affidavits filed in the Puerto Rico antitrust litigation – a litigation where some informal discovery has taken place and where some cooperation has been provided by Horizon.

1) **The Ongoing DOJ Investigation Has Restricted Lead Plaintiff's Access to Witnesses and Information**

67.     The DOJ's investigation is still active and ongoing.  The DOJ has stated that "[t]here will be charges. . . to come down the road" and indicated in May 2009 that "others remain to be charged for their roles in the charged conspiracy and other offenses."  Moreover, the DOJ confirmed in its sentencing memorandum for Defendant Gill that Gill has provided both documentary and testimonial evidence against his "superiors" at Horizon – *i.e.*, the Senior

Management Defendants – and that those superiors include "presently uncharged co-conspirators."

68.     Because there is an ongoing investigation pending against Horizon and its officers and employees, many of the participants in, or those with firsthand knowledge of, Horizon's role in the price-fixing conspiracy are unable to discuss the issues until the DOJ completes its investigation, even though they are no longer employed by Horizon.  Thus, certain information regarding the particular structure of the pricing department, the extent of the conspiracy, the involvement of others at Horizon, including but not limited to the Senior Management Defendants, and the extent and details of the relationships between Raymond, Urbania, Keenan, Taylor and Handy vis-à-vis Serra, Gill and Glova, is in the exclusive control of Defendants and/or the DOJ, and remains inaccessible to Lead Plaintiff as of the date of this Amended Complaint.  This difficulty has been exacerbated by the fact that Horizon has signed "non-disparagement" and "confidentiality" provisions with many former employees in an effort to keep them from speaking to Lead Plaintiff.

69.     The DOJ has also taken affirmative steps to prevent the production of documents seized by or produced to the Government in connection with the Horizon price-fixing conspiracy.  In early 2009, the DOJ, on behalf of the United States, intervened in the Puerto Rico antitrust action and filed a brief in support of a motion filed by Horizon Lines, Inc. and Horizon Lines, LLC, along with the other Puerto Rico antitrust defendants, to stay discovery.  The DOJ stated that its "pending criminal investigation . . .  may or could involve many of the same parties," and that discovery would negatively affect "an unhindered investigation in the overlapping criminal matter."  The Puerto Rico court granted defendants' motion.

70.     The DOJ has not made any public announcements regarding the estimated completion of its investigation.  Until the investigation is complete, however, Plaintiff's access to information is severely restricted, and the requisite factual information needed to understand the full parameters of the fraud at Horizon is peculiarly within Defendants' knowledge or control.

> **2)     Horizon Has Prevented Lead Plaintiff From Gaining Access to Information Provided By Horizon as Part of its Settlement Agreement in the Puerto Rico Action**

71.     Approval of the settlement between the plaintiffs and the Horizon defendants in the Puerto Rico antitrust litigation, first announced on July 8, 2009, is still pending.  On July 20, 2009, the remaining non-settling defendants—Sea Star, Trailer Bridge and Crowley—opposed the motion for preliminary approval of the settlement agreement on various grounds, arguing, among other things, that the proposed settlement would distort the competitive dynamics of the cabotage marketplace by allowing Horizon to promote its services at the expense of its competitors and that Horizon and the settling plaintiffs are unfairly restricting access to documents and Horizon witnesses.

72.     Information produced in the Puerto Rico antitrust litigation relating to both the antitrust conspiracy and Horizon's own culpability as a member of that conspiracy remains non-public and unavailable to Lead Plaintiff.  On September 18, 2009, the Puerto Rico antitrust court executed a broad protective order under which "all Disclosure of Discovery Material furnished by a Producing Party in conjunction with this litigation" is treated as confidential.  As a result, because they relied upon "confidential" documents provided by Horizon, the antitrust plaintiffs were obligated to move to file their third and fourth consolidated amended complaints under seal on September 24, 2009 and October 21, 2009, respectively.  These amended complaints contain "new evidence [which] consists of confidential information."  Subsequently, motions to dismiss those complaints were filed by the non-settling defendants and, along with the plaintiffs'

responsive briefs, were also filed under seal.  Finally, plaintiffs filed affidavits from victims of the price-fixing conspiracy along with the affidavit of an industry expert in further support of the proposed settlement, but those documents were likewise filed under seal.

73.     Even the hearing on Defendants' motions to dismiss, which was held in Puerto Rico on December 4, 2009, was closed to the public.  And on December 21, 2009, the Puerto Rico Court ordered that "Because the hearing . . . was closed to the public as it dealt with sealed motions, the transcript of that hearing will not be available to anyone other than the parties to the case at this time."  The Puerto Rico Court further stated that the "information contained in the transcript and the sealed motions is sensitive in that it pertains to an ongoing criminal investigation."  As a result, the information provided by Horizon and contained within Horizon's files, as well as the most recent complaints, motions to dismiss and other relevant documents, are entirely unavailable to Lead Plaintiff.

**3)     Horizon Has Specifically Barred Lead Plaintiff from Accessing Information the Company Provided Pursuant to a Delaware Books and Records Request**

74.     On March 19, 2009, Horizon shareholder Patrick Smith ("Smith"), through his counsel, submitted a letter to Horizon demanding to inspect the Company's books and records under Section 220 of the Delaware General Corporate Law.  After Horizon declined his demand, Smith filed a complaint in the Delaware Court of Chancery on May 8, 2009.  Horizon challenged the adequacy of Smith's demand and complaint, and Smith filed an amended complaint on September 30, 2009.

75.     According to Smith's amended complaint, the purpose of his books and records request is to obtain information "reviewed by Horizon Lines' Board of Directors [] regarding the Company's alleged antitrust violations, specifically pertaining to the Company's conduct within the Puerto Rican cabotage market" and to "investigate possible mismanagement and breaches of

30

fiduciary duties by the officers and directors of the Company in connection with its Puerto Rican shipping route."

76.     After Smith and Horizon met and conferred, they submitted, and the Delaware Court ultimately entered, on October 8, 2009, a Stipulation and Order Governing the Treatment of Documents in that case ("Confidentiality Order"), that limits the information obtained through Smith's books and record request to the sole purpose of prosecuting a derivative action against Horizon for breach of fiduciary duties or other state law duties.  The Confidentiality Order sharply limits who can access the information produced by Horizon to  information, and **expressly singles out the parties, attorneys, and class members in the instant action**, among others, as being prohibited from accessing the documents:

> This prohibition [on disclosing, publishing, or transmitting this information] expressly precludes, without limitation, the production, disclosure, or sharing of the Records or the information therein to the parties, attorneys, or putative class members in the class action lawsuit currently pending in the United States District Court for the District of Delaware captioned *City of Roseville Employees' Retirement Systems v. Horizon Lines, Inc.*, No. 08-969 (HB) . . . .

77.      Horizon's actions in this regard are consistent with "non-disparagement" and "confidentiality" agreements they have entered into with numerous former employees.  As a result of Horizon's own efforts to single out and restrict Lead Plaintiff from gaining information, Lead Plaintiff has been entirely unable to access the information Horizon produced to Smith relating to the antitrust conspiracy in Horizon's Puerto Rican cabotage market and to mismanagement by Horizon's officers and directors.

> ### F.     Horizon's Fraudulent Price-Fixing Scheme in Its Puerto Rico Trade Line and Defendants' Scienter

78.     Horizon has operated a Puerto Rico trade line for more than 50 years.  This trade line is very important to the overall financial health of the Company.  Confidential Witness

31

("CW") 1, a member of Horizon's Fleet Administration department from 2001 to 2003, stated

that the Puerto Rican trade line was very important "to maintain customer loyalty and brand

identification."  Puerto Rico ports are a gateway to other larger ports, such as those in

Micronesia, according to CW 2, an Horizon Operations Manager based out of California from

2007-2008.  Additionally, throughout the Class Period, Defendant Serra resided in Puerto Rico

and all of the Individual Defendants spent significant time doing business in Puerto Rico for

Horizon throughout the Class Period.

79.     It is clear that the Puerto Rican market was an integral and material source of

revenue for the Company during the Class Period.  In the Company's 2006 Form 10-K, filed on

March 2, 2007, Horizon stated, in relevant part:

> In 1958 we introduced container shipping to the Puerto Rico
> Market.
>
> * * * * *
>
> **Over 90% of our revenue** is generated from our shipping and
> logistics services in markets where the marine trade is subject to
> the coastwise laws of the United States, also known as the Jones
> Act, or other U.S. maritime cabotage laws.

80.     During the Class Period, the Company itself refused to publicly disclose the

percentage of its revenues by trade lane, despite requests from investors.  As Defendant Urbania

stated on a November 2, 2005 conference call "going forward we're not going to break down

revenue and earnings by trade lane.  We will give you general guidance."   Nonetheless,

independent analysts that report on Horizon estimated the breakdown of the Company's revenues

by trade lane.  For example, in its March 14, 2007 analyst report, Morgan Keegan reported, in

relevant part:

> In 2006, the company reported $1.2 billion in revenue, and we
> estimate that approximately 41% was generated in Hawaii and

Guam, **35% in the Puerto Rico trade** and the remaining 24% from the company's Alaska business.[1]

81.     Similarly, in its July 4, 2008 analyst report, Columbine Capital stated, in relevant part:

> Horizon Lines, Inc. (HRZ) is a container shipping and logistics company. **It accounts for approximately 37% of total marine container shipments from continental U.S. to the four noncontiguous markets — Alaska, Hawaii, and Puerto Rico, as well as Guam. These markets account for approximately 23%, 41%, and 36% of the firm's revenues, respectively. . .** The company garnered revenues of $1.2 billion in fiscal year 2007.

82.     In 2001, the Puerto Rican cabotage market was directly impacted by the bankruptcy and closing of Navieras de Puerto Rico, at that time the largest provider of shipping services to Puerto Rico.  According to CW 3, a member of Horizon's Customer Service Department for over 30 years until CW 3's departure in 2008, before Navieras declared bankruptcy, the company had severely cut its shipping rates, undercutting Horizon and the other competitors.  With the demise of Navieras de Puerto Rico, the market became highly concentrated between Horizon (at the time known as CSX Lines LLC), Sea Star, Crowley and Trailer Bridge.  According to CW 3, Horizon immediately began to devise unlawful ways to raise its shipping rates.

83.     In fact, the Puerto Rico shipping market had experienced a steady and significant decline in its shipping rates since the 1990s.  According to a 2006 report by the U.S. Department of Transportation Maritime Administration (MARAD), "freight rates have declined in real terms" in the Puerto Rico, Alaska, Hawaii and Guam markets in which Horizon operated, with Puerto Rico suffering the greatest decline.  (MARAD Report, Competition in the Noncontiguous

---

[1] Unless otherwise noted, all emphases are added.

33

Domestic Maritime Trades (May 2006)).  Relying upon data provided to MARAD by the U.S.

Army Corps of Engineers, and a study by the analyst firm Reeve & Associates prepared for the

Maritime Cabotage Task Force (an organization for which Defendant Raymond has sat on the

Board of Directors since at least 2002) titled "Competitiveness in the United States Domestic

Noncontiguous Liner Shipping Markets, June 2004," "MARAD was able to measure, compare,

and analyze liner competition" in the Jones Act markets within which Horizon operates.

MARAD concluded that, since 1991, after adjusting for inflation, average revenue in the Puerto

Rico trade line, based on shipping rates, declined 4% annually, or 39% overall, Alaska trade line

revenue declined 23%, Hawaii trade line revenue declined 14% and Guam trade line revenue

declined 23%.

84.     Horizon was eager to reverse this trend, but was unable to do so lawfully.  At

some time during 2002, Defendants hatched their fraudulent price-fixing scheme with Horizon's

competitors, which was ongoing until the DOJ announced its investigation in April 2008.  The

scheme was a success for Horizon—allowing the Company to conduct an IPO resulting in

millions of dollars for the Individual Defendants.  From the onset of the price-fixing conspiracy,

Horizon reported consistent revenue growth and profitability—despite an often "soft" market for

its shipping services in Puerto Rico—with its reported annual operating revenues increasing

11.8% from 2004 to 2005, another 5.5% from 2005 to 2006, and an additional 4.3% from 2006

to 2007.  The increase in operating revenue was achieved from steady and significant increases

in shipping rates across all lines which offset an equally steady and significant decrease in the

volume of containers being shipped, particularly in Puerto Rico:

| Year End Financial Statement: | Total Operating Revenue (in thousands): | Revenue container volume (in thousands): | Revenue from general rate increases (in thousands) |
| --- | --- | --- | --- |

| 2004 | $980,328 | $53,351 | $16,700 |
| 2005 | $1,096,156 | ($1,567) | $42,345 |
| 2006 | $1,156,892 | ($35,650) | $44,443 |
| 2007 | $1,206,515 | ($36,980) | $51,578 |
| 2008 | $1,265,789 | ($35,156) | $29,918 |

85.     The combination of these starkly declining volumes being offset by rate increases in a supposedly "competitive" environment was highly suspicious and should have alerted Horizon's senior executives to the potential that Horizon and its competitors were illegally colluding to set prices and allocate customers.  Indeed, investors repeatedly asked questions on conference calls during the Class Period attempting to understand how rates could be increasing as volumes softened.  As described below, the Defendants gave a number of false explanations for these increases (including by portraying Horizon as having "competitive advantages" and "differentiators" over its competitors).  As Defendants Gill, Glova and Serra indisputably knew, the rate increases – which were implausible in a truly competitive environment that was experiencing volume softness – were actually the result of the anticompetitive price-fixing conspiracy Horizon was engaged in throughout the Class Period.  The other Individual Defendants, who made numerous statements to investors about these rate increases, either knew that the unlawful conspiracy was the source of the improbable rate increases, or should have been alerted to the possibility that something was amiss due to the suspicious nature of these rate increases and volume declines.

86.     These revenue figures should have raised red flags to all Defendants, and imposed a duty upon Senior Management Defendants to inquire further as to the reasons behind these remarkable rate increases despite the dramatic decrease in the volume of containers being shipped.  For example, for the year ended December 24, 2006, Horizon reported a $35.65 million

35

loss in revenue "due to overall soft market conditions in Puerto Rico as well as a strategic shift away from lower margin automobile cargo to more refrigerated cargo and other higher margin freight."  Despite this significant decrease in revenue, however, Horizon offset that loss and increased its overall revenue by 5.5% because of an increase of $44.44 million due solely to "general rate increases."[2]  Likewise, for the year ended December 24, 2007, Horizon reported a $36.98 million loss in revenue "due to the revenue container volume declines [] primarily due to overall soft market in Puerto Rico and decelerating growth in Hawaii."  Despite this significant decrease in revenue, however, Horizon offset that loss and increased its overall revenue by 4.3% because of an increase of $51.58 million due to "general rate increases."

87.     The "general rate increases" responsible for Horizon's consistently improving revenues included rate increases within the "soft" Puerto Rico trade line.  For instance, on March 2, 2007, Raymond told investors that "the pricing I don't think suffered. I believe we're still gaining in terms of real dollar increases in our prices in Puerto Rico. I don't see that stopping. I believe we still have a little bit of a ways to go there."  Again, on April 26, 2007, Raymond, in response to an investor question regarding "any other kind of color or insights on the rate picture?" stated "I think number one, we have stability. . . I would say that in the case of Puerto Rico, even though that market is a little light, we're continuing to get rate increases that are slightly ahead of what our inflationary costs are. So in terms of real rate benefit in the Puerto Rico trade, that march that we've been on now since 2002, continues."

88.     As discussed above, Horizon's three Jones Act trade routes—which constitute 85% of Horizon's revenues—consist of a small group of competitors offering the same service

---

[2] Until the price-fixing conspiracy, Horizon attributed the increases to (among other things) "general rate increases" and an undefined and overly general term:  "favorable cargo mix."  Once the conspiracy was revealed, Horizon attributed that reported figure to "general rate increases" only.

with pricing rates being the main defining factor amongst competitors.  In a "slow" market with dramatically decreasing cargo volume, those small groups of competitors would naturally cut prices to gain a foothold over each other.  Moreover, as noted by the U.S. Department of Transportation Maritime Administration (MARAD), "Ocean liner companies [like Horizon and its competitors] provide similar services, and thus are viewed by shippers as close substitutes for each other, which makes competition more likely to occur."  MARAD Report, Competition in the Noncontiguous Domestic Maritime Trades (May 2006).

89.     A recent study found that the median price overcharge for all types of cartels is 25%, and the mean overcharge is 43.4%.  John M. Connor, PRICE-FIXING OVERCHARGES: SECOND EDITION (Draft Report, April 2009).  This figure is confirmed by Horizon's post-conspiracy rate increase figures, which dropped 41% from the end of 2007 ($51.6 million) to the end of 2008 ($29.9 million).

90.     The rate increases achieved in Puerto Rico as a direct result of the price-fixing conspiracy helped offset the Company's considerable losses in operating revenue for 2006 and 2007.  The Senior Management Defendants knew of, or were reckless in not monitoring, the Puerto Rico pricing and revenue figures, which constituted nearly one-third of Horizon's total operating revenue and EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization).  Not only did Defendant Raymond make public statements about pricing in Puerto Rico, but Horizon's financial statements specifically state that Horizon's management had access to and used Horizon's EBITDA "to facilitate internal comparisons to competitors' results and the marine container shipping and logistics industry in general."  The Senior Management Defendants also used EBITDA to "evaluate [Horizon's] operating performance," "make day-to-day operating decisions,' and to determine the "payment of discretionary bonuses to certain

members" of management."   Moreover, in August of 2007, Horizon "entered into a credit agreement providing for a $250.0 million five year revolving credit facility and a $125.0 million term loan with various financial lenders (the "Senior Credit Facility"). The Senior Credit Facility contains covenants that requires the Company to maintain certain interest expense coverage and leverage ratios, which contain EBITDA as a component, and restrict certain cash payments if certain ratios are not met.  Therefore, the Senior Management Defendants also use EBITDA to "monitor compliance with such covenants."  Rates achieved through the price-fixing conspiracy were a significant component of Horizon's EBITDA, a figure used regularly by the Senior Management Defendants.

91.     Prior to the disclosure of the price-fixing conspiracy, even if Defendants Raymond, Urbania, Keenan, Handy and Taylor were not knowing participants in the conspiracy, as the top five executive management officers at Horizon,  with decades of experience in the Jones Act shipping markets and as signatories to Horizon's Code of Ethics, they  were under a special duty to investigate these unusual and improbable rate increases to ensure that the rates were secured in compliance with the anti-price-fixing laws.  This duty was heightened because of their false public statements affirmatively and falsely explaining the Puerto Rico rate increases as the result of "[t]he breadth and depth of our relationships with our customers" and the Company's "long-standing customer relationships and our cross-selling efforts."

92.     Only in 2008, the year in which the price-fixing conspiracy was disclosed, did Horizon's rate increases fail to offset its losses in volumes.  Further demonstrating the impact of the disclosure of the antitrust price fixing conspiracy, Horizon's general rate increases have continued to decline in 2009 (as compared to the corresponding quarter in 2008) following the disclosure of the illegal conspiracy:

| Quarterly Financial Statement: | Revenue container volume (in thousands): | Revenue from general rate increases (in thousands) |
|---|---|---|
| **First Quarter 2009** | ($18,442) | $10,192 |
| **Second Quarter 2009** | ($27,688) | $9,229 |
| **Third Quarter 2009** | ($13,365) | $933 |

93.     According to former Sea Star executive Peter Baci, in his January 26, 2009 sentencing memorandum filed in the criminal action against him, the price-fixing conspiracy amongst Horizon, Sea Star and their two other competitors began as early as May 2002 when Defendant Serra along with a representative of Sea Star, "hatched the idea of collusion with the other carriers" that resulted in the plan to suppress and eliminate competition by rigging bids, fixing prices and allocating customers in violation of the law.  As a result of this plan, Baci was ordered to work with Defendant Gill, the Marketing and Pricing Director for Horizon, and later with Defendant Glova (who replaced Gill) in order to implement the price fixing and bid-rigging scheme.

94.     According to CW 4, a former Pricing Manager at Sea Star who reported to Baci, Baci attended meetings at Horizon's offices at least three times a year.

95.     Defendant Serra has admitted to being involved in the price fixing conspiracy.  At his sentencing, Serra also said that he had "direct communications with a number of other senior executives" at Horizon Line, Inc. about the conspiracy.  Indeed, it is clear that Serra did not organize the price-fixing scheme without input and direction from his superiors, Defendants Raymond, Urbania, Keenan, Handy and Taylor.  As CW 1 confirmed, no one in Puerto Rico could unilaterally set prices without direction from the main Horizon headquarters in Charlotte,

North Carolina.  CW 1 stated that all rates, surcharges and fees were determined by the sales department and authorized by the CEO, at all relevant times, Defendant Raymond, or his equivalent.  This information from CW 1 is corroborated by Horizon's own public filings, which stated that "all pricing activities are also coordinated from Charlotte . . . enabling us to manage our customer relationships."  At Serra's sentencing, the federal prosecutor stated "there are others higher than Mr. Serra who are certainly of interest to the government" and "[Serra] is essentially -- I don't want to use middle management in terms of the conspiracy, but he's in the middle . . ."  Since Serra was a Senior Vice President at Horizon, and one of its top officers, the prosecutor's statements indicate that at least one of Serra's superiors (all of whom are named as Defendants herein) was also involved in the conspiracy.

96.     Defendants Raymond, Urbania, Keenan, Handy and Taylor participated in all aspects of the Puerto Rican cabotage business.  For example, on April 26, 2007, during a first quarter 2007 earnings conference call, Defendant Raymond stated that he, along with other executives, had travelled to Puerto Rico earlier that month and "had a lot of discussions with our key customers."   Later, on October 26, 2007, during a third quarter 2007 conference call, Defendant Raymond stated that he and Defendant Keenan had been in Puerto Rico "all week" and that Defendant Keenan had "been working with customers," and assured investors that the Company was renewing contracts with customers at "favorable rates."  Furthermore, Handy directly supervised Serra, and Taylor directly supervised Gill, and in an October 30, 2006 conference call, Handy explicitly stated that he had recently discussed the health of the Puerto Rico trade lane with Serra.  Each of those Defendants publicly discussed the Puerto Rico trade line in public conference calls.  On information and belief, and based on Defendant Serra's role in Horizon's operations in Puerto Rico, as well as public statements during the Class Period

demonstrating that Serra was the source of information from Puerto Rico that other Defendants disseminated to the public, Defendants Raymond and others also met with Defendant Serra during these travels to Puerto Rico.  These visits to Puerto Rico indisputably involved interaction with the Puerto Rico executives about the rates charged to customers—indeed, Keenan admitted as much.

97.     Defendant Gill, in his position as Marketing and Pricing Director for Horizon's Puerto Rico division, and, later, Horizon's Vice President of Marketing, and as described in the DOJ's sentencing memorandum in the criminal action against Gill, engaged in discussions and attended meetings with representatives from Horizon's competitors where it was agreed to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers.  As stated at his Sentencing Hearing, Gill has also provided information to the DOJ in support of its ongoing investigation against Horizon and his former superiors at Horizon, among others, not only through statements but "with contemporaneous documents evincing his and others' involvement" in the conspiracy from the time the conspiracy was hatched.

98.     According to the DOJ sentencing memorandum in the criminal action against Defendant Glova, Glova, who took over as Marketing and Pricing Director for Horizon's Puerto Rico division when Gill was promoted to Vice President, also engaged in discussions and attended meetings with representatives from Horizon's competitors where it was agreed to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers.  Glova made and recorded several consensual telephone calls to others at Horizon that further evidence the conspiracy. Lead Plaintiff believes that once the content of these recorded telephone calls is revealed, some

or all of the uncharged Individual Defendants will be implicated as co-conspirators.  As stated at his Sentencing Hearing, Defendant Glova played "an indispensable role in dealing with senior executives involved in the conspiracy," and has provided useful information to the DOJ in furtherance of the government's investigation.

99.     The DOJ stated that "[Gill] has provided evidence, in the form of statements and documents, against his superiors within [Horizon], including presently uncharged co-conspirators."  As stated above, all of Defendant Gill's "superiors," *i.e.*, "presently uncharged co-conspirators,"  at the Company that were involved in the Puerto Rican trade lane are named Defendants in this action.

100.    Documents evidencing the conspiracy have been released to the DOJ in relation to its investigation, but they are not yet public.  However, it was revealed at the Sentencing Hearing that the conspiracy was well-documented and "conducted in significant part through e-mails and spreadsheets."  Moreover,

> th[ose] spreadsheets contained detailed market-share information, customer information and contact information that were circulated between the co-conspirators.  Those spreadsheets contained the information that were at risk for the amount of the conspiracy.  Based on the numbers in those spreadsheets, the decision makers made the decisions about the steps that the conspiracy would take.  Additionally, the information contained in those spreadsheets was used as a method of policing the conspiracy, to make sure that everybody was doing what they committed to do as part of the conspiratorial agreement.

