# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, INDIVIDUALLY and ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | : : : : | No. 08-969 (HB) (Securities Class Action) |
| Plaintiff, | : : : | Hon. Harvey Bartle, III |
| v. | : : | ELECTRONICALLY FILED |
| HORIZON LINES, INC., HORIZON LINES, LLC, CHARLES G. RAYMOND, MARK URBANIA, JOHN V. KEENAN, JOHN W. HANDY, BRIAN TAYLOR, GABRIEL SERRA, R. KEVIN GILL, and GREGORY GLOVA, | : : : : : : : : | |
| Defendants. | : : | |

---

## DEFENDANTS HORIZON LINES, INC., HORIZON LINES, LLC, CHARLES G. RAYMOND, M. MARK URBANIA, JOHN V. KEENAN, JOHN W. HANDY AND BRIAN W. TAYLOR'S JOINT OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

Anthony W. Clark (ID No. 2051)
Paul J. Lockwood (ID No. 3369)
Nicole A. DiSalvo (ID No. 4662)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
Telephone:  (302) 651-3000
Facsimile:   (302) 651-3001

*Attorneys for Defendants Horizon Lines,*
*Inc. and Horizon Lines, LLC*

Steven L. Caponi (ID No. 3484)
BLANK ROME LLP
1201 Market Street
Wilmington, Delaware  19801
Telephone:  (302) 425-6400
Facsimile:   (302) 425-6464

OF COUNSEL:
Joseph O. Click
BLANK ROME LLP
Watergate, 600 New Hampshire Ave., NW
Washington, DC  20037
Telephone:  (202) 772-5966
Facsimile:   (202) 572-8361

*Attorneys for Defendant Charles G. Raymond*

Kevin F. Brady (ID No. 2248)
Jeremy D. Anderson (ID No. 4515)
CONNOLLY BOVE LODGE
  & HUTZ LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware  19899
Telephone:  (302) 658-9141
Facsimile:  (302) 658-5614

*Attorneys for Defendants M. Mark
Urbania, John W. Handy and Brian W.
Taylor*

William M. Lafferty (ID No. 2755)
MORRIS NICHOLS ARSHT &
  TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware  19899
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

OF COUNSEL:
Christopher M. Curran
Matthew S. Leddicotte
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005
Telephone: (202) 626-3600
Facsimile:  (202) 639-9355

*Attorneys for Defendant John V. Keenan*

DATED: February 12, 2010

# TABLE OF CONTENTS

**PAGE**

TABLE OF CASES AND AUTHORITIES ............................................................... iii

PROCEDURAL HISTORY .................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................. 3

STATEMENT OF FACTS .................................................................................... 8

ARGUMENT ....................................................................................................... 15

I.     COUNT ONE OF THE AMENDED COMPLAINT SHOULD BE DISMISSED
WITH PREJUDICE FOR FAILURE TO PLEAD A CLAIM UNDER SECTION
10(b) OF THE EXCHANGE ACT OR SEC RULE 10b-5 ............................... 15

     A.     The Court's Prior Opinion Is The Law Of The Case ............................ 15

     B.     Plaintiff's Section 10(b) And Rule 10b-5 Claims Are Subject To
Heightened Pleading Standards ........................................................... 15

     C.     The Amended Complaint Should Be Dismissed Because It Does Not
Adequately Allege That The Individual Defendants Acted With Scienter ........... 18

          1.     The new allegations in the Amended Complaint do not adequately
allege that Raymond, Urbania, Keenan, Handy or Taylor had
knowledge of the purported price-fixing conspiracy ................................. 20

          2.     New allegations do not show that Raymond, Urbania, Keenan,
Handy or Taylor were reckless in not knowing about the price-
fixing conspiracy ..................................................................................... 27

          3.     Raymond's, Urbania's, Keenan's, Handy's and Taylor's stock sales
and/or incentive compensation fail to establish scienter ............................ 30

     D.     The Amended Complaint Fails To Adequately Allege A Violation Of
Section 10(b) Or Rule 10b-5 Against Horizon Lines ........................... 33

          1.     There can be no claim against the corporate defendants for
statements made by Raymond, Urbania, Keenan, Handy or Taylor ......... 34

          2.     Serra, Gill and Glova did not make false and misleading statements
to investors on behalf of the Company regarding Horizon Lines'
revenues, rates or price competition ......................................................... 34

(a)     The statements attributable to Serra, Gill and Glova were
        directed to customers, not investors ................................................35

(b)     The statements of Serra, Gill and Glova do not concern
        revenues, rates or price competition ................................................36

(c)     The statement attributed to Serra that occurred eight
        months before the IPO is not actionable .......................................41

E.   The Amended Complaint Fails To Allege That There Was A Material
     False Or Misleading Statement On April 25, 2008 ................................................45

II.   COUNTS TWO AND THREE OF THE AMENDED COMPLAINT SHOULD
      BE DISMISSED BECAUSE PLAINTIFF FAILS TO STATE A CLAIM UNDER
      SECTION 20 OF THE EXCHANGE ACT ......................................................................46

III.  THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE. ..........................48

CONCLUSION ...............................................................................................................................49

## <u>TABLE OF CASES AND AUTHORITIES</u>

<u>CASES</u>                                                                                      PAGE(S)

*Acito v. Imcera Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ....................................................................33

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)........................................................26, 27, 30, 39

*In re Alpharma Inc. Sec. Litig.*,
    372 F.3d 137 (3d Cir. 2004)........................................................... *passim*

*In re AM Int'l, Inc. Sec. Litig.*,
    108 F.R.D. 190 (S.D.N.Y. 1985) .........................................................43

*Beissinger v. Rockwood Computer Corp.*,
    529 F. Supp. 770 (E.D. Pa. 1981) .......................................................46

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................29

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)........................................................31, 44

*In re Cadence Design Sys., Inc. Sec. Litig.*,
    654 F. Supp. 2d 1037 (N.D. Cal. 2009) ...............................................26

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)..................................................8, 24, 25

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988)............................................................................15

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
    No. 08-969, 2009 WL 3837659 (D. Del. Nov. 13, 2009).............................. *passim*

*Clark v. Comcast Corp.*,
    582 F. Supp. 2d 692 (E.D. Pa. 2008) ...........................................24, 47

*Cozzarelli v. Inspire Pharms., Inc.*,
    549 F.3d 618 (4th Cir. 2008) .............................................................21

*In re Digital Island Sec. Litig.*,
    223 F. Supp. 2d 546 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004)...............47

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005) .................................................................................17

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
    560 F. Supp. 2d 1221 (M.D. Fla. 2008)................................................32

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    256 F.R.D. 82 (D.Conn. 2009)...............................................................44

*Galati v. Commerce Bancorp, Inc.*,
    No. 04-3252 (RBK), 2005 WL 3797764 (D.N.J. Nov. 7, 2005),
    *aff'd*, 220 F. App'x 97 (3d Cir. 2007)............................................39, 40

*In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig.*,
    No. 03-4100, 2004 WL 1541232 (3d Cir. 2004) ..................................26

*Hamilton v. Leavy,*
    322 F.3d 776 (3d Cir. 2003)....................................................................15

*Hemming v. Alfin Fragrances, Inc.*,
    690 F. Supp. 239 (S.D.N.Y. 1988).................................................35, 36

*In re Hunter Envtl. Servs. Inc. Sec. Litig.*,
    921 F. Supp. 914 (D. Conn. 1996).........................................................46

*In re IBM Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)....................................................................42

*In re IKON Office Solutions, Inc., Sec. Litig.*,
    277 F.3d 658 (3d Cir. 2002)....................................................................44

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009).......................................................... *passim*

*In re Intelligroup Sec. Litig.*,
    468 F. Supp. 2d 670 (D.N.J. 2006) .................................................42, 43

*Kushner v. Beverly Enters., Inc.*,
    317 F.3d 820 (8th Cir. 2003) ..................................................................25

*Lain v. Evans*,
    123 F. Supp. 2d 344 (N.D. Tex. 2000) ..................................................44

*LaSala v. Bordier et Cie*,
    519 F.3d 121 (3d Cir. 2008)....................................................................17

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007).................................................................16

*McGowan Investors LP v. Frucher*,
    481 F. Supp. 2d 405 (E.D. Pa. 2007) ............................................. 32-33

*Menkes v. Stolt-Nielsen S.A.*,
    No. 3:03 CV 409 (DJS), 2005 WL 3050970 (D. Conn. Nov. 10, 2005) ..............41

*In re Merck & Co. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005).................................................................43

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
    547 U.S. 71 (2006)......................................................................16, 46

*In re MetLife Demutualization Litig.*,
    229 F.R.D. 369 (E.D.N.Y. 2005) .......................................................44

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2009) ..................................................... 28-29

*Morse v. McWhorter*,
    200 F. Supp. 2d 853 (M.D. Tenn. 2000)................................................32

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002)..............................................................17

*In re Network Assocs., Inc. II Sec. Litig.*,
    No. C 00-CV-4849, 2003 WL 24051280 (N.D. Cal. Mar. 25, 2003)...................32

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)......................................................... 45-46

*In re Refco, Inc. Sec. Litig.*,
    No. 05 Civ. 8626 (GEL), 2006 WL 2337212 (S.D.N.Y. Aug. 8, 2006)...............18

*Rochez Bros., Inc. v. Rhoades*,
    527 F.2d 880 (3d Cir. 1975).................................................................48

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002).................................................................16

*Salgado v. Piedmont Capital Corp.*,
    534 F. Supp. 938 (D.P.R. 1981).............................................................43

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir.1996)....................................................................................32

*SEC v. J.W. Barclay & Co.*,
   442 F.3d 834 (3d Cir. 2006)..............................................................................48

*Sharp v. Coopers & Lybrand*,
   649 F.2d 175 (3d Cir. 1981)..............................................................................47

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008)...........................................................................................16

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006)......................................................................... 47-48

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................3, 16, 17, 19

*In re Time Warner, Inc. Sec. Litig.*,
   794 F. Supp. 1252 (S.D.N.Y. 1992), *overruled, in part, by*
   9 F.3d 259 (2d Cir. 1993) ..............................................................7, 42, 43

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)...........................................................................................45

*In re Tyson Food, Inc. Sec. Litig.*,
   No. 01-425-SLR, 2004 U.S. Dist. LEXIS 11122 (D. Del. June 17, 2004),
   *aff'd sub nom. Aetos. v. Tyson Foods, Inc.*,
   155 F. App'x 53 (3d Cir. 2005)........................................................................48

*United States v. Stewart*,
   305 F. Supp. 2d 368 (S.D.N.Y. 2004).............................................................45

*In re Vivendi Universal S.A., Sec. Litig.*,
   381 F. Supp. 2d 129 (S.D.N.Y. 2003)..............................................................17

*Wilson v. Bernstock*,
   195 F. Supp. 2d 619 (D.N.J. 2002) ............................................................ 27-28

*Winer Family Trust v. Queen*,
   503 F.3d 319 (3d Cir. 2007).............................................................17, 19, 21, 46

**STATUTES**

Private Securities Litigation Reform Act of 1995,
     15 U.S.C. §§ 78u-4 *et seq.* ..............................................................................3, 17, 35

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ......................15

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t *et seq.* ..................7

SEC Rule 10b5-1, 17 C.F.R. 240.10b5-1 .........................................................................15

Federal Rules of Civil Procedure Rule 9(b).......................................................................16

Defendants Horizon Lines, Inc. and Horizon Lines, LLC (collectively "Horizon Lines" or the "Company"), Charles G. Raymond, M. Mark Urbania, John V. Keenan, John W. Handy and Brian W. Taylor (the "Individual Defendants", and, together with Horizon Lines, the "Defendants") submit this brief in support of their motion to dismiss the Amended Consolidated Securities Class Action Complaint (the "Amended Complaint" or "AC").

