## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HORIZON LINES, INC., HORIZON LINES, LLC., INC., CHARLES G. RAYMOND, MARK URBANIA, JOHN V. KEENAN, JOHN W. HANDY, BRIAN TAYLOR, GABRIEL SERRA, R. KEVIN GILL, and GREGORY GLOVA, <br><br> Defendants. | No. 08-969(HB) <br> (Securities Class Action) <br> Hon. Harvey Bartle, III <br><br><br> **ELECTRONICALLY FILED** |

## LEAD PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

John C. Browne
Lauren A. McMillen
Sean O'Dowd
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

Andre Bouchard (#2504)
Sean M. Brennecke (#4686)
**BOUCHARD MARGULES & FRIEDLANDER, P.A.**
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500
abouchard@bmf-law.com
sbrennecke@bmf-law.com

*Liaison Counsel*

Peter S. Linden
Steven D. Cohn
**KIRBY McINERNEY LLP**
825 Third Avenue, 16th Floor
New York, New York 10022
(212) 371-6600

*Co-Lead Counsel for Lead Plaintiff the Police and Fire Retirement System of the City of Detroit*

Dated: March 12, 2010

# TABLE OF CONTENTS

**Pages**

TABLE OF AUTHORITIES ........................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS .................................. 1

SUMMARY OF ARGUMENT ..................................................................... 3

STATEMENT OF NEW FACTS ................................................................... 7

I. The Guilty Plea Defendants Made And Authorized The Making Of False And Misleading Statements Regarding Horizon's Revenue, Pricing And Competition ........... 7

II. The Structure Of Horizon's Senior Management ............................................. 10

III. Defendants Handy And Taylor Made False And Misleading  Statements Regarding Horizon's Revenue, Pricing And Competition ................................. 11

IV. Horizon's Reported Rate Increases Raised A Red Flag .................................... 13

V. Additional Allegations of Scienter ....................................................................... 15

ARGUMENT ....................................................................................................... 15

I. THE AMENDED COMPLAINT STATES CLAIMS UNDER SECTION 10(B) .......... 15

   A. Defendants Made Materially False And Misleading Statements And Omissions During The Class Period ......................................... 16

      1. Defendants Concede That The Amended Complaint Adequately Pleads Materially False Statements By Horizon And The Individual Defendants Relating To Revenue, Pricing And Competition ........................ 16

      2. The Guilty Plea Defendants Made Actionable Misrepresentations Relating To Revenue, Pricing And Competition ..................................... 17

         (a) False And Misleading Statements By The Guilty Plea Defendants Were Authorized By Horizon, Reviewed By Investors, And Incorporated Into The "Total Mix" Of Information In The Market ......................... 18

         (b) The Guilty Plea Defendants Made Actionable Class Period Misstatements That Were Authorized By Horizon ...................... 23

         (c) Serra's January 31, 2005 Misstatement Is Actionable ................. 27

i

(d) Horizon's April 25, 2008 Disclosure Was A Partial Corrective Disclosure As Well As An Actionable Misstatement ................................................................... 31

B. The Amended Complaint Adequately Alleges Scienter Against Each Individual Defendant ............................................................................. 32

1. Guilty Plea Defendants Serra, Gill And Glova Acted Knowingly ........... 33

2. The Amended Complaint Gives Rise To A Strong Inference That The Individual Defendants Made False Statements Knowingly Or, At The Very Least, With Reckless Disregard For The Truth ................... 33

(a) There Is A Strong And Compelling Inference That One or More of Defendants Serra And Gill's "Superiors"— Defendants Raymond, Urbania, Keenan, Handy And Taylor—Participated In The Price-Fixing Conspiracy ................. 34

(b) Horizon's Rate Increases Raised A Red Flag Alerting Defendants To The Existence Of The Price-Fixing Conspiracy ................................................................... 35

(c) Urbania's Abrupt Resignation Raises An Additional Inference Of Scienter ..................................................... 39

3. The Amended Complaint Gives Rise To A Strong Inference That Defendants Raymond, Urbania, Keenan, Handy, Taylor And Serra Were Motivated To Perpetuate And Conceal The Conspiracy ................. 40

C. Horizon's Corporate Scienter Is Adequately Alleged ........................................... 43

1. Horizon's Scienter Is Established By The Misleading Statements Made By The Guilty Plea Defendants And The Individual Defendants ................................................................................. 44

2. Horizon's Scienter Is Established By The Guilty Plea Defendants' Participation In The Dissemination Of False And Misleading Statements By Horizon And The Individual Defendants ......................... 45

II. THE COMPLAINT STATES CLAIMS UNDER SECTION 20(A) ............................... 49

CONCLUSION .......................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*In re Able Labs. Sec. Litig.,*
Civ. A. No. 05-2681 (JAG), 2008 WL 1967509 (D.N.J. Mar. 24, 2008)...............................16

*In re Adaptive Broadband Sec. Litig.,*
No. C. 01-1092 SC, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...........................................40

*In re Alpharma Inc. Sec. Litig.,*
372 F.3d 137 (3d Cir.2004)................................................................................................42, 49

*In re Apple Computer, Inc. Sec. Litig.,*
243 F. Supp. 2d 1012 (N.D. Cal. 2002) ..................................................................................43

*In re ATI Techs., Inc. Sec. Litig.,*
216 F. Supp. 2d 418 (E.D. PA 2002) ......................................................................................24

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)................................................................................................................38

*In re Bradley Pharms. Sec. Litig.,*
421 F. Supp. 2d 822 (D. N.J. 2006) ........................................................................................32

*In re Campbell Soup Sec. Litig.,*
145 F. Supp. 2d 574 (D.N.J. 2001) ...................................................................................24, 50

*In re Carter-Wallace, Inc. Sec. Litig.,*
150 F.3d 153 (2d Cir. 1998)...............................................................................................21, 22

*City of Monroe Employees Retirement System v. Bridgestone Corp.,*
399 F.3d 651 (6th Cir. 2005) ..................................................................................................49

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.,*
C.A. No. 08-969, 2009 WL 3837659 (D. Del. Nov. 13, 2009) ...................................... passim

*In re Connetics Corp. Sec. Litig.,*
No. 07-civ-2940, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008)...........................................31

*In re Craftmatic Sec. Litig.,*
890 F.2d 628 (3d Cir.1989)......................................................................................................21

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,*
256 F.R.D. 82 (D. Conn. 2009) (Def. Br. at 44).....................................................................29

iii

*Glazer Capital Management, LP v. Magistri,*
  549 F.3d 736 (9th Cir. 2008) ...............................................43

*Hemming v. Alfin Fragrances, Inc.*
  690 F. Supp. 239 (S.DN.Y. 1988)........................................22

*Institutional Investors Group v. Avaya, Inc.,*
  564 F.3d 242 (3d Cir. 2009).......................................33, 35, 40, 41

*In re Intelligroup Sec. Litig.,*
  468 F. Supp. 2d 670 (D.N.J. 2006) ....................................30

*In re Kidder Peabody Sec. Litig.,*
  Civ. No. 94-3954, 1995 WL 590624 (S.D.N.Y. Oct. 4, 1995)...............................................29

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
  513 F.3d 702 (7th Cir. 2008) ...............................33, 42, 44

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.,*
  576 F.3d 172 (4th Cir. 2009)................................................44

*In re Metlife Demutualization Litig.,*
  229 F.R.D. 369 (E.D.N.Y. 2005) .........................................29

*In re Moody's Corp. Sec. Litig.,*
  599 F. Supp. 2d 493 (S.D.N.Y. 2009)....................................44

*In re Motorola Sec. Litig.,*
  No. 03 287, 2004 WL 2032769 (N.D. Ill. Sept. 9, 2004) ......................................49

*In re MTC Elec. Techs. S'holders Litig.,*
  898 F. Supp. 974 (E.D.N.Y. 1995),
  *vacated in part on reconsideration*, 993 F. Supp. 160 (E.D.N.Y. 1997)...............................29

*In re New Century Fin. Corp.,*
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................42

*Norfolk County Ret. Sys. v. Ustian,*
  No. 07-civ-7014, 2009 WL 2386156 (N.D. Ill. July 28, 2009) ...............................................32

*In re NUI Sec. Litig.,*
  314 F. Supp. 2d 388 (D. N.J. 2004) ..............................48, 50

*In re Par Pharm. Sec. Litig.,*
  Civ. A. No. 06-cv-3226 (PGS), 2009 WL 3234273 (D.N.J. Sept. 30, 2009) .........................40

*Phillips v. County of Allegheny,*
  515 F.3d 224 (3d Cir. 2008)................................................15

*Pinker v. Roche Holdings Ltd.*,
  292 F.3d 361 (3d Cir. 2002).................................................................................31

*In re PNC Sec. Litig.*,
  Civ. No. 90-0592, 1992 WL 373135 (W.D. Pa. Oct. 8, 1992) .................................32

*In re Providian Fin. Corp. Sec. Litig.*,
  152 F. Supp. 2d 814 (E.D. Pa 2001) .....................................................................24

*In re Quintel Entm't Inc. Sec. Litig.*,
  72 F. Supp. 2d 283 (S.D.N.Y. 1999)......................................................................30

*In re Regal Commc'ns Corp. Sec. Litig*,
  No. 94-179, 1996 WL 411654 (E.D. Pa. July 17, 1996) .........................................31

*In re Reliance Sec. Litig.*,
  135 F. Supp. 2d 480 (D. Del. 2001)..................................................................29, 30

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
  311 F.3d 198 (3d Cir. 2002)..............................................................................15, 16

*San Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris*
  *Companies, Inc.*,
  75 F.3d 801 (2d Cir. 1996)....................................................................................27

*In re Schering-Plough Corp./Enhance Sec. Litig.*,
  08-CV-397 (DMC), 2009 WL 2855457 (D.N.J. Sept. 2, 2009) ..............................16

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 Cir. 2001 ...........................................................................................25

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
  571 F. Supp. 2d 1315 (N.D. Ga. 2007)..................................................................32

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000)..................................................................................21

*Simon v. American Power Conversion Corp.*,
  945 F. Supp. 416 (D.R.I. 1996)..............................................................................27

*Southland Sec. Corp. v INSpire Ins. Solutions, Inc.*,
  365 F.3d 353 (5th Cir. 2004) ...........................................................................44, 45

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006)..........................................................................15, 35, 42

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008)..................................................................................44

v

*Time Warner Inc. Sec. Litig*.,
794 F. Supp. 1252 (S.D.N.Y. 1992) *affirmed in part, reversed in part by,* 9 F.3d 259
(2d Cir. 1993) ..........................................................................................................30

*Tracinda Corp. v. DaimlerChrysler AG*,
197 F. Supp. 2d 42 (D. Del. 2002) ...........................................................................50

*In re U.S. Aggregates, Inc. Sec. Litig*.,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) ..............................................................29, 30

*Urbach v. Sayles*,
Civ. No. 91-1291, 1991 WL 236183 (D.N.J. Sept. 4, 1991), *clarified on other
grounds*, 779 F. Supp. 351 (D.N.J. 1991) ................................................................29

*Walsingham v. Biocontrol Tech., Inc.*
66 F. Supp. 2d 669 (W.D. Pa. 1998) .........................................................................27

*Winer Family Trust v. Queen*,
503 F.3d 319 (3d Cir. 2007) ......................................................................................32

*In re Xcel Energy, Inc.*,
364 F. Supp. 2d 980 (D. Minn. 2005) .......................................................................35

*Zelman v. JDS Uniphase Corp.,*
376 F. Supp. 2d 956 (N.D. Cal. 2005) ......................................................................28

*Zucco Partners, LLC v. Digimarc Corp.,*
552 F.3d 981 (9th Cir. 2009) .....................................................................................40

## NATURE AND STAGE OF THE PROCEEDINGS

On July 28, 2009, Lead Plaintiff filed a consolidated complaint alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act") against Horizon Lines, Inc., Horizon Lines, LLC (collectively "Horizon" or the "Company"), Horizon Lines of Puerto Rico, Inc., Charles G. Raymond, Mark Urbania, John V. Keenan, and three former executive officers of Horizon who have pled guilty to criminal violations of the antitrust laws:  Gabriel Serra, Gregory Glova and R. Kevin Gill (the "Guilty Plea Defendants").  On August 31, 2009, certain Defendants moved to dismiss the Complaint.

On November 13, 2009, the Court granted Defendants' motion to dismiss without prejudice.  *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc. ("Horizon")*, C.A. No. 08-969, 2009 WL 3837659 (D. Del. Nov. 13, 2009).  The Court held that the Complaint adequately alleged that Horizon Lines, Inc., Horizon Lines, LLC and certain Defendants (Raymond, Urbania and Keenan) made materially false and misleading statements to investors and that investors were damaged as a result.  *See Horizon*, 2009 WL 3837659, at *2.

The Court held that the Complaint pleaded misrepresentations relating to "revenue, pricing and competition" and that the Complaint "repeatedly quotes" Defendants as "offering purportedly legitimate explanations for Horizon's success in the Puerto Rico market."  *Id.* at *10 (noting that Defendants misleadingly attributed Horizon's success to, *inter alia*, "cargo mix," "strong customer relationships," "high service levels," and "customer service program[s].")  The Court held that these statements were materially false and misleading in light of the illegal price-fixing conspiracy because attributing Horizon's performance "to only lawful conduct falls below the level of honesty required by the securities laws."  *Id.* at *9.  The Court stated:

> defendants put the issue of Horizon's success "in play" and were obligated to disclose all material facts regarding Horizon's success in the Puerto Rico market.

