IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CITY OF ROSEVILLE EMPLOYEES'       :       CIVIL ACTION
RETIREMENT SYSTEM, et al.          :
                                   :
            v.                     :
                                   :
HORIZON LINES, INC., et al.        :       NO. 08-969

MEMORANDUM

Bartle, C.J.                                    May 18, 2010

        Before the court is the motion of defendants Horizon

Lines, Inc. and Horizon Lines, LLC (collectively "Horizon"),[1]

Charles Raymond ("Raymond"), Mark Urbania ("Urbania"), John

Keenan ("Keenan"), John Handy ("Handy"), and Brian Taylor

("Taylor")[2] to dismiss plaintiffs' amended consolidated

securities class action complaint ("amended complaint") pursuant

to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil

Procedure for failure to meet the heightened pleading

requirements of the Private Securities Litigation Reform Act of

1995 ("PSLRA").  15 U.S.C. §§ 78u-4 et seq.

        In this putative class action, purchasers of the common

stock of Horizon Lines, Inc. allege that defendants artificially

---

1.  We refer to defendants Horizon Lines, Inc. and Horizon Lines,
LLC collectively as "Horizon" except when it is necessary to
specifically refer to an individual entity.

2.  Defendants Gabriel Serra ("Serra"), Kevin Gill ("Gill"), and
Gregory Glova ("Glova") have not joined in this motion to
dismiss.

inflated the price of Horizon Lines, Inc. common stock by making false or misleading statements in violation of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("§ 10(b)"), as amended by the PSLRA, and Rule 10b-5 promulgated thereunder.  17 C.F.R. § 240.10b-5 ("Rule 10b-5"). They also allege violations of § 20(a) of the Exchange Act.  15 U.S.C. § 78t ("§ 20(a)").

I.

We awarded lead-plaintiff status to Police and Fire Retirement System of the City of Detroit on June 18, 2009.  It seeks to represent all those, excluding the defendants and related entities, who purchased common stock of Horizon Lines, Inc. between September 26, 2005 and April 25, 2008.

Plaintiffs filed their first consolidated securities class action complaint ("first complaint") on July 29, 2009.  On November 13, 2009, we granted the motion of certain defendants to dismiss the first complaint, because it failed to meet the heightened pleading requirements of the PSLRA.  City of Roseville Employees' Retirement System v. Horizon Lines, Inc., No. 08-969, 2009 WL 3837659, at *17-19 (D. Del. Nov. 13, 2009). Specifically, we determined that:  (1) plaintiffs, with regard to their § 10(b) and Rule 10b-5 claims, failed to plead particularized facts sufficient to establish a strong inference of scienter against defendants Horizon Lines, Inc., Horizon Lines, LLC, Raymond, Urbania, or Keenan and failed to attribute any false or misleading statements to defendants Serra, Gill,

-2-

Glova, or former defendant Horizon Lines of Puerto Rico, Inc.; and (2) plaintiffs could not make out a claim of controlling person liability under § 20(a) against any of the named defendants. We dismissed all counts in plaintiffs' first complaint without prejudice.

We allowed plaintiffs to file an amended complaint, which they did on December 23, 2009. In their amended complaint, plaintiffs have added two new defendants, Handy and Taylor, omitted former defendant Horizon Lines of Puerto Rico, Inc., and pleaded a number of additional facts, which are set forth in detail below. In Count I, plaintiffs allege that all defendants violated § 10(b) and Rule 10b-5 by falsely attributing Horizon's financial success during the class period to lawful business practices when that success was actually the result of a price-fixing conspiracy between Horizon and its competitors in the Puerto Rico cabotage market. On the same factual premise, plaintiffs aver, in Count II, that defendant Horizon Lines, Inc. is liable as a controlling person under § 20(a), and, in Count III, that defendants Raymond, Urbania, Keenan, Handy, Taylor, Serra, and Gill are also liable as controlling persons under § 20(a).

II.

The underlying facts of this case are set forth in detail in our Memorandum of November 13, 2009. <u>City of Roseville</u>, 2009 WL 3837659, at *1-6. A summary of those facts,

-3-

which, for the purposes of this motion, we accept as true, is as follows.

Horizon Lines, Inc., a publicly-traded, commercial, container-shipping company, derives approximately one third of its revenue from the Puerto Rico cabotage market. Horizon Lines, LLC is a subsidiary of Horizon Lines, Inc. All of the individual defendants, with the exception of Gill and Glova, were members of Horizon's executive officer management team during at least part of the class period. Raymond has served as President and Chief Executive Officer of Horizon Lines, Inc. since July of 2004 and was appointed Chairman of its Board of Directors in October of 2006. He has also served as President and Chief Executive Officer of Horizon Lines, LLC since January, 2000 and as a director of that company since November, 1999. Urbania was Executive Vice President and Chief Financial Officer of Horizon Lines, Inc. until April 4, 2008, when he resigned. Keenan, since August, 2007, held the position of President of Horizon Lines, LLC and was an officer of Horizon Lines, Inc. Serra was, until no later than April, 2008, the Senior Vice President and General Manager for Horizon Lines, LLC, Puerto Rico division. Gill, from May, 2002 until December 2005, was employed as the Marketing and Pricing Director for Horizon Lines, Inc., and, from December 2005 until April, 2008, was Horizon's Vice President of Marketing. From December, 2005 until April, 2008, Glova served as Marketing and Pricing Director for Horizon Lines, LLC, Puerto Rico division.

-4-

Newly added defendant Taylor served as Senior Vice President, Sales and Marketing, of Horizon Lines, Inc. from December, 2005 through August, 2007 and is now President of Horizon Logistics Holdings, LLC, a wholly-owned subsidiary of Horizon Lines, Inc.  During the relevant period, defendant Gill reported directly to Taylor, and Taylor reported directly to Raymond.  The second newly added defendant, Handy, has been Executive Vice President of Horizon Lines, Inc. since December, 2005.  He also serves as a board member of Horizon Services Group, a wholly-owned subsidiary of Horizon Lines, Inc. Defendant Serra reported directly to Handy.

On April 17, 2008, Horizon admitted publicly that it was the subject of an ongoing investigation by the United States Department of Justice and the Federal Bureau of Investigation ("FBI") regarding its Puerto Rico cabotage business.  On October 20 of that year, defendants Serra, Gill, and Glova pleaded guilty to charges of engaging in a criminal conspiracy to fix prices, rig bids, and allocate customers in violation of the Sherman Act, 15 U.S.C. § 1.  According to their confessions, this conspiracy began as early as May, 2002 and continued until April of 2008.  Defendants Serra, Gill, and Glova are now in prison.

The price of Horizon's stock plummeted upon revelation of the price-fixing scheme.  Between the 17th and the 25th of April, 2008 the price fell from $18.23 to $11.25 per share.

Plaintiffs contend that all of the named defendants knew or should have known about the price-fixing conspiracy and

-5-

concealed this information from investors while at the same time they made statements regarding Horizon's financial success, market competition, and shipping rates which were false or misleading in violation of § 10(b) and Rule 10b-5 promulgated thereunder.[3] As a result, plaintiffs assert that they were deceived into purchasing Horizon's common stock at artificially inflated prices which caused them to lose money when the price ultimately declined.

                              III.

        Section 10(b) of the Exchange Act makes it unlawful for any person

            [t]o use or employ, in connection with the
            purchase or sale of any security registered
            on a national securities exchange or any
            security not so registered, or any
            securities-based swap agreement ... any
            manipulative or deceptive device or
            contrivance in contravention of such rules
            and regulations as the Commission may
            prescribe as necessary or appropriate in the
            public interest or for the protection of
            investors.

15 U.S.C. § 78j(b).  Under its statutorily granted authority, the Securities and Exchange Commission ("SEC") promulgated Rule 10b-5, which provides:

            It shall be unlawful for any person, directly
            or indirectly, by the use of any means or
            instrumentality of interstate commerce, or of

_____

3.  In their first complaint, plaintiffs alleged that certain statements by defendants in Horizon's Sarbanes-Oxley certifications and in its Code of Ethics were also false or misleading under the securities laws.  However, we rejected those arguments, and plaintiffs have not included them in their amended complaint.

the mails or of any facility of any national
securities exchange,

(a)  To employ any device, scheme, or
artifice to defraud,

(b)  To make any untrue statement of a
material fact or to omit to state a material
fact necessary in order to make the
statements made, in the light of the
circumstances under which they were made, not
misleading, or

(c)  To engage in any act, practice, or
course of business which operates or would
operate as a fraud or deceit upon any person,
in connection with the purchase or sale of
any security.