101.    The existence and use of those spreadsheets by Horizon and its co-conspirators was confirmed by a former Sea Star manager.  Included among the documentation that was used to both facilitate the conspiracy and to analyze, calculate and report Horizon's annual and quarterly financial statements, were pricing reports listing each company's pricing information.  In the cabotage industry, pricing reports are critical to a company's financial success and, as a

result, typically garner significant interest from top executives, such as the Senior Management

Defendants.  According to CW 6, a former manager of Specialty Cargo & Projects at Sea Star

from 2002-2004 and sales manager for the Southeast Region from 1997-2002, reports about

pricing in the cabotage industry were regularly submitted to Sea Star's top executives, including

the CEO and CFO.   CW 6 described how subordinates of Peter Baci – the Sea Star Vice

President of Yield Management who is serving a 48-month sentence in federal prison after

pleading guilty to violating the Sherman Act – would create weekly and monthly reports of

competitors' pricing information based on bills of lading and on repeated inquiries Baci made to

Horizon and other competitors.  These reports went to the top executives at Sea Star, including

the CFO and CEO.

102.    CW 6 stated that these pricing reports would have had to be incorporated into Sea

Star's general ledger because pricing numbers were broken down into the average price for each

container size and were included in this format in the company's financial statements.  As a

result, CW 6 said that the accounting personnel who prepared Sea Star's financial statements

would certainly have received reports on the average price per container in each category of

container sizes.  According to CW 6, "[t]he bottom line is that[] [average price per container is]

what drives the compan[ies] in this industry, more so than harping on receivables."  Upon

information and belief, Horizon compiled and relied upon similar pricing reports for purposes of

monitoring and continuing the illegal price-fixing conspiracy and in order to provide pricing

information to be used in the preparation of Horizon's financial statements.

103.    The illegal price-fixing cartel succeeded in raising shipping rates in Puerto Rico,

despite a weak market.  As Defendant Raymond stated on April 2007, "in the case of Puerto

Rico, even though that market is a little light, we're continuing to get rate increases that are

slightly ahead of what our inflationary costs are.  So in terms of real rate benefit in the Puerto

Rico trade, that march we've been on now since 2002, continues." Moreover, Defendant Urbania

stated, in Horizon's fourth quarter 2007 guidance call on February 1, 2008, that the Company

was able to achieve price increases in Puerto Rico in 2007 "even though volume softness existed

in 2007," and that there was "no reason for us to believe that that will change in 2008."

Unbeknownst to investors, the only way that Horizon was able to raise rates in the weak Puerto

Rico economy was through its illegal agreement to allocate customers, rig bids and fix prices

within the Puerto Rico cabotage market.

104.    The disclosure of the DOJ investigation presumably ended the price fixing cartel,

and had a direct and immediate impact on the Company's pricing outlook in Puerto Rico.  In

fact, on April 25, 2008, a week after the Company disclosed that it was the subject of the DOJ

investigation into its pricing practices, the Company announced that "the outlook for our Puerto

Rico market in particular is somewhat softer than we had originally anticipated," and lowered its

earnings guidance for 2008.  The rationale for the Company's lowered guidance, however, was

an effort to conceal the fact that the Horizon had been able to raise the rates in Puerto Rico

during the Class Period only because of the price-fixing cartel.  The market in Puerto Rico had

been "soft" for years, *see, infra* ¶¶ 215-220.  The only new development between Horizon's last

positive outlook and April 25, 2008 was the DOJ investigation that abruptly terminated the price-

fixing cartel.

105.    As of the date of this Amended Complaint, the DOJ investigation is open and

ongoing.  Defendants Serra, Gill and Glova, along with former Sea Star executives Baci and

Chisholm, have provided information to the DOJ that will likely support future indictments

against additional senior executives of Horizon, potentially including the Senior Management

44

Defendants.  For instance, in Serra's sentencing memorandum, he stated that he "has provided significant information regarding individuals not otherwise implicated in the conspiracy, which will likely lead to further prosecutions."  At the Sentencing Hearing, "the government . . . [said] that given Mr. Glova's position at the company and his indispensible role in dealing with senior executives involved in the conspiracy, the information he provided has been useful in building cases against others," and that Gill has "given statements, documents, other evidence against those who are yet to be charged, including potentially superiors of his, according to the government's filing."  Moreover, in the DOJ's sentencing memorandum for Defendant Gill, the DOJ stated that "[Gill] has provided evidence, in the form of statements and documents, against his superiors within [Horizon], including presently uncharged co-conspirators."  All of Gill's "superiors" in Horizon's Puerto Rico-based business who are uncharged in the conspiracy have been named as Defendants herein.  Similarly, according to the Government, Serra has implicated others at Horizon in the conspiracy who are above him.  Only, Raymond, Urbania, Keenan and Handy held positions above Serra at Horizon during the Class Period.

106.    As discussed above, many of the participants in, or those with firsthand knowledge of, Horizon's role in the price-fixing conspiracy are unable to discuss the issues until the DOJ completes its investigation.  However, the details provided by several CWs, Defendants Serra, Gill and Glova, along with Sea Star former executives Baci and Chisholm, illustrate how the scheme was hatched in 2002, how representatives from Horizon met with representatives of Sea Star, Trailer Bridge and Crowley on many occasions, how the companies divided up and allocated potential customers and agreed on fixed prices to charge these customers, and how the companies colluded to prevent those customers from receiving competitive bids for their necessary cabotage services.  Further, it is evident that this scheme was well-documented with

emails and spreadsheets containing detailed market-share information, customer information and contact information.

107.    The information provided by Defendants Serra, Gill and Glova, and non-parties Baci and Chisholm has been corroborated by targets of the price-fixing conspiracy.

108.    According to Jorge Mayendia, President of Central Produce El Jibarito, Inc. ("Central Produce"), one of the largest distributors of fruits, vegetables and eggs in Puerto Rico, Central Produce was a victim of Horizon's illegal price-fixing scheme.[3] Between 2002 and 2008, Central Produce shipped an estimated 7,000 containers via ocean transportation services purchased directly from Horizon and Sea Star.

109.    Horizon and its competitors would allocate customers in the Puerto Rico market amongst themselves.  After such allocation, that customer would find it impossible to secure competitive rates from the market competitors, would be forced to accept business from only one company and that would be captive to the rates and surcharges offered by that company.

110.    In 2002, Central Produce was a customer of Sea Star.  But, according to Mr. Mayendia, sometime in 2002, Sea Star approached Central Produce with a "prohibitively expensive contract for the transportation of cargo" compared to the prices being offered by Horizon, and demanded that Sea Star invoices be paid in half the time Horizon allowed. Unbeknownst to Central Produce, these actions were the result of the antitrust conspiracy under which Central Produce business was to be allocated to Horizon.

---

[3] Mr. Mayendia's account of his relationship with Horizon is detailed in an individual complaint filed by Central Produce in the Puerto Rican antitrust action.  *See Central Produce El Jibarito, Inc. v. Horizon Lines, LLC, at al.*, Case No. 09-1096, Master Docket No. 08-md-1960 (DRD) (D.P.R.).

111.    Over the next five years, from 2003 through 2008, Central Produce continued to attempt to secure ocean transportation services from Sea Star, but Sea Star never altered its unreasonable demands until the conspiracy was revealed in April 2008.

112.    Through this organized conspiracy, Horizon, in collusion with Sea Star, Trailer Bridge and Crowley, forced companies like Central Produce to become and remain Horizon's client because those companies had allocated Central Produce to Horizon.  Moreover, because Sea Star and the other companies offered only ridiculously high rates for their services to clients allocated to Horizon, Horizon could increase the rates, fees and charges it demanded of Central Produce because those rates were still cheaper than the unlawful rates offered by Sea Star. Without the antitrust conspiracy, Horizon and its competitors would have been forced to charge lower rates and compete for business, weakening the Company's inflated earnings.

113.    CW 5, a former Marine Supervisor for Horizon in Puerto Rico, also confirmed the "tricks" that Horizon carried out in order to manipulate the cabotage out of Puerto Rico.  CW 5 stated that Horizon "would work with Sea Star" by allocating some it its clients' containers to Sea Star without the clients' knowledge.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

114.    Throughout the Class Period, the Company made a series of statements to the public that were materially misleading and/or failed to disclose information concerning Defendants' unlawful price fixing activities.  Rather than remaining "silent," Defendants chose to make a series of affirmative statements to the market that were either flatly false or were rendered materially misleading by Defendants' failure to disclose Horizon's unlawful activity. These misstatements and material omissions all relate to the Company's long-standing, but undisclosed, participation in an illegal horizontal cartel with its competitors, in which price-

fixing buoyed the Company's reported results of operations via illegal and unsustainable means.

The misstatements and omissions can generally be grouped into the following categories:

(a)     Misstatements and omissions related to revenue, earnings, and other financial results, including false explanations for why revenue was remaining "stable" or increasing;

(b)     (b)     Misstatements and omissions related to pricing and market dynamics, including the competitive situation in the market, and false explanations for these conditions;

(c)     (c)     Misstatements and omissions related to the nature of the Puerto Rican market and the cause of its reduced earnings guidance after the exposure of the illegal cartel; and

(d)     (d)     Misstatements and omissions in Defendants' Sarbanes-Oxley Certifications.[4]

115.    The misrepresentations and omissions are ubiquitous throughout the Company's public statements.  They arise throughout the Class Period in the Company's quarterly and annual reports, in its press releases, in quarterly earnings conference calls, as well as other periodic conference calls, and in presentations accompanying those calls.

**A.    Misstatements and Omissions Related to the Sources of Horizon's Revenues and Financial Performance**

116.    The Company and the Individual Defendants, during the Class Period, made a number of materially misleading statements or omissions relating to the causes of Horizon's rising or steady revenues, both historical and projected.  In making these statements, Horizon and the Individual Defendants failed to disclose that the Company's revenue growth and/or stability

---

[4] In deference to the Court's holding that the Consolidated Securities Class Action Complaint failed to establish the falsity of certain portions of the Sarbanes-Oxley certifications relating to the accuracy of financial figures and the adequacy of Horizon's internal controls, Lead Plaintiff has removed all allegations about these provisions from this amended pleading.  However, to preserve these allegations for a possible appeal, Lead Plaintiff includes these statements in Appendix A.

was significantly accomplished by means of an illegal price-fixing cartel arrangement with its competitors.

117.    Horizon's IPO prospectus, dated September 26, 2005, contained numerous false and misleading statements regarding the sources of Horizon's revenues, including the following statements listed under supposed "Competitive Strengths":

> *Stable and growing revenue base.*    We have achieved five consecutive years of revenue growth. Our revenue base is stable and growing due to our presence across three geographic markets, the breadth of our customer base served and the diversity of our cargos shipped, all of which better protect us against external events adversely affecting any one of our markets. We ship a diverse mix of cargos, and benefit from serving substantial and growing customers with sophisticated container shipping and logistics requirements across two or more geographic markets that we serve. In addition, many of the cargos we ship are consumer goods which are vital to the expanding populations in our markets, thereby providing us with a stable base of growing demand for our shipping and logistics services. Also, our presence across multiple geographic markets, along with our expertise in supply chain management and our sophisticated on-line shipping and logistics information technology, enables us to be the shipping and logistics solution of choice in these markets for many of our national customers. As a result, we participate in economic and demographic growth trends in each of these markets at a relatively early stage. For example when Lowe's opened two new retail stores in Alaska, Lowe's expanded our relationship by selecting us to provide the shipping and logistics services

> *Leading Jones Act* container *shipping and logistics company*.    We are the only container vessel operator with an integrated organization serving all three non-contiguous Jones Act markets and have a number-one or a number-two market position within each of our markets. As a result, we are able to serve the needs of customers shipping to individual markets as well as the needs of large customers that require shipping and sophisticated logistics services across more than one of these markets. Approximately 59% of our revenue in 2004 was derived from customers shipping with us in more than one of our geographic markets and approximately 29% of our revenue in 2004 was derived from customers shipping with us in all of our geographic markets.

118.     The IPO Prospectus stated "Our customer base is broad and diversified, with our top ten customers accounting for approximately 29% of revenue and our largest customer accounting for approximately 7% of revenue."

119.     The IPO Prospectus stated: "Operating revenue increased by $72.3 million or 15.9% from the six months ended June 20, 2004 to the six months ended June 26, 2005. This revenue growth is primarily attributable to an increase in revenue containers shipped, increased bunker fuel surcharges, other rate improvements resulting from increases in other surcharges, favorable changes in cargo mix and general rate increases and revenue increases from non-transportation and other revenue services."

120.     In a section entitled "Business Strategy," the IPO Prospectus stated:

> *Continue to organically grow our revenue.*     We intend to achieve ongoing revenue growth in our markets through the continued growth of our markets and by focusing our national and regional sales force on acquiring business from new customers, growing business with existing customers and continuing to focus on increasing the share of our revenue that is derived from our customers' higher rate cargo. These higher rate cargos include high-value cargos, time-sensitive cargos and cargos that require complete door-to-door logistics solutions and supply chain management.

121.     The IPO Prospectus also stated:

> We generate most of our revenue through non-exclusive customer contracts with pre-specified rates and volumes and with durations ranging from one to six years, providing stable revenue streatms.

122.     As discussed below, the IPO Prospectus also referenced Horizon's historical revenues and financial performance and attributed those results to legal activities, including supposed "competitive advantages."

123.     During Horizon's Third Quarter 2005 earnings conference call on November 2, 2005, Defendant Raymond made the following statements:

This has been a very, very good quarter for Horizon lines.  We were happy earlier this month on the 25th of October to declare a quarterly cash dividend for our outstanding shares of common stock of $0.11 per share . . .

Revenue increased by $38 million or 15.1% over the third quarter of 2004.

Our intense focus on cost control continues and we've undertaken initiatives to mitigate rising fuel expenses.  I must tell you the use of the IPO proceeds to pay down debt will improve our balance sheet and reduce our interest costs commencing in the fourth quarter.  And as we move into the fourth quarter we remain very encouraged by the ongoing growth in our trades and as the largest Jones Act container shipper in these markets **with excellent customer relationships we believe we are well positioned to take advantage of the opportunities ahead of us.**

And in the case of Puerto Rico, our gross domestic product has surpassed $11 billion last year, grown by $1.4 billion or 14.6% since 1999.  In Puerto Rico we pay particular attention to the manufacturing sector . . and we're confident of a good solid market in Puerto Rico going forward.

We're obviously pleased with the continued business improvement here at Horizon Lines . . . We move products that people are going to consume either in inflationary times or recessionary times and the **combination of our markets, our customer base and the commodities that we move gives us a very strong and predictable revenue base as we all know.**  The improved revenues that are moderate in looking at revenues going up 3,4%, this has been driving us good solid earnings; double-digit earnings improvements **that result from very strong operating team in the Company and our relentless focus on cost.**

124.   On the November 2, 2005 call, Defendant Urbania stated:

Now a couple of key metrics for us is EBITDA.  As you can see . . .we had a very good quarter from an EBITDA perspective.

In closing . . . the third quarter was a **very good quarter for our Company.  Revenue was up because of strong markets and higher volumes and rates in our trade.**  By all the main financial metrics, once you've eliminated these one-time non-recurring IPO or transaction adjustments . . . you will see that operating income, EBITDA, net income are all up and headed in the right direction compared to the same periods prior year.  We are pleased with the

Company and with these financial results.  **In addition, the IPO transaction we believe strengthens this Company and its financial position going forward and we're very pleased to get that process behind us and you'll see the effects of that when we have our next earnings call.**

125.    In the Company's November 2, 2005 Form 10-Q for the third quarter of 2005 ("3Q 2005 10Q") filed with the SEC and signed by Defendant Urbania, the Company failed to disclose that its revenue growth and/or stability was significantly accomplished by means of an illegal cartel arrangement with its competitors despite giving a lengthy list of other reasons why the revenue increases were possible.  In its 3Q 2005 10Q, the Company stated in relevant part:

> Operating revenue increased to $289.1 million for the quarter ended September 25, 2005 compared to $251.1 million for the quarter ended September 19, 2004, an increase of $38.0 million, or 15.5%.  This revenue increase can be attributed to [list including "revenue container volume growth", "Intermodal surcharges, more favorable cargo mix, and general rate increases", "Bunker fuel surcharges included in rates"]

126.    During Horizon's fourth quarter 2005 earnings conference call, held on February 24, 2006, Defendant Raymond stated:

> [F]or the quarter ending December 24, our adjusted earnings per share were $0.15 compared to a $0.06 loss in the fourth quarter of 2004. On a full-year basis, adjusted EPS grew from $0.17 in 2004 to $0.65 in 2006. Operating revenue increased by $5.6 million or 2% to $279 million for the fourth quarter and by $115.9 million or 11.8% to [1,096,200,000] for the full year. **Revenue compound annual growth rate equals 9.3% over the six-year period from 2000 to 2005 and that is a point that I don't want to go unnoticed here. This is a company that has continued to grow its top line efficiently and effectively over the six-year period since we became a separate entity**. Operating income improved by $12.7 million or 174% to $20 million for the fourth quarter and $28.4 million or 57.5% to $77.8 billion for the year Again, this operating income improvement reflects the leverage inherent in our core business here at Horizon Lines. Adjusted EBITDA increased by $6.7 million or 22.4% to $36.6 million in the fourth quarter and $28.1 million to $146.4 million or nearly 24% for the year after adjusting for nonrecurring IPO and other transaction and non-cash expenses. So again, our adjusted EBITDA compounded annual

growth rate is 41.5% from 2000 to 2005. Adjusted net income increased by $6.9 million in the fourth quarter and by $16.1 million or 287.5% for the full year after again adjusting for nonrecurring IPO, other transaction and non-cash expenses. With that good news, I will turn the mic here over to John Handy, our Executive Vice President, who will brief you on the (indiscernible) outlook for 2006.

127.    On the February 24, 2006 call, Defendant Handy stated:

Turning to Puerto Rico for 2006, a slower GNP growth of 1.5% to 2% is expected. Pharmaceutical investment continues though with the 1.5 billion of spending that was announced in 2005 still going strong. The highly skilled labor force fosters continued technology investment, including the $65 million announced recently by Microsoft. The pharmaceutical output per employee exceeds Ireland, U.K., France, as well as Germany. John Keenan will take over now.

128.    On the February 24, 2006 call, Defendant Keenan stated:

Thank you, John. I'd like to take you through some of the financial highlights for the quarter and for the year. Our operating revenue increased by $5.6 million or 2% in the fourth quarter. Our fourth-quarter 2005 adjusted net income increased by $6.9 million and I will take you through these adjustments. Similarly, our adjusted earnings per share grew by $0.21 quarter-over-quarter from a loss of $0.06 in 2004 to $0.15 in 2005. Our operating income on an adjusted basis for the fourth quarter of 2005 exceeded 2004 by $12.7 million or 174%. **Once again, we generated strong cash flows from operations in our business** and we utilized cash from the IPO and tax generated from operations to prepay $96.2 million of bonds and redeem $62.2 million of our preferred stock. . . .**The EBITDA for us for the full year on an adjusted basis was 146.4 compared to 118.3 in the prior year and again an improvement in our operating ratio**. Looking at the components of our operating revenue for the fourth quarter and for the full year, this represents the change. **I will draw your attention to the rate in cargo mix. Rate and cargo mix in the fourth quarter compared to the prior quarter was an improvement of 13.4 and for the full year of 42.3. This is very important for our business** and for those of you that listened in on the prior earnings calls, we have efforts ongoing throughout 2005 to improve our mix, particularly in the Hawaii and Guam trade where we had a considered effort towards growing our refrigerated cargo business and carrying less lower margin auto volumes. You see the bunker fuel surcharge components for the fourth quarter and year and then I will draw

your attention down to the volume variance for the fourth quarter of 26.1

Operationally, our business is running well and finally, the IPO gave us the ability to improve our balance sheet and set the stage for a strong 2006.

129.     In the Company's April 28, 2006 Form 10-Q for the fourth quarter of 2005 ("4Q 2005 10Q") filed with the SEC and signed by Defendant Urbania, the Company failed to disclose that its revenue growth and/or stability was significantly accomplished by means of an illegal cartel arrangement with its competitors despite giving a lengthy list of other reasons why the revenue increases were possible.  In its 4Q 2005 10Q, the Company stated in relevant part:

> Operating revenue increased by $17.4 million or 6.7% from the quarter ended March 27, 2005 to the quarter ended March 26, 2006. **This revenue growth is primarily attributable to rate improvements resulting from favorable changes in cargo mix and general rate increases, increased bunker and intermodal fuel surcharges, and revenue increases from nontransportation and other revenue services**.

130.     On the Company's second quarter 2006 earnings conference call on July 28, 2006, Defendant Raymond stated:

> The string of positive financial results continues here at Horizon Lines.  **Our people are very focused on improving our service to customers and driving down our operating costs so we can maintain a reasonable rate structure.**  Double-digit earnings gains, we're very proud of obviously.  Our management team is extremely focused on our fleet enhancement strategy as well as our service efficiency program that we described as "Horizon Edge." The economic outlook is stable overall; and I think that we're feeling like this is another great year for Horizon Lines in 2006.

131.     On the July 28, 2006 call, Defendant Urbania stated:

> The second quarter of 2006 we're very pleased with from a financial perspective.  It represents 18 consecutive quarters of adjusted EBITDA growth.  Our revenues are up, which is leading to operating income improvements, EBITEA improvements, net income improvements over the same period in 2005, and we're

very pleased with the performance in our earnings per share, growing by 61.5%.

132.    In the Company's June 25, 2006 Form 10-Q for the first quarter of 2006 ("1Q 2006 10Q") filed with the SEC and signed by Defendant Urbania, the Company failed to disclose that its revenue growth and/or stability was significantly accomplished by means of an illegal cartel arrangement with its competitors despite giving a lengthy list of other reasons why the revenue increases were possible.  In its 1Q 2006 10Q, the Company stated in relevant part:

> Operating revenue increased by $19.3 million or 7.1% from the quarter ended June 26, 2005 to the quarter ended June 25, 2006 and by $36.7 million or 6.9% from the six months ended June 26, 2005 to the six months ended June 25, 2006.  **This revenue growth is primarily attributable to rate improvements resulting from favorable changes in cargo mix and general rate increases, increased bunker and intermodal fuel surcharges, and revenue increases from non-transportation and other revenue services**.

133.    Horizon held its third quarter 2006 earnings conference call on October 30, 2006. On that call, Defendant Raymond stated:

> For the third quarter of 2006 **we, again, have set record earnings; 19 consecutive quarters of adjusted EBITDA growth year-over-year. There** is at least one erroneous interpretation of our earnings out there on the press this morning which has caused a little erratic trading of the stock and caused the price to go down by as much as $2 for a short period of time. And I trust that as we go through this earnings report that everybody will understand that by all measures we have exceeded our past earnings and have exceeded the anticipations and expectations of Wall Street.
>
> Just a quick couple of the third-quarter financial highlights. Adjusted 2006 results versus those results in the same period in 2005 operating revenue again increasing by 15.6% -- I'm sorry, $15.6 million or 5.4%. Adjusted operating income up by $4.9 million or 15.8%. EBITDA higher by $3.5 million or 7.2. Net income increased by $1 million or 7.5%. And earnings per share grew by $0.03 or 7.5%. With that I'll ask John Handy to give us a commercial and operations update on Horizon Lines. John?

134.    On the October 30, 2006 call, Defendant Urbania stated:

> Due to our strong EBITDA and earnings performance has yielded
> $43.3 million of free cash flow through the first nine months of
> 2006. Our fourth quarter will be strong as well adding
> approximately $30 million to this free cash flow number ending up
> at just north of $70 million of free cash flow.

135.    In the Company's September 24, 2006 Form 10-Q for the second quarter of 2006

("2Q 2006 10Q") filed with the SEC and signed by Defendant Urbania, the Company failed to

disclose that its revenue growth and/or stability was significantly accomplished by means of an

illegal cartel arrangement with its competitors despite giving a lengthy list of other reasons why

the revenue increases were possible.  In its 2Q 2006 10Q, the company stated in relevant part:

> Operating revenue increased by $15.6 million or 5.4% from the
> quarter ended September 25, 2005 to the quarter ended September
> 24, 2006 and by $52.3 million or 6.4% from the nine months ended
> September 25, 2005 to the nine months ended September 24, 2006.
> **This revenue growth is primarily attributable to rate
> improvements resulting from favorable changes in cargo mix
> and general rate increases, increased bunker and intermodal
> fuel surcharges, and revenue increases from non-
> transportation and other revenue services.**

136.    In a January 12, 2007 Press Release, filed with the SEC on Form 8-K on January

19, 2007, and signed by Defendant Urbania, the Company, in relevant part, stated:

> 2007 is shaping up to be another excellent year for Horizon Lines,
> said Chuck Raymond, Chairman, President and Chief Executive
> Officer. "We continue to see solid market conditions in each of our
> trade lanes. Additionally, our TP1 vessel deliveries remain on
> schedule and the performance of our new ships is exceeding our
> expectations. Our Horizon Edge program is already delivering
> benefits and we expect a minimum of $13 million in cost savings
> throughout the year. **As a result, we look forward to achieving
> our financial goals in 2007 with EPS growth accelerating from
> first quarter levels**. Operating revenue, EBITDA and EPS for
> the full year and first quarter of 2007 are all expected to
> significantly improve over comparable measures in 2006."