## PROCEDURAL HISTORY

On July 28, 2009, Lead Plaintiff Police and Fire Retirement System of the City of Detroit filed a consolidated complaint (the "Complaint") against Horizon Lines, Inc., Horizon Lines, LLC, Horizon Lines of Puerto Rico, Inc., Charles G. Raymond, M. Mark Urbania, John V. Keenan, Gabriel Serra, R. Kevin Gill and Gregory Glova alleging violations of the Securities and Exchange Act of 1934 (the "Exchange Act").  (D.I. # 47)  Plaintiff sought to transform alleged antitrust violations concerning Horizon Lines' relationships with its competitors in its Puerto Rican tradelane into purported fraud by the Company and its officers against persons who bought Horizon Lines' stock.  Plaintiff asserted that by failing to disclose an alleged price-fixing conspiracy, defendants misled investors in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Plaintiff further claimed that Horizon Lines and Raymond, Urbania and Keenan had violated Section 20(a) of the Exchange Act.

On August 31, 2009, Defendants Horizon Lines, Raymond, Keenan and Urbania moved to dismiss the Complaint on the grounds that Plaintiff had failed to meet the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") because the Complaint failed to: (1) plead the conduct of each defendant with the requisite particularity; (2) allege facts that created a strong inference that defendants' representations were made with scienter; and (3) adequately allege a false or misleading statement or omission by each defendant.  (D.I. # 69)

On November 13, 2009, the Court granted defendants' motion to dismiss without prejudice. *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, C.A. No. 08-969, 2009 WL 3837659 (D. Del. Nov. 13, 2009) (the "Dismissal Opinion").  In dismissing the Complaint, the Court held, *inter alia*, that statements contained in Horizon Lines' Code of Business Conduct and Ethics were not false or misleading.  *Id*. at *9.  The Court also dismissed the claims based on Raymond's and Urbania's signing of Sarbanes-Oxley certifications, holding that "[o]fficers are not guarantors of [the financial statements'] truth."  *Id.* at *12.

The Court found certain statements regarding "revenue, pricing and competition" in the Company's annual and quarterly SEC filings or in analyst conference calls to be misleading (*id.* at *9), but nevertheless dismissed the Complaint in its entirety for failure to allege a strong inference that Horizon Lines, Inc., Horizon Lines, LLC, Raymond, Keenan or Urbania acted with scienter. [1]  The Court held:  "Plaintiffs . . . plead no facts showing that either Raymond or Keenan or Urbania was made aware of the conspiracy or had access to information which would have allowed them to discover it."  *Id.* at *15.

With respect to the corporate defendants, the Court held:  "the requisite mental state of scienter must be found within the mind of an employee who either made, or participated in the making of, [a materially false or misleading] statement."  *Id.* at *17 (citing *Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*, 365 F.3d 353, 365-67 (5th Cir. 2004)).  This Court explained: "[i]t is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false.  A defendant corporation is deemed to

---

[1]   The Court dismissed the claims against Horizon Lines of Puerto Rico because the Amended Complaint "[did] not attribute a single false or misleading statement to this company or any employees speaking on its behalf."  *City of Roseville*, 2009 WL 3837659, at *18.  Plaintiff did not attempt to replead a claim against that entity.

have the requisite scienter for fraud only if the individual corporate officer making the . . . statement knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement." *Id.* (quoting *In re Apple Computer*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2003)). As the Court found that the Complaint had not sufficiently alleged that the three persons who spoke for the Company – Raymond, Urbania and Keenan – had any knowledge of the alleged conspiracy, the Complaint failed to plead a necessary element, *i.e.*, scienter. *See id.* While three former employees in the Puerto Rican Division of Horizon Lines – Gabriel Serra, R. Kevin Gill and Gregory Glova (the "Puerto Rican Division Employees") – have pleaded guilty to antitrust violations, "plaintiffs pleaded [no] facts connecting Serra, Gill, Glova, or any other employee with knowledge of the rate-fixing scheme with the false or misleading statements made by Horizon Lines, Inc. in its annual and quarterly SEC reports." *Id.*

The Court granted Plaintiff leave to file an amended complaint if it could do so consistent with Rule 11's pleading obligations. On December 23, 2009, Plaintiff filed the Amended Complaint, which purports to replead Exchange Act claims against Horizon Lines, Inc., Horizon Lines, LLC, and the six original individual defendants, plus adds new defendants Taylor and Handy. Plaintiff also expanded the putative class period to September 26, 2005 through April 25, 2008 (the "Putative Class Period").

## SUMMARY OF ARGUMENT

1. Plaintiff's attempt to replead its claims under Section 10(b) and Rule 10b-5 of the Exchange Act should again be rejected for failure to meet the heightened pleading standards of Rule 9(b) and the PSLRA. 15 U.S.C. §§ 78u-4, *et seq. See generally Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). In the Dismissal Opinion, the Court dismissed the claims against the senior officers of Horizon Lines, Raymond, Urbania and Keenan, because

Plaintiff had not pleaded particularized facts that could demonstrate that it had knowledge of the alleged antitrust conspiracy carried out by Serra, Gill and Glova. *City of Roseville*, 2009 WL 3837659, at *15. The Amended Complaint adds two former officers who were allegedly in the reporting chain between Raymond, Urbania and Keenan and the Puerto Rican Division Employees as defendants, but contains no allegations that could show that Raymond, Urbania, Keenan or the two new defendants, Handy and Taylor, had actual knowledge of the alleged price-fixing conspiracy. Rather, the Amended Complaint asserts, once again, that Raymond, Urbania, Keenan, Handy and Taylor are "potential targets" of a Department of Justice ("DOJ") investigation based on a few more vague statements from the Puerto Rican Division Employees' criminal sentencing memoranda and hearing transcripts. Nothing new has come out of those criminal proceedings – Plaintiff merely adds a few more quotes by the government attorney that Plaintiff elected not to include in the last Complaint. These vague references, which do not mention any individual by name or title, are no different than the prior references to unnamed "senior officers" that the Court held fell short of the requirement to plead scienter with particularity. *See id.* at *14-15.

         2. Instead of alleging new facts that could show that Raymond, Urbania or Keenan (and now Handy and Taylor) had knowledge of the alleged antitrust conspiracy, the Amended Complaint points to their roles as senior officers who, Plaintiff *assumes*, would have received reports disclosing the conspiracy from the Puerto Rican Division Employees. This same argument was rejected as inconsistent with settled law in the Dismissal Opinion. *Id.* at *14 ("[A] plaintiff cannot establish scienter on the part of defendant executives by 'loosely describing the managerial hierarchy' by which fraudulent conduct could have come to their attention.") (quoting *Clark v. Comcast Corp.*, 582 F. Supp. 2d 692, 705 (E.D. Pa. 2008)). In the Amended

Complaint, Plaintiff attempts to support its speculation that Raymond, Urbania, Keenan, Handy and Taylor received "documents and spreadsheets" regarding the conspiracy based entirely on a statement from a former employee *of another shipping company,* Sea Star Line, LLC ("Sea Star"), who claimed that *Sea Star's* executives received such documents. (AC ¶ 101) Obviously, pointing to a witness who knew how Sea Star, but not Horizon Lines, operated provides no strong inference that such reports both existed within Horizon Lines and were regularly sent to and reviewed by senior management. These allegations fall far short of the PSLRA's requirement of pleading facts based on a reliable, corroborated source. *See City of Roseville*, 2009 WL 3837659, at *14.

3.   The Amended Complaint also tries to add weight to Plaintiff's contention that Raymond, Urbania, Keenan, Handy and Taylor were reckless in not knowing that the alleged antitrust conspiracy was occurring, but the new facts alleged actually support the opposite conclusion. According to Plaintiff, rates in the Puerto Rican tradelane were declining in the 1990s because of dramatic price cuts by one competitor, Navieras de Puerto Rico. (AC ¶¶ 82-83) In 2001, Navieras ceased operations and filed for bankruptcy. (*Id.* ¶ 82) It is reasonable to expect that a reduction in supply and the departure of an aggressive rate cutter from an otherwise oligopolistic market would naturally cause rates to increase in the Puerto Rican tradelane. Such a result is consistent with basic economic theory. That outcome does not suggest an antitrust conspiracy was causing rates to rise, much less so strongly support such a conclusion that Horizon Lines' senior management's failure to recognize the alleged antitrust conspiracy was "an extreme departure from the standards of ordinary care . . . ." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009).

4.   The Amended Complaint asserts, as did the last Complaint, that the Individual Defendants were motivated to perpetrate a fraud in order to sell stock into an inflated market.  As the Court previously held in the Dismissal Opinion, such allegations fall far short of a strong inference of scienter because the stock sales were not "unusual [in] scope or timing."  *City of Roseville*, 2009 WL 3837659, at *16 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997)); *see also Avaya*, 564 F.3d at 279.  Thus, for all of these reasons, Plaintiff's Section 10(b) claim should be dismissed against Raymond, Urbania, Keenan, Handy and Taylor.

5.   The Amended Complaint also fails to plead a strong inference of scienter against Horizon Lines.  In order to plead scienter against the corporate entity, "the requisite mental state of scienter must be found within the mind of an employee who either made, or participated in the making of, [a materially false or misleading] statement."  *City of Roseville*, 2009 WL 3837659, at *17 (citing *Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*, 365 F.3d 353, 365-67 (5th Cir. 2004)).  Plaintiff attempts to meet this standard by citing to statements that Serra, Gill and Glova purportedly made in trade journals or advertisements describing the services that Horizon Lines provides to its customers.  The intended audience of these statements were customers, not investors, and the statements do not resemble the statements regarding "revenues, pricing and competition" that the Court previously found to be misleading without further disclosure of the alleged antitrust conspiracy.  In other words, these statements do not describe Horizon Lines' financial results and attribute that success to particular causes, but merely describe services of interest to Horizon Lines' customers.  (*See, e.g.*, AC ¶ 166 ("The people of Horizon Lines are adept at finding ways to partner with our customers to reduce cycle time and meet tight delivery schedules.")).

6.   The only statement attributed to the Puerto Rican Division Employees that concerns revenues or rates was a statement that Serra made regarding rates in a trade journal in January 2005, *eight months* before Horizon Lines' initial public offering of its common stock and two years before Plaintiff bought its first Horizon Lines stock.  This statement by Serra is so far removed from Plaintiff's purchase of its stock that the statement was long since stale and could not have been relied upon by Plaintiff when it made its decision to buy Horizon Lines stock. Furthermore, because there was no market for the stock until *eight months* after the trade journal article was published, there was no efficient market to absorb the statement from which the Court could presume reliance.  *See In re Time Warner, Inc. Sec. Litig.*, 794 F. Supp. 1252, 1260 (S.D.N.Y. 1992), *overruled, in part, by* 9 F.3d 259 (2d Cir. 1993).  In sum, because the Amended Complaint fails to adequately allege scienter as to Raymond, Urbania, Keenan, Taylor or Handy, and further fails to identify an actionable misstatement by Serra, Gill or Glova, the Amended Complaint has failed to identify a person who spoke on behalf of the Company and also had the requisite knowledge and intent to mislead.

7.   Finally, Plaintiff's claims under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, which holds "control persons" liable for underlying violations of Section 10(b), must be dismissed because the Amended Complaint fails to plead a claim under Section 10(b) and because Plaintiff has failed to adequately allege that any "control persons" were culpable actors in any alleged securities fraud.  *See In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004).

## STATEMENT OF FACTS[2]

### The Parties

Plaintiff, "a retirement system maintained for the benefit of current and former policemen, firemen and their families," purchased shares of common stock of Horizon Lines beginning on March 19, 2007.  (D.I. # 20 (Motion for Lead Plaintiff, Decl. of Andre Bouchard, filed 3/2/09, Ex. B))

Defendant Horizon Lines, Inc. is a Delaware corporation headquartered in Charlotte, North Carolina.  (AC ¶ 18)  Horizon Lines, Inc. made an initial public offering of its common stock on September 26, 2005.  (*Id.* ¶ 48)  Horizon Lines, Inc. operates a container shipping business through its direct and indirect subsidiaries, which include defendant Horizon Lines, LLC.  (*Id.* ¶ 19)

Defendant Charles G. Raymond is Chairman, President and Chief Executive Officer of Horizon Lines, Inc.  (*Id.* ¶ 20)

"[S]ince August 2007," defendant John V. Keenan has been President of Horizon Lines, LLC and an officer of Horizon Lines, Inc.  (*Id.* ¶ 22)

Defendant M. Mark Urbania was the Executive Vice President and Chief Financial Officer of Horizon Lines, Inc. prior to his resignation on April 4, 2008.  (*Id.* ¶ 21)

Defendant John W. Handy was Executive Vice President of Horizon Lines, Inc. from December 20, 2005 through 2009.  (AC ¶ 23)

---

[2]    Solely for the purposes of this motion, the Statement of Facts assumes the truth of the factual allegations made in the Amended Complaint (although they are vigorously disputed as matters of fact), but not Plaintiff's conclusory allegations. *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004).