*Id.* (citing *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa 2001); *see also id.* ("In our view, facts regarding an anti-competitive rate-fixing scheme 'would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'").

The Court, however, dismissed the Complaint without prejudice for three primary reasons: (1) while Lead Plaintiff had adequately alleged the scienter of the Guilty Plea Defendants, the Court noted that "no false or misleading statements are attributed to these three defendants, nor do plaintiffs claim they were instrumental in the formulation or dissemination of the false or misleading statements made by others," *id.* at *13; (2) Lead Plaintiff had failed to adequately allege the scienter of Defendants Raymond, Urbania and Keenan (each of whom the Court found to have made materially false statements), *id. at* *17; and (3) Lead Plaintiff had not adequately alleged the scienter of any Horizon entity because "the requisite mental state of scienter must be found within the mind of an employee who either made, or participated in the making of, [a false or misleading statement]." *Id.* at *17.

On December 23, 2009, Lead Plaintiff filed the Amended Complaint. On February 12, 2010, certain Defendants moved to dismiss. Lead Plaintiff respectfully submits this brief in opposition to the Defendants' Motions to Dismiss the Amended Complaint.[1]

---

[1] The Amended Complaint no longer asserts a claim against Horizon Lines of Puerto Rico, Inc. The Defendants named in the Amended Complaint are Horizon Lines, Inc. and Horizon Lines, LLC, five members of Horizon's "key" executive management team: Charles G Raymond, Mark Urbania, John V. Keenan, John W. Handy and Brian W. Taylor (the "Individual Defendants"), and the three Guilty Plea Defendants (Serra, Glova and Gill). *See* ¶¶18-27. The Guilty Plea Defendants did not respond to the initial Complaint and have not responded to the Amended Complaint. The Amended Complaint expands the Class Period, which now begins on September 26, 2005. In this opposition, Defendants' brief in support of their motion to dismiss is cited as "Def. Br. at _. All emphasis is added unless otherwise indicated.

## SUMMARY OF ARGUMENT

This action alleges that Defendants artificially inflated the price of Horizon stock from September 26, 2005 through April 25, 2008 (the "Class Period") by issuing materially false and misleading statements to the investing public. These representations failed to disclose or misrepresented that Horizon's success arose from an admitted antitrust price-fixing conspiracy that took place at Horizon over a period of at least five years. On April 17, 2008, Horizon announced that it was the subject of a federal investigation related to pricing and competitive practices in its Puerto Rico shipping business. ¶¶55-62. On this news, the price of Horizon's stock fell from $18.23 to $14.70 per share, and dropped sharply again a week later when it became clear that Horizon's seemingly positive performance and success had been due to the Company's illegal and unsustainable price-fixing conspiracy. ¶¶212-17, 277-79; *see also Horizon*, 2009 WL 3837659, at *2. In total, the price of Horizon's stock declined by more than 38% in little over a week following the revelation of the illegal activity at the Company. ¶279.

In the aftermath of these disclosures, Horizon is facing a number of civil lawsuits and an ongoing criminal investigation by the Government. The Company has entered into a $20 million preliminary settlement in an antitrust class action pending in Puerto Rico. In addition, three of the Company's senior executives have pled guilty to criminal violations of the antitrust laws in federal court. *See* ¶¶63-64. The Guilty Plea Defendants and the Government have stated that at least some of their superiors at Horizon were involved in the price-fixing conspiracy.[2] *See, e.g.,* ¶¶98-99, 105 (Gill "has provided evidence, in the form of statements and documents, against his

---

[2] The Guilty Plea Defendants were themselves high ranking executives and part of a small group of senior officers at Horizon. ¶¶25-27, 244-46. Serra was one of the five highest paid officers at Horizon and served on the executive officer management team with the Individual Defendants. ¶25. Defendants Gill and Glova – both of whom worked in Horizon's North Carolina corporate headquarters – were also high-level members of Horizon's executive team. ¶¶26-27.

superiors within [Horizon,] <u>including presently uncharged co-conspirators</u>");  ¶95 (at Serra's

sentencing hearing, in response to questioning from the federal court, a federal prosecutor

informed the court that "<u>there are others higher than Mr. Serra</u>" and "[Serra] is essentially. . .

he's in the middle.")

On December 23, 2009, Lead Plaintiff filed an Amended Complaint.  As described more

fully below, Lead Plaintiff respectfully submits that the Amended Complaint cures the pleading

defects identified in the Court's November 13, 2009 Opinion and Order.

<u>First</u>, whereas the initial Complaint did not identify any public statements made by the

Guilty Plea Defendants (Serra, Gill, Glova) (*see Horizon*, 2009 WL 3837659, at *13), the

Amended Complaint sets forth with particularity numerous public statements made on behalf of

Horizon (and with Horizon's express authorization) by each of the Guilty Plea Defendants.  *See,*

*e.g.,* ¶¶157-58, 183-84, 186, 190-91, 209, 228-36 (Serra), ¶¶185-86 (Gill), ¶208 (Glova).  Many

of these statements were materially false and misleading because they placed "the issue of

Horizon's success [in Puerto Rico] 'in play,'" while failing to disclose the illegal price-fixing

scheme.  *See Horizon*, 2009 WL 3837659, at *9-10.  For instance, the Amended Complaint sets

forth statements attributable to Serra made both before and during the Class Period that discussed

Horizon's rates, competition and costs and falsely attributed Horizon's success in the Puerto

Rico market to lawful activity such as superior "customer service."  *See, e.g.,* ¶157 ("Horizon's

rates are up an average of 5 to 6 percent," and "Horizon has not pushed rate increases as

aggressively as some competitors");  ¶184 ("Horizon Lines has remained successful in the trade

by <u>effectively managing cargo mix and operating costs</u>" and "unlike some competitors, Horizon

has avoided <u>operational losses</u> in Puerto Rico by . . . consistently delivering <u>higher levels of</u>

<u>service for its customers</u>"); *see also id.* (Serra quoted as discussing "important differentiators"

between Horizon and its competitors), *e.g.,* ¶¶191 (Serra stated that "state of the art technology . . . allows us to increase productivity and reduce costs of operation").  These and additional statements alleged in the Amended Complaint are materially false and misleading.[3]  These points are discussed in Section I.A.2 below, at pages 17-32.

Defendants' response that these statements "were directed to customers of Horizon Lines' services, not investors" is unavailing.  Def. Br. at 34-35.  Horizon authorized the Guilty Plea Defendants to make these public statements, which then became part of the "overall mix" of information available to investors.  As alleged in the Complaint, the *Journal of Commerce*, the trade journal where many of these statements were made, is the leading industry resource for ocean shipping carriers and is closely followed by investors, analysts and other market professionals.  ¶183-84.  Indeed, the *Journal of Commerce* regularly carries stories about Horizon's financial performance, reports on analyst coverage of Horizon's publicly-traded securities, and is cited as a source of news about Horizon on investor websites, in financial publications and by analysts themselves.  *Id.*  These points are discussed in Section I.B below, at pages 18 to 22.

Perhaps recognizing this, Defendants also argue that the statements made by the Guilty Plea Defendants are not technically "false or misleading."  Def Br. at 34.  But this argument fails in the face of well established law and the Court's prior opinion holding that, when Defendants chose to speak about Horizon's performance and success in Puerto Rico, "attributing such performance to only lawful conduct falls below the level of honesty required by the securities laws."  *Horizon*, 2009 WL 3837659, at *9-10.  This is particularly true with respect to statements

---

[3] The Amended Complaint also adds allegations of materially false statements by two new Defendants, Handy and Taylor, who were senior executive officers of Horizon.  *See* Section I.A.1 below.

made by the Guilty Plea Defendants – who admittedly knew of and were involved with the illegal price-fixing conspiracy.

Second, the Court held that the initial Complaint failed to allege facts sufficient to establish a strong inference of scienter against the Individual Defendants.  As detailed below, the Amended Complaint cures this deficiency by pleading additional statements by the Government demonstrating that one or more of the Individual Defendants was involved in the conspiracy. *See, e.g.,* ¶¶95, 249.  Lead Plaintiff has also added specific allegations that Horizon's "rates and revenues were so distorted by the illegal conduct that [Horizon's senior executives] should have been aware of it[.]"  *See Horizon*, 2009 WL 3837659, at *16; *see* ¶¶78-104.  Moreover, the Amended Complaint adds allegations relating to the Individual Defendants' pecuniary motive to commit fraud.  *See* ¶¶259-72 (total insider proceeds from stock sales and other cash and option-based incentives exceeded $20 million as opposed to the $2 million previously alleged).  Finally, the Amended Complaint adds details regarding the highly suspicious resignation of Defendant Urbania – the Company's long term CFO and one of the "key management personnel" identified by Horizon –  who "resigned" without any warning less than two weeks before the price-fixing conspiracy was revealed (and received no severance or other compensation and left $4 million in unvested stock options uncollected).  ¶¶257-58.  These and other scienter allegations are discussed in Section I.B below, at pages 32-43.

Third, the Court held that the initial Complaint did not allege the scienter of Horizon itself because "the requisite mental state of scienter must be found within the mind of an employee who either made, or participated in the making of, [a materially false or misleading statement.]"  *Horizon*, 2009 WL 3837659, at *17 (citing *Southland Sec. Corp. v INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 367 (5th Cir. 2004)).  The Amended Complaint cures this

deficiency by alleging numerous materially misleading statements made by the Guilty Plea

Defendants (who indisputably possessed knowledge of the illegal price-fixing scheme) and the

scienter of the Individual Defendants (who indisputably made false statements).  In addition, the

Amended Complaint contains particularized allegations supporting an inference that the Guilty

Plea Defendants "participated in the making" of materially false or misleading statements that

were made by other Horizon executives or by Horizon itself.  Under the standards articulated by

the Court in its prior opinion and well established law, these allegations are sufficient to allege a

violation of Section 10(b) of the Exchange Act against Horizon.  These points are discussed in

Section I.C below, at pages 43-49.

## STATEMENT OF NEW FACTS

The Amended Complaint contains new facts that, when taken together with the facts

previously alleged, cure the pleading deficiencies in the initial Complaint.

**I.     The Guilty Plea Defendants Made And Authorized The Making Of False And
         Misleading Statements Regarding Horizon's Revenue, Pricing And Competition**

The Court has already held that Defendants Horizon, Raymond, Keenan and Urbania

each made "numerous" false or misleading statements about the Company's revenues and

pricing, and about the level of competition in the marketplace.  *Horizon*, 2009 WL 3837659, at

*9.  While the initial Complaint did not allege any public statements by the Guilty Plea

Defendants, the Amended Complaint pleads numerous statements made by these Defendants

prior to and during the Class Period (which now begins on September 26, 2005, the date of

Horizon's initial public offering ("IPO")).  As with the statements that the Court has already

found to be false, many of these new statements misleadingly ascribed Horizon's success to

legitimate reasons, without disclosing that the Company's "success" was in large part achieved

through an illegal cartel arrangement with its competitors.  ¶116.

Even before the Class Period began, as Horizon was planning to conduct its IPO, Guilty Plea Defendant Serra was authorized to speak on behalf of Horizon and inform the marketplace of specific details about the Company's "rates," "competition," "operating costs," and "financial models."  ¶157.  In an article commissioned by Horizon and published in the *Journal of Commerce* on January 31, 2005, Serra stated that "though cargo volume remains flat, capacity has tightened and rates are rising . . . Horizon's rates are up an average of 5 to 6 percent."  *Id.* The article stated that "Horizon has not pushed rate increases as aggressively as some competitors," and Serra was quoted as stating "the rate recovery has continued and we feel more comfortable with the net-to-port rate."  *Id.* (article also quotes Serra as stating "our inland costs have gone up . . . we're trying to make sure we recover those costs, and that's part of the rate increases we're getting.").

After Horizon's successful IPO at the start of the Class Period, Serra and the other Guilty Plea Defendants were repeatedly authorized to speak on behalf of Horizon and repeatedly made misleading statements to the public.  In another *Journal of Commerce* article commissioned by Horizon bearing Horizon's logo, and published on September 25, 2006, Serra and Gill are prominently featured – indeed there are color photographs of each – and each of them are extensively quoted.  *See* Exhibit 1 (Serra Article); ¶¶183-86.  The Serra Article was primarily devoted to reassuring the public that Horizon was experiencing continued success in Puerto Rico and remained committed to that market.  ¶184.  The article repeated Defendants' misleading mantra attributing Horizon's success to "effectively managing cargo mix and operating costs" and falsely stated that "unlike some competitors, Horizon has avoided operational losses in Puerto Rico by investing in regular equipment and vessel maintenance and consistently delivering higher levels of service for its customers."  ¶184.

8

In addition, Serra is directly quoted discussing Horizon's position in the marketplace, stating that Horizon's commitment to its port facilities "has allowed us to start a multiyear project to reinvest in [Puerto Rico].  This will ultimately increase our efficiency and improve the service we provide to our customers."  *Id.*  Serra is also quoted as stating that Horizon's "customers consistently confirm" that the Company offers significant advantages – or what he called "important differentiators" – over its competitors.  ¶¶10, 184.  In that same article, Defendant Gill also discussed Horizon's position in a competitive market, stating that Horizon's implementation of "Web-tracking" tools gave it an advantage over its competitors and "our competitors are still trying to catch up."  ¶185.