17 C.F.R. § 240.10b-5.

To make out a claim under § 10(b) and Rule 10b-5, a
plaintiff must establish the following elements:  "(1) a material
misrepresentation (or omission); (2) scienter, i.e., a wrongful
state of mind; (3) a connection with the purchase or sale of a
security; (4) reliance ...; (5) economic loss; and (6) 'loss
causation,' i.e., a causal connection between the material
misrepresentation and the loss."  McCabe v. Ernst & Young, LLP,
494 F.3d 418, 424 (3d Cir. 2007) (quoting Dura Pharms., Inc. v.
Broudo, 544 U.S. 336, 341-42 (2005)).

When, as here, a defendant brings a motion to dismiss
the complaint under Rule 12(b)(6) of the Federal Rules of Civil
Procedure, we accept all well-pleaded facts as true and draw all
reasonable inferences in favor of the non-moving party.  Tellabs,
Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007);
Semerenko v. Cendant Corp., 223 F.3d 165, 180 (3d Cir. 2000).

The PSLRA, which has replaced Rule 9(b) of the Federal Rules of Civil Procedure as the pleading standard governing private securities class actions, imposes heightened pleading requirements for those seeking to establish claims under § 10(b) and Rule 10b-5.

First, the complaint must establish "falsity" by "specify[ing] each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." Inst'l Investors Group v. Avaya, Inc., 564 F.3d 242, 252-53 (3d Cir. 2009) (internal quotation marks omitted); see also 15 U.S.C. § 78u-4(b)(1). Misstatements are only actionable if they are "material," that is, when there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

Second, the complaint must "'state with particularity facts giving rise to a strong inference that the defendant acted with'" scienter. Avaya, 564 F.3d at 253 (quoting 15 U.S.C. § 78u-4(b)(2)). Scienter is defined as a "'mental state embracing intent to deceive, manipulate, or defraud'" which requires "a knowing or reckless state of mind." Id. at 252 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12

(1976); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999)).  To determine if plaintiffs have met their burden, we ask "'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'"  Id. at 267-68 (quoting Tellabs, 551 U.S. at 310). Merely "[c]obbling together a litany of inadequate allegations does not render those allegations particularized in accordance with ... the PSLRA."  Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 155 (3d Cir. 2004).

In our Memorandum of November 13, 2009, we found that some of the statements made by defendants Raymond, Keenan, and Urbania were false or misleading.  For example, during a third quarter 2007 conference call with analysts, defendant Keenan stated that Horizon's "unit revenue per container" had increased by 4.8% due to rate improvements "driven by [Horizon's] strong customer relationships ... and high service levels."  City of Roseville, 2009 WL 3837659, at *10.  Viewing the facts in the light most favorable to the plaintiffs, we found that, assuming Horizon's revenue and rates had actually increased in part due to illegal price-fixing and customer allocation between Horizon and its Puerto Rico competitors, Keenan's attributing the increases to only legitimate causes was misleading under § 10(b) and Rule 10b-5.  We found certain statements by Raymond and Urbania to be similarly false or misleading.  Id.

However, plaintiffs, in their first complaint, failed to plead with particularity facts giving rise to a strong inference that the defendants to whom false or misleading statements were attributed, that is, Raymond, Urbania, and Keenan, made such statements with scienter.  Although defendants Serra, Gill, and Glova, all of whom pleaded guilty, clearly had knowledge of the conspiracy, no false or misleading statements were attributed to those three defendants.  Accordingly, plaintiffs' first complaint failed to establish that any of the named defendants made a false or misleading statement at a time when they either knew, or were reckless in not knowing, about the conspiracy.  This failure was fatal to plaintiffs' claims, and we dismissed the complaint as a result.  Id.

IV.

In their amended complaint, plaintiffs attempt to overcome the deficiencies of their first complaint.  They have pleaded a large number of additional facts which they contend are sufficient to attribute false or misleading statements to Serra, Gill, and Glova.  Plaintiffs have also pleaded facts which they believe connect Raymond, Urbania, Keenan, and newly added defendants Handy and Taylor to the conspiracy and give rise to a strong inference that those defendants acted with scienter.  Plaintiffs contend that, by making out § 10(b) and Rule 10b-5 claims against the individual defendants, their § 10(b) and Rule 10b-5 claims against the corporate defendants should also survive this motion to dismiss.

-10-

A.

We begin with the newly pleaded facts regarding defendants' allegedly false or misleading statements.

As mentioned above, we found in our Memorandum of November 13, 2009 that plaintiffs had satisfied the "falsity" prong of the PSLRA with respect to defendants Raymond, Urbania, and Keenan.  Plaintiffs have now pleaded additional facts against those defendants regarding their allegedly false or misleading statements.[4]

According to the amended complaint, on a February 24, 2006 conference call, an analyst asked Raymond how the declining economy in Puerto Rico "could mesh ... with your expectations that the market in Puerto Rico will be quite strong?"  Raymond responded by stating, "Of course we have been in that Puerto Rico market since 1956.  So we have a pretty good understanding of how that economy works ....  So we're pretty close to our customer base down there.  We are comfortable with our share and we are comfortable with the assumption that our rates are going to continue to grow there on a reasonable basis."  (Am. Compl. ¶ 174).  When, on July 28, 2006, an analyst asked "[W]ith some of the volume softness, I know you mentioned mix and price help make up for it.  Can you be a little more specific?  How did mix work to offset some of that softness?"  Raymond explained that, "[O]n

---

4.  In their 144-page amended complaint, plaintiffs have amassed a voluminous record of statements by these individual defendants. For the sake of brevity, we will only discuss a representative sample of those statements.

the mix side, we basically replaced a lot of our automobile volume ...  So as we carried more refrigerated cargo and higher margin cargo, the rate per box is higher and the resulting margin is higher."  (Am. Compl. ¶ 182).

Urbania signed a number of Horizon's Forms 10-Q, including those for the fourth quarter 2005 (issued April 28, 2006) and the first quarter 2006 (issued June 25, 2006) both of which stated, "[Horizon's] revenue growth is primarily attributable to rate improvements resulting from favorable changes in cargo mix and general rate increases, increased bunker and intermodal fuel surcharges, and revenue increases from non-transportation and other revenue services."  (Am. Compl. ¶¶ 129, 132).  On a February 24, 2006 conference call, defendant Urbania was asked by an analyst to explain Horizon's projected revenue growth.  He responded by saying, "We are expecting overall volume growth of about 1%, 1.5% and then the balance of that being rate improvement."  (Am. Compl. ¶ 171).

Keenan stated, during Horizon's third quarter 2007 conference call on October 26, 2007, that "the unit revenue per container is up approximately 4.8% and continues to improve in all tradelanes.  It's really based on our cargo mix upgrade and our rate improvements, driven by our strong customer relationships and our high service levels."  (Am. Compl. ¶ 200).

The amended complaint also identifies similar statements by newly added defendants Taylor and Handy.  By way of

example, during Horizon's first quarter 2006 conference call,
held on April 28, 2006, defendant Taylor stated,

> Despite the volume challenges we experienced
> in the first quarter, we did achieve our
> revenue growth plans through significant
> improvements in all trades.  Year-over-year
> revenue per box is up 10%.  We see it as a
> process continuing throughout 2006.... In
> Puerto Rico we continue to negotiate rate
> increases into our customer contracts, as
> they come up for renewal.  We believe that
> the competitive environment right now
> continues to be stable enough to support
> reasonable and ongoing rate increases.  In
> addition to rate increases, our rates and
> margins have been positively impacted by the
> targeted change in our mix of cargo.

(Am. Compl. ¶ 176).  Similarly, during Horizon's second quarter
2006 conference call, held on July 28, 2006, defendant Handy said
that "in spite of some modest volume softness we continue to use
mix improvements to deliver revenue growth.  We're very
comfortable with our position in all the markets and we remain
optimistic and confident for the remainder of 2006."  (Am. Compl.
¶ 180).  In addition, during first and second quarter 2007
earnings presentations held on April 26, 2007 and July 27, 2007,
respectively, Handy discussed Horizon's ability to offset volume
softness through "rate increases" and "cargo mix improvement."
(Id. ¶¶ 140, 143).

Plaintiff alleges that the above statements are all
false or misleading in that they attribute Horizon's financial
success during the class period to purely legitimate business
practices and fail to mention that revenue growth and rate
increases were driven, in part, by the price-fixing conspiracy.