137.    Additionally, in its January 12, 2007 Earnings Guidance Presentation, filed with

the SEC on Form 8-K on January 19, 2007, and signed by Defendant Urbania, the Company

gave a list of assumptions that were necessary for its revenue growth projections.  A crucial

assumption that was notably absent from this list was that the illegal conspiracy of which the

Company was a part would remain undetected and disciplined.  The Company stated in relevant

part:

> **Revenue Growth Assumes:**
>
> Volume Growth
> Cargo Mix Improvements
> General Rate Increases
> Fuel Recovery in all tradelanes

138.   In a March 2, 2007 Press Release filed with the SEC on Form 8-K on March 9,

2007 and signed by Defendant Urbania, the Company, in relevant part, stated:

> Operating revenue increased by $8.5 million or 3% to $287.5
> million compared to $279.0 million in the fourth quarters of 2006
> and 2005, respectively. **This revenue growth was fueled by
> cargo mix upgrades, rate increases and higher fuel recovery,
> more than offsetting some volume softness.**

139.   In Horizon Lines, Inc.'s Annual Report with the SEC on Form 10-K for the 2006

fiscal year, filed on March 2, 2007 and signed by Defendants Raymond and Urbania ("2006 10-

K"), Horizon, in relevant part, issued numerous misstatements and omissions relating to the

source of its revenues, and again failed to disclose that its revenue growth and/or stability was

significantly accomplished by means of an illegal cartel arrangement with its competitors.  These

misstatements and/or omissions include:

> Approximately 59% of our transportation revenue in 2006 was
> derived from customers shipping with us in more than one of our
> markets with approximately 36% of our transportation revenue in
> 2006 being derived from customers shipping with us in all three
> markets. **We generate most of our revenue through non-
> exclusive customer contracts with pre-specified rates and
> volumes and with durations ranging from one to six years,
> providing stable revenue streams**. In addition, our relationships
> with our customers extend far beyond the length of any given
> contract. For example, some of our customer relationships extend

back over 40 years and our top ten customer relationships average 29 years

* * * * *

Our future results of operations will depend in significant part on the extent to which we can implement our business strategy successfully. **Our business strategy includes continuing to organically grow our revenue, providing complete shipping and logistics services, leveraging our capabilities to serve a broad range of customers, leveraging our brand, maintaining industry-leading information technology, and reducing operating costs. Our strategy is subject to business, economic and competitive uncertainties and contingencies, many of which are beyond our control**. As a consequence, we may not be able to fully implement our strategy or realize the anticipated results of our strategy.

Operating revenue increased by $115.8 million or 11.8% for the year ended December 25, 2005 from the twelve months ended December 26, 2004. **This revenue growth is primarily attributable to rate improvements resulting from favorable changes in cargo mix, general rate increases, increased bunker and intermodal fuel surcharges to help offset significant increases in fuel costs, and revenue increases from non-transportation and other revenue services**. This revenue increase is offset slightly by lower container volumes due to 53 weeks in the twelve months ended December 26, 2004 compared to 52 weeks in the year ended December 25, 2005.

* * * * *

The decreased revenue due to revenue container volume declines for the year ended December 24, 2006 is primarily due to overall soft market conditions in Puerto Rico as well as a strategic shift away from lower margin automobile cargo to more refrigerated cargo and other higher margin freight. The temporary government shutdown in Puerto Rico and uncertainty surrounding tax reform contributed to the continued soft market conditions. **This revenue container volume decrease is offset by higher margin cargo mix in addition to general rate increases**.

140.    Misstatements and omissions relating to revenue growth and/or stability

continued in the April 26, 2007 First Quarter 2007 Earnings Release Presentation, filed with the

SEC on Form 8-K on May 2, 2007 and signed by Defendant Urbania ("1Q 2007 Earnings

Release"), where Defendant Handy, presenting on behalf of the Company, stated, in relevant

part:

> **Unit Revenue Update**
>
> Unit rate improvements in all three tradelanes continue to offset volume softness
>
> Cargo mix focus continues to provide positive impact on overall rate improvements
>
> Fluctuations in fuel related expenses were appropriately mitigated by fleet conservation efforts and surcharges
>
> **Operating Revenue**
>
> Cargo mix improvement and rate increases offset volume softness, after accounting for one delayed sailing that fell into the second quarter

141. Additionally, in an April 26, 2007 Horizon Press Release, filed with the SEC on

Form 8-K on May 2, 2007 and signed by Defendant Urbania ("1Q 2007 Press Release"), the

Company attributed its revenue stability to higher margin cargo mix, general rate increases and

fuel recoveries without disclosing that its revenue growth and/or stability was significantly

accomplished by means of an illegal cartel arrangement with its competitors.  In this press

release, the Company, in relevant part, stated:

> Operating revenue was essentially flat, falling slightly by $1.2 million or .4% to $273.7 million for the first quarter of 2007 compared to $274.9 million during the 2006 first quarter.  **The revenue decline was primarily due to a 6.5% reduction in volumes, reflecting continued soft market conditions in Puerto Rico and an extended winter in Alaska. Higher margin cargo mix, general rate increases and fuel recoveries nearly offset the volume-related revenue decline.**
>
> **"Horizon Lines delivered record first quarter earnings and our 21st consecutive quarter of adjusted EBITDA growth, despite less than ideal market conditions," said Chuck Raymond, Chairman, President and Chief Executive Officer. "Stringent cost controls, Horizon EDGE savings, cargo mix upgrades and rate improvements all combined to more than offset some lingering volume softness.**

142.     In the Company's July 27, 2007 Form 10-Q for the second quarter of 2007 ("2Q

2007 10-Q") filed with the SEC and signed by Defendant Urbania, the Company again failed to

disclose that its revenue growth and/or stability was significantly accomplished by means of an

illegal cartel arrangement with its competitors despite giving a seemingly exhaustive list of other

reasons why the revenue increases were possible.  In its July 27, 2007 10-Q, the Company, in

relevant part, stated:

> Operating revenue increased by $5.9 million or 2.0% from the
> quarter ended June 25, 2006 to the quarter ended June 24, 2007
> and by $4.6 million or 0.8% from the six months ended June 25,
> 2006 to the six months ended June 24, 2007. **This increase in
> revenue is primarily attributable to rate improvements
> resulting from favorable changes in cargo mix and general rate
> increases as well as increased slot charter revenue, partially
> offset by fewer revenue containers shipped.**
>
> The decreased revenue container volume declines are primarily
> due to overall soft market conditions in Puerto Rico and softening
> growth in Hawaii. **This revenue container volume decrease is
> offset by higher margin cargo mix and general rate increases**.

143.     Additionally, in the July 27, 2007 second quarter 2007 Earnings Release

Presentation, which was filed with the SEC on Form 8-K on August 2, 2007 and signed by

Defendant Urbania, the Company continued to make misstatements and omissions relating to the

source of its revenue.  Presenting on behalf of the Company, Defendant Handy stated, in relevant

part:

> **Second Quarter Revenue**
>
> Rates continue to improve across the company
>
> Cargo mix: positive impact
>
> Contract renewals: very solid, with moderate rate increases
>
> Operating revenue grows by 2% despite volume softness

Stringent cost controls, Horizon EDGE benefits, cargo mix upgrade and rate increases combine to more than offset volume softness

**Operating Revenue**

Cargo mix improvement and rate increases more than offset volume shortfall

144.    Also on July 27, 2007, in a Horizon Press Release filed with the SEC on Form 8-K on August 2, 2007 and signed by Defendant Urbania, the Company, in relevant part, stated:

> **"Despite some lingering volume softness, we once again overcame challenges and delivered solid earnings in the second quarter of 2007", said Chuck Raymond, Chairman, President and Chief Executive Officer. "Benefits generated by our Horizon EDGE process re-engineering and customer service program, stringent cost controls and unit revenue and cargo mix improvements, all combined to more than offset the volume shortfall . . ."**

145.    Misstatements and omissions relating to revenue growth and/or stability were also present in the Company's October 26, 2007 Form 10-Q for the third quarter of 2007 ("3Q 2007 10-Q") filed with the SEC and signed by Defendant Urbania, in that the Company again gave a seemingly exhaustive list of reasons for its revenue increases yet failed to disclose that its revenue growth and/or stability was significantly accomplished by means of an illegal cartel arrangement with its competitors.  In this 3Q 2007 10-Q, the Company, in relevant part, stated:

> Operating revenue increased by $16.5 million or 5.4% from the quarter ended September 24, 2006 to the quarter ended September 23, 2007 and by $21.1 million or 2.4% from the nine months ended September 24, 2006 to the nine months ended September 23, 2007. **This increase in revenue is primarily attributable to unit revenue improvements resulting from favorable changes in cargo mix and general rate increases as well as increased slot charter revenue, partially offset by fewer revenue containers shipped.**
>
> * * * * *
>
> The revenue container volume declines are primarily due to overall soft market conditions in Puerto Rico and decelerating growth in

Hawaii. **This revenue container volume decrease is offset by higher margin cargo mix and general rate increases**.

146.     Additionally, in the October 26, 2007 Third Quarter 2007 Earnings Release Presentation, filed with the SEC on Form 8-K on October 31, 2007 and signed by Defendant Urbania, the Company continued to make misstatements and omissions relating to the source of its revenue.  In this presentation, Defendant Keenan, in relevant part, stated:

### Unit Revenue Update - 3rd Quarter

Unit revenue continues to improve across all tradelanes.

Broad based growth from cargo mix upgrade, rate improvement and fuel recovery

Contract renewals continue to yield moderate rate increases

147.     In this same presentation, Defendant Urbania, in relevant part, stated

Operating revenue grows by 5.4% despite volume softness

Stringent cost controls, Horizon EDGE benefits, cargo mix upgrade and rate increase combine to nearly offset volume softness

. . .

### Operating Revenue

. . .

Cargo mix and rate improvement, and revenue from acquisitions more than offset volume shortfall

148.     In an accompanying October 26, 2007 press release, filed with the SEC on Form 8-K on October 31, 2007 and signed by Urbania, the Company, in relevant part, stated:

**"Horizon Lines once again rose to the challenge and overcame a less than ideal operating environment, to deliver improved earnings in the third quarter of 2007," said Chuck Raymond, Chairman, President and Chief Executive Officer. "Volume softness, primarily caused by lingering difficult economic conditions in our Puerto Rico tradelane, was offset by unit revenue improvements,** benefits derived from our Horizon EDGE process reengineering and customer service program and tight controls on our costs. . . "

149.     Similar misstatements and omissions relating to revenue were again present in a November 19, 2007 Horizon Press Release, filed with the SEC on Form 8-K on November 21, 2007 and signed by Defendant Urbania, in which Defendant Raymond, in relevant part, stated:

> **Horizon Lines will still deliver very satisfactory results in 2007 despite an environment that was extraordinarily challenging in numerous, unforeseen ways. Results in 2007 were adversely impacted by the continuation of a deep recession in Puerto Rico and fuel prices that have soared to record levels.** In the face of all of these challenges, 2007 results will be essentially equal to those in 2006. This accomplishment is made even more impressive by the fact we incurred about $15 million in net costs to deploy our new vessels.

150.     In that same November 19, 2007 Press Release, the Company, in relevant part, stated:

> **Horizon Lines also provided financial guidance for 2008**. Based on current market conditions and forecasts, the Company projects full year 2008 operating revenue of $1,360- $1,380 million, EBITDA of $175 - $185 million, diluted EPS of $1.94 - $2.18 and free cash flow of $115 - $125 million. At the mid-ranges of the EPS guidance, 2008 results are projected to be up 53% from 2007 levels.

151.     The Company issued its Fourth Quarter 2007 Earnings Release Presentation on February 1, 2008 for the fourth quarter of 2007, filed with the SEC on Form 8-K on February 8, 2008, and signed by Defendant Urbania.  In that presentation, Defendant Raymond discussed the Company's revenue growth but again failed to disclose that this growth and/or stability was significantly accomplished by means of an illegal cartel arrangement with its competitors:

> **Revenue Growth** – Predominantly through unit revenue growth and acquisitions

152.     In that same presentation, Defendant Keenan attributed improved volume and revenues to improved rates and cargo mix, rather than to the illegal cartel arrangement:

> Unit Revenue-Improvement across All Tradelanes
> Rate Improvement-Contract renewals and tariff increases
> Cargo mix success-Refrigerated, military, pharmaceutical and others

153.   Also on February 1, 2008, Horizon issued a Press Release, filed with the SEC on

Form 8-K on February 8, 2008, and signed by Defendant Urbania, in which the Company listed

the reasons why it could, in Raymond's words, "offset soft market conditions" and, in Urbania's

words, enjoy a "stable rate environment"—among them managing costs and introducing

complementary services.  The Company, however, failed to mention the other reason:  its illegal

cartel.  In relevant part, the Company stated:

> "The fourth quarter of 2007 brought to a close a year of many accomplishments for Horizon Lines," said Chuck Raymond, Chairman, President and Chief Executive Officer. **"Over the past year, we have managed to offset soft market conditions in Puerto Rico and rising fuel costs by aggressively managing costs and introducing valuable complementary services to our customers.** Going forward, we will continue to execute on our long term strategy of offering our customers innovative shipping and logistics solutions to enhance our core service offerings. **We believe we are well positioned for continued growth and profitability in our markets."**
>
> Fourth Quarter and Full Year 2007 Financial Highlights
>
> "2007 presented some challenges and opportunities for us," said Mark Urbania, Executive Vice President and Chief Financial Officer. **"Despite the continuing soft market in Puerto Rico and unprecedented increases in fuel prices, we were able to generate net income and earnings per share that were in line with the 2006 fourth quarter and full year periods and our expectations. These challenges were offset by improved cargo mix, a stable rate environment in all three of our offshore markets, and the benefits of our cost reduction efforts.**"
>
> **"Looking ahead, we expect solid earnings growth in our core shipping business and expect to see increased momentum in our new logistics business as we continue to implement our growth strategy in 2008," Raymond said. "We believe we are well positioned to significantly grow earnings and free cash flow in 2008, despite the uncertain national economic outlook."**
>
> Based on current market conditions, the Company updated its earnings guidance for the full year 2008, with projections of operating revenue at $1,345 - $1,365 million, EBITDA at $175 -

$185 million, and diluted earnings per share at $2.01 - $2.26. Free cash flow is projected at $115 - $125 million.

154.   Misstatements and omissions relating to revenue growth and/or stability were also present in the Company's February 6, 2008 Form 10-K for the 2007 fiscal year ("2007 10-K"), which was filed with the SEC and signed by Defendants Raymond and Urbania, in that Horizon again disclosed the reasons for revenue improvements while failing to disclose that revenue growth and/or stability was significantly accomplished by means of an illegal cartel arrangement with competitors.   In the Company's 2007 10-K, Horizon, in relevant part, stated:

> **During 2007, over 85% of our revenues were generated from our shipping and logistics services in markets where the marine trade is subject to the coastwise laws of the United States, also known as the Jones Act, or other U.S. maritime cabotage laws.**
>
> * * * * *
>
> Demand for our shipping services depends on levels of shipping in our Jones Act markets and in the Guam market, as well as on economic and trade growth and logistics. **Cyclical or other recessions in the continental U.S. or in these markets can negatively affect our operating results as customers may ship fewer containers or may ship containers only at reduced rates**. For example, shipping volume in Puerto Rico was down 8% in 2007 as compared to 2006 as a result of economic conditions in Puerto Rico. **The economic downturn in Puerto Rico negatively affected our earnings**. We cannot predict whether or when such downturns will occur.
>
> Operating revenue increased by $49.6 million or 4.3% for the year ended December 23, 2007 from the year ended December 24, 2006. **This revenue growth is primarily attributable to unit revenue improvements resulting from favorable changes in cargo mix, general rate increases, revenue related to acquisitions, increased bunker fuel and intermodal fuel surcharges to help offset increases in fuel costs, as well as increased slot charter revenue. This revenue increase is offset partially by lower container volumes shipped.**
>
> Operating revenue increased by $60.7 million or 5.5% for the year ended December 24, 2006 from the year ended December 25,

> 2005. **This revenue growth is primarily attributable to rate improvements resulting from favorable changes in cargo mix, general rate increases, increased bunker fuel and intermodal fuel surcharges to help offset increases in fuel costs, and revenue increases from nontransportation and other revenue services. This revenue increase is offset partially by lower container volumes primarily attributable to soft market conditions in Puerto Rico**.

155.    The above statements were materially false or misleading because, among other things, they: (a) attributed the Company's revenue growth to solid market conditions, favorable changes in cargo mix, general rate increases, increased bunker and intermodal fuel surcharges and revenue increases from non-transportation and other revenue services, without disclosing that revenue growth was significantly accomplished by means of an illegal cartel arrangement with competitors; and (b) emphasized the Company's stable revenue would continue despite adverse conditions without disclosing that revenue stability was significantly accomplished by means of an illegal cartel arrangement with competitors.

### B.    Misstatements and Omissions Related to Pricing, the Market and Competition

156.    Defendants, prior to and during the Class Period, also made a number of materially misleading statements or omissions relating to pricing, the market, and competition in its annual and quarterly financial statements and through its conference and guidance calls and in other public statements authorized by Horizon.

157.    On January 31, 2005, in an Article in the Journal of Commerce entitled "After the Storm," Defendant Serra was quoted extensively discussing the rates that Horizon charged its customers.  This article stated:

> After years of rate-cutting that produced combined losses of as much as $100 million a year, carriers operating between the U.S. mainland and Puerto Rico are basking in the light at the end of the long tunnel.  Though cargo volume remains flat, capacity has tightened **and rates are rising** . . . **Horizon's rates are up an**

**average of 5 to 6 percent, said Gabriel Serra, vice president and general manager of the line's Puerto Rico division. Horizon has not pushed rate increases as aggressively as some competitors, and had increased its southbound market share to 30 percent from 28 percent in 2003.** Southbound volume to Puerto Rico exceeds northbound cargo by a 4-10-1 margin. **"The rate recovery has continued and we feel more comfortable with the net-to-port rate," Serra said.** Horizon's results have been hurt by rising inland-transportation costs, he said. "The increase in inland costs hit us pretty hard last year, especially because of port- and truck-capacity issues," he said. "Our inland costs have gone up disproportionately." Serra said more than half of the contracts for Horizon's Puerto Rican service include inland pickup or delivery. **"We're trying to make sure we recover those costs, and that's part of the rate increases we're getting,"** he said. He called it "a tough year" because the four hurricanes disrupted the inland leg. "We did OK on the service end, but we had to spend a lot of money."

Like Sea Star, Horizon would like to build new vessels for the trade. "We're still going through a plan that makes financial sense, but the problem is that the cost and availability of ships right now is a stretch for the returns you can get," Serra said. "**It's still in the plan to find a financial model that makes sense,** but we have not found it, so there are no ships on order." The line is making other investments in the trade. It has taken over 74 acres of terminal space that was once used by Navieras and is investing more than $5 million to refurbish it. It is also investing $2 million to refurbish the Hawaii, a 26-year-old ship now in dry dock.

158.    Serra's statements emphasizing "rate increases" and Horizon's performance in the year prior to the IPO were material to investors who later purchased shares of Horizon's publicly traded securities. Indeed, the IPO Prospectus itself confirms the materiality of such statements, as it repeatedly emphasized Horizon's performance for "the twelve months ended December 26, 2004" and prior periods, stating, among other things:

(a)    "For the twelve months ended December 26, 2004, we generated pro forma EBITDA of $115.2 million, after giving effect to certain adjustments."

(b)      "Our revenue is derived primarily from U.S. marine container shipments between the continental U.S. and Alaska, Hawaii and Guam, and Puerto Rico.  These markets accounted for approximately 23%, 41% and 36%, respectively, of our **revenue in 2004**."

(c)      "We have achieved five consecutive years of revenue growth.  Our revenue base is **stable and growing due to our presence across three geographic markets, the breadth of our customer base served and the diversity of our cargos shipped,** all of which better protect us against external events adversely affecting any one of our markets.  **In addition, our use of non-exclusive customer contracts, with durations ranging from one to six years, generates most of our revenue and provides us with stable revenue streams.**"

(d)      "**For 2004**, no customer accounted for more than approximately 7% of total revenue **and nearly all of our customer relationships are based on non-exclusive contracts.**"

159.     In addition, the IPO Prospectus contained detailed financial information for the fiscal year 2004, including revenue, expense, income and other relevant metrics.  This included comparisons of the Company's operating results – and the purported reasons for those results – between certain periods in 2004 and 2005.  For instance, the IPO Prospectus stated:

> Operating income increased by $75.5 million or 17.3% from the six months ended June 20, 2004 to the six months ended June 26, 2005.  **This revenue growth is primarily attributable to an increase in revenue containers shipped, increased bunker fuel surcharges, other rate improvements resulting from increases in other surcharges, favorable changes in cargo mix and general rate increases and revenue increases from non-transportation and other revenue services.**

160.     These and other statements contained in the IPO Prospectus and described herein (and set forth herein) confirm that information relating to Horizon's performance in pre-IPO

periods—and the purported reasons for that performance—were material to investors in Horizon's securities during and following the IPO.

161.    In addition, Horizon's IPO Prospectus, dated September 26, 2005, contained numerous false and misleading statements about Horizon's pricing and the competitive market for Horizon's services.  For instance, the IPO Prospectus described the following "competitive strengths":

> *Long-standing relationships with leading, established customers.*   We serve a diverse base of long-standing, established customers consisting of many of the world's largest consumer and industrial products companies, as well as a variety of smaller and middle-market customers. Our customers include Costco Wholesale Corporation, Johnson & Johnson, Lowe's Companies, Inc., PepsiCo, Inc., Safeway, Inc., Toyota Motor Corporation and Wal-Mart Stores, Inc. . . .  We have a long-standing history of service to our customer base, with some of our customer relationships extending back over 40 years and our relationships with our top ten customers averaging 22 years.
>
> *Customer-oriented sales and marketing presence.*   Our 120-person national and regional sales and marketing presence enables us to forge and maintain close customer relationships . . . Our national and regional presence, combined with our operational excellence, results in high levels of repeat business from our diverse customer base.
>
> *Operational excellence.*   As the leading Jones Act shipping and integrated logistics company, we pride ourselves on our operational excellence and our ability to provide consistent, high quality service.

162.    The IPO Prospectus also stated:

(a)    "we charge our customers on a per load basis and price our services based on the length of inland and ocean cargo transportation hauls, type of cargo and other requirements, such as shipment timing and type of container."

(b)    "The increased revenue due to revenue container volume growth for the six months ended June 26, 2005 compared to the six months ended June 20, 2004 reflects

69

stronger market demand for transportation services.  Bunker fuel surcharges, which are included in our transportation revenue, accounted for approximately 7% of total reenue in the six months ended June 26, 2005."

163.     During Horizon's Third Quarter 2005 earnings conference call on November 2, 2005, immediately following the IPO, Defendant Urbania stated:

> **Rate improvement and changes in our product mix account for 10.8% [of growth] for the quarter and 30.2% for the nine months . . . .**

164.     In response to a question from an analyst regarding how the Company views its growth, Defendant Urbania responded:

> [W]hen we look at measuring our business and what we're doing from a revenue driver standpoint, we are looking at it from a volume perspective.  **We are looking at rates . . . and we can tell you that quarter-over-quarter, year-over-year, we're very excited about the fact that all of our revenues are up based upon good volume growth and rate growth in the business aside from what you see on the bunker fuel sur-charges.**

165.     In response to a question from an analyst on the November 2, 2005 conference call, Defendant Raymond stated:

> **Puerto Rico tends to be a very heavily contracted trade with rates there negotiated on an annual basis with our major customers.**  We do a good job of recovering our fuel sur-charges in the Puerto Rico trade and we've kind of broken that down between the vessel portion which is shown on the freight bill as a bumper sur-charge and now a sur-charge depending upon zone of origin of the cargo or destination of cargo in the lower 48.

166.     On January 26, 2006, Horizon issued a press release entitled "Horizon Wins Lowes Outstanding Ocean Service Provider Award."   This statement quoted Defendant Gill and stated:

> For the fifth straight year, the Lowes Companies Home Improvement Transportation Division has awarded MM&P-contracted Horizon Lines with the honor of Outstanding Ocean

Service Provider for 2005.  **Horizon was the only ocean carrier so honored.  Kevin Gill, Horizon Lines Vice President of Marketing accepted the award.  In his remarks, Gill said that, "The people of Horizon Lines are adept at finding ways to partner with our customers to reduce cycle time and meet tight delivery schedules.**  This is a perfect complement to the aggressive growth plans of Lowes.  **Being recognized for five years in a row is a great source of pride for our entire team as it validates these efforts.**

167.    Gill's statement was consistent with the statements in the IPO Prospectus and subsequent SEC filings and public statements that touted as evidence of Horizon's "Operational Excellence" their "customer recognition and awards."  For instance, the IPO Prospectus specifically singled out this precise award from Lowes, stating:

> *Customer Recognition and Awards.*  Our track record of service and operational excellence has been widely recognized by some of the most demanding customers in the world.  **For example, we have received the "Outstanding Ocean Service Provider Award" for domestic shipping from Lowe's Home Centers, Inc. for the past four years** and have received the "Carrier of the Year Award" for domestic ocean services from Wal-Mart Stores, Inc. for three of the last four years this award has been announced . . . **these and numerous other accolades reflect our commitment to serving customers in a professional and timely fashion.**

Thus, rather than correct the misleading statement and omission in the IPO Prospectus that falsely touted Horizon's "commitment to serving customers," when speaking to the public during the Class Period, Gill essentially repeated and adopted the statement without disclosing the existence of the price-fixing conspiracy.