Defendant Brian W. Taylor has been President of Horizon Logistics Holdings, LLC ("Horizon Logistics"), an indirect wholly owned subsidiary of Horizon Lines since September 1, 2007.  (*Id.* ¶¶ 24, 199)  Horizon Logistics is not a party to this action.  Taylor served as Senior Vice President, Sales and Marketing of Horizon Lines, Inc. from December 2005 to August 2007.  (*Id.* ¶ 24)

Defendants Serra, Gill and Glova have not joined this motion or appeared in this action.

**Background**

On April 17, 2008, Horizon Lines announced that the DOJ had served search warrants and a grand jury subpoena on the Company in connection with the DOJ's confidential grand jury investigation into the pricing practices of Jones Act carriers.[3]  (AC ¶ 5)  The DOJ investigation led to the Puerto Rican Division Employees and an employee from Sea Star pleading guilty to violations of Section 1 of the Sherman Act.  (*Id.* ¶¶ 57-58)  Another Sea Star employee pled guilty to obstruction of justice.  (*Id.* at ¶ 61)

The Amended Complaint mostly recycles the allegations from the last Complaint regarding the Company's public statements to investors, through SEC filings and conference calls with analysts, regarding Horizon Lines' revenues in the Puerto Rican tradelane.  (*Compare* Complaint ¶¶ 93-103, 113-129 *with* AC ¶¶ 116-154, 158(a)-165, 167-182, 187-193, 195-197,

---

[3]   The Jones Act requires that commercial vessels operating between states of the United States and certain United States territories, including Puerto Rico, possessions or non-contiguous States be built and registered in the U.S., manned by predominantly U.S. crews and owned and operated by U.S. citizens.  (AC ¶¶ 39-40)  Horizon Lines is a Jones Act shipping company with a fleet of U.S. built containerships transporting cargo between mainland United States and Alaska, Hawaii and Puerto Rico.  (*Id.* ¶¶ 39, 45)  The Puerto Rican tradelane is a "highly concentrated oligopoly" with no more than three other shipping lines operating in it.  (*Id.* ¶ 45)  In the Puerto Rican tradelane, the other companies are Sea Star, Crowley Liner Services, Inc. and Trailer Bridge, Inc.  (*Id.*)

200-207)  Like the last Complaint, the Amended Complaint again alleges, in conclusory fashion,

that Raymond, Urbania and Keenan were aware of the alleged price-fixing conspiracy and

intentionally or recklessly failed to disclose it.  (*Compare* Complaint ¶¶ 64-65, 71 *with*

AC ¶¶ 95-96, 105)

**The New Allegations In The Amended Complaint**

       The new allegations in the Amended Complaint are as follows.

       <u>Defendants Handy and Taylor</u>

       The Amended Complaint names two former Horizon Lines officers who, at

certain times, were in the reporting chain between the Puerto Rican Division Employees and

senior management.  For a portion of the Putative Class Period, Serra reported to new Defendant

Handy, so Plaintiff concludes, "thus, Handy was in close contact with, and responsible for the

supervision of, Defendant Serra's work in Puerto Rico."  (AC ¶ 23)  Plaintiff also alleges that

Handy "discussed the health of the Puerto Rico tradelane with Serra."  (*Id.* ¶ 96)  There are no

particularized allegations that Handy had any knowledge of the conspiracy or even met with

Serra to discuss pricing and rates.  Nor does the Amended Complaint allege any facts about

Handy's background, knowledge or experience in the shipping industry or with Serra prior to

joining Horizon Lines at the end of 2005.  Notably, the alleged conspiracy predated Handy's

arrival at Horizon Lines by three years.

       According to the Amended Complaint:  "Defendant Gill reported directly to

Defendant Taylor, and Taylor reported directly to Defendant Raymond.  Thus, Taylor was in

close contact with, and responsible for the supervision of, Defendant Gill."  (*Id.* ¶ 24)  The

Amended Complaint contains no particularized allegations that Taylor had any knowledge of the

conspiracy or even met with Gill to discuss pricing or rates.  Nor does the Amended Complaint

allege anything about Taylor's involvement with Gill prior to December 2005, when Taylor

became Executive Vice President, Sales and Marketing.  Notably, the alleged conspiracy predated Taylor's supervision of Gill by three years.  Taylor was promoted to head of Horizon Logistics on September 1, 2007 and thereafter had no responsibility over the Puerto Rican tradelane.  (*Id.* ¶ 199)  The Amended Complaint still attributes statements to Taylor after September 1, 2007, but those statements concern wholly irrelevant initiatives at Horizon Logistics, which specialized in "truck brokerage, container grades, [and] warehousing," not Jones Act shipping to or from Puerto Rico.  (*Id.* ¶ 206)

Ultimately, the Amended Complaint's allegations regarding the Individual Defendants' knowledge of the alleged antitrust conspiracy are no different than the bald conclusory allegations rejected in the Dismissal Opinion.  The Amended Complaint again alleges, based on the same confidential sources that the Court previously found to be insufficient, that "it is clear that Serra did not organize the price-fixing scheme without input and direction from his superiors, Defendants Raymond, Urbania, Keenan," yet now Plaintiff adds Handy and Taylor to the end of that allegation without further factual support.  (*Id*. ¶ 95)

<u>The Purported "Red Flags"</u>

Unable to allege any new facts to show that Raymond, Urbania or Keenan (and now Handy and Taylor) had knowledge of the alleged conspiracy, Plaintiff points to so-called "red flags" to show that they must have known about the allegedly unlawful activities.  Plaintiff alleges that the reported rate increases in the Puerto Rican tradelane were so "unusual and improbable" that they "should have raised red flags" because the "Puerto Rico shipping market had experienced a steady and significant decline in its shipping rates since the 1990s."  (*Id.* ¶¶ 83, 86, 91)  According to the Amended Complaint, "even if Defendants Raymond, Urbania, Keenan, Handy and Taylor were not knowing participants in the conspiracy, as the top five

executive management officers at Horizon, with decades of experience in the Jones Act shipping markets . . . they were under a special duty to investigate these unusual and improbable rate increases to ensure that the rates were secured in compliance with the anti-price-fixing laws." (*Id.* ¶ 91)

The facts alleged in the Amended Complaint, however, do not support Plaintiff's contention that the rate increases were "unusual and improbable."  Regulatory restrictions pose significant barriers to entry to the Jones Act routes, resulting in an oligopolistic "market where a small number of carriers control any particular route."  (AC ¶ 40)  According to the Amended Complaint, rates in the Puerto Rican tradelane were low as a result of price cuts by one competitor, Navieras de Puerto Rico, until it declared bankruptcy and left the market in 2001. (*Id.* ¶ 82)  The departure of a carrier known for aggressive price-cutting not only reduced the number of competitors in the tradelane but also reduced capacity.  In such circumstances, it hardly would be surprising that rates in the tradelane would go up.  Thus, without any additional information (and Plaintiff has pointed to none) or any particularized allegations that Raymond, Urbania, Keenan, Handy and Taylor were participating in the alleged conspiracy, there is no indication that, considering all of the circumstances alleged by Plaintiff, they would have been reckless in not discovering the price-fixing conspiracy.

<u>The Puerto Rican Division Employees</u>

In its Dismissal Opinion, the Court stated that "no false or misleading statements are attributed to these three defendants [Serra, Gill, or Glova], nor do plaintiffs claim they were instrumental in the formulation or dissemination of the false or misleading statements made by others."  *City of Roseville*, 2009 WL 3837659, at *13.  The Amended Complaint's new allegations regarding the Puerto Rican Division Employees fail to cure this fatal pleading

12

deficiency:  Plaintiff is still unable to provide particularized allegations that Serra, Gill or Glova disseminated false or misleading information to any purchasers of Horizon Lines common stock, much less to Plaintiff itself.

As in the original Complaint, the Amended Complaint does not allege that Serra, Gill or Glova signed any of the SEC filings or participated in calls with investors or stock analysts.  Rather, almost all of the statements attributed to Serra, Gill or Glova come from the JOURNAL OF COMMERCE, an industry publication aimed at customers, not investors.  Moreover, the only statement in the JOURNAL OF COMMERCE that at all resembles the statements regarding "revenues, pricing or competition" that the Court previously found to be misleading is a statement attributable to Serra regarding rates that was printed in the January 31, 2005 issue of the JOURNAL OF COMMERCE , *nearly 8 months before Horizon Lines made its initial public offering of its common stock and two years before Plaintiff made its first purchase of Horizon Lines stock.*  (AC ¶ 157)  The other statements attributable to Serra are all customer-oriented statements about services or discussions of general economic conditions in Puerto Rico that do not concern Horizon Lines' revenues or rates.  (*See, e.g.*, *id.* ¶ 190 (statement about deploying and rotating vessels in Horizon Lines' fleet); *id.* ¶ 191 (CARIBBEAN BUSINESS article discussing Horizon Lines' shipment tracking capabilities); *id.* ¶ 184 (statement about Puerto Rico's general economic outlook); *id.* (statements about Horizon Lines' expansion of their Puerto Rican port facilities and further improvements to refrigerated shipping containers))  None of these statements attributes any of the service improvements being described as a reason or source of Horizon's revenues.  Indeed, as the audience for the statements was customers, not investors, it is hardly surprising that Serra did not mention, much less discuss, the revenue that Horizon Lines hoped to make by providing such services.

The statements cited in the Amended Complaint attributed allegedly to Gill and Glova are also unrelated to revenues, prices or competition.  While accepting a service award from Lowes on behalf of Horizon Lines on January 26, 2006, Gill mentioned "partner[ing] with our customers."  (AC ¶ 166)  He is also quoted in a customer-oriented advertisement describing the Company's technology capabilities.  (*Id.* ¶ 185)

The only statement attributed to Glova is that "the carrier hopes the economy will start to turn around in the latter part of 2008."  (*Id.* ¶ 208)  This generic statement about the economy generally is hardly a description of, much less an allegation of particularized facts concerning, the sources of Horizon Lines' revenues.

It is hardly surprising that Plaintiff left these quotes out of its original Complaint as they have no rational connection to a securities fraud lawsuit.  Ultimately, after having over a year to find facts that support its allegations, Plaintiff has not been able to link Serra, Gill and Glova to statements made to the Company's investors regarding revenues, prices or competition.

14

## ARGUMENT

I. **COUNT ONE OF THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE FOR FAILURE TO PLEAD A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT OR SEC RULE 10b-5**

    A.    **The Court's Prior Opinion Is The Law Of The Case**

        In considering whether the Amended Complaint adequately pleads a claim for securities fraud, the Court should be guided by the legal principles set forth in its prior Dismissal Opinion because the Court's rulings on such legal issues should not be re-litigated under the law-of-the-case doctrine. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) ("'[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (citation omitted). "The law of the case doctrine 'limits relitigation of an issue once it has been decided' in an earlier stage of the same litigation. [Courts] apply the doctrine with the intent that it will promote finality, consistency, and judicial economy." *Hamilton v. Leavy*, 322 F.3d 776, 786-87 (3d Cir. 2003) (quoting *In re Continental Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002)).[4]

    B.    **Plaintiff's Section 10(b) And Rule 10b-5 Claims Are Subject To Heightened Pleading Standards**

        Plaintiff's first claim for relief (AC ¶¶ 290-296) is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  Plaintiff must plead each of the following elements:

        (1)    a material misrepresentation or omission by defendant;

        (2)    scienter;

---

[4]    In deference to the law-of-the-case doctrine, Defendants will not reargue on this motion the materiality or falsity of alleged statements in the Amended Complaint that the Court found to be misleading in the Dismissal Opinion.  Defendants reserve all rights to argue the merits of that aspect of the Court's decision in the event of an appeal.

(3)     a connection between the misrepresentation or omission and the purchase or sale of a security;

(4)     reliance upon the misrepresentation or omission;

(5)     economic loss; and

(6)     loss causation.