Serra made additional false statements relating to the Company's competitive environment throughout the Class Period.  For example, in a January 22, 2007 news article commissioned by Horizon itself, Serra discussed  "utilization rates" and stated that trade volume in Puerto Rico would "return to its historic growth rate of 1 percent or less."  ¶190.  Similarly, in a January 25, 2007 article, Horizon ascribed its "increas[ing] productivity and reduce[d] costs of operation" to "technology" and "listening" to market needs, rather than to its illegal price-fixing conspiracy.  ¶¶190-91.  Serra also made a number of statements regarding the Company's "exceptional" customer service during the Class Period.  *See, e.g.,* ¶¶191 ("[w]e are here to make it easy for our customers to do business"), ¶209 ("Horizon Lines is committed to exceptional value and customer satisfaction."

All of these statements, and others detailed below, were false and misleading.  Unbeknownst to investors, but indisputably known to Serra and the other Guilty Plea Defendants, Horizon's purported success in the Puerto Rico market was not the result of "increasing productivity and reduced costs of operation," "state of the art technology,"

"effectively managing cargo mix and operating costs," "important differentiators" over its competitors, or "higher levels of customer service." *See e.g.,* ¶¶184.  In truth, the Company's success was due in large part to an illegal price-fixing conspiracy.

These public statements by the Guilty Plea Defendants also demonstrate that they were part of a select group of Horizon's senior management who, acting within the scope of their authority, were repeatedly authorized to speak to the public.  Indeed, aside from the false and misleading statements discussed above (¶¶157-58, 183-86, 190-91, 209), Serra also made numerous other statements to the public on behalf of Horizon in his capacity as one of the top senior managers of the Company.  ¶¶228-36.  Moreover, Serra provided information about the Puerto Rico business to the Individual Defendants, and thus "participated" in the making of additional false statements by the Company and others.  *See, e.g.*, ¶¶187-88. *See also* Section C.2 below.

## II.    The Structure Of Horizon's Senior Management

The Amended Complaint pleads additional details regarding the structure of Horizon's senior management.  During the Class Period, only five individuals – Defendants Raymond, Urbania, Keenan, Handy and Taylor – were senior to Defendant Serra, who was the Senior Vice President of Horizon's Puerto Rico division and one of the top ten executives at Horizon.  Thus, <u>all</u> of the executives who were senior to Serra during the Class Period are named Defendants. ¶¶20-24, 95.  Serra reported directly to Handy, regularly interacted with other members of Horizon's management team, and discussed the Puerto Rico trade lane with Handy and others. ¶¶23, 25, 187-88.  Serra's was one of the five highest paid executives at the Company and served on the executive officer management team throughout the Class Period.  Defendant Gill, as Vice President of Marketing at Horizon, was also a senior executive officer at Horizon and reported directly to Taylor.  ¶26. As detailed herein, both Serra and Gill repeatedly made statements and

contributed to the making of statements on behalf of Horizon.  ¶¶157-58, 183-86, 190-91, 209, 228-36.

Horizon publicly touted the "cohesiveness" and the "team-oriented" approach of the Company's senior management group.  ¶¶8, 49.  Horizon's IPO prospectus highlighted that "[a]ll pricing activities" are "centrally coordinated" by senior management and emphasized senior management's "long history" of working closely together, noting that six of eight senior managers worked together for over 15 years and seven of eight had served in multiple roles at Horizon.  ¶¶49, 52.

The Amended Complaint makes clear that any reference by the Government in the criminal antitrust proceedings to "other senior executives" in relation to Serra (¶5, 95, ¶244) and uncharged "superiors" of Gill (¶105) can only implicate one or more of the senior executive officers who are defendants here:  Raymond, Urbania, Keenan, Handy and Taylor.  The Government made this explicit when it stated in direct response to questions from the federal court at the Guilty Plea Defendants' sentencing hearing, that "there are others higher than Mr. Serra who are certainly of interest to the government" and "[Serra] is essentially – I don't want to use middle management in terms of the conspiracy, but he's in the middle . . ."  ¶95.  Similarly, the Government did not simply say that Gill's superiors were "potential targets" as defendants suggest.  *See* Def. Br. at 4, 20-21.  Rather, the Government identified Gill's Horizon superiors as "uncharged co-conspirators."  ¶99.

### III.    Defendants Handy And Taylor Made False And Misleading Statements Regarding Horizon's Revenue, Pricing And Competition

The Amended Complaint also adds a variety of false statements by the two new Defendants, Taylor and Handy.  ¶¶127, 140, 143, 177, 180, 183-84, 187, 189, 195, 219(k), 219(n), 219(q) (Handy); ¶¶176, 183-85, 194, 198-99, 201, 206, 219(r) (Taylor).  These

statements are false and misleading for the same reasons already discussed by the Court.  *See Horizon*, 2009 WL 3837659, at *9-10.

In a September 25, 2006 *Journal of Commerce* article, Taylor described Horizon's emphasis on customer service, stating that: "It's that promise to the customer to always deliver that makes us unique.  It's always been here since the beginning, and I suspect it will always be the key to our success."  ¶185.  Taylor is also quoted as identifying the "Seven Cs" that "unite everyone at Horizon" and as saying that "[t]o be a Horizon employee means to believe in the Seven C's," two of which are "Competition" and "Credibility."  ¶185.  Taylor explicitly connected his statements about excellent customer service with the Company's financial results. *See* ¶201 ("How will we know if our [customer service] efforts are successful?  Well, clearly, we'll see it in our EBITDA growth and the gross profit growth . . . and one of the most important ones is total incremental freight dollars that we will secure from existing Horizon customers.").  Taylor was also one of the Defendants who made statements in 2006 about the Company's "strong . . . market share" despite "volume softness" in the Puerto Rican market.  ¶219(r).

The Amended Complaint also details false statements relating to competition and pricing by Defendant Taylor.  *See, e.g.,* ¶176 ("our rates and margins have been positively impacted by the targeted change in our mix of cargo.").  Taylor repeatedly discussed competition and differentiated Horizon on the grounds of its supposedly higher "customer service."  *See, e.g.,* ¶176 ("the addition of a third vessel in Puerto Rico by our competition really hasn't had a significant impact on our business.  We really see no signs of instability at this time . . .right now, customer satisfaction is at an all-time high"); *see also* ¶¶194 ("delivering quality to the customer is a critical success factor for us."); ¶198, ¶199.

12

The Amended Complaint alleges similar false and misleading statements by Defendant Handy.  For example, in April 26, 2007 and July 27, 2007 SEC filings, Handy echoed the statements found false and misleading by the Court when he credited "[c]argo mix improvements and rate increases" with "more than offset[ting]" any "volume softness" and leading to "rate improvements."  ¶¶140, 143.  Similarly, Handy made misleading misstatements about the competitive environment, stating that "[a]ll competitors have reacted responsibly to the economic slowdown in Puerto Rico by taking an estimated 15% tonnage decrease this year"; and that Horizon would also "focus on customer service."  ¶180.  *See also* ¶¶ 189, 195 ("in terms of competitive update in light of those revenues and volume comments, overall market shares in all the trades remain very, very stable.").[4]

## IV.    Horizon's Reported Rate Increases Raised A Red Flag

The Amended Complaint includes detailed new allegations about how the Company's suspicious rate increases during the Class Period should have alerted senior management to the conspiracy.  ¶¶78-93.  The new allegations explain how the Puerto Rico shipping market had experienced a steady and significant rate decline from the 1990s until the initiation of the price-fixing conspiracy in 2002, after which the Company saw consistent revenue growth (and conducted a public offering).  ¶84.  This growth was achieved through steady and significant increases in shipping rates across all lines that offset equally steady and significant decreases in the volume of containers being shipped, particularly in Puerto Rico.  *See* ¶84 (containing a chart detailing the significant positive rate increases and the contradictory volume decreases).  This counterintuitive combination of starkly declining volume decreases being offset by rate *increases*

---

[4] The Amended Complaint pleads similar additional misleading statements were by Horizon in the IPO prospectus and elsewhere.  *See* ¶¶116-22, 125, 129, 132, 135, 158-62.

was highly suspicious and should have been a red flag to Horizon's senior executives that the Company and its competitors might be illegally colluding.  ¶¶85-92.

This fact was surprising enough to attract repeated inquiries from investors and securities analysts on conference calls, and caused Defendants to give a number of misleading explanations for this anomaly.  *See* ¶85; *see also* ¶173 ("Q: Despite the fact that you'll have to reduce capacity . . . how could it not have an effect on the financials?"); ¶182 ("Q: With some of the volume softness, I know you mentioned mix and price help make up for it.  Can you be a little bit more specific?  How did mix work to offset some of that softness?")  The impropriety of these rate increases is evidenced by what happened after the price-fixing conspiracy was revealed: Horizon's rate increases declined dramatically in 2008 through 2009. ¶¶84, 92.  Whereas reported "general rate increases" in the second quarter of 2007 were $14.44 million, that figure dropped to $933,000 in "general rate increases" by the third quarter of 2009.  ¶¶6, 92.

The Amended Complaint also alleges that the Individual Defendants, Horizon's executive officers, should have been particularly focused on the causes of these rate increases given their demonstrable significance to the Company's business.  The rate increases in Puerto Rico were responsible for pricing and revenue figures that directly contributed to one-third of Horizon's total operating revenue and EBITDA, and helped offset the Company's considerable operating revenue losses in 2006 and 2007.  ¶90.  Indeed, Defendants repeatedly stated in public filings that their financial results were boosted by "price increases . . .even though volume softness [has] existed."  ¶103, 138-48, 154, 157, 176, 180-82, 195, 203, 205, 215, 219.[5]

---

[5] In addition to making specific statements about pricing in Puerto Rico, Defendant Raymond repeatedly referenced EBITDA "to facilitate internal comparisons to competitors' results and the marine container shipping and logistics industry in general."  ¶90.  Indeed, all of the Individual Defendants relied on EBITDA to evaluate Horizon's performance, make "day-to-day" operating decisions, determine the payment of discretionary bonuses, and monitor compliance with credit

## V.    Additional Allegations of Scienter

The Amended Complaint also adds additional allegations of scienter relating to the

Individual Defendants.  These include allegations relating to Defendants' pecuniary motive to

commit fraud and an extremely suspicious and abrupt "resignation" by Defendant Urbania,

Horizon's CFO, less than two weeks before the price-fixing conspiracy was announced.  ¶¶53,

257-72.  The additional facts relating to these points are discussed in Section B.2 below.

## **ARGUMENT**

## I.    THE AMENDED COMPLAINT STATES CLAIMS UNDER SECTION 10(B)

When deciding a Rule 12(b)(6) motion to dismiss, a court must "accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotes and

citation omitted);  *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir.

2006) (dismissal of securities claims appropriate "only if it appears certain that plaintiffs can

prove no set of facts that would entitle them to relief").[6]

---

covenants. ¶90;  *see, e.g.,* ¶124 (a "key metric[] for us is EBITDA"); ¶134 ("Due to our strong
EBITDA");  ¶178 ("looking back on 17 consecutive quarters of EBITDA growth . . it really
speaks to the ability of the management team to deliver shareholder value over a sustained period
of time"); ¶219(l) ("21 consecutive quarters of EBITDA growth despite challenging market
conditions, particularly in Puerto Rico").  As discussed in Sections B.2(b) and (c) below,
Defendants' close monitoring of EBITDA is relevant to the scienter analysis because EBITDA
was directly impacted by Horizon's abnormal rate increases, and Horizon's "21 consecutive
quarters" of (fraudulently obtained) EBITDA growth resulted in millions of dollars in additional
bonus payments and other compensation for the Individual Defendants.

[6] Defendants' argument that Lead Plaintiff is trying to lower the pleading standards of the
PSLRA and this Circuit is incorrect.  Def. Br. at 16-18.  It is well-established that, in cases where
Defendants have "successfully conceal[ed] the details of their fraud," and plaintiff has "shown
that the requisite factual information is peculiarly within the defendant's knowledge or control,
the rigid requirement of Rule 9(b) may be relaxed."  *In re Rockefeller Ctr. Props., Inc. Sec.
Litig.,* 311 F.3d 198, 216 (3d Cir. 2002).  Those considerations are particularly relevant here

## A.   Defendants Made Materially False And Misleading Statements And Omissions During The Class Period

This Court previously found that with respect to "statements regarding <u>revenue, pricing, and competition</u>, by identifying each statement, explaining why those statements are false or misleading, and demonstrating the role of each defendant responsible for those statements, plaintiffs have satisfied their burden of pleading with particularity the falsity prong of the PSLRA." *Horizon*, 2009 WL 3837659, at \*9-10.  The Court found that statements attributing Horizon's success "to only lawful conduct falls below the level of honesty required by the securities laws." *Id.*, at \*9 ("defendants put the issue of Horizon's success "<u>in play</u>" and were obligated to disclose all material facts regarding Horizon's success in the Puerto Rico Market" (citing *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa 2001)).[7]

### 1.   Defendants Concede That The Amended Complaint Adequately Pleads Materially False Statements By Horizon And The Individual Defendants Relating To Revenue, Pricing And Competition

The Amended Complaint pleads additional Class Period misstatements relating to revenue, pricing, and competition that are substantially similar – indeed, they are virtually identical in many instances – to statements that the Court has already found to be misleading. These include statements in SEC filings, press releases, and analyst conference calls that were made by Horizon and the Individual Defendants, including newly added Defendants Handy and Taylor (statements by the Guilty Plea Defendants are discussed below). *See* ¶¶117-126, 128-

---

because these Defendants have gone to great lengths to conceal information from Lead Plaintiff that has otherwise been made available to parties in other matters. *See* ¶¶65-77. The Third Circuit relaxes the pleading standards under such circumstances. *See Rockefeller*, 311 F.3d at 216; *In re Schering-Plough Corp./Enhance Sec. Litig.*, 08-CV-397 (DMC), 2009 WL 2855457, at \*2 (D.N.J. Sept. 2, 2009); *In re Able Labs. Sec. Litig.*, Civ. A. No. 05-2681 (JAG), 2008 WL 1967509, at \*11 (D.N.J. Mar. 24, 2008).