-13-

As we noted in our prior opinion, a company does not generally have a duty to disclose all material information to the public. City of Roseville, 2009 WL 3837659, at *9 (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997)); see also Chiarella v. United States, 445 U.S. 222, 235 (1980); United States v. Schiff, Nos. 08-1903, 08-1909, 2010 WL 1338141, at *6 (3d Cir. Apr. 7, 2010). However, a duty to disclose does arise where a defendant makes "an inaccurate, incomplete or misleading prior disclosure." Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000). In other words, one who chooses to speak is "bound to speak truthfully." Shapiro v. UJB Fin. Corp., 964 F.2d 272, 282 (3d Cir. 1992). A statement regarding successful financial performance, even when accurate, is still misleading under the securities laws if the speaker "attribut[es] the performance to the wrong source." In re ATI Techs., Inc. Sec. Litig., 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002); see also, In re Providian Fin. Corp. Sec. Litig., 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001).

The above-mentioned statements of defendants Raymond, Urbania, Keenan, Taylor, and Handy, which attribute Horizon's rate increases and revenue growth to purely legitimate business practices, are false or misleading under the securities laws. With respect to those defendants, plaintiffs have pleaded facts with sufficient particularity to satisfy the "falsity" prong of the PSLRA. See Avaya, 564 F.3d at 259-60.

-14-

In their amended complaint, plaintiffs, for the first time, have also identified allegedly false or misleading statements by defendants Serra, Gill, and Glova.  As the court previously determined that Serra, Gill, and Glova clearly were aware of the price-fixing conspiracy during the class period, plaintiffs place considerable emphasis on the newly pleaded statements of these defendants.

In a January 26, 2006 Horizon press release regarding Horizon's being awarded the Lowes Outstanding Ocean Service Provider Award, defendant Gill is quoted as saying, "The people of Horizon Lines are adept at finding ways to partner with our customers to reduce cycle time and meet tight delivery schedules."  (Am. Compl. ¶ 166).  In a September 25, 2006 Journal of Commerce[5] article, Gill is quoted discussing Horizon's commitment to allowing customers to tap into its shipping data:

> Our management team, led by Chuck Raymond, put a stake in the ground to embrace the philosophy that the movement and sharing of information was as important to the success of international shipping as was the movement of the container itself ....  We have let our customers in ....  We opened up information in our terminals, and ports and inland operations, and we provided Web-tracking tools so shippers could tap into that information in real-time, 24 hours a day, seven days a week.

---

5.  According to the amended complaint, the Journal of Commerce is a leading trade magazine for the shipping industry and is closely followed by those in the industry as well as by investors and analysts.

(Am. Compl. ¶ 185).  Plaintiffs contend that these statements were false or misleading because Gill did not disclose the fact that Horizon was charging its customers inflated rates due to the unlawful price-fixing conspiracy.

The only statement attributed to defendant Glova comes from a news article published on March 3, 2008.  The article read, "Shipping volumes both southbound to Puerto Rico and northbound to Puerto Rico are down significantly from the recent highs experienced in 2005, which included rebuilding and recovery supply volumes after the harsh 2004 hurricane season, said Greg Glova, Horizon Lines' director of Puerto Rico marketing and pricing."  (Am. Compl. ¶ 208).  The article goes on to state that Glova "hopes the economy will start to turn around in the latter part of 2008" and that "Horizon Lines continues to invest in its Puerto Rico business."  (Id.)  Plaintiffs assert that these statements are misleading but do not explain how.

We find that plaintiffs have failed to plead with particularity the "falsity" prong of the PSLRA with respect to the statements attributed to Gill and Glova.  As mentioned above, absent some duty, a company executive is not required to disclose all material information to the public.  Burlington Coat Factory, 114 F.3d at 1432.  Although a duty to disclose arises when an executive makes a prior inaccurate or misleading statement, plaintiffs have failed to establish that any of the statements by Gill or Glova meet this criterion.  Gill's statements about Horizon's investment in information technology and Glova's

-16-

statements regarding decreased volume and Horizon's investment in Puerto Rico are totally unrelated to the price-fixing conspiracy. Accordingly, the failure of those defendants to disclose the conspiracy does not render such statements misleading.

Gill's statement regarding Horizon's desire to "partner" with customers to "reduce cycle time and meet tight delivery schedules," is similar to that in Galati v. Commerce Bancorp, Inc., where defendants said that their "unique Commerce business model continues to produce strong top-line revenue growth." 220 Fed. App'x 97, 101 (3d Cir. 2007). Our Court of Appeals determined in Galati that such statements were mere "puffery" and did not create a duty on the part of the defendants to disclose an "illegal bid-rigging and kick-back scheme." Id. at 102. We reach the same conclusion here. No reasonable investor would have relied on Gill's statement. It is therefore immaterial and cannot form the basis for liability under § 10(b) and Rule 10b-5. See S.E.C. v. Kearns, No. 09-3599, 2010 WL 715467, at *13 (D.N.J. Feb. 23, 2010) (citing Advanta, 180 F.3d at 538-39).

The amended complaint also delineates at great length allegedly misleading statements made by defendant Serra during the class period. Many of these statements are not actionable under § 10(b) or Rule 10b-5 because, like those of Gill and

Glova, they are either completely unrelated to the price-fixing scheme[6] or are mere puffery.[7]

In addition, plaintiffs attempt to attribute to Serra statements which are not direct quotes but rather are contained in the text of articles.  For example, a September 25, 2006 article in the Special Advertizing Section to the Journal of Commerce states, "Horizon lines has remained successful in the trade by effectively managing cargo mix and operating costs. Unlike competitors, Horizon has avoided operational losses in Puerto Rico by investing in regular equipment and vessel maintenance and consistently delivering higher levels of service for its customers."  (Am. Compl. ¶ 184).  Plaintiffs argue that although this statement is not attributed to Serra in the article, we should nonetheless assume that Serra provided the

---

6.  "We are confident of the long-term stability in the main drivers of the Puerto Rican economy.  The government's commitment to the land reallocation of the port facilities has allowed us to start a multiyear project to reinvest in the terminal in Puerto Nuevo.  This will ultimately increase our efficiency and improve the service we provide to our customers."  (Am. Compl. ¶ 184). "Our technology continues to be the best in the market, and our customers consistently confirm that's an important differentiator."  (Id. ¶ 184).  "The renewal of almost half of our 40-foot refrigerated fleet has allows [sic] us to reduce maintenance and claims incidents and therefore improved the utilization of our fleet."  (Id. ¶ 184).  "We are bringing in a 1,700-TEU ship, which will replace a 1,200-TEU vessel by mid-year."  (Id. ¶ 190).

7.  "During 50 years, we have been recognized for delivering excellent customer service, personalized attention, and trips that are shorter and always on time.  We are here to make it easy for our customers to do business and we do it with passion." (Id. ¶ 191).  "Horizon Lines is committed to exceptional value and customer satisfaction ...."  (Id. ¶ 209).

underlying information on which the statement relies.  To support this proposition, plaintiffs point to the fact that Serra is quoted directly elsewhere in the article and that his picture is embedded within the text.

Despite plaintiffs' argument, we see nothing in this statement to indicate that it is attributable to Serra.  When Serra is quoted, his statements are identified with quotation marks and specifically reference him by name.  In contrast, the above statement is not attributed to Serra by quotation marks, by reference to him by name, or otherwise.  Moreover, the "article" in which the statement appears is an advertisement by Horizon, not a piece of journalism.  Accordingly, plaintiffs cannot argue that the statement was derived from an interview between Serra and the article's author.[8]  On the contrary, the statement is nearly identical to others repeatedly put forth by Horizon, such as those in its Initial Public Offering ("IPO") Prospectus, SEC filings, and press releases.[9]  To attribute to Serra a statement

_____

8.  This fact distinguishes the circumstances here from those in the cases cited by plaintiffs in support of their argument that we should infer that the statement is an indirect quote by Serra. See, e.g., Simon v. Am. Power Conversion Corp., 945 F. Supp. 416, 433 (D.R.I. 1996); see also In re Columbia Sec. Litig., 747 F. Supp. 237, 245 (S.D.N.Y. 1990).

9.  For example, Horizon's September 26, 2005 IPO prospectus stated, "We have achieved five consecutive years of revenue growth ....  This revenue growth is primarily attributable to an increase in revenue containers shipped, increased bunker fuel surcharges, other rate improvements resulting from increases in other surcharges, favorable changes in cargo mix and general rate increases and revenue increases from non-transportation and other
(continued...)