168.    During Horizon's fourth quarter 2005 earnings conference call on February 24, 2006, Defendant Raymond made the following statements:

> [P]erformance of Horizon Lines continues to reflect a strong, established brand, a company that is serving **its broad diversified customer base efficiently and at industry leading levels**.  Horizon Lines therefore has built a strong, predictable and stable revenue base.  **this coupled with reliable operating assets and an organization of associates who are keenly focused on our**

> customers and serving our customers helped us once again to
> earn impressive financial results for our investors.
>
> For the quarter and for the year, we are reporting to you today
> record earnings, continued significant reinvestment in our core
> operating assts, strengthening of our senior management team,
> **repeated recognition for service excellence by some of the
> toughest judges in the industry** and all of this I should remind
> you was accomplished this past year while we dealt with a number
> of distractions here at the Company.

169.     On this February 24, 2006 conference call, Defendant Keenan emphasized that

Horizon "received the Wal-Mart Jones Act carrier of the Year award again . . .and our Lowe's

Gold Carrier award for five years.  **And that is very important because that is what our**

**customers see and that is how they measure us by."**

170.     On this February 24, 2006 conference call, Defendant Urbania stated:

> I will draw your attention to the rate in cargo mix.  Rate and cargo
> mix in the fourth quarter compared to the prior quarter was an
> improvement of 13.4 and for the full year of 42.3.  This is very
> important for our business and for those of you that listened in on
> the prior earnings calls, we have efforts ongoing throughout 2005
> to improve our mix.

171.     In response to an analyst question about the reasons for Horizon's projected

revenue growth, Defendant Urbania stated "We are expecting overall volume growth of about

1%, 1.5% and then **the balance of that being rate improvement**."

172.     In response to a question from an analyst who asked if Horizon "could comment

on the competitive landscape in Puerto Rico and what has been going on with Sea Star's vessel,"

Raymond stated:

> Sea Star has of course been a competitor in the Puerto Rico trade
> now for about ten years and they have in the past been purchasing
> quite a bit of capacity from Horizon between New York and Puerto
> Rico, Jacksonville and Puerto Rico, and the Gulf and Puerto Rico
> for about ten years.  **They are going to provide that capacity
> themselves going forward and it is going to have really no
> impact on our financials.  It is a matter of just moving cargo**

> **that they had and moving up [indiscernible] Horizon Lines and they will be moving that on their own vessels going forward. We will probably adjust our capacity down a little bit in the nonpeak periods, as we always have and we will also be replacing some of that cargo as that market grows in kind of low single digit numbers.**

173.   The analyst responded to this explanation by asking "despite the fact that you'll have to reduce capacity . . I don't know if you'll make up 100% of that, **how could it not have an effect on the financials?"** To which Raymond replied "Well the slots that we were selling down to Puerto Rico really occupied about the cost of one vessel for us.  So if we take that strip and don't operate it ourselves and if we do have a growth in the Puerto Rico market ship on Sea Star then we will see a flat line in terms of the earnings year-over-year."

174.   Another analyst on this February 24, 2006 conference call asked about the declining economy in Puerto Rico "so I was wondering if you could mesh that with your expectations that the Puerto Rico market will be quite strong?"  To this, Raymond replied:

> Of course we have been in that Puerto Rico market since 1956.  So we have a pretty good understanding of how that economy works . . . the markets are still very viable in terms of their production costs and John Handy mentioned the productivity and the quality of the investments.  They are still taking place in Puerto Rico . . . In terms of the consumption going down, that is the beer and the poultry and the beans and the rice.  Those are basic staples that the Puerto Rico family will consume.  They may not go out to the most expensive restaurants to eat, but they are going to provide meals and they are going to eat and they are going to consume just as they did in the last recession that we saw back in 2001, 2002. **So we're pretty close to our customer base down there.  We are comfortable with our share and we are comfortable with the assumption that our rates are going to continue to grow there on a reasonable basis**.

175.   As discussed below, many of the same concepts and information that Raymond provided in response to the analysts' questions about Puerto Rico were reiterated in a marketing article that Horizon commissioned in September 26, 2006—an article that prominently featured

and quoted from Defendants Serra and Gill.  Based on this information and other allegations

herein, Serra and Gill were instrumental in the formulation and dissemination of these false and

misleading statements made by Raymond and others.

176.    Horizon held its first quarter 2006 earnings conference call on April 28, 2006.

During that call, Defendant Taylor stated:

> Despite the volume challenges we experienced in the first quarter,
> we did achieve our revenue growth plans through significant
> improvements in all trades.  Year-over-year revenue per box is up
> 10%.  We see it as process continuing throughout 2006.  IN
> Hawaii, we successfully implemented a general rate increase in the
> first quarter.  **In Puerto Rico we continue to negotiate rate
> increases into our customer contracts, as they come up for
> renewal.  We believe that the competitive environment right
> now continues to be stable enough to support reasonable and
> ongoing rate increases.  In addition to rate increases, our rates
> and margins have been positively impacted by the targeted
> change in our mix of cargo.**  And we continue to focus on
> improving our share in those segments, which provide higher
> yields in our network, **either by higher market rates, lower
> network costs and, in some cases, both**.
>
> We feel we're very well-positioned competitively . . . the addition
> of a third vessel in Puerto Rico by our competition realy hasn't had
> a significant impact on our business.  We really see no signs of
> instability at this time . . . **Right now, customer satisfaction is at
> an all-time high**.

177.    On that April 28, 2006 conference call, Defendant Handy stated "We mentioned

last quarter the fact that Lowe's had presented us with the 2005 Gold Carrier Award for the fifth

straight year . . . . I'm pleased to also announce today that Wal-Mart will soon designate us as the

Domestic Ocean Carrier of the Year, and that's for the fifth year."

178.    On that April 28, 2006 conference call, Defendant Urbania stated:

> The first quarter of 2006 was a good quarter for us . . .looking back
> the 17 consecutive quarters of EBITDA growth that we've
> experienced . . . it really **speaks to the ability of the management
> team to deliver shareholder value over a sustained period of
> time** . . . the point here is that we are confident that 2006 and

> beyond will be no exception.  We will continue to grow our
> business, we will continue to deliver superior shareholder value,
> and that's our commitment to our shareholders.

179.    Horizon held its second quarter 2006 earnings conference call on July 28, 2006.

During that call, Defendant Raymond stated:

> I am joined today by John Handy, our Executive Vice President.
> John will cover commercial and operations update for the
> Company.
>
> Second quarter of 2006 was another great quarter for the
> Company.  **Our eighteenth quarter of consecutive year-over-
> year adjusted EBITDA growth, brining in double-digit
> earnings gains.**
>
> **Our customer focus and service efficiency effort, which we
> refer to internally here as "Horizon Edge" is a project that
> John Handy is going to take you through.  We're excited about
> what we see on the horizon on terms of process improvement,
> customer service improvement, and attendant cost reductions
> in our business.**
>
> **We have positive economic outlook for the remainder of 2006,
> and once again, Horizon Lines has been recognized for service
> excellence by our leading customers.**

180.    On that July 28, 2006 conference call, Defendant Handy stated:

> [I]n spite of some modest volume softness we continue to use mix
> improvements to deliver revenue growth.  We're very comfortable
> with our position in all the markets and we remain optimistic and
> confident for the remainder of 2006.
>
> **All competitors have reacted responsibly to the economic
> slowdown in Puerto Rico by taking an estimated 15% tonnage
> decrease so far this year.**  At Horizon Lines, we chose not to
> deploy our fifth vessel, and will continue to evaluate this option in
> the third quarter if we see some renewed strength in the market.
>
> [C]ontinued uncertainty over tax reform and rising energy costs
> **will dampen consumer spending in Puerto Rico and likely
> contribute to continued volume softness throughout 2006.**
>
> **In anticipation of flat volumes, we'll continue our aggressive
> mix of great strategy and an intense focus on costs that will
> further protect our operating margins in all trade lanes.**

I think a good way to look at our Horizon Edge project within the Company is that there is no area of our business that we will not look at processes and procedures to determine how efficiently and effectively we are doing our business with **the focus on customer service**.

181.   On that July 28, 2006 conference call, Defendant Urbania stated:

Looking at the Components of our revenue growth, although on a volume basis we are down primarily as a result of upgrading our cargo mix, carrying less automobiles, and some softness in the Puerto Rico market, we have more than offset that with **good cargo mix and rate improvement in our business, our bunker and intermodal fuels surcharges** have made up a component of that . . .

182.   In response to an analyst's question of "[W]ith some of the volume softness, I know you mentioned mix and price help make up for it.  Can you be a little bit more specific?  How did mix work to offset some of that softness?"  Raymond responded by stating:

Well, on the mix side, we basically replaced a lot of our automobile volume . . . So as we carried more refrigerated cargo and higher-margin cargo, the rate per box is higher and the resulting margin is higher.

183.   On September 26, 2006, Horizon placed a full page color article in the Journal of Commerce, which prominently featured Defendants Serra and Gill (as well as Raymond and Taylor and Handy).  The Journal of Commerce is the leading trade magazine for the ocean shipping industry and is closely followed by industry professionals as well as investors, analysts and other market professionals that reviewed and considered most publicly released information about Horizon during the Class Period.  This information was incorporated into the total mix of information available to the public and reflected in the stock price of the Company.  Indeed, reports by investor analysts covering Horizon's publicly-traded securities and other companies are regularly included in the Journal of Commerce.  By way of example, on July 30, 2009, the Journal of Commerce carried a story entitled "S&P Downgrades Horizon Lines Debt," which

extensively discussed Standard & Poor's downgrading of Horizon and the impact that had on Horizon's publicly traded securities.  (This article quoted the S&P analyst as saying "If the [ongoing DOJ investigation] results in a material fine or negative outcome, we might lower the ratings further.")  The Journal of Commerce is also regularly cited as a source of news and other information in financial publications and websites that are routinely consulted by market professionals and individual investors alike.  For instance, as recently as December 16, 2009, a story from the Journal of Commerce entitled "Horizon Lines Cuts Top Executives' Perks" on the "Money and Finance" page for Horizon Lines at www.finance.aol.com/quotes/horizon-lines-inc/hrz/nys.  In sum, the Journal of Commerce is a source of information for investors in Horizon.

184.    The September 26, 2006 article contained a color photograph of Serra with a caption describing him as "Vice President and General Manager Puerto Rico Horizon Lines." The article was detailed and extensive and contained a comprehensive discussion of Horizon's business and challenges, including the difficulties facing the Puerto Rico economy and Horizon's plans to expand into the market despite these difficulties.  The article quotes extensively from Serra and Gill, as well as others.  Much of the article is devoted to reassuring the public (including investors in Horizon, who are specifically referenced in the article)—in large part through quotes directly from Serra and Gill—that Horizon lines remains committed to Puerto Rico and expects to have continued success there despite certain economic difficulties.  In a section entitled "Investing for the future," the article quotes Serra and states:

> While recent events in Puerto Rico's economic environment have attracted some attention in the past few months, Horizon Lines continues to view this Caribbean Island as a sturdy long-term investment.  In fact, Horizon Lines and its predecessor company, Sea-Land Service Inc., introduced containerization to the island of Puerto Rico in 1958.

**Gilbert Serra, vice president and general manager of Horizon's Puerto Rico Division in San Juan**, has seen enough of Puerto Rico to know there isn't much that will stop the island from achieving continued economic success.

"We are confident of the long-term stability in the main drivers of the Puerto Rican economy. The government's commitment to the land reallocation of the port facilities has allowed us to start a multiyear project to reinvest in the terminal in Puerto Neuvo. **This will ultimately increase our efficiency and improve the service we provide to our customers.**"

**Looking Ahead**

The Puerto Rican economy is riding out a difficult period, as witnessed in the two-week government shutdown this past May. Since then, steps have been accomplished to help sustain and strengthen the financial environment. Puerto Rico will implement a new sales tax in November to generate additional revenue for the commonwealth. The new tax on consumption will allow the government to modify its current excise tax program, which taxes production, and thereby stimulate additional growth in the business section.

**Horizon Lines has remained successful in the trade by effectively managing cargo mix and operating costs. Unlike some competitors, Horizon has avoided operational losses in Puerto Rico by investing in regular equipment and vessel maintenance and consistently delivering higher levels of service for its customers.**

Horizon's Jacksonville Express provides the fastest north-bound transit from San Juan with cargo available Monday mornings for intermodal connections to U.S. Southeast and Midwest destinations.

**Continued commitment**

Despite Puerto Rico's relatively flat growth this year, Horizon Lines intends to continue its commitment and investments toward the Puerto Rico market.

For example, Horizon has commenced a redevelopment of its 72-acre facility in Puerto Nuevo, San Juan, to keep service at maximum efficiency. The first phase of the terminal redevelopment includes relocating existing gate facilities to two separate areas. Six dispatching lanes, give receiving lanes, three reversible lanes, one [sic] dismount lane for reefers, and one reefer

dispatch express lane, will allow the company to provide faster service.

"As part of our terminal development project, **we are already installing state-of-the-art technology and equipment," Serra said.** "The terminal has been fully automated since 2001. We will also be looking at more efficient container-handling equipment for San Juan. **Our technology continues to be the best in the market, and our customers consistently confirm that's an important differentiator," he continued. "Not only do we provide transactional capabilities to book cargo**, submit [handling] instructions and documentation and trace individual [shipments] but our customers also use our NetCapitan® Web tools to general comprehensive reports that allow them to better manage their supply chain."

**Serra expects further service improvement because of Horizon's fleet enhancement program starting next year**; the company plans to add five new vessels to the overall fleet. He predicts that with the resulting cascade effect of reallocated vessels moving into the Puerto Rico service strings, the result **will be an approximate 24 percent increase in deployed capacity offered by Horizon Lines in the Puerto Rico market**.

"The renewal of almost half of our 40-foot refrigerated fleet has allows us to reduce maintenance and claims incidents and therefore improved the utilization of our fleet. **Having equipped the units with the latest technology is also important to better-serve the strict standards required for the exports by the pharmaceutical and biotech industries**," he said.

Besides those efficiencies and improved customer satisfaction, the terminal improvements will increase the company's yard capacity by 30 percent. Projects under way since last October total $4.8 million invested by the end of this year. Subsequent phases will result in an additional $8 million to $10 million investments for 2007 and 2008.

185.    The September 25, 2006 article also featured a color photograph of Guilty Plea Defendant Gill, identifying him as the Vice President of Marketing for Horizon Lines. Gill is extensively quoted in a section of the article that also features Defendant Taylor (including a color picture of Taylor) and is titled "What Makes the Difference?: Horizon's customer-centric culture runs deep." This section of the article states:

"Going public" can be a trying process for a company.  Suddenly, everything you do is public information.  The process becomes as much an internal exploration as a capital milestone for growth and success.  In the case of Horizon Lines, the period leading up to the company's successful initial-public offering on the New York Stock Exchange in September 2005 drove senior sales and marketing management to invest time in exploring the question" **"Who are our customers: why do they choose to do business with us?"** . . . .

[S]aid Brian Taylor, the company's senior vice president of sales and marketing.  "After a while we realized we were not crating anything, only discovering a truth about ourselves . . . **It's that promise to the customer to always deliver that makes us unique.  It's always been here since the beginning, and I expect it will always be the key to our cusses."** ….

Horizon's customer-centric approach to business did not begin with this most recent campaign..  The company has been encouraging excellence and dedication in its people for years.  Many of the staff at Horizon Lines can trace their careers back to Sea-Land Service Inc., where a culture of innovation and customer service created an entire industry.

Two important differentiators for Horizon Lines are its people and its technology.  In both of these areas, the company has fostered a culture of Leadership.

**The Seven Cs**

. . . "The Seven Cs unite everyone at Horizon under one set of values," Taylor said.  "To be a Horizon employee means to believe in the Seven C's."  the Seven Cs are:

**Credibility** – we have the full confidence of our people, **our customers and investors**.,

**Customers –** they are the one and only reason for our existence . . .

**Cooperation –** no one will outperform us because we have the best teamwork in the industry . . .

**Competition** – we reinvest in our core, **and we do not yield to the marketplace**.

Together, these values form the Horizon associate that drives competitive advantage.

**Corporate culture starts at the top.**  That is certainly true at
Horizon Lines with regard to customer service and technology.
What is evident today at Horizon is the accomplishment of a vision
started years ago.  "Our management team, led by Chuck
Raymond, put a stake in the ground to embrace the philosophy that
the movement and sharing of information was as important to the
success of international shipping as was the movement of the
container itself," **said Kevin Gill, vice president of marketing
for Horizon Lines.**  "Chuck gave us the resources to develop an e-
business team and embedded us with technology . . We were early
to that awareness, and that is what makes the difference at
Horizon, even today."

**"We have let our customers in," Gill said.**  "We opened up
information in our terminals, and ports and inland operations, and
we provided Web-tracking tools so shippers could tap into that
information in real-time, 24 hours a day, seven days a week. **Our
competitors are still trying to catch up.**.  It was certainly a
challenge.  In the end we have delivered tremendous benefit."

186.    This article, which was paid for and placed by Horizon in the leading trade

journal for the industry, demonstrates that Horizon itself voluntarily injected Serra and Gill into

public statements as the face of Horizon and authorized them to make statements on behalf of the

Company.  Notably, these statements reference Horizon's supposedly competitive marketplace

and customer relations and provide purported reasons for Horizon's "success", while failing to

disclose the existence of the antitrust price fixing conspiracy, despite Serra and Gill's direct

involvement in that conspiracy and the fact that it rendered false and misleading the statements

made by Serra.  Similar statements in the September 25, 2006 article relating to "customers"

identifying "important differentiators" at  Horizon and "consistently delivering higher levels of

service for [Horizon's] customers," are false and misleading in light of the antitrust conspiracy.

187.    Horizon held its third quarter 2006 earnings conference call on October 30, 2006.

During this call, Defendant Handy stated:

Turning to my first chart, **the rate update for the third quarter.**
You'll see there are four main points here and I'll emphasize --
that's rate improvement across all three trade lanes; a solid mix

improvement, as we've told you many times in the past, going for higher margin cargo while divesting the lesser margin automotive pieces of our market; our operating efficiencies, which help moderate our contract renewal increases; and then maintaining responsible surcharges to offset the fluctuations up or down in fuel-related expense.

On the next chart from a competitive market update looking at the third quarter, **the main point there would be our ability as a company to flex our capacity across all three trade lanes. There have been no significant changes in services or marketshares as we've continued to maintain 36% of our business across all trades.** The market softness in Puerto Rico is certainly attributable to the tax issues as well as reduced consumer spending due to the lack of definition. But then in Alaska we see the softer seafood lift in Alaska was a decision that allowed us to lay up the Fairbanks three weeks early and Puerto Rico reduced our five ship sailings to 4 for the entire season, **emphasizing our flexibility across all the trade lanes.**

While the Puerto Rico economy remains somewhat sluggish as I mentioned, we remain very optimistic that the clarification of the tax law and the continued reduction in fuel-related expenses will have a positive impact. **As I've discussed recently with our VP in Puerto Rico, he is already seeing a significant increase in consumer spending and continued investment by our pharmaceutical companies and biotech.**

188.    The "VP in Puerto Rico" referenced by Handy in this conference call was Guilty Plea Defendant Serra.  As demonstrated by Handy's explicit reference to Serra on a public conference call with investors as well as the other allegations herein, Serra was instrumental in the formulation and dissemination of this and other false statements made by Horizon and the other Defendants, including other false statements alleged herein.  This also demonstrates that Serra communicated regularly with the other senior Horizon executives.

189.    On January 12, 2007, during the Company's 2007 conference call related to the Company's earnings guidance which was filed with the SEC on Form 8-K on January 19, 2007 and signed by Defendant Urbania, Defendant John Handy, Executive Vice President of Horizon Lines, Inc, stated:

82

**Turning to Puerto Rico.** Our source there is economic planning development department. They project a 1.2% economic growth in 2007, that's their prediction. . .

*****

As part of the tax reform that we've talked about for many quarters now, the employers are withholding less than they normally would effective January 1. That's supposed to put an extra $350 million into circulation throughout the year of 2007. And there is, in spite of the closure, some expansions of pharmaceutical plants offsetting those closings on the island , so overall, if you ask how we would call it, **I'd say minimal but steady growth, very positive for Puerto Rico.**

**If I look at the capital investments that we're making in the San Juan terminal, the land realignment is perhaps the major contributing factor that will improve our operating efficiency, that reallocation allows us to configure the port appropriately and we'll pave our yard areas, we've added new lighting, new generation gate automation over the current generation we've got and you see pictures of the temporary gate and the final gate that will certainly net us cost reductions and lead to improved operating margins for Puerto Rico.**

What we show here in the chart in the top left is the rather significant growth in outbound refrigerated containers as well as inbound. That's certainly because we're shifting more and more cargo to the higher margin refrigerated container than the automotive containers. **That's consistent with our business plan and indicates our plans for the future to fuel growth and increase customer satisfaction.**

* * * * *

[U]nder sales, just a small example of a system upgrades and the pricing, sales tool enhancements that are in progress and our alignment meetings which are allowing what was heretofore fairly separate areas within the sales and marketing area to work together to come up with process improvements and we're excited about what that's going to contribute well into 2007.

* * * * *

We're still at our roughly 36% of the market of the container carriers in the Jones Act**. It seems to be pretty stable in terms of market share. There may be some potential growth**, as Chuck mentioned in our red, white, and blue strategy in the government

83

sector, there may be some overall growth in the Pacific because of the troop movements but then all of us, meaning the Jones Act carriers will be competing for that business as well, and **so the bottom line is that I think we've seen stable market share, certainly in 2006 and I don't see anything that's going to dramatically change that in 2007. There's always the potential to grow but I think we're looking at good stability.**

190.    The Company continued to issue misstatements and omissions concerning the market volume and growth.  A January 22, 2007 article in the JOURNAL OF COMMERCE entitled "Island of Little Sun," cited several statements by Defendant Gabriel Serra, Senior Vice President and General Manager for Horizon Lines Inc. and Horizon Lines, LLC, Puerto Rico division:

> Horizon Lines, the biggest Jones Act carrier, also **cut its Puerto Rico capacity last year to adjust to the reduced volumes, but it is planning to increase capacity by 25 percent by the beginning of 2008. That's not because it sees any increase in demand, but because it is rotating two larger container ships from its Guam service in the Pacific into the Puerto Rico service** to replace two older ships that will put in reserve a waiting redeployment.  "We are bringing in a 1,700 - TEU ship, which will replace a 1,200-TEU vessel by mid - year," said Gabriel Serra, vice president and general manager of Horizon's Puerto Rico division.  Serra said Horizon had cut capacity last year by only operating two sailings a week from Jacksonville."  In previous years, we deployed our spare vessel in the high - volume periods, but we didn't last year," he said.  "In 2005, we deployed it for 20 weeks, but we didn't need to deploy it in 2006 because the utilization rate wasn't terribly high."  **[Serra] expects trade volume to return to its historic growth rate of 1 percent or less.  Despite this less - than - robust forecast, Horizon is expanding the capacity of its San Juan container terminal.**

191.    On January 25, 2007, the Company attributed its success to "technology" and "listening" to market needs, rather than to its illegal price fixing conspiracy.  A public news article entitled "Horizon Lines: 50 Years of Passion," cited several statements made by Defendant Serra on behalf of the Company:

Changes in technology have allowed the company to provide shipment tracking, a much needed service in terms of security and a customer's peace of mind. Horizon Services Group, a Horizon Lines subsidiary, is **a pioneer in developing state-of-the-art technology to provide cost-effective solutions to improve information flow concerning the chain supply. "This, in turn, allows us to increase productivity and reduce costs of operation," said Serra.**

Horizon Lines' investment goes beyond physical improvements. Serra told CARIBBEAN BUSINESS the company is also putting money into technology and infrastructure advances to better serve customers and associates**. "We have always reinvented ourselves as a company.   Market demands, not to mention strict regulation, force us to change constantly," said Serra.**

**Although he foresees more changes in the industry, Serra is not concerned. "We will respond to those trends as we have always done; being a step ahead in technology, researching, constantly developing our staff and listening to our market needs," he said.**

Horizon Lines, the nation's leading shipping and logistics company, is celebrating its golden anniversary this year.  "During 50 years, we have been recognized for delivering excellent customer service, personalized attention, and trips that are shorter and always on time**. We are here to make it easy for our customers to do business** and we do it with passion," said Serra.

Thus, the Defendants repeatedly attributed Horizon's growth and results to market conditions and other factors unrelated to its illegal price fixing arrangements.