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). *See also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007).

Rule 9(b) of the Federal Rules of Civil Procedure provides that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" Fed. R. Civ. P. 9(b).  In other words, Rule 9(b) requires, "at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citation omitted).

To strengthen the already high standards for pleading securities fraud, Congress passed the PSLRA.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 547 U.S. 71, 81-82 (2006).  Congress adopted the PSLRA based on the recognition that private securities lawsuits "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makov Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  Thus, the PSLRA serves as a check on "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation" by imposing more stringent substantive and procedural controls to "curb frivolous, lawyer-driven litigation, while preserving

investors' ability to recover on meritorious claims." *Id.* at 320, 322 (internal quotations marks and citations omitted).[5]

Consistent with these goals, when a plaintiff "may recover money damages only on proof that the defendant acted with a particular state of mind," the PSLRA mandates that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). These heightened pleading requirements must be satisfied for *each* particular defendant. *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007). The Amended Complaint falls far short of these exacting standards.

Instead of embracing and satisfying this well-settled legal framework, Plaintiff devotes twelve paragraphs of the Amended Complaint to complaining about the supposed unfairness of the heightened pleading requirement of the PSLRA and its stay of discovery. (*See* AC ¶¶ 65-77) Plaintiff contends that if it were only permitted to take discovery now, it could bolster its claims. (*See id.*) This argument flies in the face of the policy judgment made by Congress in enacting the PSLRA. The purpose of the heightened pleading standard and the discovery stay is to filter out lawsuits during the pleading stage that have no factual basis before the considerable costs of discovery are imposed. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002); *In re Vivendi Universal S.A., Sec. Litig.*, 381 F. Supp. 2d 129, 129-30 (S.D.N.Y. 2003).

---

[5]   *See also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (PSLRA seeks to prevent the filing of a "largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value") (citation omitted); *LaSala v. Bordier et Cie*, 519 F.3d 121, 128 (3d Cir. 2008) (PSLRA "imposed on securities plaintiffs a number of requirements designed to deter the filing of these 'strike suits' and to enable district courts more easily to dismiss frivolous suits on the pleadings").

Plaintiff alleges that parties to other proceedings may have had access to additional non-public information (*see* AC ¶¶ 66, 68, 72-73, 76), but that allegation, even if true, is irrelevant.  This case, unlike those other cases, is governed by the PSLRA and its provisions do not go away merely because other litigants may have had access to discovery.  *See In re Refco, Inc. Sec. Litig.*, No. 05 Civ. 8626(GEL), 2006 WL 2337212, at *2 (S.D.N.Y. Aug. 8, 2006) ("As a general matter, the mere fact that documents have been provided to a third party does not entitle plaintiffs to a modification of the stay [under the PSLRA] to obtain those documents.") (citation omitted).  Furthermore, the DOJ investigation to which Plaintiff wishes to gain access is a secret grand jury proceeding.  It is no hardship to require Plaintiff to conduct its own investigation instead of impinging on a grand jury.  Plaintiff has been free to conduct its own independent investigation and claims to have seven unidentified confidential witnesses.  The fact that none of these alleged witnesses are able to connect Defendants to the alleged wrongdoing by the Puerto Rican Division Employees does not show that the policies adopted by Congress and reflected in the PSLRA are unfair but, rather, that Plaintiff's extensive and lengthy investigation has turned up no basis for converting alleged antitrust violations into federal securities law fraud claims against Defendants.

**C.    The Amended Complaint Should Be Dismissed Because It Does Not Adequately Allege That The Individual Defendants Acted With Scienter**

As noted in the Dismissal Opinion, under the PSLRA "[p]laintiffs cannot proceed with their claims under § 10(b) and Rule 10b-5 unless they plead with particularity facts giving rise to a strong inference that defendants acted with scienter." *City of Roseville*, 2009 WL 3837659, at *12 (citing 15 U.S.C. § 78u-4(b)(2); *Avaya*, 564 F.3d at 267).  "Scienter" in the context of a Section 10(b) claim is defined as:

"a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even

18

> excusable negligence, but an extreme departure from the standards of ordinary
> care, . . . which presents a danger of misleading buyers or sellers that is either
> known to the defendant or is so obvious that the actor must have been aware of
> it."

*In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004) (quoting *In re IKON Office Solutions, Inc.*, 277 F.3d 658, 667 (3d Cir. 2002)).  This Court has already held that a "reckless" statement is one in which there is "'an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *City of Roseville*, 2009 WL 3837659, at *12 (quoting *Avaya*, 564 F.3d at 267 n.42 (internal quotation marks omitted)).

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court explained that the "strong inference" standard requires the court to "engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."  551 U.S. 308, 314 (2007).  "[A]n inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct."  *Id.*  However, "[t]o qualify as 'strong' within the intendment of [15 U.S.C. § 78u-4(b)(2),] an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.; see also Winer Family Trust v. Queen*, 503 F.3d 319, 329 (3d Cir. 2007) (upholding dismissal of Section 10(b) claim for failure to satisfy the PSLRA's pleading requirements because "[a] reasonable person would not deem the inference of scienter cogent and at least as compelling as any non-culpable inference") (citation omitted).

In *Institutional Investors Group v. Avaya, Inc.*, the Court observed that before *Tellabs*, a plaintiff could establish scienter by pleading motive and opportunity, "even if plaintiffs could not allege facts from which to infer defendants' knowing deceit or recklessness."

564 F.3d 242, 276 (3d Cir. 2009).  However, "[t]his conclusion is no longer tenable in light of *Tellabs*," since "'the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint.'"  *Id.* at 276-77 (quoting *Tellabs*, 551 U.S. at 325). Accordingly, "'motive and opportunity' may no longer serve as an independent route to scienter . . . ."  *Id.* at 277.

Here, the Court found that the allegations in the original Complaint did not contain facts that gave rise to a strong inference that Raymond, Urbania or Keenan knowingly or recklessly made false statements to mislead Plaintiff.  *City of Roseville*, 2009 WL 3837659, at *15-16.  As explained below, the new allegations in the Amended Complaint do not alter that conclusion.  Plaintiff has still failed to meet the exacting pleading standard as to any of the Individual Defendants – including new defendants Handy and Taylor.[6]

> **1.      The new allegations in the Amended Complaint do not adequately allege that Raymond, Urbania, Keenan, Handy or Taylor had knowledge of the purported price-fixing conspiracy**

Plaintiff recycles from the last Complaint information gleaned from the criminal cases against Serra, Gill and Glova, such as statements that those former employees had communications with unnamed "senior executives" about price-fixing (AC ¶¶ 244-246), and speculation that Raymond, Urbania and Keenan (and now Handy and Taylor) are "potential

---

[6]     The Amended Complaint still alleges that Raymond and Urbania are liable for misstatements in the Sarbanes-Oxley certifications attached to Horizon Lines' quarterly and annual SEC filings.  (AC ¶¶ 221-227)  The Court previously held that "defendants Raymond and Urbania can only be held liable under § 10(b) and Rule 10b-5 for these Sarbanes-Oxley certifications if plaintiffs plead with sufficient particularity that either Raymond or Urbania was aware or should have been aware of the rate-fixing scheme at the time those certifications were made." *City of Roseville*, 2009 WL 3837659, at *12.  As explained herein, the Amended Complaint still lacks particularized allegations that, if true, could show that Raymond or Urbania participated in, or had any knowledge of, the alleged price-fixing activity.  Accordingly, the claim based on the Sarbanes-Oxley certifications again fails to state a claim.

targets" of the DOJ.  (*Compare id.* ¶¶ 247-250 *with* Complaint ¶¶ 161-162)  The Amended

Complaint adds no new facts, but extrapolates further that the prosecutor's vague statements

must mean that "one of these Individual Defendants [Raymond, Urbania, Keenan, Handy or

Taylor] is presently an 'uncharged co-conspirator.'" (*Id.* ¶ 249)  In the Dismissal Opinion, the

Court held that statements concerning unnamed "senior executives" and "others" (who may or

may not have even been employed by Horizon Lines) mentioned in the sentencing memorandum

or hearing transcripts in the criminal proceedings against Serra, Gill and Glova fell far short of

alleging specifically that Raymond, Urbania and Keenan were aware of Serra, Gill and Glova's

price-fixing activities.  *City of Roseville*, 2009 WL 3837659, at *15 (rejecting such allegations as

"conclusory and speculative at best") (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d

1410, 1418 (3d Cir. 1997)).  The Court explained: "In addition to the caution with which we

ordinarily consider accusations against others contained in a person's guilty plea, the

Government's remarks are extraordinarily vague and do not specify who these alleged

co-conspirators were."  *Id.*, *accord Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 628 n.2

(4th Cir. 2008) (allegation that SEC is investigating officer and company for fraud "lack[s]

persuasive force" and "is too speculative to add much, if anything, to an inference of scienter").[7]

       In an effort to create some "new" fact to support its speculation, Plaintiff's counsel

has chosen a few extra quotes from the criminal proceedings, but they are of the same vague and

---

[7]    In addition, even an indictment would only mean that the government had determined there
was "probable cause" to believe a crime has been committed.  The Third Circuit has held that
"the requirement that the inference [of scienter] be 'at least as compelling as' any competing
inference . . . dictates a more stringent standard than probable cause."  *Winer Family Trust v.
Queen*, 503 F.3d 319, 329 n.3 (3d Cir. 2007) (internal citations omitted).  Because an actual
indictment would be insufficient to establish a strong inference of scienter, *a fortiori*, an
allegation that an unindicted person is a "potential target" of an investigation falls far short of
that strict standard.

non-specific nature the Court found to be inadequate in the Dismissal Opinion.  For example, the

Amended Complaint alleges that "[a]t Serra's sentencing, the federal prosecutor stated 'there are

others higher than Mr. Serra who are certainly of interest to the government' and [Serra] is

essentially – I don't want to use middle management in terms of a conspiracy, but he's in the

middle . . . .'"  (AC ¶ 95)  There is no mention of who the "others higher" are that the federal

prosecutor was referring to, or whether they were employed by Horizon Lines or other

companies.  There is also no explanation of the type of information that make these unknown

persons "of interest" to the DOJ.  Plaintiff still maintains its allegation, upon "information and

belief," that these persons are Raymond, Urbania, Keenan and now Handy and Taylor.  These

"new" allegations are just as conclusory and speculative as the original allegations.

   Plaintiff also attempts to establish scienter for Raymond, Urbania, Keenan, Handy

and Taylor based upon their positions in the organization and pure speculation about reports they

may have received as a result of those positions.  In the Dismissal Opinion, the Court held that

"[i]t is well established that, 'allegations that a securities-fraud defendant, because of his position

in the company, 'must have known' a statement was false or misleading are . . . inadequate.'"

*City of Roseville*, 2009 WL 3837659, at *14 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d

525, 539 (3d Cir. 1999)).

   The Court specifically rejected the allegations based on CW1, allegedly a person

in the Fleet Administration department from 2001 to 2003, that someone at the CEO level or

similar position would have been involved in rate-setting.  *Id.*  Those allegations are used, once

again, in the Amended Complaint.  (*See* AC ¶ 254)  The Court found that "we know nothing

about the reliability of CW1 and there are no facts pleaded to corroborate this source's

statement."  *City of Roseville*, 2009 WL 3837659, at *14.  The Court further discounted this

22

alleged source because it was not clear that his or her position made him or her privy to rate-setting procedures, nor were there allegations, particular or otherwise, to suggest that even if some senior executives approved Puerto Rican rates, they would have "any reason to believe that such rates were the result of a price-fixing conspiracy." *Id.*

The Amended Complaint neither pleads new facts from CW1, nor identifies any new witness from within Horizon Lines, that could substantiate or corroborate CW1's bald assertions. Instead, Plaintiff points to a statement by CW6, allegedly a former Sea Star employee, who states that Sea Star purportedly created reports that were delivered to its senior executives regarding rate-setting in the Puerto Rican tradelane. (AC ¶¶ 101-102) Plaintiff extrapolates, based *upon information and belief*, that because Sea Star's executives purportedly had access to such materials, Horizon Lines' executives must have had access to similar spreadsheets that would have revealed the price-fixing. (AC ¶ 102)

The PSLRA explicitly requires that where, as here, "'an allegation regarding [a defendant's] statement or omission is made on information and belief'" the plaintiff must "'state with particularity all facts on which that belief is formed.'" *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(1)); *accord City of Roseville*, 2009 WL 3837659, at *7 (holding that, where allegations are based on information and belief, a plaintiff is required to state "all facts supporting that belief with particularity"). That is, when allegations are made on information and belief, the complaint must not only state the allegations with factual particularity, but also must "describe the sources of information with particularity, providing the who, what, when, where and how of the sources, *as well as the who, what, when, where and how of the information those sources convey*." *Avaya*, 564 F.3d at 253 (emphasis added).