[7] The Court held that "[A] duty to disclose arises when there is 'an inaccurate, incomplete or misleading prior disclosure.'" *Horizon Lines*, 2009 WL 3837659, at \*9 (quoting *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000)).

139, 141-142, 144-154, 159, 161-165, 167-174, 178-179, 181-182, 196-197, 200, 202-205, 207.

Defendants do not dispute that these statements are alleged with particularity and are false and

misleading.  *See* Def. Br. at 34.

> **2.**    **The Guilty Plea Defendants Made Actionable Misrepresentations**
> **Relating To Revenue, Pricing And Competition**

As discussed above, the Amended Complaint alleges with particularity a number of

materially misleading public statements made by the Guilty Plea Defendants at the same time

they were involved in the criminal price-fixing conspiracy.  *See* ¶¶157-58, 183-86, 190-91, 208-

09.  These statements demonstrate that the Guilty Plea Defendants (and particularly Serra and

Gill) were part of a select group of Horizon's senior management who, acting within the scope of

their authority, were authorized to make statements to the public.  Moreover, these statements are

substantially similar to statements that the Court has already held are materially false and

misleading because they offer "purportedly legitimate explanations for Horizon's success in the

Puerto Rico market."  *Horizon,* 2009 WL 3837659, at *10.

Defendants do not dispute that the Guilty Plea Defendants' statements were authorized by

Horizon, but they argue that these statements are not actionable because (1) they were "directed

to customers of Horizon Lines' services, not investors," (2) "with one exception, were unrelated

to revenues and rates in the Puerto Rican tradelane," and (3) for the January 31, 2005 statements

by Serra that Defendants concede were materially false and misleading, they "were not intended

to defraud investors" because they were made prior to Horizon's IPO.  Def. Br. at 35.  None of

these arguments have merit.

      **(a)**        **False And Misleading Statements By The Guilty Plea
Defendants Were Authorized By Horizon, Reviewed By
Investors, And Incorporated Into The "Total Mix" Of
Information In The Market**

Defendants first contend that the numerous public statements and quotes from the Guilty

Plea Defendants alleged in the Amended Complaint – statements that were authorized and

commissioned by Horizon itself – are not actionable because they were "intended" by Horizon

"to raise the Company's profile among consumers, not attract investors." Def. Br. at 35. This

argument ignores the nature of the statements and the particularized allegations in the Complaint.

As a preliminary matter, Defendants argue that "the Amended Complaint does not allege

that Serra, Gill or Glova signed any of the company's SEC filings, participated in shareholder or

analyst conference calls or were quoted in press releases sent out by Horizon's investor relations

department." Def Br. at 35. It is well-established, however, that the federal securities laws

support claims for misrepresentations in a wide variety of contexts outside of SEC filings and

"official" press releases. *See, e.g.,* SEC Rule 10b-5, 17 C.F. R. Sec. 240.10b-5.[8]

Defendants next argue that the statements by the Guilty Plea Defendants that were

authorized and placed in the *Journal of Commerce* by Horizon itself are merely "advertisements

in periodicals for industry executives" and cannot support a violation of the securities laws. Def.

Br. at 35. Defendants, however, ignore that the Amended Complaint alleges that the *Journal of

Commerce* is "the leading trade magazine for the ocean shipping industry and is closely followed

by industry professionals as well as <u>investors, analysts and other market professionals</u> that

---

[8] Defendants' argument is also wrong as a factual matter. As alleged in the Amended Complaint,
Horizon itself <u>repeatedly</u> issued official press releases that referenced Serra and included direct
quotes from Serra. *See* ¶¶ 231-32 (Press release issued by Horizon on May 10, 2007 and quoting
Serra); ¶233 (Press release issued by Horizon discussing Serra); ¶234 (Press release issued by
Horizon on December 6, 2007 quoting Serra); ¶235 (Press release issued by Horizon on
December 14, 2007 quoting Serra); ¶209 (Press release issued by Horizon on April 23, 2008
quoting Serra).

reviewed and considered most publicly released information about Horizon during the Class

Period." ¶183. Indeed, the *Journal of Commerce* often quotes from analysts who cover Horizon.

*See* ¶183 (*Journal* article entitled "S&P downgrades Horizon Lines Debt," which quotes an S&P

analyst as saying "if the [ongoing investigation] results in a material fine or negative outcome,

we might lower the ratings further."). Notably, analyst reports and financial publications

followed by investors have referenced the *Journal of Commerce* as a "source" for news about

Horizon.[9]

The *Journal of Commerce* is also regularly cited as a source of news and other

information about Horizon in financial publications and websites that are frequented by investors

and financial professions. *See* ¶183 (a *Journal of Commerce* article entitled "Horizon Lines Cuts

Top Executives' Perks" was linked on the "Money and Finance" website page for Horizon Lines

on aol.com's finance page.) Thus, there can be no dispute that information about Horizon in the

*Journal of Commerce* is reviewed by investors and market professionals for information about

Horizon, which, in turn, is incorporated into the total mix of information available to the public

and reflected in the stock price of the Company. *Id.*

Moreover, notwithstanding Defendants' attempts to argue that the "context" of the

*Journal of Commerce* articles demonstrate that they do not contain relevant investment

information about Horizon (Def. Br. at 35-36), the articles cited in the Amended Complaint

plainly provide information of interest to investors, not just "customers." For instance, the

September 25, 2006 article that extensively quotes Serra virtually echoes statements Defendants

made in SEC filings and investor conference calls, including that "Horizon Lines has remained

---

[9] Attached as Exhibit 2 is an excerpt from an example of an analyst report on Horizon, which
states "Horizon Lines plans to pay down its debt first, then target some larger acquisitions." The
analyst report quotes from CEO Raymond and cites the *Journal of Commerce* as one of its
sources. *See id* at 2.

successful in the trade by <u>effectively managing cargo mix and operating costs</u>" and boasts that "Horizon has avoided operational losses in Puerto Rico by investing in regular equipment and vessel maintenance."  ¶184.

These types of statements about "cargo mix," "operating costs," and "operating losses" are precisely the types of information that would be of interest to investors.  Indeed, they were regularly discussed on Horizon's conference calls and in its SEC filings.  *See, e.g.,* ¶196 (Raymond states on conference call that "the Puerto Rico operating team is doing a magnificent job of improving productivity and managing their costs"), ¶181 (Urbania states that success in Puerto Rico market due to "good cargo mix"), ¶200 (Keenan states that revenue growth was "really based on [] cargo mix upgrade" and other factors); *see also e.g.,* ¶¶142, 144, 152.  Serra himself is quoted in the article as providing the kind of information that would be of strong interest to investors and of minimal interest to "customers," including that:

> [Serra] predicts that with the resulting cascade effect of reallocated vessels moving into the Puerto Rico service strings, the <u>result will be an approximate 24 percent increase in deployed capacity offered by Horizon Lines in the Puerto Rico Market.</u>

¶184.  This article also provides Company-specific financial information that would be of interest to investors and analysts, stating that "Projects under way since last October total $4.8 million invested by the end of this year.  Subsequent phases will result in an additional $8 million to $10 million investments for 2007 and 2008." *Id.*

Finally, the *Journal of Commerce* articles and other news stories cited in the Amended Complaint often focused on Horizon's investment in, and commitment to, the Puerto Rico market – a topic that was of intense interest to investors and analysts throughout the Class Period.  For instance, the September 25, 2006 article reaffirms Horizon's "commitment and investments toward the Puerto Rico market" and discusses the "government's commitment to the

land reallocation of the port facilities [that] has allowed us to start a multiyear project to reinvest in the terminal in Puerto Nuevo." *Id.* These <u>exact</u> same topics were often the subject of Horizon's SEC filings and the focus of investors and analysts on Horizon's conference calls. *See, e.g.,* ¶189 (Urbania states on conference call "If I look at the capital investments that we're making in the San Juan terminal, the land realignment is perhaps the major contributing factor that will improve our operating efficiency"); ¶174 (analyst asks Raymond to discuss "expectations that the Puerto Rico market will be strong" in face of declining economy in Puerto Rico"); *see also* ¶¶191, 195-96.

In any event, the Third Circuit has squarely rejected Defendants' argument that misrepresentations are not actionable unless they were "intended" to influence investors.  In *Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir. 2000), the Third Circuit held that "it is irrelevant that the misrepresentations were not made for the purpose or the object of influencing the investment decisions of market participants," because:

> The purpose underlying Section 10(b) and Rule 10b-5 is to ensure that investors obtain fair and full disclosure of material facts . . . <u>the Class is not required to establish that the defendants actually envisioned that members of the Class would rely upon the alleged misrepresentations when making their investment decisions.</u>

Indeed, the law is clear that the statements of the Guilty Plea Defendants in the Amended Complaint can support a claim for securities fraud.  The Third Circuit has found misleading statements to customers in advertising to be actionable under the securities laws, even where the advertising was directed to consumers not investors.   *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 632, 633 n.5, 646 (3d Cir.1989) (holding that bed manufacturer made false statements in "advertising, marketing, or other promotional materials," and that these "acts of false advertising" to consumers were actionable misstatements under the securities laws).  In *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156-57 (2d Cir. 1998), the Second Circuit

reversed the district court's dismissal of a Section 10(b) claim stemming in part from

misrepresentations contained in technical advertisements placed in medical journals.  *Id*.  Even

though the advertisements were not contained in SEC filings or press releases, they still bore

sufficient "connection" to investors because of the likelihood that market professionals would

look at all material information concerning a company's products and business in evaluating the

stock of a company.  *Id.* ("In fact, an analyst might consider such an advertisement more

informative than a non-technical but corresponding statement to financial market professionals.")

The same is true here.

Defendants heavy reliance on *Hemming v. Alfin Fragrances, Inc.* 690 F. Supp. 239, 244-

45 (S.DN.Y. 1988) is misplaced.  *See* Def. Br. at 35-36.  The "advertisement" at issue in

*Hemming* was contained in the *New York Times Magazine*, rather than a well-respected industry

trade journal that was regularly consulted by analysts and investors.  *See Hemming*, 690 F. Supp.

at 244-45.  Moreover, the advertisement in *Hemming* had "absolutely no connection" with any

securities transaction but was limited solely to a product's "qualities as a skin care treatment."

*Id.*  There is a profound difference between a magazine ad trying to induce consumers to

purchase a skin cream and a lengthy substantive article in an industry's leading trade journal

(which quotes extensively from senior Horizon executives and provides explicit financial

information).  ¶183.  There were no allegations in *Hemming,* as there are here, that articles in the

*New York Times Magazine* regularly include information directly relevant to investors, are

frequently cited as a source of news in financial publications and websites, and are closely

followed by investors, analysts, and other market professionals.  ¶¶183-84.  Accordingly,

*Hemming* (assuming it is even good law after the Second Circuit's decision ten years later in

*Carter-Wallace*) is of no relevance here.

22

**(b)      The Guilty Plea Defendants Made Actionable Class Period Misstatements That Were Authorized By Horizon**

Defendants next contend that the statements made during the Class Period by the Guilty Plea Defendants were not false or misleading because they do not concern Horizon's "revenues, rates or price competition at all." Def. Br. at 37. Defendants contend that these statements are only "general, positive" statements that "describe the services Horizon Lines provides to its customers." Def. Br. at 37, 39. Defendants are wrong.

As an initial matter, Defendants' arguments on this point have already been rejected by the Court. In their motion to dismiss the initial Complaint, Defendants argued at length that alleged misstatements about "revenue, pricing and competition" were "vague, generally optimistic commentary" that were not actionable as a matter of law. *See* Defendants Motion to Dismiss the Initial Complaint (D.I.#70) at 36-43 (arguing that statements about revenue and competition were not false), and n.11 (same). Defendants recycle these <u>exact same arguments</u> (and cite the very same cases) in their motion to dismiss the Amended Complaint. *See* Def. Br. at 36-40. This is improper. As described above, the Court has already ruled that "statements regarding revenue, pricing and competition" were materially misleading because they "offer[ed] purportedly legitimate explanations for Horizon's success in the Puerto Rico market." *See Horizon*, 2009 WL 3837659, at *9-10. As Defendants themselves contend, the Court's prior opinion "is law of the case" and "<u>the Court's rulings on such legal issues should not be re-litigated under the law-of-the-case doctrine.</u>" Def. Br. at 15.