-19-

issued by Horizon, without some facts identifying Serra as its author or as having personally signed-off on it, amounts to non-specific group pleading of the kind that has been rejected by our Court of Appeals as inconsistent with the particularity requirements of the PSLRA.  See Winer Family Trust v. Queen, 503 F.3d 319, 337 (3d Cir. 2007).

One of Serra's statements, however, warrants greater scrutiny.  In a January 31, 2005 article in the Journal of Commerce about the Puerto Rico shipping market's recovery from "years of rate-cutting," Serra is quoted as saying that "Horizon's rates are up an average of 5 to 6 percent."  He goes on to explain that those rate increases were driven by Horizon's need to recover increased "inland costs."  (Am. Compl. ¶ 157).

Although this statement is very similar to those by Raymond, Urbania, Keenan, Handy, and Taylor, which we have found to be false or misleading, defendants contend that Serra's statement cannot form the basis for liability.  Defendants argue that:  (1) plaintiffs have failed to plead sufficient facts to

---

9. (...continued)
revenue services."  (Am. Compl. ¶¶ 118-19).  The prospectus also touted Horizon's "long-standing history of service to [its] customer base."  (Id. ¶ 161).  Horizon's 2006 10-K contains similar boilerplate-style statements, such as, "This revenue container volume decrease is offset by higher margin cargo mix in addition to general rate increases."  (Id. ¶ 139).  Finally, Horizon's press releases often included similar statements, such as the one issued on February 1, 2008, which quoted Raymond as saying, "Over the past year, we have managed to offset soft market conditions in Puerto Rico and rising fuel costs by aggressively managing costs and introducing valuable complementary services to our customers."  (Id. ¶ 153).

establish that they reasonably relied on the statement; (2) the statement, which was made eight months prior to Horizon's IPO, was so outdated at the time plaintiffs purchased Horizon's stock as to be immaterial as a matter of law; and (3) because it was made in a trade journal aimed at consumers, not investors, it was not made "in connection with the purchase or sale of [a] security." See 15 U.S.C. § 78j(b).

"It is axiomatic that a private action for securities fraud must be dismissed when a plaintiff fails to plead that he or she reasonably and justifiably relied on an alleged misrepresentation." Semerenko, 223 F.3d at 178. Traditionally, plaintiffs were required to establish direct reliance, that is, "that they were aware of and directly misled by defendant's actions." Peil v. Speiser, 806 F.2d 1154, 1160 (3d Cir. 1986). However, courts recognized that this placed an unreasonable evidentiary burden on plaintiffs bringing § 10(b) claims, and we therefore allow a presumption of reliance under certain circumstances. Id.

In Affiliated Ute Citizens of Utah v. United States, the Supreme Court held that the trier of fact may presume reliance with regard to a § 10(b) claim where the defendant fails to disclose material information. 406 U.S. 128, 153-54 (1972). This presumption applies only "in cases seeking to predicate rule 10b-5 liability upon omissions—as opposed to affirmative misrepresentations." Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 202 (3d Cir. 1990). The distinction between an

omission and a misrepresentation is far from clear in practice, because "every misstatement both advances false information and omits truthful information."  Joseph v. Wiles, 223 F.3d 1155, 1162 (10th Cir. 2000).

It is often the case, as it is here, that a claim will present a mix of both omissions and affirmative misrepresentations.  In their amended complaint, plaintiffs contend that the defendants both failed to disclose the price-fixing conspiracy and falsely attributed Horizon's rate and revenue increases to purely legitimate business practices.  In such circumstances, our Court of Appeals has instructed that we are to "analyze the plaintiff's allegations, in light of the likely proof at trial" to determine whether those allegations are better characterized as relating to omissions, in which case we will presume reliance, or to misrepresentations, in which case we will not.  Sharp v. Coopers & Lybrand, 649 F.2d 175, 188 (3d Cir. 1981).  When making this determination, we are guided by the underlying reason for the Affiliated Ute presumption—to "aid plaintiffs when reliance on a negative would be practically impossible to prove."  Wiles, 223 F.3d at 1162.

The Tenth Circuit case Joseph v. Wiles is illustrative here.  The plaintiff in Wiles alleged that "[defendant] continually reported in its public statements that it had achieved, and would continue to achieve, substantial growth in revenue and profits.  These statements ... were materially false and misleading in that they failed to disclose the existence of

the fraudulent scheme ...." <u>Wiles</u>, 223 F.3d at 1163.  The Court of Appeals for the Tenth Circuit held that "[s]tatements such as these, while struggling valiantly to bring the alleged conduct within the definition of 'omission,' indicate that what [plaintiff] really protests are the affirmative misrepresentations allegedly made by defendants." <u>Id.</u>

The allegations in plaintiffs' amended complaint here are strikingly similar to those in <u>Wiles</u>.  For example, plaintiffs write:  "these statements reference Horizon's supposedly competitive marketplace and customer relations ... while failing to disclose the existence of the antitrust price fixing conspiracy" (Am. Compl. ¶ 186); and "the Company's February 6, 2008 10-K ... disclosed the reasons for revenue improvements while failing to disclose that revenue growth and/or stability was significantly accomplished by means of an illegal cartel arrangement with competitors."  (Am. Compl. ¶ 154). Considering all of their allegations, we determine that plaintiffs are principally complaining of defendants' alleged misrepresentations rather than their omissions.  We agree with the court in <u>Wiles</u> which recognized that "[a]ny fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself," and that "[w]e cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act.  To do otherwise would permit the <u>Affiliated Ute</u> presumption to swallow the reliance requirement

-23-

almost completely." <u>Wiles</u>, 223 F.3d at 1163.  As such, an <u>Affiliated Ute</u> presumption does not apply here.

Where the <u>Affiliated Ute</u> presumption does not apply, a plaintiff may be able to establish reliance under the "fraud-on-the-market" theory.  As the Supreme Court explained in <u>Basic, Inc. v. Levinson</u>, "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed."  485 U.S. at 247.  A court applying the fraud-on-the-market theory presumes "(1) that the market price of the security actually incorporated the alleged misrepresentations, (2) that the plaintiff actually relied on the market price of the security as an indicator of its value, and (3) that the plaintiff acted reasonably in relying on the market price of the security." <u>Semerenko</u>, 223 F.3d at 178-79.  Defendants may rebut these presumptions by, for example, showing that (1) the market did not actually respond to the allegedly false or misleading statements, (2) the plaintiff did not rely on the market price in making its decision to purchase the securities, or (3) plaintiff's reliance on the market price was unreasonable.  <u>Id.</u> at 179; <u>Zlotnick v. TIE Commc'ns</u>, 836 F.2d 818, 822 (3d Cir. 1988).

The fraud-on-the-market theory is premised on the existence of an efficient market.  <u>See</u> <u>Stinson v. Van Valley Dev. Corp.</u>, 714 F. Supp. 132, 135-36 (E.D. Pa. 1989) (citing <u>Cammer v. Bloom</u>, 711 F. Supp. 1264, 1275-77 & 1285-87 (D.N.J. 1989)).

-24-

Consequently, in the context of a Rule 12(b)(6) motion to dismiss, the court must inquire "whether plaintiff has alleged that the stock traded in an efficient market, or whether any of the facts alleged give rise to such an inference." <u>Hayes v. Gross</u>, 982 F.2d 104, 107 n.1 (3d Cir. 1992); <u>see</u> <u>also</u> <u>Burlington Coat Factory</u>, 114 F.3d at 1419 n.8.

Defendants argue that no open and efficient market for the securities at issue existed until Horizon held its IPO, which occurred eight months after Serra's allegedly misleading statement. Therefore, defendants contend that Serra's statement of February 29, 2005 was not part of the "publicly available information ... reflected in [the] market price" of Horizon's stock at the time plaintiffs purchased it, which could not have been earlier than September 26, 2005. <u>Basic</u>, 485 U.S. at 247. We agree.