192.    The Company made additional misstatements and omissions relating to its pricing on March 2, 2007 during the Company's fourth quarter 2006 earnings call, which was filed with the SEC on Form 8-K on March 9, 2007 and signed by Defendant Urbania ("4Q 2006 Earnings Call").   During this call, Defendant Raymond was asked how much more pricing power the Company had in Puerto Rico.  In response, he stated:

**I think the way we would answer that is it looks like all the carriers were pretty responsible in terms of tonnage in the trade last year.** As the market softened, we of course withdrew a vessel for a period of time. I think 1 or 2 of the barge lines did the

same. One of the other competitors, Sea-Star, actually pulled a vessel out.

The available capacity more represented the demand in the marketplace and as a result of that, the pricing I don't think suffered. **I believe we're still gaining in terms of real dollar increases in our prices in Puerto Rico. I don't see that stopping. I believe we still have a little bit of a ways to go there.**

193.     The 2006 10-K also contained numerous misstatements and omissions relating to

pricing and the appearance of a competitive market.  In this March 2, 2007 filing, Horizon

falsely represented that its "primary" mode of conducting business was to enter into

"confidential" contracts with customers, when in fact the pricing terms of those contracts were

shared directly with competitors.  The relevant portions of the filing follow:

We believe that the breadth and depth of our relationships with our customers is the principal driver of repeat business from our customers. We further believe that our long-standing customer relationships and our cross-selling efforts enable us to forge customer relationships which provide us with a distinct **competitive advantage**.

We generate most of our revenue through non-exclusive customer contracts with pre-specified rates and volumes and with durations ranging from one to six years, providing stable revenue streams. In addition, our relationships with our customers extend far beyond the length of any given contract.

**Our business strategy includes continuing to organically grow our revenue**, providing complete shipping and logistics services, leveraging our capabilities to serve a broad range of customers, leveraging our brand, maintaining industry-leading information technology, and reducing operating costs. Our strategy is subject to business, economic and competitive uncertainties and contingencies, many of which are beyond our control.

Demand for our shipping services depends on levels of shipping in our Jones Act markets and in the Guam market, as well as on economic and trade growth and logistics. Cyclical or other recessions in the continental U.S. or in these markets can

86

negatively affect our operating results as customers may ship fewer containers or may ship containers only at reduced rates.

We may face new competitors.  Other established or start-up shipping operators may enter our markets to compete with us for business.

**The entry of a new competitor on any of our trade routes could result in a significant increase in available shipping capacity that could have a material adverse effect on our business, financial condition, results of operations and cash flows**.

**Shipping Rates**

We publish tariffs with fixed rates for all three of our Jones Act trade routes. These rates are subject to regulation by the Surface Transportation Board ("STB"). However, in the case of our Puerto Rico and Alaska trade routes, **we primarily ship containers on the basis of confidential negotiated transportation service contracts** that are not subject to rate regulation by the STB.

We derive our revenue primarily from providing comprehensive shipping and logistics services to and from the continental U.S. and Alaska, Puerto Rico, Hawaii and Guam. **We charge our customers on a per load basis and price our services based on the length of inland and ocean cargo transportation hauls, type of cargo and other requirements, such as shipment timing and type of container.**

194.    The Company continued to attribute its success in the market to a variety of factors other than its illegal price fixing arrangements, instead focusing on the "quality" it delivered to customers.  On April 12, 2007, in a Horizon Press Release, Defendant Brian Taylor stated:

Like Toyota, **delivering quality to the customer is a critical success factor for us. At Horizon Lines, we continue to innovate to drive efficiency without compromising on quality.**

195.    During its April 26, 2007 First Quarter 2007 Conference Call, filed with the SEC on Form 8-K on May 2, 2007 and signed by Defendant Urbania ("1Q 2007 Earnings Call"), the Company made material misstatements regarding pricing and competition in the Puerto Rican

market.  During this call, the Company misrepresented that pricing and volume were the result

of, in Raymond's words, the "magnificent job" that the Company was doing, and led investors to

believe that the success of the Company resulted from lawful actions, without mentioning that

these results came from an illegal pricing agreement with competitors.  For instance, Defendant

Handy stated:

> If you switch to chart 9, the unit revenue update; you can see the
> bar chart reflects the first quarter data there, just about $212 more
> rate per container better in the first quarter of 2007 than 2006.
> These rate improvements in all three trade lanes continue to offset
> the volume softness. As we've discussed many times before, this is
> reflective of our cargo mix focus as we get out of the lower-margin
> cargo and focus heavily on the reefer and higher-margin types of
> cargo.
>
> And then I just mentioned that since fuel has had such a traumatic
> impact on everyone over the last year; **it certainly had its impact
> on us, but we continue to appropriately mitigate those fuel
> prices with our fuel surcharges.**
>
> * * * * *
>
> As to the 2007 GNP growth of 1.2% that the Government
> Development Bank of Puerto Rico predicted; we've just not seen
> that yet. We've watched, of course, the fact that energy prices and
> consumer confidence have depressed the economy in Puerto Rico.
> **We remain positive, but very cautious as we see that volumes
> will remain pretty flat throughout the rest of the year**
>
> **In terms of a competitive update in light of those revenue and
> volume comments, overall market shares in all the trades
> remain very, very stable. Puerto Rico carriers, as we've
> mentioned before, have continued to withhold seasonal
> tonnage due to that slow economic growth. We're doing the
> same thing.**

196.    Also during the Company's 1Q 2007 Earnings Call, Defendant Raymond

responded to questions and stated:

> **Question**:  Okay, great. And then just one last one; if the Puerto
> Rican economy remains weak and then doesn't meet I guess the
> Bank of Puerto Rico's forecasts, are there any contingency plans?

**Is there a way for you to kind of take out costs temporarily there or redeploy assets into other trade lines?**

**Chuck Raymond**: Well, I think that there are. **First of all, the Puerto Rico operating team is doing a magnificent job of improving productivity and managing their costs. We've been through some of these downturns in the past and have weathered through them.** We have the same enthusiasm and desire to continue to challenge old ways of doing things down there; and that's coupled with the EDGE process, which I think is really back-up ammunition here. **Should we see that market continue to soften, I'm not sure we can pull capacity out, because we have pretty effective capacity utilization in that trade.** But I think that the EDGE process has us positioned to operate much more efficiently for the rest of the year. I hope that answers your question.

**Chuck Raymond: We had the fortune to be down in Puerto Rico last week; several of us, and had a lot of discussions with our key customers.**

**Question**: Hi. Can you clarify when you reconfigure your fleet—are you going to add capacity to Puerto Rico at all?

**Chuck Raymond**: John, we are not. The additional capacity in the Puerto Rico trade is in the range of about 100 slots a week, which is about less than 1% capacity addition.

**Question**: Okay. **And one of your competitors recently announced a small capacity expansion in the lane. Does that concern you at all?**

**Chuck Raymond: No, it doesn't actually. We're not concerned about that.**

**Question**: Right. And any further insights on the rate picture? You mentioned one thing about Puerto Rico with that one increase; any other kind of color or insights on the rate picture in either of your markets?

**Chuck Raymond**: I think three things**. I think number one, we have stability. The supply-demand relationship in the trades is stable. I believe that we are still, as an industry, doing the right thing in terms of recovering our fuel charges**. You know, bunkers are now up at about $325-$330 a ton. And so the surcharges in all three trades continue to recover that. **And then third, I would say that in the case of Puerto Rico, even though that market is a little light, we're continuing to get rate**

**increases that are slightly ahead of what our inflationary costs
are. So in terms of real rate benefit in the Puerto Rico trade,
that march that we've been on now since 2002, continues.**

197.     Further misstatements and omissions relating to the implicitly legal stability in the

Company's market share and price increases occurred on July 27, 2007, during the Company's

second quarter 2007 earnings call, filed with the SEC on Form 8-K on August 2, 2007, and

signed by Defendant Urbania ("2Q 2007 Earnings Call").  During this call, Defendant Raymond

stated:

> Let me again emphasize that our business is characterized by stable
> markets with only a handful of competitors.  Carriers in these
> trades do understand that cutting prices to gain revenue through
> volume is a zero sum game for the individual trades.  And
> fortunately, we haven't seen major market share rating (sic.) as a
> solution to earnings softness.  We in particular can point to our
> market shares in the trades where we compete as being stable...

198.     The Company continuously touted its "integrity" and "customer service" as

reasons for its success in the market, rather than revealing to investors the truth about its illegal

price fixing arrangements.  For example, in an August 16, 2007 Press Release, Defendant Taylor

made misstatements and omissions relating to the Company's "true partnership" with customers

and "improved service levels," which purportedly led to market efficiencies:

> We are ecstatic to receive the 2007 Quest for Quality Award. It
> honors the people of Horizon Lines while also serving as a
> testament to **our customers who, in true partnership**,
> communicate to us readily where we perform well and in what
> ways we can improve, said Brian Taylor, Senior Vice President
> Sales & Marketing for Horizon Lines. He continued, "Over the
> past year we have delivered five new ships to our Pacific services,
> deployed thousands of new refrigerated and dry containers and
> **evaluated all measures of process to gain efficiencies and
> improve service levels across the organization.** We thank our
> customers for this esteemed recognition of our efforts.

199.     Similarly on August 22, 2007, the Company issued a Press Release, in which

Defendant Taylor stated:

Aero creates innovative solutions for its customers and offers a consistency of service that builds long lasting client relationships," said Brian Taylor, Senior Vice President of Sales and Marketing for Horizon Lines, LLC and recently named to head Horizon Logistics as its President effective September 1st.  Aero's **solid reputation for integrity, innovation and the highest levels of customer service make the company a great fit for Horizon Logistics**.

200.    On October 26, 2007, during the third quarter 2007 earnings call, filed with the SEC on Form 8-K on October 31, 2007 and signed by Defendant Urbania ("3Q 2007 Earnings Call") the Company directly attributed its increased revenues per container to a number of factors but failed to disclose that a principle reason for increases in revenues was the Company's agreement with its competitors to divide the market and to increase prices.  Defendant John Keenan, President of Horizon Lines, LLC, stated:

> ...the unit revenue per container is up approximately 4.8% and continues to improve in all tradelanes.  **It's really based on our cargo mix upgrade and our rate improvements, driven by our strong customer relationships and our high service levels.**

201.    In the 3Q 2007 Earnings Call, the Company continued to make misstatements and omissions, as Defendant Taylor again attributed the market success to customer service without disclosing the illegal conspiracy:

> So you'll see a **real focus on high value-added services that enhance our existing customer relationships and create a new stickiness in those relationships. We've got a solid platform now established that is really capable of sustaining both organic and acquisition-based growth.**
>
> * * * * *
>
> **How will we know if our efforts are successful? Well, clearly, we'll see it in our EBITDA growth and the gross profit growth** from each of the segments that we'll focus on. We'll see new value being created in a variety of different categories, as you see on this page. And, certainly, **one of the most important ones is total incremental freight dollars that we will secure from existing Horizon customers, where we'll leverage the synergies that**

**already exist in the relationships that we have within Horizon Lines.**

**Fanatical customer service**. This will be one of the top cornerstones of our value proposition. It is one of the cornerstones at Horizon Lines. It's a cornerstone at Aero, and that's why Aero is a great fit for the new Logistics Company. We'll be a one-stop shop — **great customer focus, ensuring that customers remain with us long term. You've heard us talk before about the deep, long-term relationships we have at Horizon Lines,** and it will be no different at Horizon Logistics.

202.    The 3Q 2007 Earnings Call is notable for another reason.  It was conducted from Puerto Rico, the Company's most important market.  On the conference call, Defendant Raymond stated, "I'm down here, John Keenan has been here all week, he's been working with customers…"  On this call, John Keenan noted certain trends in the Puerto Rican economy, which had been experiencing significant weakness for many quarters.  Despite this weakness, the Company was still "renewing contracts" with its customers with "increases in . . . tradable rates."

203.    Yet again in a November 19, 2007 conference call to discuss the Company's revised earnings guidance for the fourth quarter and full year of fiscal 2007, filed with the SEC on Form 8-K on November 21, 2007 and signed by Defendant Urbania ("4Q 2007 Revised Earnings Call"), the Company made material misstatements regarding pricing and competition in the Puerto Rican market.  In the call, the Company revealed that the Puerto Rican economy was experiencing a difficult period.  Defendant Raymond, stated, "[W]e're participating in the Puerto Rico market we have a 35% market share there, and unfortunately when that market is off our business is off also."  Defendant Raymond also noted that "the volumes [that the Company was] looking at in 2008 are between 5 and 6% below where we were in 2006."  Notwithstanding the negative outlook in the Puerto Rican market, the Company was still predicting increasing prices. The Company's Chief Financial Officer, Defendant Mark Urbania stated,

We do incorporate some price increases [in Puerto Rico] as we've communicated in the past. **There's been good discipline in the market between ourselves and our competitors. Price increases have come through even though volume softness has existed in 2007. There's no reason for us to believe that that will change in 2008 and we're factoring between 3 and 4% in terms of real rate improvement.**

204.    Moreover, in the Company's February 1, 2008 Fourth Quarter Earnings Call, filed with the SEC on Form 8-K on February 8, 2008, and signed by Defendant Urbania ("4Q 2007 Earnings Call"), Urbania stated that the Company was "most proud of the fact that we overcame difficult market conditions in Puerto Rico to keep our earnings pretty much in line with 2006."

205.    During this 4Q 2007 Earnings Call, the Company still had high expectations for its rate increases because it was, in Keenan's words, "manag[ing] our capacity." Left unstated was that the Company was lowering its volume in an illegal market allocation with its competitors. Discussing the Company's volume decreases over 2006 and 2007, Defendant Keenan stated:

> if you look at '05 to '06, [Puerto Rican cabotage] volume's down 7.7%; '06 to '07 down 4.1%, so at total 13% in volumes. And when you look at what we've done on our budget and, you know, there's a little bit of seasonality in the Puerto Rico tradelane, and what we do is we manage our capacity through that seasonality.

206.    The 4Q 2007 Earnings Call also contained misstatements and omissions about the marketplace by Defendant Taylor, who stated:

> [W]e're a single company, we look at having two very distinct sales channels. The Aero Logistics model—here we have a group that is highly specialized in specific markets, **a very deep knowledge and understanding of these markets and the customers that are within each of those segments.**
>
> **We see strong margins due to the very high end product values and the service sensitivities of the customers that are within these segments.** And in the Aero model, it usually entails a high degree of special touches to affect delivery of the shipments for the customers.

93

On the Horizon Logistics side, really specializing in truck brokerage, container grades or warehousing.  **Typically, you will find lower margins in these segments**, but clearly higher revenue opportunities over the long-term, and we often see much overlap with the requirements from our existing liner customer base.

\* \* \* \* \*

As we look to '08 core services, we're going to stay the course. **Our focus is on our core service offerings, recognizing that throughout the course of the year, we may have to adjust our sales a little bit**.

207.   On February 6, 2007, the Company filed its 2007 10-K, which, like the 2006

Form 10-K the previous year, contained numerous misstatements and omissions relating to

pricing and the appearance of a competitive market, and also falsely stated that the Company's

primary contracts were negotiated confidentially.  The relevant misstatements are quoted below:

In Puerto Rico, we are the largest provider of marine container shipping, accounting for approximately 34% of Puerto Rico's total container loads from the continental U.S. **The Puerto Rico market is currently served by two containership companies, Horizon Lines and Sea Star Lines ("Sea Star"). Sea Star is an independently operated company majority-owned by an affiliate of TOTE. Two barge operators, Crowley and Trailer Bridge, Inc., also currently serve this market.** The U.S. container shipping industry as a whole is experiencing rising customer expectations for realtime shipment status information and the on-time pick-up and delivery of cargo, as customers seek to optimize efficiency through greater management of the delivery process of their products.

We generate most of our revenue through customer contracts with pre-specified rates and volumes and with durations ranging from one to six years, providing stable revenue streams.

**Other established or start-up shipping operators may enter our markets to compete with us for business.**

**Shipping Rates**

We publish tariffs with fixed rates for all three of our Jones Act trade routes. These rates are subject to regulation by the Surface Transportation Board ("STB"). However, in the case of our Puerto

94

Rico and Alaska trade routes, we primarily ship containers on the basis of **confidential negotiated transportation service contracts** that are not subject to rate regulation by the STB.

We derive our revenue primarily from providing comprehensive shipping and logistics services to and from the continental U.S. and Alaska, Puerto Rico, Hawaii and Guam**. We charge our customers on a per load basis and price our services based on the length of inland and ocean cargo transportation hauls, type of cargo and other requirements,** such as shipment timing and type of container.

208.    On March 3, 2008, the Company made misstatements and omissions concerning its Puerto Rican shipping volumes and investments in the Puerto Rican market despite tough economic conditions.  A public news article entitled "Pain on the Spanish Main," included the following statements from the Company, through Defendant Gregory Glova, the Marketing and Pricing Director for Horizon Lines LLC, Puerto Rico division:

Shipping volumes both southbound to Puerto Rico and northbound to Puerto Rico are down significantly from the recent highs experienced in 2005, which included rebuilding and recovery supply volumes after the  harsh 2004 hurricane season, said Greg Glova, Horizon Lines' director of Puerto Rico marketing and pricing.

**He said the carrier hopes the economy will start to turn around in the latter part of 2008.  Despite the dismal economic climate, Horizon Lines continues to invest in its Puerto Rico business** to improve its terminal infrastructure and to replace its dry and refrigerated containers.

209.    The Company made further misstatements and omissions concerning the "exceptional value" for its customers in the Puerto Rican market, without disclosing that that "value" was significantly impacted by the Company's price fixing conspiracy, or that customers had little choice other than to accept Horizon's services given the anti-competitive conspiracy that Horizon was engaged in since at least 2002.  In an April 23, 2008 Horizon Press Release,

Horizon stated that it had renewed its contract with Walgreens to remain the drugstore's primary

carrier to Puerto Rico over the next two years, and Defendant Serra stated:

> **Horizon Lines is committed to exceptional value and customer
> satisfaction and we will continue to provide reliable, on - time
> logistics and shipping solutions for Walgreens into the future,
> said Gabriel Serra, senior vice president and general manager
> of Horizon Lines' Puerto Rico Division.**

210.    This statement was consistent with the statements in the IPO Prospectus that

touted as evidence of Horizon's "Operational Excellence" their "customer recognition and

awards."   For instance, the IPO Prospectus stated:

> *Customer Recognition and Awards.*  Our track record of service
> and operational excellence has been widely recognized by some of
> the most demanding customers in the world.  For example, we
> have received the "Outstanding Ocean Service Provider Award"
> for domestic shipping from Lowe's Home Centers, Inc. for the past
> four years and have received the "Carrier of the Year Award" for
> domestic ocean services from Wal-Mart Stores, Inc. for three of
> the last four years this award has been announced . . . **these and
> numerous other accolades reflect our commitment to serving
> customers in a professional and timely fashion.**

Thus, rather than correct the misleading statement and omission in the IPO Prospectus that

falsely touted Horizon's "commitment to serving customers," when speaking to the public during

the Class Period, Serra essentially repeated and adopted the statement without disclosing the

existence of the price-fixing conspiracy.

211.    During the Class Period, the Company continuously repeated that its revenue

growth and stability were the result of negotiated contracts, cargo mix upgrades, rate

improvements, strong customer relationships and high service levels.  In fact, the Company's

revenue growth and stability were in large part achieved through its illegal price-fixing

arrangement with competitors, as evidenced by the Company's revised downward earnings

guidance for the 2008 fiscal year only days after the U.S. Department of Justice uncovered

Horizon's illegal cartel.

212.    As a result of the Company concealing its illegal cartel with its competitors,

Horizon investors were shocked when, on April 17, 2008, the Company issued a public

statement in which it revealed that it was the subject of an antitrust investigation by the United

States Department of Justice's Antitrust Division, and that federal agents had served search

warrants and a grand jury subpoena relating to pricing practices in the Puerto Rican tradelanes.

In response to this disclosure, Horizon's shares fell from their April 16, 2008 closing price of

$18.23 per share to close on April 17, 2008 at $14.70 per share, a 1-day decline of $3.53 per

share, or 19.36%.

213.    Additionally, on April 25, 2008, only 8 days after the DOJ's investigation was

revealed, the Company revised downward its earnings guidance for the 2008 fiscal year, further

evidencing that the Company's revenue growth and stability were in large part achieved through

its illegal price-fixing arrangement with competitors.

214.    The above statements were materially false or misleading because, among other

things, they:

> a.    described the actions of the Company and the Company's competitors in seeking to (i) reduce and restrain the amount of freight capacity in the market; (ii) maintain a stable market share and avoid price reductions without stating that the competitors, rather than competing, were illegally collectively agreeing to reduce their capacity in order to keep pricing strong;
>
> b.    attributed the Company's rate improvements to its strong customer relationships and high service levels, without disclosing that rate improvements were accomplished by means of an illegal arrangement with competitors;
>
> c.    described the actions of the Company and the Company's competitors in their "disciplined" pricing.  The Company did not reveal that the discipline arose because of an illegal agreement;

    d.      misled investors who would have thought that the actions of the participants in the industry, which served to increase prices in Puerto Rico despite a weak economic environment, occurred without illegal collusion. An investor would have been more likely to invest in an industry that enjoyed legal price increases and containment of supply than one that did so illegally;

    e.      reported that the entry of a new competitor into the market might harm the Company's pricing power, but did not disclose that this occurrence would be so detrimental to the current competitive situation because the current players in the market were colluding; and

    f.      represented that the customer contracts that formed the basis of the Company's revenue were "confidentially negotiated" when, in fact, the terms of those contracts were shared with other market participants in order to fix prices.

### C.    Materially Misleading Statements and Omissions Related to the Puerto Rican Market and Its Post-Cartel Exposure Earnings Guidance

215.    On April 25, 2008, after the announcement of the Department of Justice investigation, the Company issued a press release entitled, "Horizon Lines Reports First Quarter 2008 Results," filed with the SEC on Form 8-K on April 30, 2008.  Therein, the Company announced a material reduction in its earnings guidance for 2008 and blamed this reduction on "soft"-ness in the Puerto Rican economy:

> "In the first quarter of 2008, Horizon Lines continued to improve the strength and efficiency of its operations in the face of a number of macroeconomic challenges," said Chuck Raymond, Chairman, President and Chief Executive Officer of Horizon Lines, Inc. **"Reduced southbound volumes in Puerto Rico and extreme weather conditions in our otherwise robust Alaska trade offset the strength of the Hawaii market.** Despite these challenges, we grew volumes from key customers and scored impressive wins in our logistics business. As reflected by our revenue growth and revenue per container, our business lines are fundamentally healthy and poised for future growth. While fuel prices in the quarter rose at a faster pace than anticipated, we were able to minimize their impact through reduced consumption and fuel cost recovery measures . . ."
>
> **Outlook**

> **Mr. Raymond concluded, "The outlook for our Puerto Rico market in particular is somewhat softer than we had originally anticipated and fuel costs have continued to rise at unprecedented rates, impacting our profitability in the near-term.** While we will clearly face some economic challenges in 2008, we are actively taking all measures we can to control our cost base. We also remain focused on utilizing our solid cash flows to reinvest in our business, positioning the Company to continue providing the highest quality service to our customers, and taking advantage of the eventual rebound in our Puerto Rico market. "

> **Based on current market conditions, the Company updated its earnings guidance for the full year 2008, with projections of operating venue at $1,315-$1,350 million, EBITDA at $145 - $160 million, and diluted earnings per share at $1.30-$1.69.** Free cash flow is projected at $72 - $ 87 million. Financial guidance does not include the potential impact of the previously announced Puerto Rico pricing investigation, which cannot be estimated at this time.

216.    In addition, Horizon's pricing guidance changed dramatically only a few short days after news of the DOJ investigation became public.  On April 25, 2008, Horizon's first statement on earnings guidance since the DOJ investigation broke, the Company adjusted its pricing expectations downward.  As part of its First Quarter 2008 earnings call presentation, filed with the SEC on Form 8-K on April 30, 2008 ("1Q 2008 Earnings Call Presentation"), the Company showed its assumptions for, among other things, "Unit Revenue Increase, Net."  In February 2008, before the price-fixing investigation became public, the estimate was 2.6%.  By April 2008, after the authorities initiated the probe of the industry, the Company lowered its unit revenue increase to 1.5%.

217.    On this news, the Company's shares declined $3.83 per share, or 23.1 percent, to close on April 25, 2008 at $ 11.25 per share, on unusually heavy trading volume.

218.    While Raymond, speaking for the Company, cited a "somewhat softer" Puerto Rican market as a reason for its revised reduction in earnings guidance, as demonstrated by the Company's prior statements above in ¶ 219, this assertion is not credible because it is clear that

(a) the Company had already recognized and confronted a weak Puerto Rican economy since at least 2006, and had experienced earnings growth despite that weak market, and (b) the Company had already factored in the weak Puerto Rican economy into its original 2008 earnings guidance. Moreover, during the 1Q 2008 Earnings Call Presentation, when asked about the "pretty substantial reduction" in pricing forecasts, Defendant Keenan responded:

> Our rates have been moderate and I think it's just a sign of in each of the three markets [Alaska, Guam and Puerto Rico] not only the competitive landscape but the state of the markets where - **we're choosing to be less aggressive on the rate lever.**

219.   The 2008 guidance reduction was thus due to the reality that the Company could no longer engage in its illegal cartel arrangement with competitors to boost earnings.  As shown below in subparagraphs (a) through (s), the weak Puerto Rican economy had existed for quite some time.