23

Applying that strict standard, the sole basis for Plaintiff's "information and belief" allegation that spreadsheets documenting the alleged price-fixing scheme were delivered to the Individual Defendants is that such spreadsheets may have been delivered to executives of Sea Star.  (AC ¶ 102)  As this single "fact" about an entirely different and unrelated company is the only "fact" upon which Plaintiff's belief is based, the allegation is plainly insufficient to raise any inference of scienter as to Raymond, Urbania, Keenan, Taylor and Handy.  *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004) (such "[g]eneric and conclusory allegations based on rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. § 78u-4(b)(1)").  *See also In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004) (general allegations that a whistleblower passed information concerning accounting regularities in Brazil to executives at corporate headquarters in New Jersey was insufficient to establish that the information was actually provided to the specific defendant executives named in the complaint).  It is well-established that "'[r]eliance upon alleged documents which are undated, unquoted, undescribed, and unattached amounts to nonspecific allegations, at best." *Clark v. Comcast Corp.*, 582 F. Supp. 2d 692, 705 (E.D. Pa. 2008) (Bartle, J.) (quoting *Klein v. Autek Corp.*, No. Civ. 01-5751, 2004 WL 3635650, at *7 (D.N.J. June 30, 2004), *aff'd*, 147 F. App'x 270 (3d Cir. 2005)).  Further, "a plaintiff relying on internal reports must 'specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them.'"  *Chubb* 394 F.3d at 147 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72-73 (2d Cir. 2001)).

In *Chubb*, the Third Circuit Court of Appeals affirmed the District Court's decision to discount allegations of an "internal report" because, although it may have existed, the plaintiff had not alleged "who authored the alleged report, when it was authored, who reviewed

the report, and what data its conclusions were based upon." *Chubb*, 394 F.3d at 147.  Clearly

then, Plaintiff's allegations here of internal reports at Sea Star cannot raise an inference of

scienter not only because the Amended Complaint does not allege with particularity that there

were any internal reports at *Horizon Lines* (as opposed to Sea Star), but also because it does not

allege who authored or reviewed them or what information was in them.  (*See* AC ¶ 102)  *See*

*also Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827-28 (8th Cir. 2003) (to establish scienter

against senior officer defendants, it was inadequate to plead merely that falsified records "w[ere]

prepared at corporate headquarters and reviewed by 'senior officers'").[8]

       The other new facts alleged in the Amended Complaint regarding the senior

executives' roles within the organization are trivial.  For example, Plaintiff now alleges that

Raymond served on the Board of Directors of the Maritime Cabotage Task Force, but does not

specify any information he would have received in that position.  (AC ¶ 42)  Plaintiff also alleges

that Serra "served on the executive officer management team" with Raymond, Urbania, Keenan,

Handy and Taylor.  (*Id.* ¶ 25)  Plaintiff further makes the generic allegation that Horizon's senior

management "has a long history of working together as a team" or "served in multiple roles at

Horizon Lines or its predecessors or have continuing direct involvement with multiple aspects of

---

[8]    The other new confidential witness in the Amended Complaint is CW7, who purportedly worked for Matson Navigation, a competitor of Horizon Lines in the *Hawaiian* tradelane. (AC ¶ 243)  As with Plaintiff's other confidential witnesses, the Court should "discount steeply" the allegations from CW7 because the Amended Complaint does not plead any facts that "would make him or her privy to Horizon's rate setting procedures."  *See City of Roseville*, 2009 WL 3837659, at *14.  Indeed, not only was CW7 not a Horizon Lines employee, but Matson Navigation was not even one of the four shipping companies that served the Puerto Rican tradelane.  (*See* AC ¶ 45 (describing the three other "players" in the Puerto Rican tradelane as Sea Star, Crowley Liner Services, Inc. and Trailer Bridge, Inc.))  CW7 offers no direct factual information regarding pricing in the Puerto Rican tradelane.  Instead, he opines about supposed market dynamics in a market with four competitors.  The Amended Complaint does not even describe any personal experience that CW7 had in a four-player market to support that opinion.

our business." (*Id.* ¶ 8)  Such "'generalized imputations of knowledge' do not satisfy the scienter requirement 'regardless of the defendants' positions within the company.'"  *Alpharma*, 372 F.3d at 149 (quoting *In re Advanta Corp.*, 180 F.3d at 539); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny'") (quoting *Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir. 1998)).

Plaintiff attempts to make much about the fact that Urbania resigned from his position at Horizon Lines on April 4, 2008, before the DOJ investigation became public.  (AC ¶¶ 21, 257)  But an executive's mere resignation, without specific allegations linking that resignation to the fraud, has not been found to support a strong inference of scienter on the part of a defendant executive.  "'[A] plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one.'"  *In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1050 (N.D. Cal. 2009) (granting motion to dismiss and holding that resignation of six executive officers one week prior to company's announcement of its restatement alone does not meet pleading standard of scienter) (citation omitted); *see also In re Great Atlantic & Pacific Tea Co. Sec. Litig.*, No. 03-4100, 2004 WL 1541232, at *4 (3d Cir. 2004) (affirming dismissal and holding that defendant's resignation was not enough to plead scienter when plaintiff failed to plead any facts linking resignation to alleged wrongdoing).

The addition of another layer of management-level defendants, Taylor and Handy, to whom the Puerto Rican Division Employees reported, actually further distances Raymond, Urbania and Keenan from the alleged conspiracy.  More significantly, there are no allegations to

26

show that these new defendants were aware of the alleged price-fixing.  Handy, who was

Horizon Lines' Executive Vice President from December 21, 2005 until his retirement in the

spring of 2009, is not alleged to have had any contact with Horizon Lines' competitors and is not

alleged to have participated in setting shipping rates or pricing practices.  Taylor, who

transitioned to an entirely different subsidiary of Horizon Lines in 2007, is likewise not alleged

to have been involved in any way with setting rates or pricing practices in the Puerto Rico

tradelane.  Instead, the Amended Complaint repeatedly states that Serra reported to Handy and

that Gill reported to Taylor.  (AC ¶¶ 23-26, 96)  This allegation is insufficient to find scienter as

a matter of law.  *See In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 150 (3d Cir. 2004)

("[A]llegations that Williams, Andrews' subordinate, knew of the irregularities occurring in

Brazil provide an insufficient basis upon which to impute knowledge to Andrews") (citation

omitted).

> **2.     New allegations do not show that Raymond, Urbania, Keenan, Handy or Taylor were reckless in not knowing about the price-fixing conspiracy**

Plaintiff next contends that Raymond, Urbania, Keenan, Handy and Taylor "must

have known" about the alleged price-fixing activities because the conspiracy was purportedly too

obvious to have been missed.  (AC ¶¶ 91)  Scienter based on a claim of recklessness can be

found only if the complaint alleges specific facts that constitute "*strong* circumstantial evidence

of conscious misbehavior or recklessness." *Advanta*, 180 F.3d at 532 (emphasis added).  A

reckless statement is a material misstatement or omission "'involving not merely simple, or even

inexcusable negligence, but an *extreme departure from the standards of ordinary care,* and

which presents a danger of misleading buyers or sellers that is either known to the defendant or

is so obvious that the actor must have been aware of it.'" *Id.* at 535 (3d Cir. 1999) (quoting

*McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979) (emphasis added)).  "Allegations of

intentional, conscious, or reckless misconduct, like allegations of motive and opportunity, must

be supported by specific facts that give rise to a 'strong inference' of scienter." *Wilson v.*

*Bernstock*, 195 F. Supp. 2d 619, 638 (D.N.J. 2002) (citation omitted).  Simply put, the new

allegations in the Amended Complaint do not meet these standards.

      In the Dismissal Opinion, the Court held that Plaintiff's obligation was to allege

specific facts that would show "that the rates charged to Puerto Rico customers were so

suspicious that Raymond, Keenan and Urbania should have suspected something was amiss."

*City of Roseville*, 2009 WL 3837659, at *15.  The Court further held:  "While it is true that false

or misleading statements by key executives regarding a company's lead product or core business

practices will weigh in favor of finding a strong inference of scienter, we will not make such an

inference 'absent particularized allegations showing that defendants had ample reason to know of

the falsity of their statements.'"  *Id.* (quoting *In re Stonepath Group, Inc. Sec. Litig.*, No. Civ. A.

04-4515, 2006 WL 890767, at *12 (E.D. Pa. Apr. 3, 2006)).  Furthermore, the Court noted that

such a strong inference is undercut by the fact that an illegal price-fixing conspiracy "by its very

nature is a secret undertaking."  *City of Roseville*, 2009 WL 3837659, at *16.

      Plaintiff theorizes that because Raymond, Urbania, Keenan, Handy and Taylor all

had "substantial industry experience," and because the Puerto Rico tradelane was so important to

the overall revenues of Horizon Lines, these executives should have been incredibly suspicious

that the Company was able to increase rates in the Puerto Rican tradelane when shipping volume

allegedly was low.  (AC ¶¶ 83-91)  Without specific facts supporting such a conclusion,

allegations of this type are insufficient.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540

F.3d 1049, 1068 (9th Cir. 2008) ("[C]orporate management's general awareness of the day-to-

day workings of the company's business does not establish scienter – at least absent some

28

additional allegation of specific information conveyed to management and related to the fraud.")
(citation omitted).

Plaintiff claims that that Horizon Lines' EBITDA figures, which contained the
revenue received from the alleged fixed rates, should have made clear that illegal antitrust
activities were occurring.  (AC ¶ 90)  Plaintiff's leap of logic is actually refuted by the specific
facts alleged in the Amended Complaint.

Plaintiff concedes that Horizon Lines operated in an oligopolistic market.  (AC
¶ 45 ("Puerto Rican cabotage has been a highly concentrated oligopoly" with only "three [other]
players in the oligopoly" besides Horizon Lines)).  Stable or increasing rates are neither unusual
or unexpected in such markets.  Courts have long recognized that in an oligopolistic market, a
rational competitor setting its own prices will consider the likely reactions by its competitors,
which discourages price-cutting and can lead to parallel, but lawful, behavior.  *Bell Atl. Corp. v.
Twombly*, 550 U.S. 544, 553-54 (2007) ("Even 'conscious parallelism,' a common reaction of
'firms in a concentrated market [that] recogniz[e] their shared economic interests and their
interdependence with respect to price and output decisions' is 'not in itself unlawful.'") (citing
*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)).  While
this parallel conduct may produce stable or even rising prices, the Supreme Court has held that
allegations of parallel conduct are insufficient to create even "plausible" grounds to infer that the
conduct is the result of an illegal agreement.  *See Bell Atl.,* 550 U.S. at 554 ("Without more,
parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some
unidentified point does not supply facts adequate to show illegality."); *id.* at 557.  Thus, it is
simply not unreasonable, let alone reckless, that Raymond, Urbania, Keenan, Handy and Taylor

would not realize that stable or rising prices in the Puerto Rico tradelane were the result of an

illegal price-fixing conspiracy.

Furthermore, Plaintiff's argument that the rate increases were "unusual and

improbable" given the "starkly declining volumes" and the fact that "the Puerto Rico shipping

market had experienced a steady and significant decline in its shipping rates since the 1990s" is

further contradicted by the fact that a competitor who aggressively cut rates in the 1990s,

Navieras de Puerto Rico, went bankrupt and left the market in 2001.  (AC ¶¶ 82, 83, 85, 91)

With less supply – in this case, less capacity to carry cargo – prices typically rise, especially

when the lost supplier was a known rate-cutter.  Thus, the new facts alleged in the Amended

Complaint do not create a strong inference that Raymond, Urbania, Keenan, Handy and Taylor

were reckless in failing to identify the alleged conspiracy.  (*See also* pp. 11-12, *supra*)  Applying

the *Tellabs* standard, which directs the Court to engage in a comparative evaluation and consider

"competing inferences rationally drawn from the facts alleged," there is no strong inference of

scienter that can be gleaned from these new allegations.