Indeed, Defendants concede, as they must, that the Court held that statements relating to "revenues, <u>rates or competition</u>" were materially false and misleading. *See* Def. Br. at 36-37.[10]

_____

[10] Despite Defendants' concession, they selectively quote and paraphrase the Court's opinion so as to seemingly constrain the holding to statements about Horizon's "revenues: "the Court further found that defendants offered 'a number of explanations' for Horizon's successful

23

They suggest, however, that the statements by the Guilty Plea Defendants did not concern these matters and therefore are not actionable under the Court's prior opinion. But, even a cursory review of the particularized statements alleged in the Amended Complaint reveals that many of the public statements that Horizon authorized Serra and the other Guilty Plea Defendants to make were of precisely the type that the Court has found to be materially misleading. For instance, a significant portion of the September 25, 2006 marketing article was devoted to reassuring the public that Horizon was experiencing continued success in Puerto Rico and remained committed to that market. ¶184. Indeed, Serra is quoted discussing Horizon's position in the marketplace, stating that Horizon's commitment to its port facilities "has allowed us to start a multiyear project to reinvest in [Puerto Rico]. This will ultimately increase our efficiency and improve the service we provide to customers." *Id.* As discussed, these <u>exact</u> topics were often the subject of Horizon's SEC filings and the focus of investors and analysts on Horizon's conference calls. *See, e.g.,* ¶¶174, 189, 192, 195 (Handy: "energy prices and consumer

increases in revenues and therefore 'were obligated to disclose all material facts' regarding the sources of those revenues." Def. Br. at 37 (*Horizon*, 2009 WL 3837659, at *9). In this section of its opinion, the Court actually stated "Defendants offered a number of explanations for <u>this current success</u>, including "favorable changes to cargo mix," . . . "good customer relationships," and "market discipline.'" *Horizon*, 2009 WL 3837659, at *9. Thus, the Court plainly held that any statements falsely attributing the Company's "success" to legitimate activities were actionable (which included more than statements that solely relate to "revenue"). As discussed above, the Court held that these types of statements are actionable because Defendants "put into play" the reasons "for Horizon's success in the Puerto Rico market." *Id.*; *see also In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) (cited at *Horizon*, 2009 WL 3837659, at *9) (finding that statements attributing the Company's "good fortunes to its 'customer focused approach' . . . puts the topic of <u>the cause of success in play</u> [and] obligated [defendants] to disclose information concerning the source of its success"); *see also In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 436 (E.D. PA 2002) (cited at *Horizon*, 2009 WL 3837659, at *9) (finding that statements that demand for a product was "good," "strong," and "solid" were materially false); *In re Campbell Soup Sec. Litig.*, 145 F. Supp. 2d 574, 588-89 (D.N.J. 2001) (cited at *Horizon*, 2009 WL 3837659, at *9) (statements about <u>volume-driven growth</u>" held to be misleading because "reasonable investor would want to know about the questionable sales practices behind this 'volume-driven growth.'")

confidence have depressed the economy in Puerto Rico. We remain positive, but very cautious as

we see that volumes will remain pretty flat throughout the rest of the year"); ¶196 (analyst asks

"if the Puerto Rican economy remains weak . . .are there any contingency plans?" to which

Raymond response "First of all, the Puerto Rico operating team is doing a magnificent job of

improving productivity and managing their costs"; ¶204 (Urbania states that the Company was

"most proud of the fact that we overcame difficult market conditions in Puerto Rico").

    Also as detailed above, Serra made a number of statements regarding the Company's

"exceptional" customer service being the basis for Horizon's Puerto Rican market success.

These statements include that Horizon's "customers consistently confirm" that the Company

offers significant advantages – or what Serra called "important differentiators" – over its

competitors.  ¶¶10, 184-85.  Defendant Gill also discussed Horizon's position in a competitive

market, stating that Horizon's implementation of "Web-tracking" tools gave it an advantage over

its competitors and "Our competitors are still trying to catch up. "[11] ¶185.  Likewise, in an April

23, 2008 Press Release issued by Horizon, Serra stated that "Horizon Lines is committed to

exceptional value and customer satisfaction . . . ."  ¶209.  These statements mirror those that the

Court has already found to be materially false and misleading.  *See Horizon*, 2009 WL 3837659,

at *4 (false statements include "good customer relationships") and n. 17 ("customer service

program").  As discussed above, Defendants' arguments that these type of statements are

"puffery" or "immaterial" and "vague" have already been rejected by the Court.

    Notably, the September 25, 2006 *Journal of Commerce* article also states:

---

[11] As Horizon's Vice President of Marketing and Sales, Guilty Plea Defendant Gill, who was
also quoted in the September 25, 2006 advertisement, undoubtedly participated in the preparation
of this advertisement.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 2d Cir. 2001)
(company's vice president for finance and investor relations held to have "made" misleading
statements concerning his area of responsibility where he was "in a position both to access
confidential information and to control the extent to which it was released to the public").

> <u>Horizon Lines has remained successful in the trade by effectively</u>
> <u>managing cargo mix and operating costs</u>.  Unlike some
> competitors, <u>Horizon has avoided operational losses in Puerto Rico</u>
> by investing in regular equipment and vessel maintenance and
> consistently delivering higher levels of service for its customers.

This statement, which Defendants do not even address in their motion, is nearly <u>identical</u> to

statements that the Court has already found to be materially false and misleading.  *See Horizon*,

2009 WL 3837659, at *9.  Indeed, these types of statements about "cargo mix," "operating

costs," and "operating losses" are precisely the type of information that would be of interest to

investors and was regularly discussed on Horizon's conference calls.  *See, e.g.,* ¶196 (Raymond

states that "the Puerto Rico operating team is doing a magnificent job of improving productivity

and managing their costs"), ¶181 (Urbania states on conference call that success in Puerto Rico

market due to "good cargo mix"), ¶200 (Keenan states on conference call that revenue growth

was "really based on cargo mix upgrade" and other factors).

        In their motion to dismiss, Defendants simply ignore these particular statements.

Defendants may try to argue on reply that these statements were not specific "quotes" from Serra

and therefore are not attributable to him.  This argument has no merit.  The marketing article was

divided into separate sections relating to aspects of Horizon's business, and the <u>only</u> Horizon

officer referenced in this portion of the article relating to Puerto Rico is Serra.  Moreover, the

article bears Horizon's logo and includes a large color picture of Serra (identifying him as "Vice

President and General Manager Puerto Rico, Horizon Lines") displayed prominently in the

article, with these statements about "cargo mix," "operating costs," and "operational losses" <u>in</u>

<u>Puerto Rico</u> are sandwiched between repeated quotes by Serra.  *See* Exhibit 1.  Moreover, the

Puerto Rico market was Serra's sole area of responsibility at Horizon and he was the executive

who had the most knowledge of these issues.  It is clear that the mere absence of quotation marks

around these statements does not change the fact that they are attributable to Serra.  *See* ¶¶25,

184.  *See Simon v. American Power Conversion Corp.*, 945 F. Supp. 416 , 433 (D.R.I. 1996)

(declining to dismiss statements that were not direct quotes in an article in an industry

publication, and holding that "it is reasonable to infer that the writer received all her information

. . . from conversations with [defendants' employees] named in the article"); *Walsingham v.*

*Biocontrol Tech., Inc.* 66 F. Supp. 2d 669, 677 (W.D. Pa. 1998) (rejecting defendants' motion to

dismiss indirect quotations in a media report and finding that "[t]he defendants will later have an

opportunity to challenge the accuracy and admissibility of these statements.").  *See also San*

*Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Companies, Inc.*, 75

F.3d 801, 810 (2d Cir. 1996) (it might be reasonable to infer that an indirectly quoted statement

in a *Wall Street Journal* article credited to unnamed "tobacco executives" is in fact attributable to

Phillip Morris executives identified elsewhere in the article).

### (c)    Serra's January 31, 2005 Misstatement Is Actionable

Defendants seem to concede that the January 31, 2005 statements by Serra "concern[]

revenues, rates or price competition" and are materially false and misleading in accordance with

the Court's prior opinion.  *See* Def. Br. at 41-42;  *see also* ¶157 (Serra states "though cargo

volume remains flat, capacity has tightened <u>and rates are rising . . . Horizon's rates are up an</u>

<u>average of 5 to 6 percent</u>," "the rate recovery has continued and we feel more comfortable with

the net-to-port rate," "We're trying to make sure we recover those costs, and that's part of the

rate increases we're getting," and "it's still in the plan to find a financial model that makes

sense.")  Defendants argue, however, that these pre-Class Period statements were "stale" and no

Class member could have "relied" on them during the Class Period.  Def. Br. at 41-44.

As an initial matter, there is no dispute that Serra's January 31, 2005 statements were

made at a time when he was engaged in a massive unlawful price-fixing conspiracy, or that Serra

knew that these statements were materially false.  These statements were part of the "total mix"

of information that investors analyzed, and they inflated the market value of Horizon's stock prior to and after the IPO. *See* ¶¶158-59 (the IPO prospectus explicitly reported on Horizon's historical performance, thus demonstrating that the type of information Serra disseminated prior to the IPO was still relevant to investors at the time of the IPO). Indeed, if Serra had revealed the truth when he spoke in January 2005, the IPO would <u>never</u> have occurred just eight months later or, if it had, it would have occurred at a lower price (and Serra himself would have lost nearly $3 million that he personally gained through the IPO). *See* ¶¶259, 261-62.

In this case, the Amended Complaint alleges a long-running fraud (from 2002 through April 25, 2008) into which a public stock offering occurred in September 2005. The Amended Complaint clearly contains allegations of fraudulent conduct prior to September 2005. ¶¶3, 58, 60, 78, 84, 93, 100. Numerous courts have recognized that pre-class period statements may be actionable in similar situations. For example, in *Zelman v. JDS Uniphase Corp.,* 376 F. Supp. 2d 956, 965-66 (N.D. Cal. 2005), the court denied a motion to dismiss statements that were made 15 months prior to the start of the Class Period, holding:

> [t]he fact that the proposed class period begins after the first of the alleged misstatements does not make those earlier statements irrelevant or not actionable. The Court rejects the argument that Plaintiff cannot maintain an action on the basis of statements made before the proposed class period.

In *Zelman*, the court stated the "[d]efinition of the plaintiff class is not a device for limiting the universe of actionable conduct." Rather, the typical "overlap [between the start of the class period and earliest false statements] occurs simply because it is only those plaintiffs who traded in the securities at issue while the fraud could have been affecting those securities' value who can possibly state a claim for damage resulting from the fraud." *Id*.

Here, Serra's January 31, 2005 false statements artificially inflated the value of Horizon's securities because the statements were not "corrected" until the end of the Class Period (even

28

though Serra himself spoke publicly throughout the Class Period).  *See, e.g., Urbach v. Sayles*, Civ. No. 91-1291, 1991 WL 236183, at * 9 (D.N.J. Sept. 4, 1991) (refusing to dismiss allegations concerning false statements made "three and one-half months before the class period beg[an]"), *clarified on other grounds*, 779 F. Supp. 351 (D.N.J. 1991); *In re MTC Elec. Techs. S'holders Litig.*, 898 F. Supp. 974, 987 (E.D.N.Y. 1995) (whether a research report issued three months before the class period played a role "in the rise of [the defendant's] stock price is an issue of fact" that is "particularly unsuited for resolution on a motion to dismiss"), *vacated in part on reconsideration*, 993 F. Supp. 160 (E.D.N.Y. 1997); *In re Kidder Peabody Sec. Litig.*, Civ. No. 94-3954, 1995 WL 590624, at * 5 (S.D.N.Y. Oct. 4, 1995) (sustaining false statements made three months before the class period because the "Court does not agree that, as a matter of law, . . . the alleged misrepresentations were so obviously unimportant to investors that reasonable minds could not differ on the question of materiality").  *See also, In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1065 n.1 (N.D. Cal. 2002) (sustaining relevance of pre-class period allegations).[12]

That the impact of false statements persists long after they are made (and until they are corrected) was recognized by *In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 510 (D. Del. 2001). In that case, the court rejected a motion to dismiss by a former director who argued that plaintiffs

---

[12] Defendants' reliance on class certification decisions is not helpful to them on this motion to dismiss.  At the class certification stage, of course, there will be expert discovery regarding whether Serra's January 31, 2005 statements were "stale."  For instance, *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100-01(D. Conn. 2009) (Def. Br. at 44), was an antitrust case where synthetic rubber purchasers moved for, and were granted, class certification.  *Id.*  EPDM evaluated the fraud-on-the-market theory with regard to predominance at the class certification stage related to class damages; it did not evaluate a defendant's pre-IPO statement which artificially inflated the price of the IPO offering and continued to artificially inflate the price during the remainder of the Class Period.  *Id.*  Similarly, *In re Metlife Demutualization Litig.*, 229 F.R.D. 369 (E.D.N.Y. 2005) was also a class certification decision (which granted certification) that involves a one-time action rather than a long-running fraud.

who invested after his resignation from the board could not have relied on his

misrepresentations.  The court agreed with plaintiffs that "although [the director] stopped putting

fraudulent information into the market when he resigned from [the company], the effect of a

fraudulent statement only ends when full disclosure discredits the other one so obviously that the

risk of real deception drops to nil." *Id.* at 510 (internal quotations omitted).  As a result, the court

found that "plaintiffs may be able to show that individual purchasers or shareholders could have

relied on documents published while [defendant] worked for [the company] even after his

resignation from the board." *Id.*  Similarly, here, Lead Plaintiff can show injury from

misrepresentations made and fraud committed prior to the Class Period.[13]

Moreover, despite knowing that his pre-class period statements were materially false,

Serra never updated or corrected them at the time of Horizon's IPO or afterwords – despite

speaking repeatedly to the public throughout the Class Period.  As noted by the court in *In re*

*Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 291 (S.D.N.Y. 1999), "statements made prior

to the Class Period are relevant in determining whether defendants had a duty to make a

corrective disclosure during the Class Period."  *See also In re U.S. Aggregates, Inc. Sec. Litig.*,

---

[13] Defendants cite numerous cases for the proposition that Serra's January 2005 misstatements were stale by the time Lead Plaintiff invested in Horizon. Def. Br. at 42.  All of Defendants' cases, however, are easily distinguishable.  *See In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 699 (D.N.J. 2006) (statements stale because they only related to "financial performance achieved *long in the past*, and upon which Intelligroup's *future* earnings did *not* depend"); *In re Time Warner Inc. Sec. Litig.*, 794 F. Supp. 1252, 1255, 1260 (S.D.N.Y. 1992) *affirmed in part, reversed in part by,* 9 F.3d 259 (2d Cir. 1993) (statement that company was worth "a hell of a lot more than $200.00 a share" could not have formed basis for plaintiffs' expectations because "innumerable intervening factors could have changed the company's value since [defendant] spoke.").   Here, Serra's January 31, 2005 misstatement failed to reveal a price-fixing arrangement which continued throughout the Class Period, and impacted *future* earnings.  His statements were not a mere opinion of the Company's stock price or value, but a direct (and false) explanation of Horizon's success.