Plaintiffs have not cited a single case to support their proposition that the court should apply a fraud-on-the-market presumption when the statement alleged to have affected the price of the security was made eight months before any market for that security came into existence.[10] Our Court of Appeals has repeatedly cautioned that we are to apply a presumption of

---

10. At best, the cases cited by plaintiffs can be read as allowing a § 10(b) claim to proceed based on misstatements made prior to the class period. <u>See</u>, <u>e.g.</u>, <u>Zelman v. JDS Uniphase Corp.</u>, 376 F. Supp. 2d 956, 965-66 (N.D. Cal. 2005); <u>Urbach v. Sayles</u>, No. 91-1291, 1991 WL 236183, at *9 (D.N.J. Sept. 4, 1991). This is quite different than plaintiffs' attempt to rely on statements made at a time when there was no market for Horizon's stock.

reliance "only where it is 'logical to do so.'" Zlotnick, 836
F.2d at 822 (quoting Peil, 806 F.2d at 1161 n.11)); Sharp, 649
F.2d at 188.  It is simply illogical to believe that the market
for Horizon's common stock, at the time plaintiffs purchased it,
was infected by an allegedly misleading statement made by Serra
in a trade journal eight months prior to Horizon's IPO.

Nonetheless, plaintiffs contend that we should apply
the presumption because Serra's infectious statement was
transmitted to the market for Horizon's IPO shares via Horizon's
IPO Prospectus, which touted Horizon's performance during the
same time period as was the focus of Serra's statement.[11]
Plaintiffs argue that this overlap suggests that "the type of
information Serra disseminated prior to the IPO was still
relevant to investors at the time of the IPO." (Pls.' Br. in
Opp'n to Defs.' Mot. to Dismiss 28).  Even if this were true, it
cannot support a fraud-on-the-market presumption because the
market for IPO shares is, by definition, neither developed nor
efficient.  In re Initial Public Offering Sec. Litig., 471 F.3d
24, 42 (2d Cir. 2006); see also Peil, 806 F.2d at 1161 n.10;
Freeman v. Laventhol & Horwath, 915 F.2d 193, 199 (6th Cir.
1990).

In sum, plaintiffs have failed to plead facts to
support their claim that they reasonably relied, either directly

---

11.  The prospectus contained numerous statements regarding
Horizon's financial performance during "the twelve months ended
December 26, 2004."  (Am. Compl. ¶ 158).

or impliedly, on Serra's allegedly false or misleading statement of January 31, 2005. We note that we also have serious doubts that Serra's statement, made long before plaintiffs purchased any of Horizon's stock, would be considered material by a reasonable investor. However, because plaintiffs have failed to establish reliance, we need not decide the issue.

Finally, plaintiffs allege that Horizon's disclosure of its financial results on April 25, 2008, more than a week after it announced that it was under investigation by the Department of Justice, was misleading in that the company attributed its downgraded earnings forecast to a "somewhat softer" Puerto Rican market when, according to plaintiffs, the true reason for the downgrade was the fact that Horizon could no longer engage in illegal price-fixing.

Claims pursuant to § 10(b) and Rule 10b-5 may only be brought by actual purchasers or sellers of a security. Winer, 503 F.3d 325 (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 754 (1975)). To have standing, a plaintiff must base its claims on allegedly false or misleading statements made prior to plaintiff's security purchases or sales. Id. When, as here, a lead plaintiff seeks to represent a class, we must inquire "whether the lead plaintiff individually has standing, not whether or not other class members have standing." Id. at 326. Lead plaintiff Police and Fire Retirement System of the City of Detroit does not claim to have purchased or sold Horizon Lines, Inc. stock after the allegedly misleading statements of April 25,

-27-

2008.  Thus, it has no standing to assert § 10(b) and Rule 10b-5 claims based on those statements.[12]

As in their first complaint, plaintiffs have not established that defendants Serra, Gill, or Glova made materially false or misleading statements during the class period on which plaintiffs reasonably relied.[13]

B.

Having found that plaintiffs have pleaded sufficient facts to support their claims that defendants Raymond, Urbania, Keenan, Handy, and Taylor made materially false or misleading statements on which plaintiffs reasonably relied, we must now determine whether plaintiffs, in their amended complaint, have also pleaded particularized facts establishing the "scienter" element of the PSLRA.  See Avaya, 564 F.3d at 267.

As mentioned above, plaintiffs must plead with particularity facts giving rise to a "strong inference" of scienter.  Id.; 15 U.S.C. § 78u-4(b)(2).  That is, the facts in the amended complaint must allow us to conclude that defendants

---

12.  We note that plaintiffs are also unable to establish that they reasonably relied on the April 25 statement because:  (1) they have not pleaded direct reliance; and (2) the fraud on the market presumption does not apply here as plaintiffs did not purchase Horizon stock on or after April 25, 2008 and therefore cannot establish that they "traded the shares between the time the misrepresentations were made and the time the truth was revealed."  Basic, 485 U.S. at 248 n.27.

13.  Although we do not discuss, in this Memorandum, each of the statements of Serra, Gill, and Glova that appear in the amended complaint, we have considered them all and conclude that none is actionable under § 10(b) and Rule 10b-5.

"made a material misstatement <u>with an intent to deceive</u>—not merely innocently or negligently." <u>Merck & Co., Inc. v. Reynolds</u>, No. 08-905, 2010 WL 1655827, at *12 (U.S. Apr. 27, 2010).  A "strong inference" is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 314.

We begin with those alleged facts regarding the individual defendants' motive and opportunity to engage in or conceal the price-fixing conspiracy.  Prior to the Supreme Court's decision in <u>Tellabs</u>, our Court of Appeals held in <u>In re Advanta Corporation Securities Litigation</u> that a plaintiff could successfully establish scienter "by alleging facts establishing a motive and opportunity to commit fraud."  180 F.3d 525, 534 (3d Cir. 1999) (internal quotation marks omitted).  However, after the Supreme Court in <u>Tellabs</u> instructed that all scienter allegations should be considered collectively, our Court of Appeals in <u>Avaya</u> declared that "motive and opportunity may no longer serve as an independent route to scienter."  564 F.3d at 277 (internal quotation marks omitted).  Rather, such allegations "are to be considered along with all the other allegations in the complaint." <u>Id.</u>

Not all allegations of motive or opportunity are relevant to our scienter analysis, however.  Though the Supreme Court has recognized that "personal financial gain may weigh heavily in favor of a scienter inference," we are mindful of the

-29-

fact that "[c]orporate officers always have an incentive to improve the lot of their companies" and "this is not, absent unusual circumstances, a motive to commit fraud." Tellabs, 551 U.S. at 325; Avaya, 564 F.3d at 278-79.  Thus, the "the bottom-line question is not whether defendants were likely to have a motive to commit fraud, but whether they were at least as likely as not to have acted on that motive and actually committed fraud."  Avaya, 564 F.3d at 277-78.

In their first complaint, plaintiffs attempted to establish scienter by alleging that a number of individual defendants profited from the sale of personally held Horizon stock throughout the class period.  We found such allegations to be insufficient to establish scienter, as those sales were small in comparison to the total stock holdings of each defendant and because the sales were made on a regular basis pursuant to Rule 10b5-1 plans.  City of Roseville, 2009 WL 3837659, at *16.

In their amended complaint, plaintiffs include two stock sales not pleaded in their first complaint, one by Raymond in November, 2006 for $2.6 million and one by Keenan in March, 2007 for $3.4 million.  Although these sales were larger than others made during the class period, they both occurred more than a year before the price-fixing conspiracy was uncovered and before the price of the stock declined significantly. Accordingly, they were not "unusual in ... timing," and we see no reasonable connection between these sales and the price-fixing

conspiracy.  Id. (quoting Avaya, 564 F.3d at 279) (internal
quotation marks omitted).

        The amended complaint also includes information
regarding compensation received by the individual defendants in
connection with Horizon's IPO, stock options, merit awards, and
Horizon's "Equity Incentive Plan."

        With respect to the IPO, plaintiffs allege that the
value of the Horizon Lines, Inc. common stock held by Raymond,
Urbania, Keenan, Taylor, Serra, and Gill increased exponentially
when the stock vested on October 18, 2005 following the
successful completion of Horizon's IPO.[14]  Plaintiffs argue that
the potential for defendants to realize such extravagant profits
provided "unique and powerful motives to conceal Horizon's true
financial condition from the public."  (Am. Compl. ¶ 260).  While
this may be true, it is no more true with respect to Raymond,
Urbania, Keenan, Taylor, Serra, and Gill as it is for executives
at any company who hold company stock prior to an IPO.
Plaintiffs are simply implying that defendants had an interest in
maximizing their own compensation, which is "'common to every
company and thus add[s] little to an inference of fraud.'"
Avaya, 564 F.3d at 279 (quoting Cozzarelli v. Inspire Pharms.
Inc., 549 F.3d 618, 627 (4th Cir. 2008)).