(a)   Horizon's Statements from the February 6, 2008 Form 10-K stated:

> **For example, shipping volume in Puerto Rico was down 8% in 2007 as compared to 2006 as a result of economic conditions in Puerto Rico. The economic downturn in Puerto Rico negatively affected our earnings. We cannot predict whether or when such downturns will occur.**
>
> The decreased revenue due to revenue container volume declines is primarily due to overall soft market conditions in Puerto Rico and decelerating growth in Hawaii.
>
> **The decreased revenue due to revenue container volume declines for the year ended December 24, 2006 is primarily due to overall soft market conditions in Puerto Rico** as well as a strategic shift away from lower margin automobile cargo to more refrigerated cargo and other higher margin freight. The temporary government shutdown in Puerto Rico and uncertainty surrounding tax reform contributed to the continued soft market conditions.
>
> Our outlook for 2008 reflects stable market conditions in Hawaii, **flat economic conditions in Puerto Rico**, and continued economic growth in Alaska.

(b)     On February 1, 2008, during the 4Q 2007 Earnings Call, Defendant Urbania

stated:

> I think we're most proud of the fact that we overcame difficult market conditions in Puerto Rico to keep our earnings pretty much in line with 2006.
>
> * * * * *
>
> In Puerto Rico, our expectation. . . is flat. So from a volume perspective we've brought for the company overall down from 3% to a percent and a half, which our view is that's a very realistic outlook given current economic conditions.

(c)     On February 1, 2008, during the 4Q 2007 Earnings Call, Defendant Raymond

stated:

> Well, we obviously talk to a lot customers down in Puerto Rico, and we see it changing a little bit. As we've been through a period of stagflation down there, it bottomed out, we believe, back last quarter. It started back in May of '06 when the rating agencies were about to—and did, in fact, downgrade their general obligation bonds.

(d)     On November 19, 2007, during the 4Q 2007 Revised Earnings Call, Defendant

Raymond stated:

> Once again, Puerto Rico has been a tough market for us. We have seen that market down about 7% to 8% for us, year-over-year, here, 2006 versus 2007.  Next year, we're going to be real careful about budgeting large volumes in that market. We're going to be quite conservative there to make sure that we're accurate in our forecasting.

(e)     On November 19, 2007, during the 4Q 2007 Revised Earnings Call Defendant

Urbania responded to the following question:

> **Jon Chappell - JPMorgan – Analyst**
>
> Thank you. Good afternoon, guys. Just [the] housekeeping question on the new guidance for the revenue side in Puerto Rico. Revenue is actually up from your previous guidance in the fourth quarter, yet you said there's some Puerto Rican softness that had

101

about a $4-million impact on EBITDA. Does that mean that there's some higher fuel surcharges that you're estimating in the fourth quarter? How do we rectify getting higher revenues with some further weakness in Puerto Rican volumes?

**Mark Urbania - Horizon Lines, Inc. - EVP and CFO**

Jon, this is Mark Urbania. You're exactly right. Our surcharge levels are going up. That's creating the revenue increase although we've decreased our EBITDA guidance. And, as you know, we don't earn any margin on fuel. Fuel is strictly a pass through. Because of the sharp increase in fuel prices, we have passed along what we can. That's created the additional revenue, but nothing on the EBITDA line for that.

(f)     On November 19, 2007, during the 4Q 2007 Revised Earnings Call, Defendant

Raymond responded to the following question:

**Kevin Sterling - Stephens, Inc. - Analyst**

Okay. And Chuck, do you think you could share with us maybe some granularity regarding your volume for Puerto Rico? I know we talked about Puerto Rico and you're being very conservative, which I think is the right thing to do, but can you help us think about in terms of kind of what you guys are thinking of in volumes for Puerto Rico?

**Chuck Raymond - Horizon Lines, Inc. - Chairman, President, and CEO**

Yes, Mark, we don't want to presume that Puerto Rico is going to bounce right back, so the kinds of volumes we're looking at in 2008 are between 5% and 6% actually below where we were in 2006. So we're being very, very careful about that. I would say that the 2008 volume in the headhaul direction, southbound of Puerto Rico, we're probably looking at somewhere around 112,000 loads, whereas in 2006, we handled about 118,000, 119,000.

(g)     In the 3Q 2007 10-Q, filed October 26, 2007, the Company stated:

The revenue container volume declines are primarily due to overall soft market conditions in Puerto Rico and decelerating growth in Hawaii.

(h)     In the 2Q 2007 10-Q, filed July 27, 2007, the Company stated:

> The revenue container volume declines are primarily due to overall soft market conditions in Puerto Rico and softening growth in Hawaii.

(i)     On July 27, 2007, during the 2Q 2007 Earnings Call, Defendant Raymond stated:

> But we really treasure our credibility and we think it is appropriate to use caution in forecasting the second half, particularly in Puerto Rico.

(j)     In the Company's First Quarter 2007 Form 10-Q , filed on April 26, 2007 and

signed by Defendant Urbania ("1Q 2007 10-Q"), the Company stated:

> The decreased revenue due to revenue container volume declines is primarily due to overall soft market conditions in Puerto Rico, an extended winter season in Alaska, as well as a strategic shift away from lower margin automobile cargo to more refrigerated cargo and other higher margin freight.

(k)     On April 26, 2007, during the 1Q 2007 Earnings Call, John Handy stated:

> In terms of a competitive update in light of those revenue and volume comments, overall market shares in all the trades remain very, very stable. Puerto Rico carriers, as we've mentioned before, have continued to withhold seasonal tonnage due to that slow economic growth. We're doing the same thing.

(l)     On April 26, 2007, during the 1Q 2007 Earnings Call, Defendant Urbania stated:

> 21 consecutive quarters of EBITDA growth despite challenging market conditions, particularly in Puerto Rico

(m)     In the 2006 10-K, the Company stated:

> The temporary government shutdown in Puerto Rico and uncertainty surrounding tax reform contributed to the continued soft market conditions.

(n)     In the March 2, 2007 Earnings Release Presentation, filed with the SEC on Form

8-K on March 9, 2007 and signed by Defendant Urbania,  Defendant Handy, presenting

on behalf of the Company, stated:

Puerto Rico volume did not rebound in the fourth quarter, but favorable rate, operating efficiencies, and intelligent deployment decisions mitigate shortfall

(o)     On March 2, 2007, during the 4Q 2006 Earnings Call, Defendant Urbania stated:

As you can see, the fourth quarter revenue analysis shows that we continue to offset volume softness, primarily due to softer market conditions in Puerto Rico, as John Handy just talked about, and offsetting that with improved rates and cargo mixes depicted here.

(p)     On October 30, 2006, during the 2006 Third Quarter Earnings Call, Defendant

Raymond stated:

Our presumption for next year is that we won't have that tax issue and that we'll have kind of a very low single-digit growth in the economy of Puerto Rico. One of the important things to know though is that as has occurred this year, even though the market is a little soft, we react to that and do a great job of managing our overhead costs and our variable cost in this business so our earnings don't suffer.

(q)     On July 28, 2006, during the 2006 Second Quarter Earnings Call, John Handy

stated:

All competitors have reacted responsibly to the economic slowdown in Puerto Rico by taking an estimated 15% tonnage decrease so far this year.

(r)     On April 28, 2006, during the 2006 First Quarter Earnings Call, Brian Taylor

stated:

The economic slow down in Puerto Rico has continued into 2006. We did see a little volume softness in quarter one. Higher interest rates, higher energy costs clearly impacted disposable income and there continues to be some uncertainty over the potential implement implementation of sales taxes coming on in 2000 sick. In spite of this positive GM P. growth is still projected. Our market shares continue to be strong.

(s)     On February 24, 2006, during the 2005 Fourth Quarter Earnings Call, Defendant

Raymond stated:

**Of course we have been in that Puerto Rico market since 1956. So we have a pretty good understanding of how that economy works.** And typically the economy of Puerto Rico trails the U.S. leading economic indices by eight or nine months I think if you go back and average over the last 20, 25 years. What we see happening in Puerto Rico is first of all the exports coming out. That includes the pharmaceuticals, the electronics, other products, some agricultural still moving off the island would be unimpacted by inflationary costs in Puerto Rico. The markets are still very viable in terms of their production costs and John Handy mentioned the productivity and the quality of the investments. They are still taking place in Puerto Rico.

In terms of the consumption going down, that is the beer and the poultry and the beans and the rice. Those are basic staples that the Puerto Rico family will consume. They may not go out to the most expensive restaurants to eat, but they are going to provide meals and they are going to eat and they are going to consume just as they did in the last recession that we saw back in 2001, 2002**. So we're pretty close to our customer base down there. We are comfortable with our share and we are comfortable with the assumption that our rates are going to continue to grow there on a reasonable basis going forward.**

220.    Thus, the Company, by its own admission, was already facing a weak Puerto Rican economy when it issued its original 2008 earnings guidance.  Defendant Keenan's admission on April 25, 2008 that the Company was now choosing to be less aggressive on its rates shows that the Company's reasoning for reducing its 2008 earnings guidance was that it no longer could engage in its illegal cartel with its competitors.  The market's reaction to the revised guidance, coming so closely on the heels of the announcement of the DOJ investigation, revealed to the market that the weak Puerto Rican market was not the impetus behind Horizon's lowered guidance.

**D.    Misstatements in Sarbanes-Oxley Certifications**

221.    Horizon, during the Class Period, made a number of materially misleading statements or omissions relating to the Sarbanes-Oxley certifications attached to its quarterly and annual SEC reports.

105

222.    The Company's 2006 10-K, filed on March 2, 2007 and signed by Defendants Raymond and Urbania, contained Sarbanes-Oxley required certifications, signed by Raymond and Urbania, who certified on behalf of Horizon that:

(a)    I have reviewed this report on Form 10-K of Horizon Lines, Inc.;

(b)    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; [and]

(c)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

223.    The Company's 1Q 2007 10-Q, filed on April 26, 2007 and signed by Defendant Urbania, also contained Sarbanes-Oxley required certifications signed by Defendants Raymond and Urbania, substantially similar to the certifications contained in ¶ 222.

224.    The Company's 2Q 2007 10-Q, filed on July 27, 2007 and signed by Defendant Urbania, also contained Sarbanes-Oxley required certifications signed by Defendants Raymond and Urbania, substantially similar to the certifications contained in ¶ 222.

225.    The Company's 3Q 2007 10-Q, filed on October 26, 2007 and signed by Defendant Urbania, also contained Sarbanes-Oxley required certifications signed by Defendants Raymond and Urbania, substantially similar to the certifications contained in ¶ 222.

226.    The Company's 2007 10-K, filed on February 6, 2008 and signed by Defendants Raymond and Urbania, also contained Sarbanes-Oxley required certifications signed by Defendants Raymond and Urbania, substantially similar to the certifications contained in ¶ 222.

227.    The above statements were materially false or misleading because, among other things, they failed to disclose and/or indicate that as a result of the illegal price-fixing

106

arrangement, the Company's public revenue, reported earnings reports, and revenue guidance during the Class Period were false and/or misleading.

## VII. ADDITIONAL STATEMENTS DEMONSTRATING AUTHORITY TO SPEAK ON BEHALF OF HORIZON BY DEFENDANT SERRA

228. Defendant Serra was repeatedly authorized prior to and during the Class Period to speak on behalf of Horizon on numerous matters. These public statements by Serra demonstrated that he was one of a select group of individuals at Horizon who, acting within the scope of their apparent authority were authorized to promote statements (including the false and misleading statements set forth above) to the public. Many such statements are set forth above in Section VI, ¶¶ 157-58, 183-86, 190-91, 209, and additional statements are set forth below.

229. A March 16, 2004 article in the Journal of Commerce stated that Horizon had added additional cranes to its Puerto Rico terminal and "the increased capacity of these cranes will help improve the line's productivity, said Gabriel Serra, division vice president and general manager, Puerto Rico, for Horizon Lines."

230. In a July 22, 2004 article in the Journal of Commerce, which discussed Horizon's service between Jacksonville and San Juan, stated:

> "The MJX service is generally suspended for the entire summer to coincide with off-peak seasonal demand," said Gabriel Serra, vice president and general manager, Puerto Rico services, for Horizon Lines. "**We have closely monitored the service levels and are experiencing a strong demand for Horizon Lines services**. Our commitment to providing best-in-class service drives our decision to return the MJX into service a month ahead of schedule." Mr. Serra noted that the carrier "has the ability and capacity to respond to immediate demands of the trade. Horizon Lines will again have ample capacity to handle the demand during August and has advised customers of this additional availability via Jacksonville."

231.    In a press release issued by Horizon on May 10, 2007, Serra was quoted as discussing an agreement between Horizon and the International Longshoremen's Association. The article stated:

> "The people of Horizon Lines are proud of this achievement," said Gabriel Serra, Vice President and General Manager. "our management team will continue working with union leaders to ensure that every worker returns home at the end of the day healthy and safe – the same way that they came to work."

232.    That press release contained an extensive discussion of Horizon Lines, Inc. and described the Company as "the nation's leading domestic ocean shipping and integrated logistics company."

233.    On September 24, 2007, Horizon issued a press release touting the fact that Serra had "been awarded a Top Management Award by the Puerto Rico Sales and Marketing Executives Association."  This information was repeated in a new story issued on October 15, 2007, which stated "Horizon also said Gabriel M. Serra, vice president and general manager of the company's Puerto Rico division, was named a Top Management Award winner by the Puerto Rico Sales and Marketing Executives Association."

234.    In a press release issued by Horizon on December 6, 2007, Serra was quoted as discussing the partnership between the U.S. military and law enforcement agencies and Horizon relating to the "continuous focus and improvement in the areas of safety and homeland security." That press release contained an extensive discussion of Horizon Lines, Inc. and described the company as "the nation's leading domestic ocean shipping and integrated logistics company."

235.    In a press release issued by Horizon on December 14, 2007, Serra was quoted as discussing a community outreach program between Horizon and a local school in Puerto Rico. That press release contained an extensive discussion of Horizon Lines, Inc. and described the company as "the nation's leading domestic ocean shipping and integrated logistics company."

236.    These statements were part of a long and continuous history of Serra speaking on behalf of Horizon.

## VIII.   ADDITIONAL ALLEGATIONS RELEVANT TO SCIENTER

> A.    **The Senior Management Defendants Had A Duty to Monitor Horizon's Compliance With the U.S. Antitrust Laws Prohibiting Price-Fixing and Ignored Red Flags Alerting Them To the Need to Investigate**

237.    During the Class Period, the Company, in its public statements including its filings with the SEC, repeatedly touted its Code of Business Conduct and Ethics, and implied that its management was compliant with this code.[5]  Indeed, the Code of Business Conduct and Ethics was signed by Defendant Raymond.  As described below and herein, these statements are probative of Defendants' scienter because they show that ethics concerns generally and concerns about antitrust violations specifically, were an area of particular focus for Defendants.

238.    The Jones Act trade lanes were unique in that, unlike other international ocean shipping lanes, price collusion amongst competitors was strictly prohibited and punishable by criminal and civil sanctions.  As discussed above in Section V(F), the improbable rate increases, especially in the "soft" Puerto Rico market raised a red flag because these increases were achieved despite a declining market and dramatically decreased volume of containers being shipped.  The Senior Management Defendants, if not themselves co-conspirators in the conspiracy (as alleged), had a duty to investigate the causes of these unlikely rate increases, and could do so through a review of pricing reports, during their direct discussions with customers,

---

[5] The Code of Business Conduct and Ethics is attached to the Company's 2007 10-K and referred to by reference in the Company's 2006 10-K and April 18, 2008 Schedule 14A Proxy Statement which state, in relevant part, "The Company has adopted a Code of Business Conduct and Ethics that governs the actions of all Company employees, including officers. The Code of Business Conduct and Ethics is posted within the Investor Relations section of the Company's internet website at www.horizonlines.com. The Company will provide a copy of the Code of Business Conduct and Ethics to any stockholder upon request."

or by using Horizon's EBITDA to make relevant comparisons between Horizon and its competitors.

239.   The Company's Code of Business Conduct and Ethics was "distributed electronically to all officers, employees and directors of Horizon Lines, Inc. and its subsidiaries . . . to provide guidance and set common ethical standards that each Associate of the Company adheres to on a consistent basis."

240.   The Code of Business Conduct and Ethics directly addressed the need for compliance with the U.S. Antitrust Laws:

> **a. U.S.A. Antitrust Laws.**
>
> **Our policy is to comply with all applicable antitrust laws.** Most of our business is conducted in the U.S. noncontiguous domestic trade and commerce. Except for certain exemptions, the U.S. antitrust laws generally apply fully to such trade and commerce as well as to our other businesses.
>
> **Unless a particular activity is specifically exempted from the antitrust laws, those laws apply. Associates must be certain that actions or practices either comply with the antitrust laws or fall specifically within an exemption.**
>
> Certain practices or actions are considered so basically wrong that they are deemed unreasonable in all cases and can be ruled a violation of antitrust laws without need for proof that the conduct actually restrained trade. Such practices or actions (called "per se" violations) include:
>
> > (1) **price fixing among two or more competitors;** and
> >
> > (2) **division of markets, customers or territories among two or more competitors.**
>
> Tying devices or arrangements, and reciprocal dealing, can also constitute "per se" violations in some circumstances and are strictly prohibited by Company policy.

241.   The Code of Business Conduct and Ethics discussed the full parameters of illegal price fixing and division of markets:

**Price Fixing.** It is a "per se" violation for rates to be fixed among two or more competitors. **Unless expressly authorized by an exemption, there cannot be any discussion with competitors with regard to rates in U.S. domestic or foreign trades or in any business in U.S. commerce.** Even if there is no actual agreement reached as to the prices to be charged by each, if the prices should subsequently be the same the courts may rule that an unlawful "agreement" is inferred under the theory of conscious parallelism between competitors. Agreements as to minimum or maximum prices are also illegal per se. Courts have broadly defined conduct which constitutes price collusion to include any agreement which attempts to limit competition by tampering with price. There are no defenses to price-fixing, even if:

> 1. The price is reasonable;
>
> 2. The competitors who agreed had no market power;
>
> 3. The agreement was never carried out; or
>
> 4. The agreement stopped "ruinous" competition.

**Division of Markets. Two or more competitors cannot agree among themselves as to the customers, markets or territories which each will serve when U.S. antitrust laws apply.** This prohibition includes agreements to restrict the amount of service each is to render in the same market.

242.    Further, the Company's Code of Business Conduct and Ethics emphasized that all employees must strictly adhere to these principles and that a failure to do so was unlawful and to the detriment of stockholders:

> **Strict adherence to the principles in the Company's Code of Business Conduct and Ethics is one of the conditions of the continued employment.** Any infraction will subject the offending Associate(s) to disciplinary actions, including dismissal.
>
> The principal purposes of this Code are to educate and inform Associates as to the standard expected of them in the business activities of the Company and to avoid acts that might be unlawful or contrary to the business ethics of the Company, to its detriment and to the detriment of its Associates **and stockholders.**

243.    Moreover, as the allegations herein (including the information alleged above that is not repeated herein but is expressly incorporated)—particularly the repeated references in the

public filings regarding how pricing for Puerto Rico was directed centrally from Charlotte, and how all senior executives had "direct involvement" with all aspects of the business, including servicing customers, as well as the statements of the Government—demonstrate, the Senior Management Defendants knew or were reckless in failing to investigate and uncover the long-standing price-fixing conspiracy that raised red flags by offsetting Horizon's losses and increasing its revenue to show steadily rising operating revenue despite a declining market. The obviousness of these red flags was further confirmed by CW 7, the Director of Strategic Development from 1997 to 2005 in the Corporate Development Department at Horizon's main Hawaiian competitor, Matson Navigation ("Matson"), who worked with the Puerto Rico trade line and was present at meetings with Horizon employees during the Class Period, stated that, in his experience, the stability of prices in the Puerto Rico trade line should have raised a red flag and indicated to the Senior Management Defendants the possibility of active collusion. CW 7 explained that in a market with four competitors, such as Puerto Rico, explicit collusion would be necessary to keep prices fixed amongst all competitors because, even if two or three players in a market like Puerto Rico tacitly agree through signaling or publication of their rates to keep rates low and increase volume, one maverick will typically attempt to increase volume by lowering rates and increasing competition. Thus, the fact that prices were so stable across the four Puerto Rican market competitors should have indicated to Horizon's executives that active collusion was taking place.

### B. Defendants Serra, Gill and Glova Have Already Admitted Their Scienter and Confirmed Horizon's Participation in the Price-Fixing Conspiracy

244. As described above, in Section V(C), Defendants Serra, Gill and Glova have each admitted to their roles in creating and implementing Horizon's price-fixing scheme. At all relevant times, Defendants Serra and Glova acted with scienter in making the above-quoted

materially false and misleading statements throughout the Class Period.  As described herein,

Defendant Serra, who pleaded guilty and is serving 34 months in jail, was heavily involved with

Horizon's price-fixing scheme and had regular and "direct communications with a number of

other senior executives."  His close relationship with the rest of management was not only

demonstrated by the facts referenced above, including statements in public filings and references

to him on public conference calls, but was highlighted in September 2007 after he was awarded a

management prize from the Puerto Rico Sales and Marketing Executives Association and

Defendant Raymond stated that "Gabe [Serra] is not only a great manager, which he proves

everyday in our company, he is a great person."  His close relationship with other senior

executives is also confirmed by the statements in the IPO prospectus and by the fact that Serra

was repeatedly authorized to speak for the Company to the public.

245.    Defendant Gill, who pleaded guilty and is serving 29 months in jail, has also

admitted to his central role in the price fixing scheme.  Moreover, Gill generated and received,

and has now produced to the government, "contemporaneous documents evincing his and others'

involvement" in the price-fixing conspiracy from inception.  *See*, *supra*, ¶97.

246.    Likewise, Defendant Glova also pleaded guilty to participating in an illegal price-

fixing scheme and is serving 20 months in jail.  Glova played "an indispensible role in dealing

with senior executives involved in the conspiracy" and has provided information to the DOJ,

including recordings of several telephone calls made to others at Horizon.  *See*, *supra*, ¶98.

**C.    Defendants Raymond, Urbania, Keenan, Taylor and Handy Acted With Scienter**

247.    At all relevant times, the uncharged Senior Management Defendants acted with

scienter in making the above-quoted materially false and misleading statements throughout the

Class Period.  Each of the Senior Management Defendants had actual knowledge that the

statements made by them were false and misleading, or acted with deliberate reckless disregard for the truth or falsity of those statements. These Defendants' intent to deceive, or deliberately reckless disregard for the truth, is demonstrated by substantial circumstantial evidence collectively supporting a strong inference of scienter.

248.    Upon information and belief, the uncharged Senior Management Defendants, along with the corporate Horizon Defendants, are potential targets of the investigation by the DOJ. As stated above, Defendants Serra, Gill and Glova have all cooperated with the DOJ and have provided testimonial, documentary and telephonic evidence that implicates senior executives at Horizon. *See*, *supra*, Section V(C). Further, the DOJ has very clearly indicated that the criminal investigation is "ongoing" and is "charges in other aspects of the case . . . are to come down the road. *See*, *id.*

249.    Moreover, in the DOJ's sentencing memorandum for Defendant Gill, the DOJ stated that "[Gill] has provided evidence, in the form of statements and documents, against his superiors within [Horizon], including presently uncharged co-conspirators." The only possible uncharged Horizon employees involved in the Puerto Rican market that were "superior" to Defendant Gill were Defendants Raymond, Urbania, Keenan, Handy, and Taylor. As such, one of these Individual Defendants is presently an "uncharged co-conspirator." Further, at Serra's sentencing, the federal prosecutor stated "there are others higher than Mr. Serra who are certainly of interest to the government" and "[Serra] is essentially -- I don't want to use middle management in terms of the conspiracy, but he's in the middle . . ."

250.    The uncharged Senior Management Defendants all had substantial industry experience such that they knew or were deliberately reckless in not knowing how prices were being fixed, bids being rigged and clients being manipulated in each of their primary cabotage

markets.  Moreover, the uncharged Senior Management Defendants were each particularly involved in the management of the Puerto Rican trade lines.  Some earnings conference calls were held in Puerto Rico, and Defendant Raymond indicated that he, Defendant Keenan and other senior executives visited with customers in Puerto Rico on a regular basis.  Because of their regular interaction with Horizon's clients in Puerto Rico and elsewhere, Defendants knew, or were deliberately reckless in not knowing, how prices were arrived at, how customers were allocated and bids rigged.