### 3. Raymond's, Urbania's, Keenan's, Handy's and Taylor's stock sales and/or incentive compensation fail to establish scienter

In the Complaint, Plaintiff claimed that Raymond, Urbania and Keenan were

"motivated" to make false and misleading statements and omissions in order to profit personally

from Horizon Lines' artificially inflated stock when making periodic stock sales pursuant to

10b5-1 plans that were put in place in November 2006.  (*See* Compl. ¶¶ 271-272)  In its

Dismissal Opinion, this Court stated that "[a]bsent evidence of 'unusual . . . scope or timing,' we

will not 'infer fraudulent intent from the mere fact that some officers sold stock.'"  *City of*

*Roseville*, 2009 WL 3837659, at *16 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114

F. 3d 1410, 1424 (3d Cir. 1997); *In re Advanta Corp.*, 180 F.3d 540 (3d Cir. 1999)).  The Court

found that the stock sales by Raymond, Urbania and Keenan were not unusual in scope because the same number of shares was sold throughout the class period every month and at each time was less than 1% of each individual's holdings. *City of Roseville,* 2009 WL3837659, at *16. The Court also found that the fact that the sales were at monthly intervals pursuant to the respective 10b5-1 plans was also not unusual. *Id.* In the Amended Complaint, Plaintiff provides no new allegations regarding these stock sales; however, it now alleges that, in addition to these sales (which the Court has already held did not establish scienter), the vesting of restricted stock after the IPO, the granting of stock options at the time of the IPO, and Horizon's Cash Incentive Plan provided motive for Raymond, Keenan, Urbania, Taylor and Handy to make materially false or misleading statements. (AC ¶¶ 259-267) As explained below, these allegations do not establish a strong inference of scienter for any of these five executives.

As it failed to do in the Amended Complaint, Plaintiff still fails to show how any of these new stock or cash offerings "was made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997) (citation omitted); *see also Avaya*, 564 F.3d at 279. There are no allegations that these stock transactions evidenced a substantial portion of Raymond, Urbania and Keenan's holdings, and, as the Court found in its Dismissal Opinion, they were insubstantial. *City of Roseville*, 2009 WL 3837659, at *16. Moreover, Plaintiff does not allege that Taylor or Handy sold any Horizon Lines' stock whatsoever during the Putative Class Period.[9] This fact tends to negate any inference of ill motive of the officers who are alleged to

---

[9] Handy joined the Company at the end of December 2005, three months *after* the IPO, so he had no motive or opportunity to conceal anything about the Company's financial condition from the public. Indeed, it was not until he retired in 2009 that Handy's stock options for restricted stock vested. (AC ¶ 23)

have sold stock. *Morse v. McWhorter*, 200 F. Supp. 2d 853, 898 (M.D. Tenn. 2000) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1423 (3d Cir. 1997) (holding no inference of scienter where principal officers, two of five defendants, did not make any sales), *vacated on other grounds by*, 290 F.3d 795 (6th Cir. 2002); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris, Cos*., 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares . . . sufficiently undermines plaintiffs' claim regarding motive.")).

Granting stock-based compensation to executives at the time of an IPO is not unusual and does not, in and of itself, create a strong inference of scienter. *In re Network Assocs., Inc. II Sec. Litig.*, No. C 00-CV-4849, 2003 WL 24051280, at *15 (N.D. Cal. Mar. 25, 2003) (granting motions to dismiss and holding that granting of stock options to executives during company's IPO did not indicate scienter); *see Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 560 F. Supp. 2d 1221, 1240 (M.D. Fla. 2008) ("Receipt of a stock option evidences scienter only if the option grant is unusual or suspicious.") (citation omitted). Moreover, the fact that certain individual executives received cash bonuses pursuant to a board-authorized cash incentive plan is also unavailing. "[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated." *Morse*, 200 F. Supp. 2d at 898 (rejecting claim that defendants' cash incentive plan can establish basis for scienter) (emphasis in original and internal quotation omitted); *see also Acito v. Imcera Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). That the Company's cash incentive plan paid bonuses in 2006 based on a combination of personal goals and EBITDA performance is hardly extraordinary – most plans are set up in this fashion, and it is well-established that scienter cannot be pled by alleging that an executive's compensation is based on personal and corporate goals. *McGowan Investors LP v. Frucher*, 481

F. Supp. 2d 405, 417 (E.D. Pa. 2007) ("If motive and opportunity could be established simply by pleading that corporate boards and executives want increased compensation and have access to the means to increase their compensation, then every single corporate manager or board member in the United States would have the requisite scienter."); *see also Acito*, 47 F.3d at 54 ("If scienter could be pleaded on [the basis of executive compensation] alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.").

**D.    The Amended Complaint Fails To Adequately Allege A Violation Of Section 10(b) Or Rule 10b-5 Against Horizon Lines**

In its Dismissal Opinion, this Court found that Plaintiff had not adequately pled a violation of Section 10(b) or Rule 10b-5 against Horizon Lines, Inc. and Horizon Lines, LLC, and Horizon Lines of Puerto Rico.  *City of Roseville*, 2009 WL 3837659, at *18.  In so ruling, the Court held that "the requisite mental state of scienter must be found within the mind of an employee who either made, or participated in the making of, [a materially false or misleading] statement."  *Id.* at *17.  This Court further held: "'[i]t is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false.  A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the . . . statement knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement." *Id.* (quoting *In re Apple Computer*, *Inc. Sec. Litig.* 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002)). As explained below, the Amended Complaint fails to allege with particularity that any employee of Horizon Lines made, or participated in the making of, a materially false or misleading statement with the intent to defraud investors.

**1.      There can be no claim against the corporate defendants for statements made by Raymond, Urbania, Keenan, Handy or Taylor**

As explained above, Plaintiff has still not alleged with particularity that Raymond, Urbania, Keenan, Handy and Taylor participated in or had knowledge of the Puerto Rican Division Employees' participation in the alleged antitrust conspiracy when they made statements that this Court found, at the pleading stage, to be materially misleading.  (*See supra* pp. 20-30)  Therefore, Horizon Lines cannot be held liable for these statements made by these individuals. *See In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 149-53 (3d Cir. 2004) (dismissing securities fraud suit against corporation because complaint failed to allege that members of management who prepared financial statements and made representations to securities market were aware of alleged wrongdoing).

**2.      Serra, Gill and Glova did not make false and misleading statements to investors on behalf of the Company regarding Horizon Lines' revenues, rates or price competition**

In dismissing the original Complaint, the Court held that even though "it is true that defendants Serra, Gill, and Glova were part of the rate-fixing conspiracy, and therefore would likely have been aware of the false or misleading nature of the statements made by Raymond, Keenan, and Urbania, plaintiffs have pleaded no facts showing that Serra, Gill, or Glova themselves made any false or misleading statements."  *City of Roseville*, 2009 WL 3837659, at *18.  In order to address this pleading deficiency in the Amended Complaint, Plaintiff has apparently scoured Lexis-Nexis and similar databases in an attempt to find any quote attributable to Serra, Gill or Glova in any medium so that their statements may be attributed to the Company and was able to find a few scattered quotes in trade journals or advertisements.  But these statements provide no grounds for attributing scienter to the Company because the statements (i) were directed to customers of Horizon Lines' services, not investors,

and (ii) with one exception, were unrelated to revenues and rates in the Puerto Rican tradelane.

Further, the lone statement attributable to Serra, Gill or Glova that concerns rates or revenues in

the Puerto Rican tradelane plainly was not intended to defraud investors because it was made in

January 2005, eight months before Horizon Lines sold its shares in a public offering.  Thus, the

Amended Complaint still fails to adequately plead that Horizon Lines had the requisite scienter

under Section 10(b) and Rule 10b-5.

**(a)      The statements attributable to Serra, Gill and Glova were<br>directed to customers, not investors**

In stark contrast to the alleged statements made by the other Individual

Defendants, the Amended Complaint does not allege that Serra, Gill or Glova signed any of the

Company's SEC filings, participated in shareholder or analyst conference calls or were quoted in

press releases sent out by Horizon Lines' investor relations department.  Instead, Plaintiff's

counsel combed through trade journals, such as the JOURNAL OF COMMERCE and CARIBBEAN

BUSINESS, to find quotes attributable to these marketing officials.  (*See* AC ¶¶ 9-11, 157, 184-

185, 190-191)  Indeed, five of the quotes attributable to the Puerto Rican Division Employees

come from a special advertising section printed in the September 26, 2006 edition of the

JOURNAL OF COMMERCE. (AC ¶¶ 184-185)  These statements and advertisements in periodicals

for industry executives were clearly an attempt by Horizon Lines' marketing department to raise

the Company's profile among consumers, not to attract investors, and therefore do not satisfy the

"in connection with the purchase or sale" of a security requirement of Section 10(b).  *See*

15 U.S.C. § 78u-4; *see also Hemming v. Alfin Fragrances, Inc.*, 690 F. Supp. 239, 244-45

(S.D.N.Y. 1988).

Because Section 10(b) requires that an alleged misstatement or omission be made

"in connection with the purchase or sale of any security," promotional materials directed at

35

consumers cannot form the basis of a Section 10(b) claim. *Hemming*, 690 F. Supp. at 244-45 (ad in *New York Times Magazine* cannot serve as basis upon which relief can be granted pursuant to Section 10(b)). In *Hemming*, the court, in considering alleged misstatements in a multipage special advertising section published in the *New York Times Magazine*, held that "[a]lthough an investor might read these promotional materials, the [materials] are geared to consumers of a product, not investors in a corporation." *Id.* at 244. The court further reasoned that allowing advertisements directed at consumers to serve as the basis for claims under Section 10(b) would distort the purpose of the securities laws. *Id.* at 245.

It is clear from their context that Horizon Lines' advertisement in the JOURNAL OF COMMERCE, as well as its marketing executives' statements to reporters from that industry periodical and CARIBBEAN BUSINESS, were designed to attract customers and are not the type of statements "that set forth a corporate earnings report geared toward investors." *Hemming*, 690 F. Supp. at 244. The statements attributed to Serra, Gill or Glova concern improvements to *customer service* through technology, investing in equipment and vessel maintenance and fleet enhancement, not corporate earnings or profits. (*See, e.g.*, AC ¶¶ 184-185; *see also infra* pp. 37-40) Indeed, revenues and earnings are not discussed at all (with one exception discussed below) in these statements. This is unsurprising given that extolling the revenues and profits to be earned from customers would be a highly unconventional marketing technique. Since these statements were not intended for investors at all, they could not have been intended to mislead investors. *See Hemming*, 690 F. Supp. at 244.

### (b)  The statements of Serra, Gill and Glova do not concern revenues, rates or price competition

As noted above, the statements made by Serra, Gill and Glova that Plaintiff was able to glean from trade magazines were aimed at customers, not investors. As such, these

statements are quite different from those found to be misleading in the Dismissal Opinion where

the Court held that "statements regarding Horizon's ability to increase revenue in the Puerto

Rican market despite volume decreases" were misleading because of the failure to disclose the

alleged illegal price-fixing conspiracy.  *City of Roseville*, 2009 WL 3837659, at \*9.  The Court

further found that defendants offered "a number of explanations" for Horizon's successful

increases in revenues and therefore "were obligated to disclose all material facts" regarding the

sources of those revenues.  *Id.*  In contrast, the statements attributed to Serra, Gill and Glova are

not misleading absent a disclosure of all of the reasons why the Company was able to earn

revenues in the Puerto Rican tradelane because these statements do not concern revenues, rates

or price competition at all.  Rather, a review of these statements shows that they describe the

services Horizon Lines provides to its customers:

- January 26, 2006 Horizon Lines press release (AC ¶ 166) – Statements attributed
  to Gill:

  o "In his remarks, Gill said that, 'The people of Horizon Lines are adept at
    finding ways to partner with our customers to reduce cycle time and meet
    tight delivery schedules. This is a perfect complement to the aggressive
    growth plans of Lowes. Being recognized for five years in a row is a great
    source of pride for our entire team as it validates these efforts."