235 F. Supp. 2d 1063, 1065 n.1 (N.D. Cal. 2002) (denying motion to strike pre-class period

statements and holding that these statements are material to scienter).

### (d)     Horizon's April 25, 2008 Disclosure Was A Partial Corrective Disclosure As Well As An Actionable Misstatement

Defendants argue that Lead Plaintiff cannot plead a claim regarding Horizon's April 25,

2008 disclosure because it came: (i) after the disclosure of the DOJ's investigation, and (ii) after

Lead Plaintiff purchased shares.  Def. Br. at 45-46.  Neither of these arguments has merit.

The April 25, 2008 disclosure that Horizon had to unexpectedly revise downward the

Company's earnings guidance for the fiscal year 2008 caused a dramatic 23% decline in

Horizon's stock price.  ¶278.  The Amended Complaint alleges that, while Defendants tried to

blame a "somewhat softer Puerto Rico market" for the revision, the true reason was that Horizon

could no longer sustain its artificially inflated financial results without the illegal price-fixing

conspiracy.  *Id.*  Thus, Defendants' contention that the April 17, 2008 disclosure of the price-

fixing investigation had completely revealed the fraud (Def. Br at 45) is not correct.  It is well

settled that when a disclosure has not fully informed the market (as here), subsequent disclosures

can result in further actionable declines in the price of the stock.  *See In re Regal Commc'ns

Corp. Sec. Litig*, No. 94-179, 1996 WL 411654 at *3 (E.D. Pa. July 17, 1996) (fact that the price

of Regal stock fell 28 percent following the disclosure that financial statements and audit and

opinion were faulty precluded argument that the market was fully informed of the fraud by an

earlier disclosure); *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 (3d Cir. 2002) (holding that

plaintiff may plead reliance on a misrepresentation that followed an earlier disclosure of an

antitrust lawsuit which "hardly indicated to the market with any degree of certainty that

[defendant] had indeed engaged in anti-competitive activity.").[14]

---

[14] *See also In re Connetics Corp. Sec. Litig*., No. 07-civ-2940, 2008 WL 3842938, at *11 (N.D.

Defendants next claim that Lead Plaintiff cannot recover for a misstatement that postdates its last purchase of Horizon stock. Def. Br. at 6-7, 46. But this ignores the fact that Horizon's earlier disclosure did not fully inform the market. Moreover, Lead Plaintiff represents a <u>class</u> of investors, and there is no requirement that a lead plaintiff have personally made a purchase after every partial disclosure (and at best, this is an issue for class certification not a motion to dismiss), and that the April 25 statement was itself misleading. *See In re PNC Sec. Litig.*, Civ. No. 90-0592, 1992 WL 373135, at *2 (W.D. Pa. Oct. 8, 1992) (refusing to exclude from the class plaintiffs who purchased "after the defendants' curative disclosure" because "plaintiffs allege that defendants' disclosure. . . was not complete and that defendants continued to make fraudulent statements and omissions."). Moreover, a class action complaint may plead misstatements that postdate plaintiff's purchases if, as here, those misstatements were part of a pre-existing pattern which continued the earlier misconduct.[15]

**B.      The Amended Complaint Adequately Alleges Scienter Against Each Individual Defendant**

To plead scienter under the PSLRA, a plaintiff must "plead with particularity facts giving rise to a strong inference that defendants acted with scienter." *Horizon*, 2009 WL 3837659, at

---

Cal. Aug. 14, 2008) (disclosure after the end of the class period was actionable because earlier disclosure failed to disclose the full extent of the fraud)*; Norfolk County Ret. Sys. v. Ustian*, No. 07-civ-7014, 2009 WL 2386156, at *6 (N.D. Ill. July 28, 2009) (citing *Dura Pharms.*, 544 U.S. 366, 342 (2005)) ("[l]oss causation may be pled on a theory of partial disclosures."); *In re Bradley Pharms. Sec. Litig.,* 421 F. Supp. 2d 822, 828-29 (D. N.J. 2006) (finding that the relevant 'truth' was not released as "a single, unitary disclosure, but occurred through a series of disclosing events.").

[15] *See, e.g., In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315 (N.D. Ga. 2007) (the post-purchase statement "was a continuation of the earlier fraudulent conduct" and arose from the same "pattern and practice" of fraud). Defendants' citation to *Winer Family Trust v. Queen*, 503 F.3d 319, 325-26 (3d Cir. 2007), is easily distinguishable. Def. Br. at 46. In that case, the district court dismissed all claims based on pre-purchase statements, and the Third Circuit affirmed. 503 F.3d at 323, 339. As a result, *Winer* could not argue that post-purchase statements continued a pattern of misconduct. *Id.*

*12 .  To plead a strong inference of scienter, a plaintiff must "allege facts giving rise to a

'strong inference' of either reckless or conscious behavior."  *Horizon*, 2009 WL 3837659, at *12.

Allegations of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre."  *Tellabs*, 127

S. Ct. at 2510.  Scienter is sufficiently pled when "all of the facts alleged, taken collectively, give

rise to a strong inference" of either reckless or conscious behavior, "not whether any individual

allegation, scrutinized in isolation, meets that standard."  *See Tellabs*, 127 S. Ct. at 2509;

*Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009).

> ### 1.      Guilty Plea Defendants Serra, Gill And Glova Acted Knowingly

There is no dispute that Defendants Serra, Gill and Glova - all senior executives of

Horizon - knowingly engaged in the illegal price-fixing conspiracy at the Company.  *See*

*Horizon*, 2009 WL 3837659, at *18.

> ### 2.      The Amended Complaint Gives Rise To A Strong Inference That The
> ### Individual Defendants Made False Statements Knowingly Or, At The
> ### Very Least, With Reckless Disregard For The Truth

The Amended Complaint contains particularized allegations regarding the scienter of the

Individual Defendants.  In its earlier opinion, the Court held that the scienter of these Defendants

was not sufficiently pled because (a) the nature of their roles as the top executives at Horizon

combined with the Government's "statements regarding Serra and Gill's alleged collusion with

unnamed Horizon executives" did not allege facts sufficient to show that those defendants knew

or were reckless in not knowing of the conspiracy (*Horizon*, 2009 WL 3837659, at *15); and (b)

the Complaint did not plead facts sufficient to show that those Defendants "had available to them

information which would have alerted them to the conspiracy, or that [Horizon's] rates and

revenues were so distorted by the illegal conduct that they should have been aware of it" (*id.* at

*16).  The Amended Complaint contains new facts that, viewed together with previously alleged

facts, demonstrate that these Defendants' scienter.

> **(a)**     **There Is A Strong And Compelling Inference That One or More of Defendants Serra And Gill's "Superiors"— Defendants Raymond, Urbania, Keenan, Handy And Taylor— Participated In The Price-Fixing Conspiracy**

The structure of the senior executive management at Horizon is simple.  The top five executive officers during the Class Period were Defendants Raymond, Urbania, Keenan, Handy and Taylor.  ¶¶20-24; 91; 105; 249.  Defendant Serra, as Senior Vice President and head of Horizon's Puerto Rico division, reported directly to Handy, served on the executive officer management team with the five other Individual Defendants, and was one of the highest paid executive officers.  Serra was authorized to make public statements on behalf of Horizon.  ¶¶25; 157-58; 183-86; 190-91; 209; 228-36.  Defendant Gill, as a senior executive officer, was also authorized to make statements on behalf of Horizon, and reported directly to Defendant Taylor.  ¶¶26; 166-67; 183-86.  All of the Individual Defendants were also senior to Glova.  ¶27.

No other individuals at Horizon could have been Serra or Gill's "superiors" or "other senior executives" except for Defendants Raymond, Urbania, Keenan, Handy and Taylor.  Therefore, when the Government states that (a) Serra claims to have had "direct communications with a number of <u>other senior executives</u>" at Horizon about the conspiracy (¶244); (b) "there are <u>others higher than Mr. Serra who are certainly of interest to the government</u>"; (95) (c) Serra is "<u>middle management in terms of the conspiracy</u>" (*id.*); (d) Gill "provided evidence, in the form of statements and documents, <u>against his superiors within [Horizon], including presently uncharged co-conspirators</u>" (¶99), and (e) Glova played "an indispensible role in dealing with senior executives involved in the conspiracy," and has provided useful information to the DOJ in furtherance of the government's investigation (¶98),  these statements raise a strong inference that one or more of these executive officers are co-conspirators in the price-fixing conspiracy.[16]

---

[16] None of these statements were made by Serra, Gill or Glova in their guilty pleas, and need not

*See Avaya*, 564 F.3d at 269; *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d

Cir. 2006) (scienter alleged as to two officer defendants where Suprema's management team

consisted of only three officers, and plaintiff alleged that the guilty pleas of Suprema's customers

implicated "Suprema's management" without specifically identifying defendants).[17]

> **(b)      Horizon's Rate Increases Raised A Red Flag Alerting
> Defendants To The Existence Of The Price-Fixing Conspiracy**

Defendants made false statements to the public regarding Horizon's core business

practices related to revenue, pricing and its competitive environment.  *See e.g., Horizon*, 2009

WL 3837659, at *10; ¶¶114-227.  In its November 13, 2009 Opinion, the Court held that, while

an inference of scienter may derive from false or misleading statements by key executives

regarding a company's lead product or core business, Lead Plaintiff must allege that the

Individual Defendants had reason to know of the statements' falsity.  One way of accomplishing

this would be if Lead Plaintiff alleged facts that Horizon's "rates and revenues were so distorted

by the illegal conduct that [the Individual Defendants] should have been aware of it."  *See*

*Horizon*, 2009 WL 3837659, at *16.  The Amended Complaint alleges new facts showing that

Horizon's reported rate increases were sufficiently suspicious and "distorted by illegal conduct"

---

be viewed with the "caution" this Court applies toward such statements.  *See Horizon*, 2009 WL
3837659, at *15.  Rather, these statements were all made in open court by the Government at
Serra, Gill and Glova's sentencing hearing, and also in the Government's memorandum in aid of
Gill's sentencing in the criminal action.  *See, e.g., In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980,
995 (D. Minn. 2005) (noting that the governmental investigations "into the primary allegations
of securities fraud" in a private case are included among the "usual indicia of securities fraud").

[17] At the very least, the compelling inference that at least one of these senior officers (each of
whom made false statements during the Class Period) had knowledge of the conspiracy means
that the "corporate scienter" of Horizon is alleged, even if the Court cannot determine which of
these Defendants specifically acted with scienter.  *See Horizon*, 2009 WL 3837659, at *13
(corporate scienter is adequately alleged when "at least one individual officer [is] alleged to have
made or participated in the making of a false or misleading statement" with scienter).  Horizon's
scienter is discussed in Section I.C below.

that, when viewed holistically, demonstrate that the Individual Defendants either knew, or were reckless in not knowing about the conspiracy.

The Amended Complaint alleges that Defendants knew Horizon was governed by a "truly unique regulatory structure" that required competition.  ¶¶41-44.  In fact, the Company's Code of Ethics acknowledged the strict antitrust laws that govern the company and require that the rates achieved in Puerto Rico and in the other two shipping lanes operated by Horizon be negotiated legally and in good faith.  ¶44.  An industry study published in 2004 (and commissioned by an organization for which Defendant Raymond sits on the Board of Directors), revealed that revenues in the Puerto Rico trade line, based on shipping rates, declined 4% annually since 1991, for a total decline of 39%.  ¶83.  Horizon, however, reversed this trend by 2004, reporting consistent rate increases leading to revenue growth and profitability, despite a steady and significant decrease in volume, particularly in Puerto Rico:

| Year End Financial Statement: | Total Operating Revenue (in thousands): | Revenue container volume (in thousands): | Revenue from general rate increases (in thousands) |
|---|---|---|---|
| 2004 | $980,328 | $53,351 | $16,700 |
| 2005 | $1,096,156 | ($1,567) | $42,345 |
| 2006 | $1,156,892 | ($35,650) | $44,443 |
| 2007 | $1,206,515 | ($36,980) | $51,578 |
| 2008 | $1,265,789 | ($35,156) | $29,918 |

(¶84.)

The fact that Horizon's starkly declining volumes were completely offset by rate increases in a supposedly "competitive" but "soft" environment was highly suspicious and should have raised a red flag imposing a duty upon Horizon's senior executives (who repeatedly discussed rates and volume in Horizon's SEC filings and on conference calls) to investigate the

reason behind these dramatic and illogical rate increases.  ¶¶85-87.[18]  In a small but competitive market, when the market is "soft" and shipping volume low, competitors are expected to cut prices to gain market share.  ¶88.  In Horizon's Puerto Rico trade lane, the opposite occurred – Horizon continuously raised prices despite declining volume and steady competition.