_____

14.  On October 18, 2005, the value of Raymond's 689,861 shares
rose from $243,032 to $7,602,268; the value of Urbania and
Keenan's 258,695 shares rose from $91,136 to $2,850,818; the
value of Taylor and Serra's 86,224 shares rose from $30,178 to
$950,188; and the value of Gill's 26,865 shares rose from $9,052
to $285,032.

The same can be said about plaintiffs' other compensation-based allegations.  Plaintiffs state that:  (1) Raymond, Urbania, Keenan, Taylor, and Serra realized millions of dollars in additional value from the exercise of stock options on the date of the IPO; (2) Raymond, Urbania, and Keenan received hundreds of thousands more in "merit awards" following the IPO; (3) Raymond, Urbania, Keenan, Taylor, Serra, and Handy acquired tens of thousands of shares of Horizon Lines, Inc. common stock through an Equity Incentive Plan adopted on September 20, 2005, just a few days prior to the IPO; and (4) in 2006, Raymond, Urbania, Keenan, Taylor, and Handy received hundreds of thousands of dollars pursuant to Horizon's "Cash Incentive Plan," which was based in part on Horizon's financial performance.

The mere fact that defendants had access to stock options and were compensated according to the performance of their company, both of which are ubiquitous in corporate America, can hardly form the basis for a strong inference of scienter.  See, e.g., Alpharma, 372 F.3d at 152; Stevens v. InPhonic, Inc., 662 F. Supp. 2d 105, 123 (D.D.C. 2009).  Such facts, at best, imply that defendants had a motive to commit fraud.  But as our Court of Appeals recognized in Avaya, "[i]ndividuals not infrequently have both strong motive and ample opportunity to commit bad acts—and yet they often forbear, whether from fear of sanction, the dictates of conscience, or some other influence." Avaya, 564 F.3d at 277.  Plaintiffs have simply not established that it was at least as likely as not that defendants "acted on

that motive and actually committed fraud." Id. at 278 (emphasis added).

We next consider plaintiffs' allegations that defendants Raymond, Urbania, Keenan, Handy and Taylor had actual knowledge of the conspiracy at the time they made false or misleading statements.  The amended complaint contains a number of quotes made during the sentencing of Serra, Gill, and Glova which, according to plaintiffs, implicate the other individual defendants as conspirators in the price-fixing scheme.  For example, Serra stated that he had "direct communications with a number of other senior executives" at Horizon.  (Am. Compl. ¶ 95).  The amended complaint also quotes the federal prosecutor, who said, "there are others higher than Mr. Serra who are certainly of interest to the government" and "[Serra] is essentially—I don't want to use middle management in terms of the conspiracy, but he's in the middle ...."  (Id.)  Plaintiffs assert that these statements imply that defendants Raymond, Urbania, Keenan, Handy or Taylor were either involved in or aware of the price-fixing conspiracy during the class period.

As in our prior Memorandum, we find such allegations to be vague and speculative at best.  City of Roseville, 2009 WL 3837659, at *15.  Plaintiffs contend that, by including Handy and Taylor in the amended complaint, they have now named all of Serra and Glova's "superiors" and the above statements must therefore refer to at least one of the named defendants.  However, the PSLRA requires plaintiffs to plead particularized facts with

-33-

regard to scienter, including "the role of each defendant." Winer, 503 F.3d at 335; In re NutriSystem, Inc. Sec. Litig., 653 F. Supp. 2d 563, 575 (E.D. Pa. 2009).  Plaintiffs are essentially attempting to establish scienter through a form of "group pleading," and such non-specific allegations have been rejected by our Court of Appeals as falling short of the PSLRA's particularity requirement.  Winer, 503 F.3d at 337.

        Plaintiffs also assert that at least some of the yet-to-be-charged defendants had access to internal documents which would have alerted them to the conspiracy.  Plaintiffs base this allegation on the following:  (1) Gill allegedly provided the government with "evidence, in the form of statements and documents, against his superiors within [Horizon], including presently uncharged co-conspirators" (Am. Compl. ¶ 99); (2) the price-fixing conspiracy was allegedly "well documented" in spreadsheets that contained detailed market and customer information and were circulated among co-conspirators (Id. ¶ 100); and (3) a confidential witness ("CW6"), identified only as a former manager for one of Horizon's competitors, Sea Star, reported that documents were created during the class period by employees of Sea Star which contained competitor pricing information, and that these documents were forwarded to Sea Star's top executives for the purpose of facilitating the conspiracy.  From these statements by CW6, plaintiffs conclude, on information and belief, that "Horizon compiled and relied upon

-34-

similar pricing reports for purposes of monitoring and continuing the illegal price-fixing conspiracy."  (Id. ¶ 102).

"Reliance upon alleged documents which are undated, unquoted, undescribed, and unattached amounts to nonspecific allegations, at best."  Clark v. Comcast Corp., 582 F. Supp. 2d 692, 705 (E.D. Pa. 2008) (internal quotation marks omitted).  Our Court of Appeals held in California Public Employees' Retirement System v. Chubb Corporation that "a plaintiff relying on internal reports must specify the internal reports, who prepared them and when, ... or which company officers reviewed them."  394 F.3d at 147 (internal quotation marks omitted).  Here, plaintiffs' nonspecific references to "documents" and "spreadsheets" allegedly prepared by Horizon personnel fall far short of the PSLRA's particularity requirement as explained in Clark and Chubb.

The statements of CW6 do not resolve this deficit of specificity.  Not only do plaintiffs fail to show that CW6 is a credible witness,[15] the statements attributed to CW6 pertain to documents allegedly circulated internally at Sea Star, not Horizon.  Even if we were to believe CW6's statements to be true,

_____

15.  Under the PSLRA, when a plaintiff relies on statements by anonymous witnesses the court must consider "the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'"  Avaya, 564 F.3d at 263 (quoting Chubb, 394 F.3d at 147)).  When allegations based on anonymous sources are "found to be wanting with respect to these criteria," as we find them to be here, "we must discount them steeply."  Id.

we will not make the inferential leap required to arrive at plaintiffs' conclusion that, not only were Horizon employees creating documents similar to those purportedly circulated within Sea Star, such documents were also made available to defendants Raymond, Urbania, Keenan, Handy, and Taylor.

Next, plaintiffs contend that Urbania's resignation on April 1, 2008 was "extremely suspicious" and from it we can imply that he, and other Horizon executives, were aware of the conspiracy by at least that time. According to the amended complaint, Urbania, who worked for Horizon for five years, including as its Chief Financial Officer from July of 2004 until the date of his resignation, received no severance pay or other compensation at the time of his resignation, which was contrary to Horizon's customary practice.[16] Furthermore, he forfeited more than $4 million in unvested stock and options. Finally, plaintiffs suggest that the timing of his resignation, which occurred less than two weeks before the Department of Justice investigation was revealed, was also suspect.

We agree with plaintiffs that, under certain circumstances, a defendant's abrupt resignation may add to a strong inference of scienter, such as where the resignation comes at the heels of a company's restating its financials after discovering accounting irregularities. See, e.g., In re Par

---

16. Plaintiffs allege that Handy, who resigned in 2009 after working for Horizon for only four years, received a lump sum payment of $388,000, stock valued at $370,00, and a dividend payment of $19,000.

Pharm. Sec. Litig., No. 06-cv-3226, 2009 WL 3234273, at *2
(D.N.J. Sept. 30, 2009). However, there must be some reason to
believe that the resignation was actually connected with the
alleged fraud. Plaintiffs here simply have not connected
Urbania's resignation to the price-fixing conspiracy. See In re
Great Atl. & Pac. Tea Co., Inc. Sec. Litig., 103 Fed. App'x 465,
470 (3d Cir. 2004). The temporal proximity between Urbania's
resignation and the later disclosure of the Department of Justice
investigation is irrelevant because, by plaintiffs' own
admission, the investigation was covert as of the date Urbania
resigned. And, although Horizon's alleged failure to compensate
Urbania at the time of his resignation may have been
uncharacteristic, there are no facts to support plaintiffs
conclusion that this lack of compensation was due to Urbania's
participation in price-fixing, customer allocation, or any other
aspect of the alleged conspiracy. We will not allow a securities
fraud claim to proceed on such tenuous assumptions.