251.    Scienter is further demonstrated by the Defendants' Class Period statements and conduct.  Defendant Urbania stated in November 2007 that "[t]here's been good discipline in the market between ourselves and our [Puerto Rico market] competitors. Price increases have come through even though volume softness has existed in 2007. There's no reason for us to believe that will change in 2008 and we're factoring between 3 and 4% in terms of real rate improvement." He made similar statements at other times during the Class Period.  These statements show that Defendant Urbania either was conveying the knowing misstatements of his subordinates or himself knew or was reckless in not knowing of the price-fixing conspiracy. The Puerto Rican market was the largest market for Horizon. It was critical for Horizon management to understand its pricing dynamics. It was so important that Defendant Raymond conducted the third quarter 2007 conference call from Puerto Rico.  On the conference call, Defendant Raymond stated, "I'm down here, John Keenan has been here all week, he's been working with customers…" On this call, John Keenan noted certain trends in the Puerto Rican economy, which had been experiencing significant weakness for many quarters. Despite this weakness, the Company was still "renewing contracts" with its customers with "increases in . . . tradable rates."  Defendant Handy also spoke frequently about the Puerto Rico trade lane and the Company's success in

raising rates there.  For example, during the third quarter 2006 earnings conference call on

October 30, 2006, Handy stated that he had talked to Serra (identified by his position as VP in

Puerto Rico), and that "he is already seeing a significant increase in consumer spending and

continued investment" in Puerto Rico, and, during a fourth quarter 2006 conference call, Handy

stated that the Company projected "minimal but steady growth, very positive for Puerto Rico."

Likewise, Defendant Taylor was heavily involved in the Puerto Rico market and made false and

misleading representations about rate increases without disclosing that those increases were

achieved through an illegal price fixing conspiracy.  For example, in a first quarter 2006 earnings

conference call held on April 28, 2006, Taylor stated that "[i]n Puerto Rico we continue to

negotiate rate increases into our customer contracts. . . We believe that the competitive

environment right now continues to be stable enough to support reasonable and ongoing rate

increases."

252.    In the face of a very weak Puerto Rican market, Defendant Urbania nevertheless

was optimistic that Horizon and its competitors could continue to raise its rates 3-4% per year.

This projection is contrary to accepted business and economic wisdom that downward price

pressure usually exists in weak demand markets.  *See* MARAD Report, *supra* ¶¶ 46, 83, 88.

Defendant Urbania knew that he was providing a projection that was, in typical situations,

economically unjustifiable.  This is why he juxtaposed the weak demand situation in Puerto Rico

against the countervailing price guidance. Defendant Urbania could not have responsibly

undertaken his job had he assumed that prices would continue to rise in the weak Puerto Rican

market without first verifying this situation with his employees who worked in Puerto Rico.  The

employees Urbania spoke to would have included Serra, who was the head of Horizon's Puerto

Rican market and a member of Horizon's executive office management team with Urbania. As

alleged herein, Urbania knew or were reckless in not knowing that the competitors were communicating amongst themselves to raise rates.  If, however, he was deceived by Serra, Serra knew that his deception would be repeated by Urbania in statements they made to the public.  In either case, however, defendant Urbania knowingly or recklessly conveyed materially false and deceptive information to the market through his comments during the earnings calls. In the first instance, he knowingly communicated the misstatements; in the second, he recklessly communicated information which his subordinates knew to be false and misleading without further investigating the cause of the projected and historical rate increases.

253.    Similarly, Defendants Keenan and Raymond traveled to Puerto Rico for the third quarter conference call and spoke to the employees about the pricing and demand situation in Puerto Rico.  The employees these executives spoke to would have included Serra, who was the head of Horizon's Puerto Rican market and a member of Horizon's executive office management team with Keenan and Raymond. As alleged herein, Defendants Keenan and Raymond knew or were reckless in not knowing that the competitors were communicating amongst themselves to raise rates.  If, however, they were deceived by Serra, Serra knew that his deception would be repeated by these executives in statements they made to the public.

254.    As corroborated by CW 1, prices could not be unilaterally set in Puerto Rico; they had to get authorization from the headquarters sales department and the CEO, Defendant Raymond, or his equivalent.  Additionally, all pricing activities and directions relating to the Puerto Rican market were "centrally coordinated" by the executives working out of the Company's North Carolina headquarters.  A successful price-fixing conspiracy could not occur without those prices being coordinated and approved by the executives working out of North Carolina, including Defendants Raymond and Urbania.  Information relating to this direction,

which also suggested that pricing direction gave the Company a "competitive" advantage, were

clearly delineated in the Company's 2006 Form 10-K and 2007 Form 10-K.  The Sales and

Marketing Section of the 2006 Form 10-K and 2007 Form 10-K are substantially similar, and

state, in relevant part:

### Sales and Marketing

We manage a sales and marketing team of 114 employees strategically located in our various ports, as well as in seven regional offices across the continental U.S., from our headquarters in Charlotte, North Carolina. Senior sales and marketing professionals in Charlotte are responsible for developing sales and marketing strategies and are closely involved in servicing our largest customers**. All pricing activities are also centrally coordinated from Charlotte and from Renton, Washington, enabling us to manage our customer relationships. The marketing team located in Charlotte is responsible for providing appropriate market intelligence and direction to the Puerto Rico sales organization.**

Our regional sales and marketing presence ensures close and direct interaction with customers on a daily basis. Many of our regional sales professionals have been servicing the same customers for over ten years. We believe that we have the largest sales force of all container shipping and logistics companies active in the major non-contiguous Jones Act markets**.  Unlike our competitors, our sales force cross-sells our shipping and logistics services across all of these markets. We believe that the breadth and depth of our relationships with our customers is the principal driver of repeat business from our customers.** We further believe that our long-standing customer relationships and our cross-selling efforts enable us to forge customer relationships which provide us **with a distinct competitive advantage**.

255.    Throughout 2007 and early 2008, Horizon experienced profitable shipping rates

in Puerto Rico, despite the admittedly "slow" market.  Defendants repeatedly and falsely

attributed these unlikely rate increases to strong customer relationships, high service levels and

discipline in the market, despite the fact that these rates were actually the result of a price-fixing

conspiracy between Horizon and its three competitors.

256.    Similarly, as set forth above, Defendants Raymond and Urbania repeatedly signed

sworn certifications attesting to the adequacy of Horizon's internal controls and reliability of the

Company's public revenue, reported earnings reports and revenue guidance in each and every

quarter during the Class Period.  These Defendants acted intentionally or in a deliberately

reckless manner in repeatedly issuing sworn certifications attesting to the adequacy of Horizon's

internal controls, when the facts alleged herein demonstrate that Horizon's financial results were

not accurately presented and that Horizon suffered from significant deficiencies and material

weaknesses in internal controls.

257.    The sudden and precipitous "resignation" of Defendant Urbania raises an

additional inference of scienter as against him and the other senior executive defendants.  The

circumstances of Urbania's resignation, while shrouded in mystery, are extremely suspicious

under any standard.  As of April 2008, Urbania had been employed with the Company for

approximately five years and had received a number of promotions, including holding the "key"

position of Chief Financial Officer from July 2004 when the Company was privately held until

his abrupt and unexplained resignation from the public company on April 1, 2008.  He had

received (and was continuing to receive) millions of dollars in stock and other compensation

from Horizon.  In his position as Chief Financial Officer, Urbania was the regular face of the

Company on public conference calls and spoke repeatedly to analysts and investors regarding all

aspects of Horizon's business.  For each quarter during the Class Period, Urbania took the lead

on conference calls addressing financial performance and he signed each of the Company's Form

10-Qs filed with the SEC during the Class Period, including the attached Sarbanes-Oxley

certifications.  Moreover, Urbania was one of the "key management personnel" identified in

Horizon's public filings as follows:

> Our future success will depend, in significant part, upon the continued
> services of Charles G. Raymond, our Chairman of the Board, President
> and Chief Executive Officer, M. Mark Urbania, our Executive Vice
> President and Chief Financial Officer , John W. Handy, our Executive

Vice President, John V. Keenan, our President, Horizon Lines, LLC, and Brian W. Taylor, our President, Horizon Logistics, LLC. **The loss of the services of any of these executive officers could adversely affect our future operating results because of their experience and knowledge of our business and customer relationships.  If key employees depart, we may have to incur significant costs to replace them and our ability to execute our business model could be impaired if we cannot replace them in a timely manner.** We do not expect to maintain key person insurance on any of our executive officers.

258.    This disclosure identifying Urbania as a "key" employee whose departure could adversely affect the Company's operations was made throughout the Class Period, including in the Company's 2007 Form 10-K, **which was filed with the SEC on February 6, 2008 – less than five weeks before Urbania abruptly "resigned" and left the Company**.  In addition, Urbania's exit was extremely hasty.  He "resigned" on April 1, a Tuesday, was "replaced" by another officer on Thursday and was "out the door" on Friday, April 4.  For a senior "key" executive to depart in such haste – without so much as the customary two weeks' notice that would be expected of even a much lower level employee with less responsibility – is highly peculiar.  Moreover, Urbania's exit came just two weeks before the price fixing investigation was revealed and only three weeks before the Company was scheduled to announce its earnings for the first quarter of 2008 – an event that Urbania would be heavily involved with (both in preparing and signing the Form 10-Q and Sarbanes-Oxley certifications and speaking extensively to investors on the earnings conference call), as he was for other quarters throughout the Class Period.  For this long-serving CFO to abruptly leave the Company on the eve of this quarterly filing (and just weeks after being identified as a key employee) raises an inference that he was involved or had knowledge of the illegal activity that was revealed to the public shortly thereafter.  The suspicious nature of Urbania's resignation is further confirmed by the fact that he did not receive any severance pay or other payment, as would be customary for the services of a "key" executive who had been with the Company for years (and who had shepherded it through a

"successful" IPO). While Horizon barely commented on Urbania's exit in April 2008, Horizon's Proxy Statement filed in April 2009 states that Urbania "was not paid any compensation or benefits when he resigned except for amounts that he had previously earned." By way of contrast, as set forth above, when Defendant Handy (who had served the Company for far less time than Urbania) resigned in 2009, he received a lump sum payment of $388,000, full vesting of 70,000 shares of stock (now valued at approximately $370,000), a "dividend" payment of $19,000 and additional compensation as set forth above. Finally, the questions surrounding Urbania's resignation are particularly odd given that, according to Horizon's April 2009 Proxy, Urbania lost more than $4 million worth of unvested stock and options by resigning when he did "by resigning, Mr. Urbania forfeited his unvested shares of restricted stock and stock options").

> **D.     Defendants Were Motivated By a Desire to Make Millions of Dollars in the IPO and Then to Sell Their Inflated Shares of Common Stock Throughout the Class Period**

259.    In the lead-up to the September 26, 2005 IPO, the Senior Management Defendants were uniquely motivated to take Horizon public. On January 14, 2005, the Company issued and sold 1.7 million restricted shares of common stock to 14 members of its management team, with the vast majority of those shares sold to the Senior Management Defendants and Defendant Gill at a nominal price of $0.35 per share for a total of $0.6 million. The benefits of these restricted shares could only be realized through their vesting into common stock following an IPO, which created a public trading market for the stock and substantially increased its trading value, thereby greatly increasing the Defendants' personal wealth. Indeed, the IPO Prospectus stated "prior to the consummation of this offering, there has been no market for our common stock." On October 18, 2005, approximately two weeks after the IPO was completed, Horizon's Board of Directors vested in full all of the stock purchased on January 14, 2005 at a cost to the Company of $19 million (approximately $11.02 per share), $15.5 million of that amount was

attributable to the vesting of the Senior Management Defendants' and Defendant Gill's restricted stock. The following chart sets forth the Senior Management Defendants' stock holdings and value on the eve of the IPO, and the value when these shares vested as of October 18, 2005 directly following the IPO:

| Defendant | Number of Shares | Value Before IPO | Value at Vesting Price |
|---|---|---|---|
| Raymond | 689,861 | $243,032 | $7,602,268 |
| Urbania | 258,695 | $91,136 | $2,850,818 |
| Keenan | 258,695 | $91,136 | $2,850,818 |
| Taylor | 86,224 | $30,178 | $950,188 |
| Serra | 86,224 | $30,178 | $950,188 |
| Gill | 26,865 | $9,052 | $285,032 |

260.    These Defendants had unique and powerful motives to conceal Horizon's true financial condition from the public in order to conduct the IPO because without a public market for the shares, the shares were worth a nominal amount and not freely tradable.

261.    In the IPO Prospectus dated September 26, 2005, the Company stated that as of the date of the Offering, its management team—namely, Defendants Raymond, Urbania, Keenan, Taylor, Serra, and  three others—owned 19% of the Company's common equity, and would own 11% of the common equity totaling $19 million worth of common stock once the Offering was completed.  Once the Company became publicly-traded, the Senior Management Defendants' ownership shares were monetized and publicly tradable, making some of them instant multi-millionaires if they were not so already.

262.    The Company's April 24, 2006 Proxy Statement identified additional value realized by the Senior Management Defendants on September 26, 2005 when they exercised stock options granted under the "Horizon Lines Stock Option Plan" prior to July 7, 2004 to purchase shares of the Company's common stock.  According to the proxy, through the exercise of these stock options, Raymond realized an additional value of $6,822,390; Urbania realized an additional value of $1,842,449; Keenan realized an additional value of $2,569,449; Serra realized an additional value of $1,898,553; and Taylor realized an additional value of $1,954,798.

263.    Moreover, once the Senior Management Defendants and Defendant Gill were able to vest their restricted shares and purchase shares of the Company's common stock at a discount, the Defendants were virtually assured a dividend of $0.11 per quarter or $0.44 per year per share, netting nearly $1 per share over the course of the Class Period which amounted to millions of dollars in additional compensation over the course of the Class Period, yet another example of the Senior Management Defendants' incentive to keep the price of the common stock inflated.

264.    The substantial pecuniary benefits that these Defendants received through an IPO did not stop there.  Following the IPO, on October 18, 2005, the Company also announced the granting of cash "merit awards" to the Company's three top executives:  Defendant Raymond received $800,000; Urbania received $600,000 and Keenan received $600,000—monies that they would not have received if the illegal price-fixing conspiracy had been disclosed.

265.    The Senior Management Defendants were also motivated to conceal Horizon's true financial condition as a result of the Horizon Lines, Inc. Amended and Restated Equity Incentive Plan ("Equity Incentive Plan") that was adopted on the eve of the IPO on September 20, 2005.  Under the terms of the Equity Incentive Plan, the Company granted the Senior Management Defendants, along with three other members of management, nonqualified stock

options to purchase up to 705,100 shares in the IPO, at the public offering price per share of $10.

Half of these non-qualified stock options were granted to the Senior Management Defendants, a

portion of which were fully exercisable on September 27, 2006, when the Company's common

stock closed at $16.14, a significant increase from the option price of $10.  These stock options

created additional incentive for the Senior Management Defendants to artificially inflate the

price of Horizon's stock.  The following chart shows the amount of options granted to the Senior

Management Defendants as part of the Equity Incentive Plan on the eve of the IPO:

| Senior Management Defendant | Number of Options Granted on 9/27/05 |
|---|---|
| Raymond | 154,626 |
| Urbania | 67,925 |
| Keenan | 67,925 |
| Taylor | 42,175 |
| Serra | 42,175 |
| Handy (served as a consultant, but not an employee in 2005) | 10,000 |

266.     Horizon's IPO was extremely attractive to the Individual Defendants because it

allowed them to reap huge financial rewards from their ownership stake in the Company.  Not

only did a small group of Defendants stand to immediately make more than tens of millions of

dollars from the IPO, but they had other benefits as well.  For example, the IPO created a public

trading market that would allow the Individual Defendants to sell their stock for large profits, or,

at a minimum, use their Horizon stock as collateral for personal loans, and it created a capital

infusion for the Company that increased the book value of Horizon shares.  In addition,

Defendant Raymond's sons, Joe Raymond and Sam Raymond, also stood to gain financially

from the IPO, as they each held at least 34,000 shares of common and preferred Company stock

as of December 16, 2004, according to the Company's September 20, 2005 registration statement

filed on Form S-1/A.

      267.    The Individual Defendants were also motivated to conceal Horizon's participation

in an illegal price-fixing conspiracy—and the true financial condition of the Company absent

that conspiracy—as a result of Horizon's Cash Incentive Plan that would only pay cash bonuses

to senior management subject to both corporate and individual performance criteria based in

large part on EBIDTA.  Had Horizon's rates not been arrived at through price-fixing, bid-rigging

and customer allocation, they would not have steadily increased year after year, thereby causing

a substantial reduction in Horizon's EBIDTA.  In fact, Defendants, through the positive

performance numbers achieved as a result of the price-fixing conspiracy, received substantial

cash bonuses in 2006:  Raymond received a cash incentive bonus of $775,000; Urbania received

a cash incentive bonus of $281,750; Handy received a cash incentive bonus of $237,196; Keenan

received a cash incentive bonus of $173,880; and Taylor received a cash incentive bonus of

$152, 400.  The Individual Defendants' desire to receive bonuses under the Cash Incentive Plan

also raises a strong inference of scienter.

      268.    Moreover, after the IPO and during the remainder of the Class Period, Defendants

Raymond, Urbania, Keenan, Handy, Taylor and Serra each took advantage of the artificial

inflation they created in the price of Horizon common stock by selling, in the aggregate, 441,602

shares of their personally held Horizon common stock for aggregate proceeds of over

$11,064,716.51 as follows:

| Defendant | Date | Shares | Price | Proceeds |
|-----------|------|--------|-------|----------|
| Raymond | 11/17/2006 | 125,000 | $21.11 | $2,639,831.85 |
| Raymond | 11/29/2006 | 6,000 | $27.34 | $164,017.80 |
| Urbania | 12/5/2007 | 3,000 | $28.80 | $86,400.00 |
| Keenan | 12/15/2006 | 3,000 | $28.47 | $85,412.10 |
| Raymond | 12/29/2007 | 6,000 | $26.78 | $160,693.80 |
| Urbania | 1/5/2007 | 3,000 | $26.49 | $79,470.00 |
| Keenan | 1/24/2007 | 3,000 | $28.86 | $86,577.00 |
| Raymond | 1/29/2007 | 6,000 | $29.77 | $178,624.80 |
| Keenan | 2/22/2007 | 3,000 | $31.18 | $93,542.70 |
| Raymond | 3/1/2007 | 6,000 | $28.86 | $173,160.00 |
| Keenan | 3/14/2007 | 138,602 | $24.74 | $3,428,327.46 |
| Keenan | 3/21/2007 | 3,000 | $31.71 | $95,130.00 |
| Raymond | 3/29/2007 | 6,000 | $32.78 | $196,680.00 |
| Urbania | 4/5/2007 | 3000 | $32.88 | $98,640.00 |
| Keenan | 4/23/2007 | 3000 | $33.54 | $100,620.00 |
| Raymond | 4/30/2007 | 6000 | $34.23 | $205,380.00 |
| Urbania | 5/7/2007 | 3000 | $33.87 | $101,610.00 |
| Keenan | 5/21/2007 | 3000 | $32.11 | $96,324.00 |
| Raymond | 5/29/2007 | 6000 | $33.46 | $200,760.00 |
| Urbania | 6/5/2007 | 3000 | $34.24 | $102,720.00 |

| Defendant | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Keenan | 6/21/2007 | 3000 | $32.91 | $98,730.00 |
| Raymond | 6/29/2007 | 6000 | $32.96 | $197,742.00 |
| Urbania | 7/5/2007 | 3000 | $33.78 | $101,340.00 |
| Keenan | 7/23/2007 | 3000 | $35.75 | $107,250.00 |
| Raymond | 7/30/2007 | 6000 | $28.67 | $171,990.00 |
| Urbania | 8/10/2007 | 3000 | $26.40 | $79,200.00 |
| Keenan | 8/22/2007 | 3000 | $29.85 | $89,538.00 |
| Raymond | 8/29/2007 | 6000 | $27.51 | $165,060.00 |
| Urbania | 9/5/2007 | 3000 | $27.49 | $82,470.00 |
| Serra | 9/17/2009 | 650 | $25.99 | $16,890.00 |
| Keenan | 9/24/2007 | 3000 | $28.57 | $85,710.00 |
| Raymond | 10/1/2007 | 6000 | $30.98 | $185,880.00 |
| Urbania | 10/9/2007 | 3000 | $31.58 | $94,740 |
| Serra | 10/15/2007 | 650 | $32.93 | $21,405.00 |
| Keenan | 10/19/2007 | 3000 | $32.82 | $98,472.00 |
| Raymond | 10/29/2007 | 6000 | $31.52 | $189,120.00 |
| Urbania | 11/5/2007 | 3000 | $30.00 | $90,000.00 |
| Serra | 11/15/2007 | 650 | $27.01 | $17,557.00 |
| Keenan | 11/21/2007 | 3000 | $20.02 | $60,045.00 |
| Raymond | 11/29/2007 | 6000 | $20.02 | $120,090.00 |
| Keenan | 12/21/2007 | 3000 | $19.08 | $57,228.00 |
| Raymond | 12/31/2007 | 6000 | $18.56 | $111.354.00 |
| Keenan | 1/23/2008 | 3000 | $17.98 | $53,949.00 |

| Defendant | Date | Shares | Price | Proceeds |
|-----------|------|--------|-------|----------|
| Keenan | 2/22/2008 | 3000 | $21.24 | $63,711.00 |
| Raymond | 2/29/2008 | 6000 | $20.18 | $121,104.00 |
| Keenan | 3/24/2008 | 3000 | $18.88 | $56,647.00 |
| Raymond | 3/31/2008 | 6000 | $18.60 | $111,573.00 |
| Keenan | 4/21/2008 | 3000 | $14.00 | $42,000.00 |

269.    The above sales resulted in significant profits for these Individual Defendants. Whereas Keenan's base salary in 2007 was $325,000.00, he grossed **nearly $4.8 million** from stock sales during the Class Period.  Similarly, whereas Raymond's base salary in 2007 was $640,000.00, he grossed **over $5.3 million** from stock sales during the Class Period.  And Urbania, whose base salary in 2007 was $364,000.00, grossed $916,590.00 from stock sales during the Class Period, nearly tripling his salary.  Finally, Serra grossed an additional $55,872.00 from stock sales during the Class Period.   Defendants Raymond, Urbania, Keenan and Serra were able, through the above-listed insider sales, to receive very large sums of money and maximize their profits from the vested shares received in 2005 that they never would have received if the truth were disclosed.

270.    Moreover, because the corrective disclosures at the end of the Class Period were triggered not by any of these Defendants, but by the completely unexpected announcement of the DOJ investigation, these Defendants' insider trading was cut short by that announcement.

271.    Some of the above sales by Defendants Raymond, Urbania and Keenan were made pursuant to 10b5-1 sales plans, all executed in November 2006, in the middle of the Class Period, and during the period that the antitrust price-fixing scheme was well underway.  Those

128

plans – commenced only during the time of the scheme complained of herein – cannot negate

Defendants' substantial motive and opportunity to profit from selling their personally-held

Horizon common stock during the Class Period.  To the contrary, as noted by the SEC's Director

of Enforcement in a speech on March 8, 2007:

> In 2000, the SEC enacted Rule 10b5-1 in order to clarify the law
> about when executives who may come into possession of inside
> information can legally trade. Rule 10b5-1 allows corporate
> executives to make a plan, at a time when they are not in
> possession of inside information, to make prearranged trades at
> specified prices or dates in the future. The idea was to give
> executives "a safe harbor" to proceed with these prearranged trades
> without facing charges of insider trading. The Rule was intended to
> give executives regular opportunities to liquidate their stock
> holdings—to pay their kids' college tuition, for example—without
> risk of inadvertently facing an insider trading inquiry. However,
> recent academic studies suggest that the Rule is being abused.  The
> academic data shows that executives who trade within a 10b5-1
> plan outperform their peers who trade outside of such a plan by
> nearly 6%; it ought to be the case that plan participants should be
> no more successful on average than those who trade outside a plan.
> ***The difference seems to be that executives with plans sell more
> frequently and more strategically ahead of announcements of
> bad news. This raises the possibility that plans are being abused
> in various ways to facilitate trading based on inside information.***
> We're looking at this—hard. We want to make sure that people are
> not doing here what they were doing with stock options. ***If
> executives are in fact trading on inside information and using a
> plan for cover, they should expect the "safe harbor" to provide
> no defense.***  [Emphasis added.]

272.    Indeed, all of the Horizon Individual Defendants' 10b5-1 plans (none of which

are public) are highly suspicious because they were all entered into in late 2006, six years after

such plans were allowed by the SEC and over a year after the IPO.  Moreover, prior to the

implementation of their 10b5-1 plans in late November 2006, except for the one notably huge

sale of 125,000 shares for a profit of over $2.6 million by Defendant Raymond on November 17,

2006, none of these Defendants made any sales of their stock in 2006.

## IX.    LOSS CAUSATION

273.    Defendants' failure to disclose their wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

274.    Defendants' above-mentioned, undisclosed and fraudulent business practices allowed Horizon to report misleading, false and inflated financial revenues, income, profits, margins and growth. Defendants omitted to disclose the illegitimate practices underlying Horizon's reported and purported financial results, and instead attributed such revenues, earnings, profits, margins and growth to Horizon's managerial, strategic and operational quality. Believing Horizon to be a well managed, well-run, fast-growing company, the market consequently so valued Horizon's shares, enabling them to close at a class period high of $36.51 on July 19, 2007.