- Horizon Lines' special advertising section printed in the September 26, 2006
  JOURNAL OF COMMERCE – Statements attributed to Serra and Gill (AC ¶¶184-
  185):

  o "Gilbert Serra, vice president and general manager of Horizon's Puerto
    Rico Division in San Juan, has seen enough of Puerto Rico to know there
    isn't much that will stop the island from achieving continued economic
    success. 'We are confident of the long-term stability in the main drivers of
    the Puerto Rican economy. The government's commitment to the land
    reallocation of the port facilities has allowed us to start a multiyear project
    to reinvest in the terminal in Puerto Neuvo. This will ultimately increase
    our efficiency and improve the service we provide to our customers.'"

  o "'As part of our terminal development project, we are already installing
    state-of-the-art technology and equipment,' Serra said. 'The terminal has

been fully automated since 2001. We will also be looking at more efficient container-handling equipment for San Juan. Our technology continues to be the best in the market, and our customers consistently confirm that's an important differentiator,' he continued. 'Not only do we provide transactional capabilities to book cargo, submit [handling] instructions and documentation and trace individual [shipments] but our customers also use our NetCapitan® Web tools to general comprehensive reports that allow them to better manage their supply chain.'"

- o "Serra expects further service improvement because of Horizon's fleet enhancement program starting next year; the company plans to add five new vessels to the overall fleet. He predicts that with the resulting cascade effect of reallocated vessels moving into the Puerto Rico service strings, the result will be an approximate 24 percent increase in deployed capacity offered by Horizon Lines in the Puerto Rico market.

  'The renewal of almost half of our 40-foot refrigerated fleet has allows us to reduce maintenance and claims incidents and therefore improved the utilization of our fleet. Having equipped the units with the latest technology is also important to better-serve the strict standards required for the exports by the pharmaceutical and biotech industries,' he said."

- o "'Our management team, led by Chuck Raymond, put a stake in the ground to embrace the philosophy that the movement and sharing of information was as important to the success of international shipping as was the movement of the container itself,' said Kevin Gill, vice president of marketing for Horizon Lines. 'Chuck gave us the resources to develop an e-business team and embedded us with technology . . . .  We were early to that awareness, and that is what makes the difference at Horizon, even today.'"

- o "'We have let our customers in,' Gill said. 'We opened up information in our terminals, and ports and inland operations, and we provided Web-tracking tools so shippers could tap into that information in real-time, 24 hours a day, seven days a week. Our competitors are still trying to catch up.. [sic] It was certainly a challenge. In the end we have delivered tremendous benefit.'"

- "Horizon Lines: 50 Years of Passion" printed in the January 25, 2007 CARIBBEAN BUSINESS – Statements attributed to Serra (AC ¶191):

  - o "'This, in turn, allows us to increase productivity and reduce costs of operation,' said Serra."

    "'We have always reinvented ourselves as a company. Market demands, not to mention strict regulation, force us to change constantly,' said Serra.

Although he foresees more changes in the industry, Serra is not concerned. 'We will respond to those trends as we have always done; being a step ahead in technology, researching, constantly developing our staff and listening to our market needs,' he said."

o "'During 50 years, we have been recognized for delivering excellent customer service, personalized attention, and trips that are shorter and always on time. We are here to make it easy for our customers to do business and we do it with passion,' said Serra."

• April 23, 2008 Horizon Lines press release (AC ¶ 209) – Statements attributed to Serra:

o "Horizon Lines is committed to exceptional value and customer satisfaction and we will continue to provide reliable, on-time logistics and shipping solutions for Walgreens into the future, said Gabriel Serra, senior vice president and general manager of Horizon Lines' Puerto Rico Division."

These quotes are not, sans a corrective disclosure describing the alleged price-fixing, materially misleading because none of these statements concern Horizon Lines' revenues, rates or price competition.  Rather, these general, positive statements about Horizon Lines' services to customers are, at most, the type of "vague, generally optimistic commentary that the Third Circuit has deemed immaterial puffery."  *See Galati v. Commerce Bancorp, Inc.*, No. 04-3252 (RBK), 2005 WL 3797764, at *5 (D.N.J. Nov. 7, 2005), *aff'd*, 220 F. App'x 97 (3d Cir. 2007) (defendant's claims were too vague and subjective to influence reasonable investor) (citation omitted).  *See also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999).

For example, in *Advanta,* the Third Circuit Court of Appeals held that this statement – "'[d]espite industry-wide pressure on credit card asset quality, Advanta continued to produce better-than-industry credit measures, and achieved excellent growth and returns throughout our core businesses'" – did not give rise to a duty to disclose the alleged wrongdoing related to the Company's credit card program.  *In re Advanta*, 180 F.3d at 537-38 (citation omitted).  Similarly, in *Galati*, the court held that a disclosure by the company stating "'in the

most difficult low-rate operating environment in the last 45 years, the unique Commerce

business model continues to produce strong top-line revenue growth'" did not give rise to the

duty to disclose the uncharged bid-rigging activities occurring at the company.  *Galati*, 2005 WL

3797764, at *4, 7 (citation omitted).  The statements attributed to the Puerto Rican Division

Employees described above, which merely emphasize Horizon Lines' commitment to customer

service, *are far less* related to the alleged wrongdoing here than the statements found not to be

misleading in *Galati* and *Advanta*.[10]

       The Amended Complaint next cites two statements attributed to the Puerto Rican

Division Employees' opining about general economic conditions in Puerto Rico in business

articles reporting about the general economy:

- "Pain on the Spanish Main" printed in the March 3, 2008 FLORIDA SHIPPER (a
  subsidiary of the JOURNAL OF COMMERCE) – Statements attributed to Glova
  (AC ¶ 208):

  o "Shipping volumes both southbound to Puerto Rico and northbound to
    Puerto Rico are down significantly from the recent highs experienced in
    2005, which included rebuilding and recovery supply volumes after the
    harsh 2004 hurricane season, said Greg Glova, Horizon Lines' director of
    Puerto Rico marketing and pricing."

---

[10]   Likewise, Plaintiff alleges that several quotes allegedly made by Serra in circumstances
entirely unrelated to investor communications show that he had "authority" to speak on
behalf of the Company.  (AC ¶¶ 229-235)  A review of these statements shows that they were
clearly aimed at customers, not investors.  (*See, e.g.*, *id.* ¶ 230 (Serra quoted, saying "[t]he
MJX service is generally suspended for the entire summer to coincide with off-peak seasonal
demand"); *id.* ¶ 231 (announcing agreement reached between Horizon Lines and the
International Longshoremen's Association, Serra quoted saying "our management team will
continue working with union leaders to ensure that every worker returns home at the end of
the day healthy and safe – the same way that they came to work"); *id.* ¶ 233 ("Serra had 'been
awarded a Top Management Award by the Puerto Rico Sales and Marketing Executives
Association.'")).  Furthermore, two of these quotes are from mid-2004, over a year and a half
before Horizon Lines became a publicly traded company and three years before Plaintiff
bought its first Horizon Lines shares.  (*Id.* ¶¶ 229-230)

- o "He said the carrier hopes the economy will start to turn around in the latter part of 2008."

- "Island of Little Sun" printed in the January 22, 2007 JOURNAL OF COMMERCE – Statements attributed to Serra (AC ¶ 190):

  - o "'We are bringing in a 1,700 - TEU ship, which will replace a 1,200 - TEU vessel by mid - year,' said Gabriel Serra, vice president and general manager of Horizon's Puerto Rico division. Serra said Horizon had cut capacity last year by only operating two sailings a week from Jacksonville. '[sic] In previous years, we deployed our spare vessel in the high - volume periods, but we didn't last year,' he said. 'In 2005, we deployed it for 20 weeks, but we didn't need to deploy it in 2006 because the utilization rate wasn't terribly high.' [Serra] expects trade volume to return to its historic growth rate of 1 percent or less."

These statements regarding general economic conditions in Puerto Rico are also not misleading without disclosure of the alleged anti-trust violations. *See Menkes v. Stolt-Nielsen S.A.*, No. 3:03 CV 409 (DJS), 2005 WL 3050970, at *8 (D. Conn. Nov. 10, 2005) (holding alleged illegal price-fixing did not need to be disclosed in connection with "generic description(s) of the state of the market as a whole, a recitation of historical facts about [the company's] operations, or vague forecasts of future success"). Here, as in *Menkes*, the "subject matter of [each] statement [was] so attenuated from [the alleged illegal conduct] that it could not reasonably be found to have created a false impression in a reasonable investor.'" *Id.* at *8 (citation omitted).

### (c) The statement attributed to Serra that occurred eight months before the IPO is not actionable

There is just one statement attributed to any of the Puerto Rican Division Employees that concerns revenues, rates or price competition. In the January 31, 2005 JOURNAL OF COMMERCE article, Serra is reported as discussing Horizon Lines' rates. (AC ¶ 157) (alleging that Serra was quoted discussing Horizon Lines' rates charged to customers in 2003-2004 and efforts to recover rising costs by increasing rates) Even if this statement could be deemed

41

misleading, it could not have been material as a matter of law because it was made *eight months* before Horizon Lines' initial public offering of its shares and *two years* before Plaintiff first purchased Horizon Lines' stock. That long time gap between the statement and any share purchases requires dismissal for at least three reasons.

First, by the time of the IPO, and even more so when Plaintiff first made its investment, Serra's statement was "stale," and stale information is immaterial as a matter of law. *See In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d. 670, 699 (D.N.J. 2006) (citing *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 413 (S.D.N.Y. 1998)). Courts recognize that it is highly unlikely that a statement made significantly in advance of the plaintiff's purchase of stock was material to that plaintiff when making its decision to purchase. *See In re Time Warner Sec. Litig.*, 794 F. Supp. 1252, 1260 (S.D.N.Y. 1992), *overruled, in part, by* 9 F.3d 259 (2d Cir. 1993) (alleged misstatement made ten months before class period began, "cannot have formed a basis for plaintiffs' expectations when they purchased shares ten or more months later"); *see also In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (affirming dismissal of claim based on statement made before class period began and holding that "[a] defendant, however, is liable only for those statements made during the class period").

Here, the statements attributed to Serra in this article were plainly stale and immaterial as to any investors' purchase of Horizon Lines stock because when the statement was made in January 2005, Horizon Lines was a private company with no public investors to influence. Further, Serra's statements concerned Horizon Lines' experience in the Puerto Rican tradelane from *2003* to *2004*. (AC ¶ 157 ("Horizon has not pushed rate increases as aggressively as some competitors, and had increased its southbound market share to 30 percent from 28 percent in 2003" and "He called it 'a tough year'")) Thus, by the time public investors were

purchasing shares of Horizon Lines stock in September 2005, this statement was more than eight

months old and it concerned market conditions that were one to two years old.  By the time

Plaintiff purchased its shares in March 2007, the statement was more than two years old and

concerned events three to four years before Plaintiff's investment.  The time frame of this story

renders Serra's comments stale and too far removed to have influenced Plaintiff's purchase of

stock (or any putative class member's purchase).  *See Time Warner*, 794 F. Supp. at 1260; *In re

Intelligroup*, 468 F. Supp. 2d. at 699.[11]

        Second, and similarly, Plaintiff cannot adequately allege reliance based on this

out-of-date statement, either directly or under a fraud-on-the-market theory.  This JOURNAL OF

COMMERCE article was published *two years* before Plaintiff is even alleged to have purchased

Horizon Lines stock.  (AC ¶ 17, D.I. # 20-2)  Because Plaintiff cannot show personal reliance on

the quotes attributed to Serra in this article, in order to use this statement to make out a Section

10(b) claim, Plaintiff needs to plead that there was an efficient market for Horizon Lines stock.