The Individual Defendants were under a heightened duty to investigate these unusual and improbable rate increases for several reasons.  First, they frequently made affirmative (and false) statements to the public about these rate increases, putting them "in play," and thus "were obligated to disclose all material facts" regarding them.  *See e.g.,* ¶91; *Horizon*, 2009 WL 3837659, at *9.  For instance, Defendant Raymond was aware of and specifically identified the increasing rates in Puerto Rico during the Class Period, stating on March 2, 2007 that Horizon was "still gaining in terms of real dollar increases in our prices in Puerto Rico.  I don't see that stopping."  ¶¶87, 192.  He also told investors, on April 26, 2007, that "in the case of Puerto Rico, even though that market is a little light, we're continuing to get rate increases that are slightly ahead of what our inflationary costs."  ¶¶87, 196.  Indeed, investors repeatedly asked questions on conference calls during the Class Period attempting to understand how rates could be increasing as volumes softened.  *See, e.g.,* ¶87.  Defendants gave a number of false explanations for these increases (including by portraying Horizon as having "competitive advantages" and "differentiators" over its competitors). ¶85.  Defendants were equally aware of the "volume

---

[18] The unattainable nature of Horizon's rate increases in Puerto Rico while the Company was experiencing a decrease in volume was confirmed after the end of the Class Period, when Horizon's rate increases ended and there was nothing to offset Horizon's decreased container volume.  As a result, reported rate increases decreased from $14.44 million in the second quarter of 2007 to just $933,000 in the third quarter of 2009.  ¶92.

softness" in Puerto Rico and elsewhere, making repeated public references to it.  *See* ¶¶103, 138-48, 154, 157, 176, 180-82, 195, 203, 205, 215, 219.[19]

Defendants raise two fact-based arguments in an effort to convince the Court that the "most compelling" inference is that they lack scienter.

<u>First</u>, they argue that the Individual Defendants could have assumed that the stable or rising rates in Puerto Rico were due to anticompetitive, yet legal, "parallel conduct" amongst Horizon's competitors.  Def. Br. at 29-30 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007)).  This is unconvincing.  In *Twombly*, the Supreme Court held that in order to allege a violation of the Sherman Act, allegations of illegal "parallel conduct" amongst competitors "must be placed in a context that raises a suggestion of a preceding [anticompetitive] agreement."  *Id.* at 557.  Such allegations include behavior that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  *Id.* at 556 n.4.   In striking contrast to the situation in *Twombly*, while rates increased at Horizon, the volume of goods being shipped actually decreased, raising a red flag indicating that illegal activity could be the source of the increasing rates.  ¶¶83-92.  These events were highly suspicious (indeed, as discussed, they prompted numerous questions on conference calls from analysts, *see, e.g.,* ¶¶85, 182, 196), and the senior executive officers of Horizon were under a duty to investigate.

---

[19] Moreover, the Individual Defendants had access to rate and pricing information that provided evidence of the conspiracy.  ¶¶100-02.  Documents obtained by the Government show that the conspiracy was well-documented, and "conducted in significant part through e-mails and spreadsheets" that "contained detailed market-share information, customer information and contact information that were circulated between the co-conspirators."  ¶100.  According to CW 6, an employee of co-conspirator Sea Star, documentation of the conspiracy included pricing reports listing each co-conspirator's pricing information.  ¶101.  These pricing reports are typically shown to high level officers such as the Individual Defendants, and would have been incorporated into the general ledger and the Company's financial statements and EBITDA.  ¶¶101-02.

Next, Defendants argue that the bankruptcy of a competitor in 2001 caused Horizon's increased rates because there was now "less capacity to carry cargo" among the four competitors. Def. Br. at 30.  Not only is this an improper factual argument, it is contradicted by Defendants' own statements during the Class Period.  Defendants offered several explanations for why rates were increasing during the Class Period but <u>never attributed</u> the increases to the bankruptcy of their competitor or a related decrease in "capacity."  Rather, they Defendants ascribed them to "favorable cargo mixes" (¶¶86, n.2, 125),"long-term customer contracts," "superior customer service," (¶¶145, 148, 198, 201), and other factors.  Their argument now – conjured up for the first time on the motion to dismiss – is an unconvincing post-hoc justification that cannot defeat the inference of scienter raised by the Amended Complaint.[20]

### (c)   Urbania's Abrupt Resignation Raises An Additional Inference Of Scienter

The Amended Complaint alleges that Horizon's CFO, Defendant Urbania, resigned abruptly less than two weeks before the announcement of the Government's criminal investigation of the Company.  The circumstances of his resignation are extremely suspicious. Urbania had been with Horizon for years and received a number of promotions.  He held the "key" position of Chief Financial Officer and was identified as one of the select group of "key management personnel" in Horizon's SEC filings, including in Horizon's 2007 Form 10-K, filed with the SEC just a month before Urbania's resignation.  ¶257.  He also was a regular participant on conference calls and signed many of Horizon's SEC filings.  Nonetheless, Urbania resigned from the Company on April 1, a Tuesday, was "replaced" on April 3, and was forever out the door on April 4, a Friday.  ¶258.  For this long-serving CFO to abruptly leave the Company – on

---

[20] Moreover, the volume of containers to be shipped decreased each year, so that even if there was "less capacity to carry cargo" as a result of the bankruptcy, there was also less cargo to be carried year after year.  ¶¶84-85.

the eve of a quarterly filing – without even a customary "two weeks' notice" is extremely odd,

particularly since the price-fixing conspiracy was revealed less than two weeks later.

The suspicious nature of Urbania's abrupt resignation is further confirmed by the fact that

it cost him millions of dollars:  he left without any other severance package or customary exit

payment, which caused him to lose more than $4 million in unvested restricted stock options.

¶¶21, 257-58.[21]  Defendants' argument that a "mere resignation" cannot support an inference of

scienter (Def. Br. at 26) simply ignores the highly suspicious nature of Urbania's departure.

When viewed together with the other particularized allegations of the Amended Complaint, this

"adds one more piece to the scienter puzzle" and creates a particularly strong inference of

scienter as to Urbania.  *See In re Adaptive Broadband Sec. Litig.*, No. C. 01-1092 SC, 2002 WL

989478, at *14 (N.D. Cal. Apr. 2, 2002) (finding scienter based in part on the replacement of the

CFO when the company was conducting an internal investigation and restating its financials);

*see also  In re Par Pharm. Sec. Litig.*, Civ. A. No. 06-cv-3226 (PGS), 2009 WL 3234273, at *10

(D.N.J. Sept. 30, 2009); *see, e.g., Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 1002

(9th Cir. 2009) ( "resignation at issue was uncharacteristic when compared to defendant's typical

hiring and termination patterns or was accompanied by suspicious circumstances.").

> **3.     The Amended Complaint Gives Rise To A Strong Inference That
> Defendants Raymond, Urbania, Keenan, Handy, Taylor And Serra
> Were Motivated To Perpetuate And Conceal The Conspiracy**

Motive and opportunity "are to be considered along with all other allegations in the

complaint" in assessing whether scienter has been adequately alleged, and, when insider stock

sales are "unusual in scope or timing, they may support an inference of scienter."  *Avaya*, 564

---

[21] In contrast, Defendant Handy, when he resigned from Horizon in 2009, received a lump sum
payment of $388,000, full vesting of 70,000 shares of stock (valued at approximately $370,000
as of December 23, 2009), a "dividend" payment of $19,000 and additional compensation as set
forth above.  ¶258.

F.3d at 276-79 (quoting *Tellabs*, 127 S. Ct. at 2511).  The Amended Complaint adds compelling new allegations regarding the Individual Defendants' and Serra and Gill's motive to participate in or conceal the fraud at Horizon.

First, these Defendants were motivated to further the price-fixing conspiracy and raise rates so that Horizon's 2005 IPO would be a success.  When the IPO was successful, it created a public market for Horizon's shares and immediately vested Defendants Raymond, Urbania, Keenan, Taylor, Serra and Gill with $15.5 million of newly issued common stock totaling nearly 11% of the Company's outstanding shares and making them instant multi-millionaires.  ¶¶259-61.  Also in connection with the IPO, these Defendants exercised stock options to purchase additional common stock on the day of the Offering, realizing a benefit of an additional $15 million in total (¶262), and Defendants Raymond, Urbania and Keenan received cash "merit awards" for the completion of the IPO totaling $2 million.

Second, these Defendants, as part of an Equity Incentive Plan adopted on the eve of the IPO, were allowed to purchase up to 700,000 shares of Horizon common stock in the IPO, at the public offering price of $10 per share.  ¶265.  Defendants had every incentive to inflate the price of Horizon stock and turn a profit on these shares by the time they vested one year later, when the Company's common stock traded at $16.14.  *Id.*

Third, Defendants Raymond, Urbania, Keenan, Handy, Taylor and Serra were all motivated to perpetuate and conceal the fraudulent conspiracy in order to reap the benefits of Horizon's "Cash Incentive Plan" that paid out awards tied in large part to the Company's EBITDA which steadily increased due to the rising rates achieved through the conspiracy.  ¶267.  Indeed, this motive was particularly strong because Horizon enjoyed (and Defendants consistently touted) EBITDA growth through the length of the conspiracy despite a "soft"

market.  ¶141 (as of May 2007, Horizon had enjoyed 21 consecutive quarters of EBITDA

growth, "despite less than ideal market conditions").  Defendants had a concrete motive to ensure

Horizon enjoyed "EBITDA growth" in order to achieve substantial cash bonuses.

Finally, between September 26, 2005 and April 25, 2008, the Senior Management

Defendants took advantage of the artificial inflation they created by selling, in the aggregate,

441,602 shares of Horizon stock for proceeds of $11 million (in contrast to the $2 million

previously alleged). ¶268.  In particular, (a) Raymond grossed $5.3 million from stock sales –

over 12 times his annual salary; (b) Urbania grossed $916,590.00 – tripling his annual salary;

and (c) Keenan grossed $4.8 million, over 6.5 times his annual salary.  ¶¶268-69.  *See In re*

*Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277-78 (3d Cir. 2006) (finding that one

defendant's stock sales earned him over four times his annual salary to be probative of scienter).

Standing alone, the Individual Defendants' stock sales may not be independent grounds

for finding an inference of scienter, but they are probative of scienter in a totality of the

circumstances analysis.[22]  In addition, the Amended Complaint alleges that Defendants received

over $17 million in additional benefits, none of which would have been recognized without the

continuation and concealment of the price-fixing conspiracy.  ¶¶262-65.  *See Tellabs*, 127 S.Ct.

at 2511 ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference."); *In re*

*Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 152 (3d Cir.2004) (recognizing that "an inference of

---

[22] The fact that Defendants' 2007 and 2008 sales were made pursuant to Rule 10b5-1 plans does
not protect them from liability because the plans were created in late 2006, years after they
became available and a year after Horizon went public.  ¶271; *see, e.g.*, *In re New Century Fin.*
*Corp.*, 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008) (finding that allegations of insider stock
sales support a strong inference of scienter and "the timing of the 10b-5 plans, several years after
they became available, at least raises the question precisely why there was a delay in creating
those plans, and why they were formed during the Class Period").

scienter may be created when plaintiffs demonstrate that sales are . . . "unusual in scope (e.g., compared to their total level of compensation or the size of previous sales)").[23]

###### C.      Horizon's Corporate Scienter Is Adequately Alleged

In its November 13, 2009 Opinion, the Court held that the scienter of a corporate defendant depends on "whether plaintiffs have adequately pleaded the requisite state of mind on the part of an individual officer alleged to have made, or participated in the making of, false or misleading statements on behalf of the corporation." *Horizon*, 2009 WL 3837659, at *13 (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 367 (5th Cir. 2004)).[24]  Thus, the Court adopted the Fifth Circuit's view of "corporate scienter," which requires allegations that a corporate officer either made a materially false statement with scienter or "participated in the making of" a false statement made by another officer or by the Company itself.[25]  The Fifth

---

[23] The timing of Defendants' sales was also suspicious.  For example, Raymond's largest single sale, $2.6 million, occurred on November 17, 2006, only two weeks after the Company's positive third quarter 2006 earnings conference call in which Raymond touted the Company's "19 consecutive quarters of adjusted EBITDA growth year-over-year."  ¶133.  Keenan's largest single stock sale on March 14, 2007, yielded $3.4 million, and came less than two weeks after Horizon's 10-K was released and after the Company misleadingly reassured the market that Horizon was "still gaining in terms of real dollar increases in our prices in Puerto Rico."  ¶¶192-93.  None of these sales were made pursuant to a 10b-5 plan.

[24] The Court's Opinion also cited the District Court's decision in *In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002).  *See Horizon*, 2009 WL 3837659, at *13.  That decision has been criticized by the Ninth Circuit as "overstating" the Ninth Circuit's law on pleading corporate scienter.  In *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008), the Ninth Circuit stated:

> The district court in *Apple* appears to have overstated our holding in *Nordstrom*. We had at that time not categorically rejected the concept of "collective scienter" . . . *Nordstrom* does not foreclose the possibility that, <u>in certain circumstances, some form of collective scienter pleading might be appropriate</u> . . . For instance, there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that <u>at least *some* corporate officials knew of the falsity upon publication.</u>"

[25] Lead Plaintiff notes that the Fifth Circuit's view of corporate scienter is somewhat more stringent than the view taken by other Circuits.  For instance, the Second Circuit has held:

Circuit in *Southland* described the test as whether the plaintiff has alleged that a corporate

executive:

> acted with scienter in or respecting the making or issuing of any of
> the complained of statements (or in ordering or approving any of
> such statements or furnishing information or language for inclusion
> therein or omission therefrom, or the like) or indeed in any other
> respect.