Finally, plaintiffs argue that, even if Raymond,
Urbania, Keenan, Handy, and Taylor were not actually involved in
the conspiracy, they were at least reckless in failing to
discover it. As stated above, scienter can take the form of
either intentional or reckless conduct. Avaya, 564 F.3d at 267 &
n.42. To establish recklessness, plaintiffs must plead facts
demonstrating "an extreme departure from the standards of
ordinary care,... which presents a danger of misleading buyers or
sellers that is either known to the defendant or so obvious that

-37-

the actor must have been aware of it." In re Suprema
Specialties, Inc. Sec. Litig., 438 F.3d 256, 276 (3d Cir. 2006)
(internal quotation marks omitted).  Mere allegations that a
defendant "should have known" of fraud because of his supervisory
role within a company or because his subordinates were aware of
it, are insufficient.  Id. at 282; Alpharma, 372 F.3d at 150;
Advanta, 180 F.3d at 539; In re Bio-Tech. General Corp. Sec.
Litig., 380 F. Supp. 2d 574, 596 (D.N.J. 2005).

          According to plaintiffs, all of the individual
defendants had significant experience working in the shipping
industry and were particularly familiar with the Puerto Rico
cabotage market.  Plaintiffs argue that, at a time of economic
downturn and low shipping volume, the rate increases that Horizon
was obtaining in the Puerto Rico market, which constitutes a
significant portion of Horizon's business, should have alerted
the individual defendants to the price-fixing conspiracy.

          The amended complaint begins with the genesis of the
price-fixing conspiracy.  Plaintiffs allege that the Puerto Rico
shipping market experienced a steady and significant decline in
its shipping rates since the 1990s.  In 2001, the largest of
Horizon's competitors in the Puerto Rico cabotage, Navieras de
Puerto Rico ("Navieras"), declared bankruptcy and shut down its
business.  Prior to its bankruptcy, Navieras had been drastically
reducing its shipping rates to undercut Horizon and other
competitors.  According to plaintiffs, Navieras's bankruptcy
provided Horizon an opportunity to increase rates, which it did

by fixing prices and allocating customers between it and its competitors.

Plaintiffs maintain that, from 2004 until the conspiracy was uncovered in 2008, despite a continuous decline in the revenue generated from container volume, Horizon's total operating revenue steadily increased as a result of increased revenue from general rate increases.  Horizon's revenue from general rate increases was $16,700,000 in 2004; $42,345,000 in 2005; $44,443,000 in 2006; and $51,578,000 in 2007.  Plaintiffs argue that the link between the conspiracy and increased rates is evidenced by the fact that revenue from general rate increases dropped to only $29,918,000 in 2008, the year in which the conspiracy was revealed.

Plaintiffs insist that shipping rates were a crucial component of Horizon's financial performance during the class period and the individual defendants should have been monitoring them closely, especially in light of the multiple questions from analysts specifically pertaining to Horizon's ability to generate revenue during that period[17] as well as defendants' many

---

17.  For example, on a February 24, 2006 conference call, an analyst asked Raymond, "despite the fact that you'll have to reduce capacity ... I don't know if you'll make up 100% of that, how could it not have an effect on the financials?"  (Am. Compl. ¶ 173).  On July 28, 2006 Raymond was asked, "with some of the volume softness, I know you mentioned mix and price help make up for it.  Can you be a little bit more specific?  How did mix work to offset some of that softness?"  (Id. ¶ 182).  And on April 26, 2007 Raymond was asked "And any further insights into the rate picture?  You mentioned one thing about Puerto Rico with that one increase; any other kind of color or insights on the rate picture
                                                          (continued...)

unprompted statements about rate and revenue increases, as
detailed above.  In addition, plaintiffs assert that Horizon's
Earnings Before Interest, Taxes, Depreciation and Amortization
("EBITDA"), which was significantly impacted by the increased
rates, was followed closely by defendants as EBITDA was used to
"make day-to-day operating decisions," to determine the "payment
of discretionary bonuses," and as a benchmark for comparison to
competitors.  (Am. Compl. ¶ 90).

     Finally, plaintiffs set forth the positions that each
individual defendant held within the Horizon management hierarchy
and quote Horizon's IPO Prospectus, which stated that
"[Horizon's] management has a long history of working together as
a team."  (Am. Compl. ¶ 8).  They argue that the close working
relationships between the management "team" allows the court to
infer that all of Horizon's executives were privy to the price-
fixing scheme.  Plaintiffs specifically highlight the fact that
Serra, who pleaded guilty to the conspiracy, reported directly to
Handy, and that Gill, who also pleaded guilty, reported directly
to Taylor.

     First, it is far from clear that Horizon's rate
increases were suspicious under the circumstances that existed
during the class period.  Some degree of increase would likely
have been expected once Navieras went bankrupt and was no longer
able to undercut Horizon's prices.  However, accepting for the

---

17.(...continued)
in either of your markets?"  (Id. ¶ 196).

moment that Raymond, Urbania, Keenan, Handy, or Taylor did see
such increases as peculiar, plaintiffs have pleaded no facts to
establish that any of those defendants had access to information
which, had they looked into it, would have confirmed the
existence of the conspiracy.  As explained in our prior
Memorandum, it is the covert nature of a price-fixing conspiracy
which distinguishes this case from those where an executive-
defendant's examination of routine financial data or other
internal company information would have informed him of the
falsity of his statements.  City of Roseville, 2009 WL 3837659,
at *16 (citing Avaya, 564 F.3d at 268-72).

        The importance of the Puerto Rico market to Horizon's
business, questions from analysts, and prominence of EBITDA as an
evaluation metric do not change our conclusion.  While "knowledge
of the 'core activities of a business may be imputed to its
highest officials in some circumstances,'" such imputation is
done "'cautiously'" and only where plaintiffs have pleaded
"'particularized allegations showing that defendants had ample
reason to know of the falsity of their statements.'"  In re
Radian Sec. Litig., 612 F. Supp. 2d 594, 616 (E.D. Pa. 2009)
(quoting In re RAIT Fin. Trust Sec. Litig., No. 2:07-cv-03148,
2008 WL 5378164, at *12 (E.D. Pa. Dec. 22, 2008); In re Stonepath
Group, Inc. Sec. Litig., No. 04-4515, 2006 WL 890767, at *12
(E.D. Pa. Apr. 3, 2006)).  Because plaintiffs have failed to
establish that defendants had "ample reason" to know of the

conspiracy, we will not impute scienter, regardless of the importance of the Puerto Rico shipping rates.

Nor will we infer scienter with respect to the defendants who did not plead guilty to conspiracy based only on their working relationships with the defendants who did.  Without some facts indicating that Serra or Gill's knowledge of the conspiracy was communicated to Raymond, Urbania, Keenan, Handy or Taylor, or that those defendants otherwise should have known of it, the amended complaint does not give rise to a strong inference of scienter.  See Alpharma, 372 F.3d at 150; Payne v. Deluca, No. 2:02-cv-1927, 2006 WL 3590014, at *25 (W.D. Pa. Dec. 11, 2006); Bio-Tech., 380 F. Supp. 2d at 596.  Plaintiffs contend that such communications did occur, and provide as evidence the following quote by defendant Handy:  "As I've discussed recently with our VP in Puerto Rico, he is already seeing a significant increase in consumer spending and continued investment by our pharmaceutical companies and biotech."  (Am. Compl. ¶ 187).  Assuming that the "VP in Puerto Rico" was Serra, the information which Handy obtained from Serra, according to this quote, has nothing to do with price-fixing or even with Horizon's rates.  We cannot infer from this quote that Serra or Gill informed the other individual defendants about the conspiracy.

Of course, our scienter analysis must be comprehensive. Rather than scrutinizing each allegation in isolation, we ask "'whether all the facts alleged, taken collectively, give rise to

a strong inference of scienter.'" <u>Avaya</u>, 564 F.3d at 267-68
(quoting <u>Tellabs</u>, 551 U.S. at 323).   Considering all of
plaintiffs' allegations against defendants Raymond, Urbania,
Keenan, Handy, and Taylor, the inference of scienter is not
"cogent and at least as compelling as any opposing inference one
could draw from the facts alleged." <u>Tellabs</u>, 551 U.S. at 324.

        Taken together, the facts alleged in the amended
complaint show that Horizon's executives were determined to make
their company successful and were given financial incentives to
do so.   Plaintiffs have clearly established that three of those
executives, Serra, Gill, and Glova, decided to participate in an
unlawful price-fixing conspiracy to enrich themselves at the
expense of Horizon's customers and, ultimately, its shareholders.
However, plaintiffs have offered no facts indicating that the
other individual defendants, Raymond, Urbania, Keenan, Handy, and
Taylor, were participants in, or were otherwise aware of or
should have been aware of, the conspiracy.   Although they have
suggested possible ways in which those defendants could have
discovered the conspiracy, plaintiffs have simply not provided
any facts to support a conclusion that either Raymond, Urbania,
Keenan, Handy, or Taylor were aware of the conspiracy, or should
have been aware of it, prior to the disclosure of the Department
of Justice investigation in April of 2008.