275.    Analysts covering the Company were unaware of the illegal cartel which allocated customers and fixed prices.  For example, in its March 14, 2007 analyst report, analyst Morgan Keegan reported, in relevant part:

> [I]n Horizon's Alaska and Puerto Rico trade lanes, a majority of the containers shipped are priced on confidential, negotiated contracts, which are not subject to oversight by the STB. **We are somewhat concerned about yields in the near term given the additional capacity that Horizon is adding to its fleet in 2007. We believe that this capacity will ultimately be absorbed but remain cautious regarding the timing of pricing equilibrium.**
>
> Overcapacity – Overcapacity is always a concern for transportation service providers as it relates to price sensitivity. Although HRZ's domestic markets are protected by the Jones Act, the company is increasing its capacity in two of its three U.S. trade lanes. If demand slows and excess capacity exists, pricing pressure could ensue.

276.    But despite the analyst's concerns, the Company managed quickly to arrive at a beneficial pricing equilibrium.  Although the market and the investing public did not then know

it, Horizon's profits were not legitimate.  The revenues, profits, income and margins, and the growth in the foregoing, which formed the basis for the market's doubling the value of the Horizon's shares, were arrived at, not by operational excellence, but by Defendants' above-mentioned, undisclosed and fraudulent business practices, which, as described below, exposed Horizon to undisclosed and highly material liabilities including fines and penalties, disgorgement, increased legal and regulatory costs, and loss of further business with customers.

277.    On April 17, 2008, Horizon announced that it was the subject of an antitrust investigation by the United States Department of Justice's Antitrust Division, and that federal agents had served search warrants and a grand jury subpoena relating to pricing practices in the Puerto Rican trade lanes.  In response to this April 17, 2008 disclosure, Horizon's shares fell from their April 16, 2008 closing price of $18.23 per share to close on April 17, 2008 at $14.70 per share, a 1-day decline of $3.53 per share, or 19.36%, on a volume of 4,365,902 shares traded. The government's investigation still continues.

278.    On April 25, 2008, Horizon disclosed its financial results for the 2008 fiscal first quarter, and unexpectedly revised downward the Company's earnings guidance for the 2008 fiscal year.  While the Company cited a "somewhat softer" Puerto Rican market as a reason for its revised reduction in earnings guidance, it is clear that the guidance reduction was, in fact, due to the reality that the Company could no longer engage in its  illegal cartel arrangement with competitors to boost earnings. In response to this April 25, 2008 disclosure, Horizon's shares fell from their April 24, 2008 closing price of $15.08 per share to close on April 25, 2008 at $11.25 per share, a 1-day decline of $3.83 per share, or 23.10%, on a volume of 4,701,598 shares traded.

279.    In sum, disclosure of the government investigation and its consequences between April 17, 2008 and April 25, 2008 caused Horizon shares to decline from $18.23 per share on

April 16, 2008 (the last closing price of the shares prior to disclosure of the government

investigation) to $11.25 per share on April 25, 2008, a decline of $6.98 per share, representing

the loss of 38.29 % of the value Horizon shares possessed prior to disclosure of the government

investigation.  Horizon's shares have steadily declined since the end of the Class Period.

280.    During the Class Period, by failing to disclose that Horizon's financial

performance was the result of improper, illegitimate and illegal business practices, Defendants

engaged in a course of conduct that deceived the market, that artificially inflated the prices of

Horizon's shares, and that operated as a fraud and deceit upon Plaintiff and the Class.

Defendants' failure to disclose their undisclosed and illegal business practices misled Plaintiff

and the Class not only as to Horizon's contemporary financial results, but also Horizon's future

prospects. As a result of Defendants' failure to disclose its fraudulent business practices,

investors did not know of the sizeable liabilities to which Defendants' conduct had exposed

Horizon, nor of the possible and actual loss of business, nor of the Government scrutiny that

would fall upon Horizon and Horizon's operations. Therefore, by concealing rather than

disclosing such risks (and the conduct which gave rise to those risks), Defendants presented to

Plaintiff and the Class a misleading picture of Horizon's business and prospects. The April 2008

disclosures had substantial and material corrective effects on the value of and artificial inflation

in Horizon's shares, causing Plaintiff and other Class members economic losses and thus

damages under the federal securities laws.

281.    The near 40% decline in the value of Horizon's shares following the above-

detailed disclosures was the direct result of the nature and extent of Defendants' fraud finally

being revealed to investors and the market. The timing, speed and magnitude of Horizon's price

declines negate any inference that the losses suffered by Plaintiff and the Class were caused by

changed market conditions, macroeconomic or industry-wide factors, or Company-specific facts

unrelated to Defendants' fraudulent conduct.  The economic losses and legal damages suffered

by Plaintiff and the Class were the direct result of Defendants' artificial inflation of Horizon's

share price and the subsequent decline in the value of Horizon's shares when Defendants' Class-

Period misrepresentations and other fraudulent conduct were revealed.

## X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

282.    The statutory safe harbor and/or bespeaks caution applicable to forward-looking

statements under certain circumstances does not apply to any of the false or misleading

statements pleaded in this Amended Complaint.

283.    First, none of the statements complained of herein was a forward-looking

statement.  Rather the statements complained of herein were historical statements or statements

of purportedly current facts and conditions at the time the statements were made, including

statements of reported financial results and underwriting practices and loan quality.  Given the

then-existing facts contradicting Defendants' statements, the generalized risk disclosures made

by Horizon in its SEC filings and press releases were not sufficient to insulate Defendants from

liability for the statements they made because those statements were materially misstated when

made.

284.    Second, the statutory safe harbor does not apply to statements included in

financial statements which purport to have been prepared in accordance with GAAP.

285.    To the extent any of the false or misleading statements alleged herein can be

construed as forward-looking statements, the statements were not accompanied by meaningful

cautionary language identifying important facts that could cause actual results to differ materially

from those in the statements.  This is because, as set forth above in detail, the then-existing facts

contradicted Defendants' statements regarding the Company's pricing practices, its purported

compliance with GAAP and the purported effectiveness of its internal controls.

286.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any

forward-looking statements pleaded herein, Defendants are liable for those false and misleading

forward-looking statements because at the time each of those statements was made, the speakers

knew the statement was false or misleading, or the statement was authorized or approved by an

executive officer of Horizon who knew that the statement was materially false or misleading

when made.

## XI.    PRESUMPTION OF RELIANCE

287.    The market for Horizon common stock was, at all relevant times, an efficient

market that promptly digested current information with respect to the Company from all

publicly-available sources and reflected such information in the price of the securities.

288.    Horizon common shares were traded on the New York Stock Exchange, a highly

efficient market.  The Company was consistently followed, before and throughout the Class

Period, by the media, which issued over 230 news stories regarding the Company during the

Class Period and by securities analysts who published over 65 analyst reports regarding Horizon

during the Class Period.  The price of Horizon securities reacted promptly to the dissemination of

new information regarding the Company, as set forth above.  Horizon securities were actively

traded throughout the Class Period, with substantial trading volume and average weekly turnover

and high institutional investor participation.

289.    Accordingly, Plaintiff and other members of the Class did rely and are entitled to

have relied upon the integrity of the market price for Horizon securities and to a presumption of

reliance on Defendants' materially false and misleading statements and omissions during the

Class Period.  Additionally, Plaintiff is entitled to a presumption of reliance because the claims

asserted herein against Defendants also are predicated upon omissions of material fact which there was a duty to disclose.

## XI.    CLAIMS FOR RELIEF

### COUNT ONE:  For Violations Of Section 10(b)
### Of The Exchange Act, Against All Defendants

290.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

291.    This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, including rule 10b-5(a) and (c), on behalf of Plaintiff and members of the Class against all Defendants.

292.    As alleged herein, throughout the Class Period, these Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  These Defendants intended to and did, as alleged herein:  (i) deceive the investing public, including Plaintiff and other members of the Class; (ii) artificially inflate and maintain the price of Horizon common stock; and (iii) cause Plaintiff and the members of the Class to purchase Horizon securities at artificially inflated prices.

293.    The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiff and members of the Class, by virtue of having prepared, approved, signed and/or disseminated documents which contained

untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

294.    As set forth above, the Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiff and the other members of the Class who purchased Horizon common stock during the Class Period.

295.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Horizon common stock, Plaintiff and other members of the Class purchased Horizon securities at artificially inflated prices during the Class Period.  But for the fraud, Plaintiff and members of the Class would not have purchased Horizon securities at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Horizon common stock declined precipitously and Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Horizon securities at artificially inflated prices and the subsequent decline in the price of Horizon common stock and when the truth was disclosed.

296.    By reason of the foregoing, Defendants are liable to Plaintiff and the members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### COUNT TWO: For Violations Of Section 20(a) Of The Exchange Act Against Horizon Lines, Inc.

297.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

136

298.    This claim is brought pursuant to Section 20(a) of the Exchange Act against Horizon Lines, Inc. on behalf of Plaintiff and members of the Class.

299.    Horizon Lines, Inc. acted as a controlling person of the Individual Defendants, Horizon Lines, LLC and Horizon Lines of Puerto Rico, Inc. within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of its high level position, and its ownership and contractual rights, culpable participation in and/or awareness of the Individual Defendants', Horizon Lines, LLC's and Horizon Lines of Puerto Rico, Inc.'s operations, activities and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the defendant named in this Count had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the  Individual Defendants, Horizon lines, LLC and Horizon Lines of Puerto Rico, Inc., including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The defendant named in this Count, Horizon Lines, Inc., was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after the statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

300.    In particular, due to Horizon Lines, Inc.'s direct and supervisory involvement in the day-to-day operations of the Company; complete ownership of Horizon Lines, LLC. and Horizon Lines of Puerto Rico, Inc.; its participation in the preparation and dissemination of the Company's public filings; the overlapping management of Horizon Lines, Inc. with its subsidiaries, Horizon lines, LLC and Horizon Lines of Puerto Rico, Inc., as described in Horizon's annual reports and other public filings during the Class Period; Horizon Lines, Inc.,

therefore, is  presumed to have had the power to control or influence the particular transactions

giving rise to the securities violations as alleged herein, and exercised the same.

301.    As set forth above, Horizon Lines, Inc. and Individual Defendants, Horizon Lines,

LLC and Horizon Lines of Puerto Rico, Inc. each violated Section 10(b) and Rule 10b-5 by their

acts and omissions as alleged in this Amended Complaint.  By virtue of its position as a

controlling person of the Individual Defendants and Horizon Lines, LLC, Horizon Lines, Inc. is

liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of

Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in

connection with their purchases of the Company's securities during the Class Period.

302.    By reason of the foregoing, Horizon Lines, Inc. is liable to Plaintiff and the

members of the Class for violations of Section 20(a) of the Exchange Act.

## COUNT THREE: For Violations Of Section 20(a) Of The Exchange Act
### Against Defendants Raymond, Urbania, Keenan, Handy, Taylor, Serra and Gill

303.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set

forth herein.

304.    This claim is brought pursuant to Section 20(a) of the Exchange Act against

Defendants Raymond, Urbania, Keenan, Handy, Taylor, Serra, and Gill on behalf of Plaintiff and

members of the Class.

305.    The defendants named in this Count, Defendants Raymond, Urbania, Keenan,

Handy, Taylor, Serra, and Gill acted as controlling persons of the Company (Horizon Lines, Inc.

Horizon Lines, LLC and Horizon Lines of Puerto Rico, Inc.) within the meaning of Section 20(a)

of the Exchange Act as alleged herein.  By virtue of their high level positions, and their

ownership and contractual rights, culpable participation in and/or awareness of the Company's

operations and/or intimate knowledge of the false financial statements filed by the Company

with the SEC and disseminated to the investing public, the defendants named in this Count,

Defendants Raymond, Urbania, Keenan, Handy, Taylor, Serra, and Gill, had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Plaintiff

contends are false and misleading.  The defendants named in this Count were provided with or

had unlimited access to copies of the Company's reports, press releases, public filings and other

statements alleged by Plaintiff to be misleading prior to and/or shortly after their statements were

issued and had the ability to prevent the issuance of the statements or cause the statements to be

corrected.

306.    In particular, the defendants named in this Count had direct and supervisory

involvement in the day-to-day operations of the Company and, therefore, are presumed to have

had the power to control or influence the particular transactions giving rise to the securities

violations as alleged herein, and exercised the same.

307.    As set forth above, the Individual Defendants and the Company each violated

Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Amended Complaint.

By virtue of their positions as controlling persons of the Company, Defendants Raymond,

Urbania, Keenan, Handy, Taylor, Serra, and Gill are liable pursuant to Section 20(a) of the

Exchange Act.  As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff

and other members of the Class suffered damages in connection with their purchases of the

Company's securities during the Class Period.

308.    By reason of the foregoing, the Defendants Raymond, Urbania, Keenan, Handy,

Taylor, Serra and Gill are liable to Plaintiff and the members of the Class for violations of

Section 20(a) of the Exchange Act.

## XII.   JURY TRIAL DEMAND

309.   Plaintiff, on behalf of itself and the Class, hereby demands a trial by jury.

## XIII.   PRAYER FOR RELIEF

310.   WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for relief and

judgment as follows:

A.   Determining that this action is a proper class action and certifying Lead Plaintiff, Detroit P&F, as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' violations in an amount to be proven at trial, together with interest thereon;

C.   Awarding rescission and/or rescissory damages in favor of Plaintiff and the members of the Class;

D.   Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiff and the other members of the Class;

E.   Awarding Plaintiff and the Class the fees and expenses incurred in the prosecution of this action, including attorneys' fees and expert fees; and

F.   Granting such other and further relief as the Court may deem just and proper.

Dated: December 23, 2009                      Respectfully submitted,


_____
                    **/s/ Sean M. Brennecke**
Andre Bouchard  (#2504)
Sean M. Brennecke (#4686)
**BOUCHARD MARGULES &
FRIEDLANDER, P.A.**
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500

*Liaison Counsel*

John C. Browne
Lauren A. McMillen
Sean O'Dowd

140

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Telephone: 212-554-1400
Facsimile: 212-554-1444

Peter S. Linden
Ira M. Press
David Kovel
Steven D. Cohn

**KIRBY McINERNEY LLP**
825 Third Avenue, 16th Floor
New York, New York 10022
(212) 371-6600

*Co-Lead Counsel for Lead Plaintiff the Police &
Fire Retirement System of the City of Detroit*

141

# APPENDIX A

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

| | |
|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br><br>Plaintiff,<br><br><br>v.<br><br><br>HORIZON LINES, INC., HORIZON LINES, LLC, HORIZON LINES OF PUERTO RICO, INC., CHARLES G. RAYMOND, MARK URBANIA, JOHN V. KEENAN, GABRIEL SERRA, R. KEVIN GILL, and GREGORY GLOVA,<br><br><br>Defendants. | No. 08-969(HB)<br><br>(Securities Class Action)<br><br>Hon. Harvey Bartle, III |

## APPENDIX A: DISMISSED FALSE AND MISLEADING STATEMENTS FROM THE CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

In its Memorandum Opinion and Order of November 13, 2009, the Court held that Lead Plaintiff had failed to sufficiently plead the falsity of certain statements identified in the Consolidated Securities Class Action Complaint. In deference to the Court's holding, these statements have been removed from the Amended Consolidated Securities Class Action Complaint. However, the following allegations about Defendants' misstatements and omissions

are appended to the Amended Consolidated Securities Class Action Complaint to preserve the record for appeal.

**A.**     **Misstatements and Omissions Related to the Company's Code Of Ethics**

1.     During the Class Period, the Company, in its public statements including its filings with the SEC, repeatedly touted its Code of Business Conduct and Ethics, and implied that its management was compliant with this code.[1]   As described below and herein, the statements set forth in the Company's Code of Business Conduct and Ethics were materially false and/or misleading when made.

2.     The Company's Code of Business Conduct and Ethics states, in relevant part:

> **This Code is being distributed electronically to all officers, employees and directors of Horizon Lines, Inc. and its subsidiaries.** Each officer, employee and director should read it carefully.
>
> **The purpose of this Code is to provide guidance and set common ethical standards that each Associate of the Company adheres to on a consistent basis.** It governs the actions and working relationships of the Company's Associates with current and potential customers, fellow employees, competitors, vendors, suppliers, government and self-regulatory agencies, the media and anyone else with whom the Company has contact. These relationships are essential to the continued success of the Company.
>
> This Code is designed to deter wrongdoing and to promote:

---

[1] This Code of Business Conduct and Ethics is attached to the Company's February 6, 2008 Form 10-K, filed with the SEC, and referred to by reference in the Company's March 2, 2007 Form 10-K and April 18, 2008 Schedule 14A Proxy Statement which state, in relevant part, "The Company has adopted a Code of Business Conduct and Ethics that governs the actions of all Company employees, including officers. The Code of Business Conduct and Ethics is posted within the Investor Relations section of the Company's internet website at www.horizonlines.com. The Company will provide a copy of the Code of Business Conduct and Ethics to any stockholder upon request."

> • **honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;**
>
> • **full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, governmental and regulatory agencies and in other public communications made by the Company;**
>
> • **compliance with applicable governmental laws, rules and regulations;**
>
> • the prompt internal reporting to an appropriate person of violations of this Code; and
>
> • accountability for adherence to this Code.
>
> **Supervisors are responsible for ensuring that their employees are aware that the Company's basic operating principle is to** conduct business in accordance with the highest level of integrity and ethical standards.

3.   The Company's Code of Business Conduct and Ethics also includes an overview of its adherence with U.S. Antitrust Laws.  This section states, in relevant part:

> **a. U.S.A. Antitrust Laws.**
>
> **Our policy is to comply with all applicable antitrust laws.** Most of our business is conducted in the U.S. noncontiguous domestic trade and commerce. Except for certain exemptions, the U.S. antitrust laws generally apply fully to such trade and commerce as well as to our other businesses.
>
> **Unless a particular activity is specifically exempted from the antitrust laws, those laws apply. Associates must be certain that actions or practices either comply with the antitrust laws or fall specifically within an exemption.**
>
> Certain practices or actions are considered so basically wrong that they are deemed unreasonable in all cases and can be ruled a violation of antitrust laws without need for proof that the conduct actually restrained trade. Such practices or actions (called "per se" violations) include:

(1) **price fixing among two or more competitors**; and

(2) division of markets, customers or territories among two or more competitors.

Tying devices or arrangements, and reciprocal dealing, can also constitute "per se" violations in some circumstances and are strictly prohibited by Company policy.

4.  The Company's Code of Business Conduct and Ethics also includes an overview of its policies with regards to price-fixing and division of markets.  This section states, in relevant part:

> **Price Fixing.** It is a "per se" violation for rates to be fixed among two or more competitors. **Unless expressly authorized by an exemption, there cannot be any discussion with competitors with regard to rates in U.S. domestic or foreign trades or in any business in U.S. commerce.** Even if there is no actual agreement reached as to the prices to be charged by each, if the prices should subsequently be the same the courts may rule that an unlawful "agreement" is inferred under the theory of conscious parallelism between competitors. Agreements as to minimum or maximum prices are also illegal per se. Courts have broadly defined conduct which constitutes price collusion to include any agreement which attempts to limit competition by tampering with price. **There are no defenses to price-fixing**, even if:
>
> > 1. The price is reasonable;
> >
> > 2. The competitors who agreed had no market power;
> >
> > 3. The agreement was never carried out; or
> >
> > 4. The agreement stopped "ruinous" competition.
>
> **Division of Markets. Two or more competitors cannot agree among themselves as to the customers, markets or territories which each will serve when U.S. antitrust laws apply.** This prohibition includes agreements to restrict the amount of service each is to render in the same market.

5.  Further, the Company's Code of Business Conduct and Ethics emphasized that all

employees must strictly adhere to these principles.  The Code's Conclusion states, in the relevant part:

> **This Code is a guide to all Associates in their business activities and all Associates are expected to strictly adhere to both the letter and the spirit of this Code.**
>
> **Strict adherence to the principles in the Company's Code of Business Conduct and Ethics is one of the conditions of the continued employment.** Any infraction will subject the offending Associate(s) to disciplinary actions, including dismissal.
>
> The principal purposes of this Code are to educate and inform Associates as to the standard expected of them in the business activities of the Company and to avoid acts that might be unlawful or contrary to the business ethics of the Company, to its detriment and to the detriment of its Associates **and stockholders**.

6.     Through this Code of Ethics, the Company falsely gave investors the comfort that its employees were abiding by U.S. antitrust laws and that it had rigorous controls that ensured that its employees would not violate those laws.

7.     The Company's website also emphasized that "credibility" and "competition" were important values to the Company, without informing the public that Horizon was, in fact, colluding with competitors in an illegal price-fixing cartel.  The Company's website states, in relevant part:

> The Values
>
> **Horizon Lines' values** are captured in our focus and commitment to the Seven C's:
>
> 1. **Credibility**
>
> 2. Customers
>
> 3. Consideration
>
> 4. Cost

5. Cooperation

6. Communication

7. **Competition**

**Horizon Lines is committed to the highest ethical standards and best practices in corporate governance. Our standards, practices and structures are designed to guide our management and directors in a manner consistent with the interests of our shareholders.**

8.      These statements were materially false and misleading because (a) the Company failed to disclose that Defendants, rather than acting in accordance with the Company's Code of Business Conduct and Ethics banning illegal price-fixing, had entered into and engaged in an illegal price-fixing conspiracy in the Puerto Rico and elsewhere, with the intent to suppress and eliminate competition by, among other things, allocating customers, rigging bids, and fixing the rates, surcharges and other fees charged to customers for ocean freight services; and (b) Defendants' illegal price-fixing conspiracy violated the Company's own Code of Business Conduct and Ethics.

**B.  Misstatements Related to Sarbanes-Oxley Certifications**

1.      Horizon, during the Class Period, made a number of materially misleading statements or omissions relating to the Sarbanes-Oxley certifications attached its quarterly and annual SEC reports.

2.      The Company's 10-K filed on March 2, 2007 contained Sarbanes-Oxley required certifications, signed by Defendants Raymond and Urbania, who certified on behalf of Horizon that:

(a)      I have reviewed this report on Form 10-K of Horizon Lines, Inc.;

(b)      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(c)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(d)    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (i)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (ii)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (iii)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(e)    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (i)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(ii)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

3.     On April 26, 2007 the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2007 fiscal first quarter. The Company's 10-Q was signed by Defendant Urbania and reaffirmed the Company's financial results announced on April 26, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications signed by Defendants Raymond and Urbania, substantially similar to the certifications contained in ¶ 106, *supra*.

4.     On July 27, 2007 the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2007 fiscal second quarter. The Company's 10-Q was signed by Defendant Urbania and reaffirmed the Company's financial results announced on July 27, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications signed by Defendants Raymond and Urbania, substantially similar to the certifications contained in ¶ 106, *supra*.

5.     On October 26, 2007 the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2007 fiscal third quarter. The Company's 10-Q was signed by Defendant Urbania and reaffirmed the Company's financial results announced on October 26, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications signed by Defendants Raymond and Urbania, substantially similar to the certifications contained in ¶ 106, *supra*.

6.     On February 6, 2008 the Company filed its Annual Report with the SEC on Form 10-K for the 2007 fiscal year. The Company's 10-K was signed by Defendants Raymond and Urbania and reaffirmed the Company's financial results announced on February 1, 2008. The Company's 10-K also contained Sarbanes-Oxley required certifications signed by Defendants Raymond and Urbania, substantially similar to the certifications contained in ¶ 106, *supra*.

7.     Additionally, the Company's filings falsely suggest that its internal controls were adequate and effective. In the Company's 2007 Form 10-K, filed on March 2, 2007, Horizon

stated, in relevant part:

> We are required to satisfy the requirements of Section 404 for the fiscal year ended December 24, 2006. Although we have satisfied the requirements of Section 404 for the year ended December 24, 2006, **if we fail to maintain the adequacy of our internal controls, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act. Moreover, effective internal controls, particularly those related to revenue recognition, are necessary for us to produce reliable financial reports and are important to helping prevent financial fraud. If we cannot provide reliable financial reports or prevent fraud, our business and operating results could be harmed, investors could lose confidence in our reported financial information and the trading price of our common stock could drop significantly.**
>
> **Disclosure Controls and Procedures**
>
> The Company maintains disclosure controls and procedures designed to ensure information required to be disclosed in Company reports filed under the Securities Exchange Act of 1934, as amended (the Exchange Act), is recorded, processed, summarized, and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in Company reports filed under the Exchange Act is accumulated and communicated to management, including the Company's Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.
>
> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures pursuant to Rule 13a-15(b) of the Exchange Act as of December 24, 2006. **Based on that evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of December 24, 2006.**

**Management's Report on Internal Control over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) under the Securities Exchange Act of 1934. Pursuant to the rules and regulations of the Securities and Exchange Commission, internal control over financial reporting is a process designed by, or under the supervision of, the Company's principal executive and principal financial officers, and effected by the Company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States. Due to inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Further, because of changes in conditions, effectiveness of internal control over financial reporting may vary over time.

8.      The above statements were materially false or misleading because, among other things, they failed to disclose and/or indicate that (a) as a result of the illegal price-fixing arrangement, the Company's public revenue, reported earnings reports, and revenue guidance during the Class Period were false and/or misleading; and (b) the Company lacked adequate internal controls.