The efficient market theory states that "'information important to reasonable investors (in effect,

the market) is immediately incorporated into stock prices.'"  *In re Merck & Co. Sec. Litig.*, 432

F.3d 261, 269, n.5 (3d Cir. 2005) (citation omitted).  However, if there is no market for stock at

the time the misleading statements allegedly are made, then a plaintiff cannot rely upon a fraud-

---

[11]   The two-year gap between Serra's statement and Plaintiff's first purchase of shares is the
relevant measure of time, not the gap between the statement and the start of the Putative
Class Period, because no class has been certified, nor could ever be certified with Plaintiff as
class representative if Plaintiff itself has no claim.  *See In re AM Int'l, Inc. Sec. Litig.*, 108
F.R.D. 190, 194-95 (S.D.N.Y. 1985) ("[A] proposed class representative who clearly did not
rely upon either the allegedly misleading financials or on the integrity of market price or
information is subject to unique defenses, and therefore may not represent the class.");
*Salgado v. Piedmont Capital Corp.*, 534 F. Supp. 938, 953 (D.P.R. 1981) ("It is well settled
that to be a representative of the class on a particular claim the plaintiff must himself have a
cause of action on that claim.").

on-the-market theory to establish reliance. *See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 101 (D. Conn. 2009) ("[I]t would be impossible for the plaintiffs to ever establish the fraud-on-the-market theory because there is no developed market for newly offered securities and thus the market for initial public offerings ('IPOs') is not an 'efficient' market by definition.") (emphasis omitted); *In re MetLife Demutualization Litig.*, 229 F.R.D. 369, 379 n.5 (E.D.N.Y. 2005) ("MetLife correctly points out that Plaintiffs may not rely on the 'fraud on the market' presumption of reliance because no efficient market for MetLife's shares existed at the time of the demutualization vote.") (citations omitted).  When the January 2005 statement attributed to Serra was made, there was no market for Horizon Lines stock at all. Without an efficient market, Plaintiff cannot invoke the fraud-on-the-market presumption of reliance. *See Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1415 n.1 (3d Cir. 1997) (an "'efficient' market" is necessary "to use the 'fraud on the market' theory to satisfy the reliance requirement in a Section 10(b) claim") (citation omitted); *see also id.* at 1419 n.8 (explaining relationship between an "'efficient' market" and the "'fraud-on-the-market'" theory of reliance) (citation omitted).

Third, Plaintiff has not alleged with particularity that Serra intended to deceive investors by allegedly making statements in the January 21, 2005 JOURNAL OF COMMERCE article, which is a necessary element of scienter.  Plaintiff must plead that Serra acted with a "'mental state embracing intent to deceive, manipulate, or defraud'" *investors. Lain v. Evans*, 123 F. Supp. 2d 344, 347 (N.D. Tex. 2000) (dismissing securities fraud claim because plaintiff did not allege any defendant intended to deceive investors) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)); *see also In re IKON Office Solutions, Inc., Sec. Litig.*, 277 F.3d 658, 667 (3d Cir. 2002) (same).  Since there were no investors on January 31, 2005, and there

would be no investors until September 2005, Serra could not have intended to mislead investors

or potential investors with his statements.  Further, for the reasons discussed above, the forum in

which Serra is alleged to have made his statements – an industry journal – does not indicate an

intent to mislead investors.  Rather, the facts alleged in the Amended Complaint merely show

that, at a time when Horizon Lines had no public investors, Serra responded to questions from a

reporter from the JOURNAL OF COMMERCE regarding a story on the Puerto Rican tradelane.

Those facts do not suggest a strong inference of a fraudulent intent to deceive investors.  *Cf.*

*United States v. Stewart*, 305 F. Supp. 2d 368, 376 (S.D.N.Y. 2004) (criminal defendant did not

have requisite scienter because, among other reasons, she did not intend to influence investors

when she was quoted in news story in the *Wall Street Journal* about a recent stock trade, which

was the subject of an insider trading charge).

**E.      The Amended Complaint Fails To Allege That There Was A Material False Or
         Misleading Statement On April 25, 2008**

       The Amended Complaint also attempts to plead a claim based on statements made

on April 25, 2008, *after* Horizon Lines disclosed the DOJ investigation.  Specifically, the

Amended Complaint alleges that Horizon Lines' stated reasons for reducing its earnings

guidance – softer than anticipated Puerto Rican market and unprecedented fuel cost increases –

were misleading because the disruption of the alleged price-fixing conspiracy was the true reason

for the change.  This allegation has at least two flaws.

       As an initial matter, the April 25, 2008 statement was not misleading due to an

omission of the DOJ investigation because that information had already been disclosed on April

17, 2008.  In determining whether information is material, courts must look to the "total mix" of

information that is already publicly available.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438,

449 (1976); *see also Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[U]ndisclosed

information is considered material if there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor.") (internal quotations omitted).  Where, as here, the market already had access to the information in issue through other public filings, such information is not material and, therefore, need not be disclosed as a matter of law.  *See, e.g.*, *In re Hunter Envtl. Servs. Inc. Sec. Litig.*, 921 F. Supp. 914, 922 (D. Conn. 1996) (dismissing claim when omitted shareholder correspondence was already available to the market in public filings); *Beissinger v. Rockwood Computer Corp.*, 529 F. Supp. 770 (E.D. Pa. 1981) (information in issue was not material as a matter of law because it was already part of the "total mix" of publicly available information).

In any event, Plaintiff cannot allege reliance on any statements made during the first quarter 2008 earnings call because the call occurred on April 25, 2008 (AC ¶ 215) – after its last purchase or sale of Horizon Lines stock during the Putative Class Period.  (*See* D.I. # 20-2 (listing Plaintiff's last purchase during the Putative Class Period as April 24, 2008 and its last sale during the Class Period as December 12, 2007))  Plaintiff can only assert claims based on activity prior to the date of its purchase or sale of stock.  *See Winer Family Trust v. Queen*, 503 F.3d 319, 325-26 (3d Cir. 2007) (affirming district court's dismissal of Rule 10b-5 claims based on representations made after the date lead plaintiff purchased stock); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 80 (2006) (holding there is no private right of action under Rule 10b-5 for mere holders of securities).

## II.   COUNTS TWO AND THREE OF THE AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 20 OF THE EXCHANGE ACT

Plaintiff's claims under Section 20(a) of the Exchange Act also must be dismissed for failure to state a claim.  Section 20 imposes liability on one who controls a violator of Section

10(b).  *In re Alpharma, Inc. Sec. Litig.*, 372 F.3d at 137, 153.  To state a claim under Section

20(a), Plaintiff must allege, at a minimum, that (1) one person controlled another person; and (2)

the "controlled person" is liable under the primary statute.  *Id.*; *Clark v. Comcast Corp.*, 582 F.

Supp. 2d 692, 706-07 (E.D. Pa. 2008) (Bartle, J.).  Plaintiff's Section 20(a) claim should be

dismissed for three reasons.

       First, Plaintiff has failed to state a primary violation of Section 10(b), so its claim

for secondary liability under Section 20(a) must be dismissed.  *Clark*, 582 F. Supp. 2d at 706-07.

       Second, Plaintiff must allege actual control on the part of the alleged control

person.  *See In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002) *aff'd*, 357

F.3d 322 (3d Cir. 2004) ("'In order to establish controlling person liability under [Section 20(a)],

a defendant must possess 'actual control over the transactions in questions.'") (quoting *Antinoph

v. Laverell Reynolds Sec., Inc.*, 1989 WL 102585, at *5 (E.D. Pa. Sept. 5, 1989), *aff'd mem.*, 911

F.2d 719 (3d Cir. 1990)).  Assuming there could be a primary violation against Serra, Gill or

Glova, there are no allegations in the Amended Complaint regarding the actual control that any

Individual Defendant had over them (or, for that matter, any other corporate speaker).  "[E]ven a

CEO is not automatically a 'controlling person' under section 20(a)."  *In re Digital Island*, 223 F.

Supp. 2d at 561 n.9.

       Third, an "element of any case imposing liability under s[ection] 20(a) is 'culpable

participation' in the securities violation.… To impose secondary liability on a controlling person

for his inaction, the plaintiff must prove that the inaction 'was deliberate and done intentionally

to further the fraud.'"  *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 185 (3d Cir. 1981) (quoting

*Rochez Bros. v. Rhoades*, 527 F.2d 880, 885, 890 (3d Cir. 1975)); *see also In re Suprema

Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 n.16 (3d Cir. 2006) ("culpable participation" is an

element of section 20(a) claim and must be shown by plaintiff); *see also SEC v. J.W. Barclay & Co.*, 442 F.3d 834, 845 n.17 (3d Cir. 2006) (*Rochez* "look[ed] to the language of § 20(a) to define the scienter requirements for control persons under § 20(a)").  Here, culpable participation is not alleged as to any of the Individual Defendants.

To the extent that the purported culpable participation supporting Plaintiff's Section 20(a) claim is based on a failure to prevent alleged wrongful conduct by others, such allegations do not state a claim.  "Inaction alone cannot be a basis for [imposing] liability [under section 20(a)]."  *Rochez Bros. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975).  In *Rochez*, the Third Circuit affirmed the district court's rejection of a Section 20(a) claim because, among other things, the alleged control person "had no knowledge of [the primary violator's] fraudulent acts and did not 'consciously intend' to aid [the primary violator] in his fraudulent scheme."  *Id.*  Moreover, "[w]hile deliberate inaction can rise to the level of culpable participation, it does so only if the intent is to further the fraud of another."  *In re Tyson Foods, Inc. Sec. Litig.*, No. 01-425-SLR, 2004 U.S. Dist. LEXIS 11122, at *38-39 (D. Del. June 17, 2004) (citing *Rochez*, 527 F.2d at 890), *aff'd sub nom. Aetos v. Tyson Foods, Inc.*, 155 F. App'x 53 (3d Cir. 2005)).

## III.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Defendants respectfully request that the Amended Complaint be dismissed with prejudice.  This is the third complaint in this action, and the second filed by Lead Plaintiff Police and Fire Retirement System of the City of Detroit.  Lead Plaintiff had months to investigate its claims before it filed its initial consolidated Complaint on July 29, 2009.  After that Complaint was dismissed, Plaintiff requested, and received, several weeks of additional time to investigate its claims in order to replead.  Having been given two opportunities to fully investigate its claims, Plaintiff should now be required to accept the consequences of this Court's judgment.

# CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted in its

entirety and the Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

|  |  |
|---|---|
| ___/s/ Paul J. Lockwood_____ | ___/s/ Steven L. Caponi_____ |
| Anthony W. Clark (ID No. 2051) | Steven L. Caponi (ID No. 3484) |
| Paul J. Lockwood (ID No. 3369) | BLANK ROME LLP |
| Nicole A. DiSalvo (ID No. 4662) | 1201 Market Street |
| SKADDEN, ARPS, SLATE, | Wilmington, Delaware  19801 |
|   MEAGHER & FLOM LLP | Telephone:  (302) 425-6400 |
| One Rodney Square | |
| P.O. Box 636 | OF COUNSEL: |
| Wilmington, Delaware  19899 | Joseph O. Click |
| Telephone:  (302) 651-3000 | BLANK ROME LLP |
| | Watergate, 600 New Hampshire Ave., NW |
| *Attorneys for Defendants Horizon Lines,* | Washington, DC  20037 |
| *Inc. and Horizon Lines, LLC* | Telephone:  (202) 772-5966 |
| | |
| | *Attorneys for Defendant Charles G. Raymond* |
| | |
| ___/s/ Kevin F. Brady_____ | ___/s/ William M. Lafferty_____ |
| Kevin F. Brady (ID No. 2248) | William M. Lafferty (ID No. 2755) |
| Jeremy D. Anderson (ID No. 4515) | MORRIS NICHOLS ARSHT & |
| CONNOLLY BOVE LODGE | TUNNELL LLP |
|   & HUTZ LLP | 1201 North Market Street |
| 1007 North Orange Street | P.O. Box 1347 |
| P.O. Box 2207 | Wilmington, Delaware  19899 |
| Wilmington, Delaware  19899 | Telephone:  (302) 658-9200 |
| Telephone:  (302) 658-9141 | |
| | OF COUNSEL: |
| *Attorneys for Defendants M. Mark* | Christopher M. Curran |
| *Urbania, John W. Handy and Brian W.* | Matthew S. Leddicotte |
| *Taylor* | WHITE & CASE LLP |
| | 701 Thirteenth Street, NW |
| | Washington, DC  20005 |
| | Telephone: (202) 626-3600 |
| | |
| | *Attorneys for Defendant John V. Keenan* |

DATED:  February 12, 2010

49