*Southland*, 365 F.3d at 367;  *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702,

708-09 (7th Cir. 2008) ("the *Southland Securities* case said that corporate scienter could be based

on the state of mind of someone who furnished false information that became the basis of a

fraudulent public announcement").   As demonstrated below, Lead Plaintiff has satisfied this

standard for alleging scienter against Horizon Lines, Inc. and Horizon Lines, LLC.

### 1.   Horizon's Scienter Is Established By The Misleading Statements Made By The Guilty Plea Defendants And The Individual Defendants

As discussed above, the Amended Complaint contains particularized allegations that the

Guilty Plea Defendants made materially misleading statements.  Because there is no dispute that

---

> Congress has imposed strict requirements on securities fraud pleading, but we do
> not believe that they have imposed the rule urged by defendants, that in no case
> can corporate scienter be pleaded in the absence of successfully pleading scienter
> as to an expressly named officer.

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195
(2d Cir. 2008) ("the most straightforward way to raise such an inference [of scienter] for a
corporate defendant will be to plead it for an individual defendant.  But it is possible to raise the
required inference with regard to a corporate defendant without doing so with regard to a specific
individual defendant"); *see also In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16
(S.D.N.Y. 2009) ("[S]cienter by management-level employees is generally sufficient to attribute
scienter to corporate defendants," and "the individual making an alleged misstatement and the
one with scienter do not have to be one and the same").  The Fourth Circuit has held that "a
complaint that alleges facts giving rise to a strong inference that at least one corporate agent
acted with the required state of mind satisfies the PSLRA even if the complaint does not name
the corporate agent as an individual defendant or otherwise identify the agent." *Matrix Capital
Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182, 189-90 (4th Cir. 2009).  The Seventh
Circuit has held that "it is possible to draw a strong inference of corporate scienter without being
able to name the individuals who concocted and disseminated the fraud." *Makor Issues &
Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

these high-level executives "were part of the rate-fixing conspiracy," they acted with scienter and

their conduct is imputed to Horizon.  *See Horizon*, 2009 WL 3837659, at \*18.  Moreover, the

scienter of the Individual Defendants has also been adequately alleged.

> **2.      Horizon's Scienter Is Established By The Guilty Plea Defendants'
> Participation In The Dissemination Of False And Misleading
> Statements By Horizon And The Individual Defendants**

Even if the Court were to find that none of the Individual Defendants acted with scienter,

and that the alleged misrepresentations by the Guilty Plea Defendants are not actionable, the

Amended Complaint still pleads a claim against Horizon.  The Amended Complaint presents

particularized allegations demonstrating that Defendants Serra, Gill and Glova "participated in

the making of . . . false or misleading statement[s]" made by other Defendants.  *See Horizon*,

2009 WL 3837659, at \*13.  As discussed above, pursuant to the *Southland* test adopted by the

Court, the "most plausible inference" from the detailed allegations of the Amended Complaint is

that Serra and others "participated in" the making of misleading statements by "approving"

certain statements "or furnishing information or language for inclusion therein or omission

therefrom, or the like[] or indeed in any other respect."  *Southland*, 365 F.3d at 367.

First, Serra was plainly involved in the preparation and dissemination of the articles and

press releases in which he was quoted.  These include the September 25, 2006 article that

included Serra's picture, contained numerous quotes from Serra himself, and falsely stated:

> Horizon Lines has remained successful in the trade by effectively
> managing cargo mix and operating costs.  Unlike some
> competitors, Horizon has avoided operational losses in Puerto Rico
> by investing in regular equipment and vessel maintenance and
> consistently delivering higher levels of service for its customers.

¶184.  As demonstrated above, this statement is directly attributable to Serra himself and is false

and misleading.  *See supra* at pages 25-26.  But even if the Court were to find that this statement

is not directly attributable to Serra, under the *Southland* test, Serra's scienter can be imputed to

45

Horizon with respect to this statement because Serra obviously "reviewed and approved" the statement prior to dissemination and "furnished the information" on which the statement was based. The statement is squarely within Serra's area of responsibility at Horizon (the "operational, sales and strategic activities of the Puerto Rico market" (¶25)), it is contained in an article that includes a color photograph of Serra (and no other officer of Horizon), and is replete with direct quotations from Serra himself (and includes <u>no quotations</u> from any other officer of Horizon). *See* Exhibit 1; ¶¶183-184. Because Serra knew this statement was false when made and he "participated in the making of" the statement, Serra's scienter is attributable to Horizon. *Horizon*, 2009 WL 3837659, at *17.[26]

<u>Second</u>, Serra was repeatedly authorized by Horizon to speak publicly on matters relating to the Company – and particularly with respect to the Company's Puerto Rico operations. As set forth above, prior to the IPO, he was speaking with knowledge and detail about Horizon's rates, providing specific financial information opining that "the rate recovery has continued and we feel more comfortable with the net-to-port rate," and discussing the Company's "financial model." ¶157. These statements demonstrate that Serra was involved with, and knowledgeable about, the financial metrics of the Company, particularly as they related to Puerto Rico. *See, e.g.*, ¶¶157 ("Serra said more than half of the contracts for Horizon's Puerto Rican service include inland pickup or delivery," "it's still in the plan to find a financial model that makes sense"). Throughout the Class Period, the Individual Defendants had ample and continuous access to Serra with respect to the Puerto Rico market, and repeated information that they

---

[26] Guilty Plea Defendants Gill and Glova, as the "Marketing and Pricing Directors" for Puerto Rico (¶¶26, 27) also undoubtedly reviewed, commented upon, and approved the *Journal of Commerce* articles prior to their dissemination (particularly since one of them featured quotes from Gill (¶185 ), and they knew that these articles were false in light of the illegal price-fixing conspiracy. *See* ¶¶245-46.

46

received from Serra in public statements they made.  On multiple occasions, these Defendants

publicly referenced the time they spent in Puerto Rico talking to customers and to Serra, and in

one instance, actually held an investor conference call in Puerto Rico.  *See, e.g.,* ¶¶174, 196, 202.

When the Individual Defendants' made false and misleading public statements concerning the

health and success of the Puerto Rico business, it is clear that they received that information, in

whole or in part, from Serra – whose role at Horizon was to operate and manage all of the

Company's affairs in Puerto Rico.[27]  *See* ¶¶174-75; 176 (Taylor (Serra's direct supervisor)

provides information about the Puerto Rico market that plainly came from Serra:  "In Puerto

Rico we continue to negotiate rate increases into our customer contracts . . . we believe that the

competitive environment right now continues to be stable enough to support reasonable and

ongoing rate increases").

        Moreover, the Amended Complaint alleges facts raising a strong inference that Serra

"furnished information" that other Defendants used to make false and misleading statements in

Horizon's SEC filings, press releases and conference calls.  The Amended Complaint alleges that

that the pricing figures and reports that were the direct product of the price-fixing conspiracy

were generated by Serra's Puerto Rico division and incorporated into Horizon's reported

revenues and EBITDA.  ¶¶4, 100-02 ("[i]n the cabotage industry, pricing reports are critical to a

company's financial success," and pricing reports would have had to be incorporated into the

---

[27] *See, e.g.,* ¶¶123 (Raymond repeated some Puerto Rico financial figures and stated that "we're
confident of a good solid market in Puerto Rico going forward" on November 5, 2005); 139
(Horizon's 2006 Form 10-K,  stated that the Company's revenue contained volume declines were
"due to overall soft market conditions in Puerto Rico" that were being offset by "higher cargo
mix in addition to general rate increases"); 141-42, 145, 148-49, 153-54 (similar statements
made in various press releases and quarterly filings); 145, 165, 172-76, 180-81, 189-92, 195-96,
202-05, 207 (Defendants Horizon and the Individual Defendants each made statements about
Puerto Rico, including direct statements in response to analyst questions about Puerto Rico, with
details on Puerto Rico's financials, rates and rate negotiations, surcharges, market share, rates,
lane capacity, competition and growth).

general ledger and the company's financial statements).[28]  The pricing information provided by

the Puerto Rico trade lane, managed by Defendant Serra, would then have been incorporated into

Horizon's false and misleading reports of rate increases and revenue growth which concealed the

fact that those rate increases were the byproduct of an illegal price-fixing conspiracy.  ¶100.

Moreover, Handy publicly acknowledged that Serra provided him with information regarding the

health of the Puerto Rico trade lane when he told investors on an earnings conference call on

October 30, 2006 that "As I've discussed recently with our VP in Puerto Rico, he is already

seeing a significant increase in consumer spending . . ."  ¶187-88.

Thus, the most compelling inference to be drawn from these allegations is that Serra did

not merely sit passively aside as the other Defendants issued misleading statements.  Rather, he

"furnished information" and otherwise "participated in" the making of these statements, knowing

that they were materially false.  These allegations are sufficient to establish the scienter of

Horizon even if the Individual Defendants' scienter is not established.  *See In re NUI Sec. Litig.,*

314 F. Supp. 2d 388, 412 (D. N.J. 2004) (finding that scienter was established against company

because the company's general counsel (who did not speak and was not named as a defendant)

---

[28] Defendants argue that no inference may be made about Horizon's use of pricing reports because support for this allegation is derived in part from the statements made by CW 6, a former manager at Sea Star, Horizon's chief competitor in Puerto Rico because no inference can be made about Horizon's practices from the practices of an "entirely different and unrelated company."  Def. Br. at 24-25.  But in fact, under these circumstances where Sea Star and Horizon are two direct competitors in a small industry that perform exactly the same services, and where there is direct evidence that these two companies conspired in a long-running price-fixing conspiracy that was conducted through emails and spreadsheets containing pricing and customer information, a reasonable inference is that Sea Star's industry practice of using weekly and monthly pricing reports from its satellite offices to communicate relevant pricing information to the Company's top executives was representative of Horizon's industry practice.

was alerted to the fraud, but dismissing claims against the "speaking" individual defendants (CEO and CFO) because they personally lacked scienter).[29]

Fourth, as discussed above, at the very least, the compelling inference that at least one of the Individual Defendants (each of whom made false statements during the Class Period) had knowledge of the conspiracy means that the "corporate scienter" of Horizon is alleged, even if the Court cannot determine which of these Defendants specifically acted with scienter. *See Horizon*, 2009 WL 3837659, at *13 (corporate scienter is adequately alleged when "at least one individual officer [is] alleged to have made or participated in the making of a false or misleading statement" with scienter). *See supra* Section I.B.2.(a).

## II.    THE COMPLAINT STATES CLAIMS UNDER SECTION 20(A)

Because, as shown above, the Complaint adequately pleads primary violations by Defendants of Section 10(b) of the Exchange Act and Rule 10b-5, Lead Plaintiff has also stated Section 20(a) claims.  Contrary to Defendants' arguments, the Amended Complaint contains sufficient allegations of "control."  *See* ¶¶31, 299-300, 305-06.   "Allegations that 'support a

---

[29]  *See also In re Motorola Sec. Litig.*, No. 03 287, 2004 WL 2032769, at *31 (N.D. Ill. Sept. 9, 2004) (holding that plaintiffs had alleged a strong inference that Motorola "through its various officials, sought to mislead the investing public," but dismissing claims against the individual defendants (CEO, CFO and COO) because the plaintiffs' scienter allegations as to them were insufficient); *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 682 (6th Cir. 2005) (lead plaintiff adequately pled scienter against a corporation even though there was no scienter established as against any particular corporate officer making a statement). Although the Third Circuit has not directly opined on the standard for pleading a corporation's scienter, its decision in *In re Alpharma Inc. Securities Litigation* is informative.  In *Alpharma*, the district court concluded, and the Third Circuit affirmed, that violations of a multinational corporation's revenue recognition policy in its Brazil division could not be imputed to the four individual defendants – all officers of Alpharma – or to the company itself because "the Complaint fails to link Alpharma's executives or any of the named Individual Defendants to the Brazil incidents."  372 F.3d 137, 150 (3d Cir. 2004).  Whereas in *Alpharma*, no senior executive (defendant or otherwise) was sufficiently linked to the wrongdoing to satisfy the scienter requirement for the corporation, in this action, the Complaint directly links the Guilty Plea Defendants to the illegal activity in Horizon's Puerto Rico division.

reasonable inference that [defendants] had the potential to influence and direct the activities of

the primary violator, suffice to plead control person liability...Allegations that a [defendant]

signed a fraudulent SEC filing and was in a position to exercise control over the primary violator

are sufficient to withstand a motion to dismiss." *Tracinda Corp. v. DaimlerChrysler AG*, 197 F.

Supp. 2d 42, 72 (D. Del. 2002). *See also In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 417-18

(D.N.J. 2004); *Campbell Soup*, 145 F. Supp. 2d at 599-600.

### <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' motion should be denied.

Dated: March 12, 2010                         Respectfully submitted,


  /s/ Sean M. Brennecke        
Andre Bouchard (#2504)
Sean M. Brennecke (#4686)
**BOUCHARD MARGULES &
FRIEDLANDER, P.A.**
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500
abouchard@bmf-law.com
sbrennecke@bmf-law.com

*Liaison Counsel*

John C. Browne
Lauren A. McMillen
Sean O'Dowd
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
(212) 554-1400

50

Peter S. Linden
Ira Press
Steven D. Cohn
**KIRBY McINERNEY LLP**
825 Third Avenue, 16th Floor
New York, New York 10022
(212) 371-6600

*Co-Lead Counsel for Lead Plaintiff the Police &
Fire Retirement System of the City of Detroit*