        The facts in <u>Menkes v. Stolt-Nielson S.A.</u>, in which the
United States District Court for the District of Connecticut
found a strong inference of scienter, demonstrate what is lacking

-43-

here.  No. 3:03CV409 (DJS), 2006 WL 1699603 (D. Conn. June 19,
2006).  Stolt involved circumstances virtually identical to those
in this case: Stolt-Nielson ("Stolt"),[18] an international
shipping company, had come under investigation by the FBI for an
anti-competitive conspiracy in which Stolt employees met with
competitors to allocate customers and then submitted artificially
high bids to drive up rates.  Stolt I, No. 3:03CV409(DJS), 2005
WL 3050970, at *2 (D. Conn. Nov. 10, 2005).  With respect to the
Stolt plaintiffs' second amended complaint, the court found that
the plaintiffs had pleaded particularized facts alleging that the
Stolt defendants had made false or misleading statements by
falsely describing market competition and by attributing the
company's success to purely legitimate practices instead of
disclosing the price-fixing scheme.  Stolt II, 2006 WL 1699603,
at *4.

    To establish scienter, the plaintiffs alleged that one
of Stolt's vice presidents announced in a company meeting that
Stolt and one of its competitors had "reached an agreement that
certain customers belonged to Stolt" and that they had "carved up
the world."  Id. at *5.  This statement prompted another vice
president to voice concerns to one of Stolt's Chairmen.  The
plaintiffs also identified emails in which Stolt executives
discussed a desire to "cooperate on rates" and a fax which
included a "cost-benefit analysis prepared by Stolt regarding the

---

18.  Stolt consists of Stolt-Nielson S.A. and its subsidiary,
Stolt-Nielson Transportation Group, Inc.

profitability of conspiring with [its main competitor]." Id.
Furthermore, plaintiffs alleged that Stolt's general counsel
resigned in protest after one of Stolt's Chairmen refused to
investigate the anti-competitive activities of a company
executive. Id.

Unlike the plaintiffs in Stolt, plaintiffs here have
pleaded no facts to indicate that defendants Raymond, Urbania,
Keenan, Handy or Taylor were involved in the price-fixing
conspiracy or that they were aware, or should have been aware, of
it at the time they made allegedly false or misleading
statements. While plaintiffs may have their suspicions,
suspicions cannot carry the day. Because plaintiffs have failed
to plead particularized facts creating a strong inference of
scienter, we dismiss Count I of the amended complaint with
respect to those defendants.[19]

C.

We now consider plaintiffs' § 10(b) and Rule 10b-5
claims against the corporate defendants, Horizon Lines, Inc. and
Horizon Lines, LLC. Because plaintiffs have attributed a number
of false or misleading statements to individual defendants
speaking on behalf of the corporate defendants, the only question
is whether plaintiffs can also establish a strong inference of
corporate scienter.

---

19. As Serra, Gill, and Glova have not joined in this motion to
dismiss, we do not decide it as to them.

In our prior Memorandum, we applied the rule of corporate scienter set forth by the Court of Appeals for the Fifth Circuit in <u>Southland Securities Corporation v. INSpire Insurance Solutions, Inc.</u>, which held that:

> For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.

365 F.3d 353, 366 (5th Cir. 2004).  Thus, we held that plaintiffs' attributing false statements to one group of defendants, Raymond, Urbania, and Keenan, but pleading scienter against another group, Serra, Gill, and Glova, was insufficient to survive defendants' motion to dismiss the § 10(b) and Rule 10b-5 claims against Horizon.  <u>City of Roseville</u>, 2009 WL 3837659, at *18.

Plaintiffs argue that, with respect to their amended complaint, we should instead apply a "collective scienter" theory, which allows a plaintiff to establish scienter with respect to a corporate defendant even where the plaintiff cannot plead both falsity and scienter with respect to any individual employee.  <u>See</u>, <u>e.g.</u>, <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.</u>, 531 F.3d 190, 195-96 (2d Cir. 2008); <u>Makor Issues & Rights, Ltd. v. Tellabs, Inc.</u>, 513 F.3d 702, 710

(7th Cir. 2008).  Our Court of Appeals has not ruled on the validity of the "collective scienter" theory within the Third Circuit.  However, district courts which have considered the issue have expressed doubts that our Court of Appeals would adopt such a rule, especially in light of its rejecting the "group pleading" theory in Winer.  See Zavolta v. Lord, Abbett & Co. LLC, No. 2:08-cv-04546, 2010 WL 686546, at *7-8 (D.N.J. Feb. 24, 2010); Bio-Tech, 2006 WL 3068553, at *13-14.

We will not adopt the "collective scienter" theory. Instead, we reiterate our prior determination that "a corporate defendant will not be held liable absent a showing that at least one individual officer who made, or participated in the making of, a false or misleading statement did so with scienter." City of Roseville, 2009 WL 3837659, at *13.

As determined above, plaintiffs have not pleaded particularized facts sufficient to establish both falsity and scienter against any of the individual defendants who made materially false or misleading statements on behalf of Horizon and on which plaintiffs reasonably relied.  Nonetheless, plaintiffs assert that we should find a strong inference of scienter with respect to Horizon because defendant Serra or Gill "participated in the making of" the misstatements by Horizon and other individual defendants.  Plaintiffs premise this assertion on (1) their assumption that any statements by Raymond, Urbania, Kennan, Handy or Taylor regarding rates or revenue increases in the Puerto Rican market must have been based on information

obtained from Serra or Gill; and (2) pricing figures or reports alleged to have been created by Serra's Puerto Rico division would have been incorporated into the financial results presented in Horizon's SEC filings, which we found to contain material misstatements.  We reject both of these arguments.

First, plaintiffs plead no facts to support their assertion that Raymond, Urbania, Keenan, Handy and Taylor's false or misleading statements must have been based on information provided by Serra or Gill.  Second, plaintiffs have no evidence that any pricing figures or reports were prepared by Serra or anyone else at Horizon.  This second argument is based entirely on the testimony of CW6, who stated that such reports were created internally at Sea Star, not Horizon.  Such baseless allegations are not the sort of evidence of participation envisioned by the Court of Appeals for the Fifth Circuit in Southland, which reasoned that corporate scienter may arise where an employee, acting with scienter, had some direct involvement with a false or misleading statement, such as by "order[ing] or approve[ing]" a false or misleading statement or "furnish[ing] information or language for inclusion therein."  Southland, 365 F.3d at 366.

As plaintiffs have failed to plead sufficient facts in their amended complaint to give rise to a strong inference of corporate scienter, we will dismiss their Count I claims against Horizon Lines, Inc. and Horizon Lines, LLC.

V.

In Count II and III of the amended complaint,
plaintiffs assert § 20(a) claims against Horizon Lines, Inc.,
Raymond, Urbania, Keenan, Handy, Taylor, Serra, and Gill.
Section 20(a), which provides:

> Every person who, directly or indirectly,
> controls any person liable under any
> provision of this chapter or of any rule or
> regulation thereunder shall also be liable
> jointly and severally with and to the same
> extent as such controlled person to any
> person to whom such controlled person is
> liable, unless the controlling person acted
> in good faith and did not directly or
> indirectly induce the act or acts
> constituting the violation or cause of
> action.

15 U.S.C. § 78t(a).  "[L]iability under Section 20(a) is
derivative of an underlying violation of Section 10(b) by the
controlled person."  Avaya, 564 F.3d at 252.  As plaintiffs have
failed to plead a claim under § 10(b) against any defendant, it
is impossible for them to hold defendants liable under § 20(a).
Shapiro v. UJB Fin. Corp., 964 F.2d 272, 279 (3d Cir. 1992).

We therefore dismiss Count II against defendant Horizon
Lines, Inc. and Count III against Raymond, Urbania, Keenan,
Handy, and Taylor.[20]

VI.

For the reasons set forth above, we grant the joint
motion of defendants Horizon Lines, Inc., Horizon Lines, LLC,

---

20.  As Serra and Gill have not joined in this motion to dismiss,
we do not decide it as to them.

-49-

Raymond, Urbania, Keenan, Handy, and Taylor to dismiss the amended complaint with prejudice.